*Paid*
*S1*
*99*

1  | *LAW OFFICE OF ROBERT LUBIN*
   | ROBERT M. LUBIN ESQ. (055863)
2  | r1817@aol.com
   | JOSEPH CAMENZIND, IV (244154)
3  | camenzindlaw@yahoo.com
   | 177 Bovet Road, Suite 600
4  | San Mateo, CA 94402
   | Telephone: (650) 638-2331
5  | Fax: (650) 638-1005

6  | *LAW OFFICE OF KENNETH PRITIKIN*   E-filing
   | KENNETH PRITIKIN, ESQ. (108072)
7  | kwpritikin@gmail.com
   | 2950 Buskirk Avenue, Suite 300
8  | Walnut Creek, CA 94597
   | Phone: (925) 407-2158
9  | Fax: (925) 262-4688

ADR

10 | Attorneys for the Plaintiffs

11

12

13 | UNITED STATES DISTRICT COURT

14 | NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

15

16

17 | ROBERT PRITIKIN, EARL O BENDER and    Case No.: **C 09 03303** RS
   | JOAN C. BENDER individually and as trustees )   COMPLAINT FOR:
18 | of the BENDER FAMILY TRUST, dated )
   | JUNE 27, 1980, INTERCOASTAL )   (1) Aiding and Abetting Breach of
19 | PROPERTY SERVICES, LLC, HOWARD )         Fiduciary Duty;
20 | BLITZ and TRACEY BLITZ, SIDNEY BLITZ )   (2) Aiding and Abetting Fraud;
   | individually and as trustee of the SID BLITZ, )   (3) Violation of Cal. Bus. & Prof. Code
21 | INC. PSP, Dr. DERALD E BRACKMANN and )      §17200 et. seq.,
   | CHARLOTTE J BRACKMANN individually )   (4) Aiding and Abetting Violation of Cal.
22 | and as trustees of the BRACKMANN FAMILY )      Bus. & Prof. Code §17200 et. seq.,
   | TRUST, ROBERT BRETT, and CATHLEEN )   (5) Violation of 18 USC §1961(c)(d)
23 | M. BRETT individually and as trustees of the )      (RICO),
24 | ROBERT A. AND CATHLEEN M. BRETT )   (6) Violation of 18 USC §1961(d) (RICO),
   | 1989 REVOCABLE TRUST, ROBERT )   (7) Civil Conspiracy
25 | BRETT as trustee of the GEORGE H. BRETT )
   | 1989 REVOCABLE TRUST, and the )   DEMAND FOR JURY TRIAL
26 | THERESA S. BRETT 1988 REVOCABLE )
   | TRUST, GEORGE BRETT, THERESA A. )
27 | BRETT, TERRY D. BULLER as trustee for )
28 | the TERRY D. BULLER, P.C., MONEY )

---

PRITIKIN v. COMERICA BANK ET. AL.
COMPLAINT                                                      Page 1

1   PURCHASE PENSION TRUST, JON                )
    FERRARA and ARLEAN FERRARA, an             )
2   individually and as trustees of the FERRARA )
    LIVING TRUST, HARRY S. GARTSMAN            )
3   and DOROTHY GARTSMAN individually          )
    and as trustees of the GARTSMAN FAMILY     )
4   TRUST, DATED APRIL 12, 1990, STEVEN        )
    GEVIRTZ, EDWIN J. HAGERTY,                 )
5   RICHARD HORNSTROM, RICHH                   )
6   LIMITED PARTNERSHIP, ROBERT                )
    ISENBERG, JOSEPH R. JOHNSON and            )
7   ERNA M. JOHNSON, JEAN KAUTH                )
8   MCGRATH individually and as trustee of the )
    JEAN KAUTH MCGRATH TRUST,                  )
9   PHYLLIS KLEIN, individually and as trustee )
10  of the PHYLLIS KLEIN TRUST, KENNETH        )
    KRAUS and PERRY GIBSON, individually       )
11  and as trustees of the KRAUS/GIBSON        )
12  REVOCABLE TRUST OF 1987, DAVID             )
    LEON as trustee of the LEVEL 1             )
13  PROMOTION, INC. PROFIT SHARING             )
    PLAN, FRANCIS MCGRATH individually         )
14  and as trustee of the FRANCIS MCGRATH      )
15  TRUST, RODNEY G. MINOTT individually       )
    and as trustee of the RODNEY G. MINOTT,    )
16  JR. TRUST, as assignee of the POLLY        )
17  BERRY KENNEDY GST FBO RODNEY G.            )
    MINOTT, and the FRANK KENNEDY              )
18  TRUST FBO RODNEY G. MINOTT, PAUL           )
    NADEL, MICHAEL J. O'MALLEY,                )
19  JOHANNA PIPES, MONROE                      )
20  ROSENTHAL, individually and as trustee of  )
    the MONROE AND ANDREA N.                   )
21  ROSENTHAL FAMILY                           )
    TRUST and the NOURAFCHAN                   )
22  ROSENTHAL CHILDREN'S TRUST,                )
23  NICHOLAS ROTHENBERG                        )
    as trustee of the JANNOTTA                 )
24  ROTHENBERG REVOCABLE TRUST,                )
    SCHOENFELD PROPERTIES LLC, L.              )
25  KENNETH SCHOENFELD, and BEVERLY            )
26  SCHOENFELD, L. KENNETH                     )
    SCHOENFELD as trustee of the               )
27  IRREVOCABLE INTER VIVOS TRUST              )
    FOR GREAT GRANDCHILDREN                    )
28  OF RUTH CLAYBURGH FOR                      )
                                               )

PRITIKIN v. COMERICA BANK ET. AL.
COMPLAINT

1  EDUCATIONAL PURPOSES,  RICHARD
   ELDER, as trustee for the L.
2  KENNETH AND BEVERLY ANN
   SCHOENFELD GRANDCHILDREN'S
3  TRUST-DATED OCTOBER 1, 1989,
4  and the KEN & BEVERLY
   SCHOENFELD IRREVOCABLE TRUST,
5  DATED SEPTEMBER 2, 1986, ROBERT
6  SCHOENFELD,  MICHAEL SCHWARTZ
   and SHEILA SCHWARTZ,  STERLING
7  FURNITURE CORPORATION dba M.
   JACOBS FINE FURNITURE, CHARLES B.
8  SCOTT as trustee of the SCOTT FAMILY
9  TRUST DATED MARCH 1994,  SAM
   SILVERBERG, ESTHER SILVERBERG,
10 ROBERT SILVERBERG,  MARGOT
   STRONG,  ROBERT S. TOLL,  MERRICK
11 UNGAR, SCOTT UNGAR,  STEVEN
12 UNGAR and KAREN UNGAR, a married
   couple individually and as trustees of the
13 UNGAR FAMILY INTERVIVOS
   REVOCABLE TRUST,   CLIFF WARREN,
14 RENEE WARREN,  MARK
15 WEINSTEIN individually and as trustee of the
   MJW INVESTMENTS PSP,  714-910 S. LOS
16 ANGELES LLC, HI- DESERT MOBILE
   HOME PARK LIMITED  PARTNERSHIP, as
17 successor in interest of HI-DESERT MOBILE
18 HOME PARK, LLC,  KEVIN WISER,
   ALAN ALPERT, individually
19 and as trustee of the ALAN
20 ALPERT & SOPHIE ALPERT TRUST OF
   AUGUST 19, 1991,HARRY
21 FAVERSHAM and SYLVIA FAVERSHAM,
    individually and as trustees
22 of the HARRY & SYLVIA FAVERSHAM
23 TRUST, RAFAEL SABAG, JULIE
   FRIEDMAN, individually and as
24 trustee of the JEFF & JULIE
25 FRIEDMAN FAMILY TRUST and as
   assignee for SAMANTHA FRIEDMAN
26 and JESSICA FRIEDMAN, MERVIN
   KURTZMAN,  JUDITH ROTHMAN ROFÉ,
27 individually and as trustee of the
28 ROFÉ/ROTHMAN FAMILY TRUST, as
   assignee of LEO ROFÉ and as custodian for

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

1  IAN ROFÉ, JEROME V. NAVARRA,                    )
   NAVARRA MORENA PROPERTIES, LLC.                 )
2  a successor in interest to NAVARRA             )
   PROPERTIES,  NAVARRA PROPERTIES                )
3  BROADWAY, L.P., a successor in interest to     )
4  NAVARRA PROPERTIES, NAVARRA                    )
   PROPERTIES EC-SM, L.P., a                       )
5  successor in interest to  NAVARRA             )
6  PROPERTIES,  JOHANNA PIPES FAMILY             )
   PARTNERSHIP II, L.P., as successor in          )
7  interest to the JOHANNA PIPES FAMILY           )
   PARTNERSHIP, L.P., BERNARDO VIEW               )
8  PROPERTIES, INC., JEROMES                       )
9  FURNITURE WARESHOUSE                            )
                                                   )
10    Plaintiffs,                                  )
11       vs.                                        )
                                                   )
12  COMERICA BANK, COMERICA                        )
    INCORPORATED, DOES 1-100,                      )
13  CORPORATE DOES 101-110,                         )
                                                   )
14                                                  )
       Defendants                                  )
15                                                 )
                                                   )
16 _____

17

18  The Plaintiffs in this action include the following:

19       (1)     Plaintiff ROBERT PRITIKIN, a citizen of the state of the state of California.

20       (2)     Plaintiffs EARL O BENDER and JOAN C. BENDER, a married couple and

21  citizens of the state of California, individually and as trustees of the BENDER FAMILY TRUST,
22
23  dated JUNE 27, 1980.

24       (3)     Plaintiff INTERCOASTAL PROPERTY SERVICES, LLC, a California limited

25  liability company, organized under the laws of the state of California, with its principal place of
26
    business in the state of California.
27

28

(4)     Plaintiffs HOWARD BLITZ and TRACEY BLITZ, a married couple and citizens of the state of California.

(5)     Plaintiff SIDNEY BLITZ a citizen of the state of California, individually and as trustee of the SID BLITZ, INC. PSP.  Some or all of Plaintiff SIDNEY BLITZ's PSP investments were rolled over into an Individual Retirement Account held at Smith Barney, which investments Plaintiff is seeking to recover on behalf of his IRA.

(6)     Plaintiffs Dr. DERALD E. BRACKMANN and CHARLOTTE J. BRACKMANN, both individually and as trustees of the BRACKMANN FAMILY TRUST, dated NOVEMBER 21, 1980 a California trust.  Dr. BRACKMANN  had a Profit PSP which invested in Four Star.  Those funds have been rolled over into his individual IRA.  The name of the IRA is RBC Capital Markets as Custodian for DEARELD E. BRACKMANN IRA.   Plaintiff is seeking to recover on behalf of said IRA.

(7)     Plaintiffs ROBERT BRETT and CATHLEEN M. BRETT, a married couple and citizens of the state of Washington, individually and as trustees of the ROBERT A. and CATHLEEN M. BRETT 1989 REVOCABLE TRUST.   Plaintiff ROBERT BRETT is also appearing as trustee of the GEORGE H. BRETT 1989 REVOCABLE TRUST, and the THERESA S. BRETT 1988 REVOCABLE TRUST.

(8)     Plaintiff GEORGE BRETT, a citizen of the state of Kansas.

(9)     Plaintiff THERESA A. BRETT, a citizen of the state of Washington.

(10)     Plaintiff TERRY D. BULLER, a citizen of the state of California, as trustee for the TERRY D. BULLER, P.C., MONEY PURCHASE PENSION TRUST.

(11)     Plaintiffs JON FERRARA and ARLEAN FERRARA, a married couple and citizens of the state of California, individually and as trustees of the FERRARA LIVING

1   TRUST.

2       (12)    Plaintiffs HARRY S. GARTSMAN and DOROTHY GARTSMAN, a married

3   couple and citizens of the state of California, individually and as trustees of the

4   GARTSMAN FAMILY TRUST, DATED APRIL 12, 1990.

5

6       (13)    Plaintiff STEVEN GEVIRTZ, a citizen of the state of California.

7       (14)    Plaintiff EDWIN J. HAGERTY, a citizen of the state of Texas.

8       (15)    Plaintiff RICHARD HORNSTROM, a citizen of the state of Florida.

9       (16)    Plaintiff RICHH LIMITED PARTNERSHIP, a Florida limited partnership.

10

11      (17)    Plaintiff ROBERT ISENBERG, a citizen of the state of California.

12      (18)    Plaintiffs JOSEPH R. JOHNSON and ERNA M. JOHNSON, a married couple

13  and citizens of the state of California.

14      (19)    Plaintiff JEAN KAUTH MCGRATH, a citizen of the state of California,

15  individually and as trustee of the JEAN KAUTH MCGRATH TRUST.

16

17      (20)    Plaintiff PHYLLIS KLEIN, a citizen of the state of California, individually,

18  and as trustee of the PHYLLIS KLEIN TRUST.

19      (21)    Plaintiffs KENNETH KRAUS and PERRY GIBSON, a married couple and

20  citizens of the state of California, both individually and as trustees of the KRAUS/GIBSON

21  REVOCABLE TRUST OF 1987.

22

23      (22)    Plaintiff DAVID LEON, a citizen of the state of California, as trustee of the

24  LEVEL 1 PROMOTION, INC. PROFIT SHARING PLAN.

25      (23)    Plaintiff FRANCIS MCGRATH, a citizen of the state of California, individually

26  and as trustee of the FRANCIS MCGRATH TRUST.

27      (24)    Plaintiff RODNEY G. MINOTT, a citizen of the state of California,

28

1    individually and as trustee of the RODNEY G. MINOTT, JR. TRUST and as assignee of

2    the POLLY BERRY KENNEDY GST FBO RODNEY G. MINOTT, and the FRANK

3    KENNEDY TRUST FBO RODNEY G. MINOTT.

4
5    (25)    Plaintiff PAUL NADEL, a citizen of the state of California.

6    (26)    Plaintiff MICHAEL J. O'MALLEY, a citizen of the state of Florida.

7    (27)    Plaintiff JOHANNA PIPES, a citizen of the state of California.

8    (28)    Plaintiff MONROE ROSENTHAL, a citizen of the state of Wyoming,

9
10    individually and as trustee of the MONROE and ANDREA N. ROSENTHAL FAMILY

11    TRUST, and the NOURAFCHAN ROSENTHAL CHILDREN'S TRUST.    Plaintiff

12    MONROE ROSENTHAL made some investments through his Individual Retirement Account

13    held by Lincoln Trust, and seeks to recover on behalf of his IRA.

14    (29)    Plaintiff NICHOLAS ROTHENBERG, a citizen of the state of Oregon,

15    as trustee of the JANNOTTA ROTHENBERG REVOCABLE TRUST.

16
17    (30)    Plaintiff SCHOENFELD PROPERTIES, LLC, a state of Washington Limited

18    Liability Company, organized under the laws of the state of Washington, with its principal

19    place of business in the state of Washington,

20    (31)    Plaintiffs L. KENNETH SCHOENFELD, and BEVERLY A. SCHOENFELD, a

21    married couple and citizens of the state of Washington.

22
23    (32)    Plaintiff L. KENNETH SCHOENFELD, a citizen of the state of Washington, as

24    trustee of the IRREVOCABLE INTER VIVOS TRUST FOR GREAT GRANDCHILDREN

25    OF RUTH CLAYBURGH FOR EDUCATIONAL PURPOSES.

26    (33).    Plaintiff RICHARD ELDER, a citizen of the state of Washington, as trustee for

27    the L. KENNETH AND BEVERLY ANN SCHOENFELD GRANDCHILDREN'S TRUST-

28

---

PRITIKIN v. COMERICA BANK ET. AL.
COMPLAINT                                                            Page 7

DATED OCTOBER 1, 1989, and the KEN & BEVERLY SCHOENFELD IRREVOCABLE

TRUST, DATED SEPTEMBER 2, 1986.

(34)    Plaintiff ROBERT SCHOENFELD, a citizen of the state of Washington.

(35)    Plaintiffs MICHAEL SCHWARTZ and SHEILA SCHWARTZ, a married

couple and citizens of the state of Oregon.

(36)    Plaintiff STERLING FURNITURE CORPORATION dba M. JACOBS FINE

FURNITURE, an Oregon corporation, organized under the laws of the state of Oregon, with its

principal place of business in the state of Oregon.

(37)    Plaintiff CHARLES B. SCOTT, a citizen of the state of California, as

trustee of the SCOTT FAMILY TRUST DATED MARCH 1994.

(38)    Plaintiff SAM SILVERBERG, a citizen of the state of California.

(39)    Plaintiff ESTHER SILVERBERG, a citizen of the state of California.

(40)    Plaintiff ROBERT SILVERBERG, a citizen of the state of California.

(41)    Plaintiff MARGOT STRONG, a citizen of the state of California.

(42)    Plaintiff ROBERT S. TOLL, a citizen of the state of California.

(43)    Plaintiff MERRICK UNGAR, a citizen of the state of Texas.

(44)    Plaintiff SCOTT UNGAR, a citizen of the state of Texas.

(45)    Plaintiffs STEVEN UNGAR and KAREN UNGAR, a married couple and

citizens of the state of Texas, individually and as trustees of the UNGAR FAMILY

INTERVIVOS REVOCABLE TRUST.

(46)    Plaintiffs CLIFTON WARREN a citizen of the state of California.

(47)    Plaintiff MARK WEINSTEIN, a citizen of the state of California, individually

and as trustee of the MJW INVESTMENTS PSP.

(48)    Plaintiff 714-910 S. LOS ANGELES LLC, a state of California Limited

Liability Company, organized under the laws of the state of California, with its principal

place of business in the state of California.

(49)    Plaintiff HI-DESERT MOBILE HOME PARK LIMITED PARTNERSHIP, a

state of California Limited Partnership, organized under the laws of the state of California,

with its principal place of business in the state of California, as successor in interest of HI-

DESERT MOBILE HOME PARK, LLC.

(50)    Plaintiff KEVIN WISER, a citizen of the state of California.

(51)    Plaintiff ALAN ALPERT, a citizen of the state of California, individually and

as trustee of the ALAN ALPERT & SOPHIE ALPERT TRUST OF AUGUST 19, 1991.

(52)    Plaintiff HARRY FAVERSHAM and SYLVIA FAVERSHAM, a married

couple and citizens of the state of California, individually and as trustees of the HARRY and

SYLVIA FAVERSHAM TRUST.

(53)    Plaintiff RAFAEL SABAG, a citizen of the state of California.

(54)    Plaintiff JULIE FRIEDMAN, a citizen of the state of California, individually

and as trustee of the JEFF & JULIE FRIEDMAN FAMILY TRUST, and as assignee for

SAMANTHA FRIEDMAN and JESSICA FRIEDMAN.

(55)    Plaintiff MERVIN KURTZMAN a citizen of the state of California.  Plaintiff

MERVIN KURTZMAN made some investments through his Individual Retirement Account

held by City National Bank, and seeks to recover on behalf of his IRA.

(56)    Plaintiff RENEE WARREN  a citizen of the state of California.

(57)    Plaintiff JUDITH ROTHMEN ROFÉ, a citizen of the state of California,

individually and as trustee of the ROFÉ/ROTHMAN FAMILY TRUST, as assignee of

1  LEO ROFÉ and as custodian, pursuant to the California Uniform Transfer to Minors

2  Act, for IAN ROFÉ. Plaintiff ROFÉ is also seeking to recover investments on behalf of her

3  Individual Retirement Account: First Regional Bank Cust. FBO Judith Rothman, c/o Polycomp

4
   Self Directed IRA, and on behalf of her husband PETER ROFÉs Individual Retirement
5
6  Account: First Regional Bank Cust. FBO Peter Rofè, c/o Polycomp Self Directed IRA, which

7  is community property.

8        (58)    Plaintiff JEROME V. NAVARRA a citizen of the state of California.

9
         (59)    Plaintiff NAVARRA MORENA PROPERTIES, LLC. a state of California
10
11 Limited Liability Company, organized under the laws of the state of California, with its

12 principal place of business in the state of California, as a successor in interest to NAVARRA

13 PROPERTIES.

14
         (60)    Plaintiff NAVARRA PROPERTIES BROADWAY, L.P., a state of California
15
16 Limited Partnership, organized under the laws of the state of California, with its

17 principal place of business in the state of California, as a successor in interest to NAVARRA

18 PROPERTIES.

19       (61)    Plaintiff NAVARRA PROPERTIES EC-SM, L.P., a state of California

20 Limited Partnership, organized under the laws of the state of California, with its
21
22 principal place of business in the state of California, as a successor in interest to NAVARRA

23 PROPERTIES.

24       (62)    Plaintiff JOHANNA PIPES FAMILY PARTNERSHIP II, L.P. a state of

25 California Limited Partnership, organized under the laws of the state of California, with its

26
   principal place of business in the state of California, as successor in interest to the JOHANNA
27
28 PIPES FAMILY PARTNERSHIP, L.P.

---

(63)    Plaintiff BERNARDO VIEW PROPERTIES, INC., a California corporation, organized under the laws of the state of California, with its principal place of business in the state of California.

(64)    Plaintiff JEROMES FURNITURE WAREHOUSE, a California corporation, organized under the laws of the state of California, with its principal place of business in the state of California.

The Plaintiffs hereby allege as follows:

**DEFENDANTS**

1.      Defendant COMERICA BANK is a Texas corporation, with corporate headquarters located in Dallas, Texas. Plaintiffs are informed and believe and thereon allege that COMERICA BANK is a subsidiary of Defendant COMERICA INCORPORATED, a publicly-traded Delaware corporation with corporate headquarters located in Dallas, Texas. COMERICA INCORPORATED is a financial holding company that has operations in Business Banking, Retail Banking and Wealth & Institutional Management. COMERICA BANK divides its activities in the United States into geographical regions, including a region called "Western Market", which region includes California. The headquarters of COMERICA BANK's Western Market are located in San Jose, California. COMERICA INCORPORATED and COMERICA BANK and their banking activities are, and were at all times relevant to this Complaint, subject to the jurisdiction of the laws and regulations of the State of California and the Federal Deposit and Insurance Corporation.

2.      Plaintiffs do not know the true names and capacities of those Defendants sued herein as DOES 1-100, inclusive, and therefore sue these defendants by such fictitious names.

Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Upon information and belief, each Defendant sued under such fictitious names is in some manner responsible for the wrongs and damages as alleged below, and in so acting was functioning as the agent, servant, partner and/or employee of the co-Defendants, and in doing the actions mentioned below, was acting within the course and scope of his or her authority as such agent, servant, partner, and/or employee with the permission and consent of the co-Defendant.

3.      Plaintiffs do not know the true names, jurisdictions or principal places of business of business entities sued herein as DOES 101-110, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names, jurisdictions and principal places of business when ascertained. Upon information and belief, each Defendant sued under such fictitious names is a predecessor, successor, parent, subsidiary, and/or affiliate of COMERICA INCORPORATED and/or COMERICA BANK. The term "**COMERICA**" as used throughout this Complaint shall refer, collectively, to COMERICA INCORPORATED, COMERICA BANK and DOES 101-110.

4.      Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned, each of the Defendants was the agent and/or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment, and that all Defendants acted at all times with the knowledge of the actions of each of the remaining Defendants, and/or said acts were subsequently ratified by each of the remaining Defendants.

**VENUE**

5.    Defendant COMERICA's headquarters for its Western Region including California is at 333 West Santa Clara Street, San Jose, CA 95113. The United States District Court of the Northern District of California is the proper venue pursuant to 28 U.S.C.A. §1391(b)(c) and 18 U.S.C.A. §1965(a).

**GENERAL ALLEGATIONS**

**Introductory Statement**

6.    Four Star Financial Services, LLC ("**Four Star**") was engaged in a Ponzi scheme (hereinafter, the "**Four Star Ponzi Scheme**") during the period from approximately December 1999 through approximately October 2002. Four Star would not have been able to operate the Four Star Ponzi Scheme but for the active and knowing cooperation and assistance of COMERICA and DOES 1-100, inclusive, as hereinafter alleged.

7.    Four Star maintained its checking account at COMERICA. Between approximately December 1999 and April 2000, several creditors of Four Star obtained judgments and prejudgment writs of attachment totaling several million dollars. In order to enable Four Star to avoid paying these creditors, COMERICA allowed Four Star to maintain a negative balance in its checking account on most banking days. It was not unusual for this daily negative balance to average several hundreds of thousands of dollars in a given month. COMERICA arranged for Four Star's cash to be held in non-Four Star accounts where Four Star's creditors couldn't reach it. The principal non-Four Star account used for this purpose was a personal line of credit, believed to be unsecured, that COMERICA had issued to Ronald Anson ("**Anson**") and Jack Garrett ("**Garrett**"), two of Four Star's principals (hereinafter referred to as the "**Anson/Garrett**

**Line of Credit**").  On a typical day, COMERICA would allow Four Star to move just enough funds from these non-Four Star accounts into the Four Star checking account to cover that day's checks, leaving the account balance at zero or near zero at the end of the day.  In this way, Four Star was able to write checks to Plaintiffs for regular distribution payments on their investments, thus fraudulently maintaining an illusion of its profitability, even though Four Star was actually insolvent.  Using this process, Four Star defrauded Plaintiffs of approximately $50 million. COMERICA's conduct, as hereinafter alleged, violated, inter alia, the California Uniform Fraudulent Transfer Act, federal banking regulations, its own internal procedures and guidelines, and good banking practices.

**Overview**

8.    Four Star was formed on April 12, 1996.  At all times relevant to this Complaint, Four Star was managed by Mark Cohn ("**Cohn**"), Anson and Garrett (hereinafter collectively referred to as the "**Four Star Managers**").  At all times relevant to this Complaint, Cohn was an attorney admitted to practice law in the State of California, and served as corporate counsel for Four Star.  At all times relevant to this Complaint, Garrett and Anson were Certified Public Accountants licensed to practice accounting in the State of California, and doing business as Anson, Garrett & Company.

9.    Plaintiffs were investors in Four Star during the period from about December 1999 through approximately October 2002 (hereinafter referred to as the "**Loss Period**").

10.    During the Loss Period, Plaintiffs invested approximately $50 million in Four Star (hereinafter referred to as the "**Loss Period Investments**").

11.     Plaintiffs made the Loss Period Investments in reliance on representations made to Plaintiffs by Four Star and the Four Star Managers that Four Star was a highly profitable enterprise that offered safe investments and lucrative returns to its investors.

12.     In addition, throughout the Loss Period, Four Star maintained a practice it had followed since its inception of regularly paying monthly distributions to its investors. The regular payment of monthly distributions was itself a representation by Four Star to Plaintiffs that Four Star was financially sound and solvent, because Plaintiffs' investments in Four Star had been made pursuant to written investment documents which, by their express terms, provided that distributions to investors would be paid only from available cash flow generated by Four Star's investments. As such, the payment of regular monthly distributions constituted a continuing representation by Four Star to Plaintiffs that Four Star's investments were continuing to generate sufficient cash flow to allow for the continued payment of distributions in accordance with the investment documents.

13.     The truth, as was actually known by Four Star and the Four Star Managers, was that throughout the Loss Period, Four Star was insolvent. Its investments were generating insufficient revenue to pay even its immediate creditor obligations. Four Star was only maintaining its operations by virtue of Four Star's receipt of large sums of new investment capital during the Loss Period. A total of approximately $129 million of new investment capital, which sum included the approximately $50 million of Loss Period Investments made by Plaintiffs, was received by Four Star during the Loss Period. Plaintiffs are informed and believe and thereon allege that virtually none of this $129 million was actually invested by Four Star in any legitimate investments, but that instead, Four Star simply banked these funds and then immediately turned around and used these same monies to fund the monthly distributions that Four Star had always

made to its investors, including Plaintiffs, under the guise of being "returns" on investment. Plaintiffs, believing that the distributions they were receiving during the Loss Period constituted evidence of Four Star's continued financial solvency and good health, responded by investing even more of their money with Four Star, until finally they had invested the full $50 million of Loss Period Investments during the Loss Period.

14.    In or about October 2002, i.e., at the close of the Loss Period, Four Star finally ran out of cash to continue making monthly distributions to Plaintiffs. When this happened, Plaintiffs immediately suspected that Four Star was in financial trouble, and Plaintiffs immediately stopped making new investments in Four Star. Without new investment capital, Four Star ceased operations.

15.    In October 2003, Four Star was placed into involuntary bankruptcy by its creditors. On November 21, 2008, in an adversary proceeding in the Four Star bankruptcy, *Richard A. Marshack, Solely in his Capacity as the Chapter 7 Trustee v. David Roberts*, U.S. Bankruptcy Court, Central District of California, Case No. LA 03-37579TD, the court found that Four Star was a Ponzi scheme from January 1, 2000 to December 31, 2002. A Ponzi scheme is a per se fraudulent business practice.

16.    As alleged in detail below, Four Star would not have been able to operate the Four Star Ponzi Scheme during the Loss Period without the material assistance of COMERICA. Four Star used accounts maintained at COMERICA, including Four Star's checking account and at least two non-Four Star accounts, e.g., the Anson/Garrett Line of Credit and a bank account in the name of FSF, LLC, an entity which was controlled by the Four Star Managers and had been set up solely to hold Four Star funds, to move Four Star's funds instantaneously between the Four Star checking account and these non-Four Star accounts during the Loss Period. This movement of

funds between the Four Star checking account and the non-Four Star accounts was part of a strategy implemented jointly by Four Star and COMERICA that was designed to hinder the ability of Four Star's creditors, including creditors holding millions of dollars of judgment writs and prejudgment writs of attachment against Four Star, from reaching Four Star's cash assets. At the same time, this scheme allowed Four Star immediate access to its cash so that it could pay from its checking account at COMERICA the distribution checks it wrote on a monthly basis to Plaintiffs. This allowed Four Star to continue to maintain the illusion to Plaintiffs that Four Star was a profitable and financially sound business.

17.    The foregoing creditor avoidance mechanism worked as designed: Although Four Star creditors holding writs repeatedly levied Four Star's COMERICA accounts during the Loss Period, these levies were largely unsuccessful in attaching funds, despite the fact that Four Star regularly used its COMERICA checking account to clear millions of dollars of checks to Plaintiffs and other investors every month during this same period.

18.    As hereinafter explained, if Four Star had been unable to execute the foregoing creditor avoidance mechanism during the Loss Period, Four Star would have been unable to continue making regular monthly distribution payments to Plaintiffs. Had that occurred, Plaintiffs would not have lost any of the funds they are seeking as damages in this action.

**COMERICA's Role in Concealing Four Star's Cash From Its Creditors**

19.    The genesis of COMERICA's role in the Four Star Ponzi Scheme began no later than approximately mid-1999 when Richard Smith ("**Smith**"), then a Vice President of COMERICA, arranged for COMERICA to issue to Garrett and Anson a personal multi-million million line of credit (hereinafter the "**Anson/Garrett Line of Credit**").

20.    Anson and Garrett were Smith's personal accountants and had prepared his tax returns for many years.  Consequently, Smith's active involvement in arranging a loan from COMERICA to Anson and Garrett violated conflict of interest rules as set forth both in federal banking regulations and good banking practices and, on the basis of information and belief, COMERICA's own banking guidelines.

21.    Plaintiffs are informed and believe and thereon allege that Smith, in arranging for the loan, was returning a favor to Anson and Garrett.  As Smith's personal accountants, Anson and Garrett had given Smith approximately $750,000 in fraudulent tax losses for a general partner interest that Smith purchased from them in a company called Phoenix Hotel Associates, Ltd. Anson pled guilty to federal tax fraud charges arising from that scheme.  Plaintiffs are informed and believe and thereon allege that Garrett also pled guilty to federal tax fraud charges in connection with said scheme.

22.    Plaintiffs are informed and believe and thereon allege that Smith had a financial incentive to arrange for the issuance of the Anson/Garrett Line of Credit because COMERICA had instituted a lucrative bonus program to its loan officers, such that Smith's compensation increased by making the loan.

23.    Although the Anson/Garrett Line of Credit was set up solely as a personal line of credit for Anson and Garrett, Plaintiffs are informed and believe and thereon allege that at all times relevant to this Complaint, Smith knew and understood that the intended use of funds from the Anson/Garrett Line of Credit would be to finance Four Star operations, and that the intended source of repayment of the Anson/Garrett Line of Credit was cash flow from Four Star operations. Indeed, Plaintiffs are informed and believe and thereon allege that, on the basis of the personal financial statements of Anson and Garrett that were submitted to COMERICA in connection with

the Anson/Garrett Line of Credit, Anson and Garrett had no potential source of cash flow that would be even remotely sufficient to service a $4.5 million line of credit apart from anticipated cash flow from Four Star operations. Despite these facts, Smith deliberately kept Four Star off the loan; Four Star was neither a borrower nor a guarantor of the Anson/Garrett Line of Credit. Nevertheless, payments made to COMERICA on the Anson/Garrett Line of Credit came directly from Four Star accounts, including Four Star's checking account at COMERICA.

24.     Plaintiffs allege that COMERICA had actual knowledge that Four Star funds, including investor capital invested by Plaintiffs, was the source of repayment of interest and principal owed to COMERICA by Anson and Garrett on the Anson/Garrett Line of Credit.

25.     The issuance of the Anson/Garrett Line of Credit under the above circumstances meant that COMERICA had no creditor rights to look to Four Star's assets for repayment, even though the Anson/Garrett Line of Credit was underwritten based on Four Star's cash flow and was intended for Four Star's use. Under these circumstances, the loan, as written, violated ordinary banking practices. Plaintiffs are informed and believe and thereon allege that the loan, as written, also violated federal banking regulations and COMERICA's own banking guidelines.

26.     Despite these facts, Smith had a good reason to keep Four Star off the loan: Although Four Star maintained its business checking account with COMERICA (hereinafter the "**Four Star Comerica Account**"), COMERICA had recently refused to give a line of credit to Four Star because Four Star was involved in "adult" businesses, and COMERICA did not want to be identified as a lender to that type of business. Smith knew that if Four Star were on the loan, the loan wouldn't be approved.

27.    Plaintiffs are informed and believe that Smith knew about the loan irregularities on the Anson/Garrett Line of Credit and knowingly ignored them for the reasons set forth in paragraphs 21 and 22.

28.    In approximately December 1999, Four Star was looking for a way to conceal its funds from an onslaught of creditor attacks so that the funds could remain available to Four Star to continue to pay monthly investor distribution checks to its investors.  The continued payment of distribution checks was essential in order to continue to sustain the illusion of Four Star's profitability and thus assure the continued inflow of new investor capital.

29.    From its inception in 1996, Four Star had always paid regular investor distributions, a practice that had generated investor confidence and a continuous inflow of new investor capital.  Indeed, Four Star's principal attraction to investors was that its investments were so successful that investors could expect distributions every month, like clockwork.  But by December 1999 Four Star's investments had gone bad, and Four Star didn't have sufficient resources to pay its creditors and make investor distributions.  The only way that Four Star could continue to pay investor distributions was to use new investor capital which is the very definition of the classic Ponzi scheme.  This is what Four Star proceeded to do.

30.    An immediate threat was posed to the Four Star Ponzi Scheme when, beginning in or about December 1999, several creditors obtained judgments and/or prejudgment writ of attachments against Four Star totaling several hundred of thousands of dollars.  In April 2000, a judgment of approximately $2.2 million was entered against Four Star in favor of Sentinel Trust.  These creditors actively sought to enforce their execution writs and/or prejudgment writs of attachment (collectively hereinafter the "**Creditor Writs**") against Four Star's bank accounts.

31.   In order to maintain its ability to operate in the face of the Creditor Writs, and in particular to be able to continue making regular investor distributions so as to maintain the pipeline of new investor capital that was the lifeblood of the company, Four Star needed a mechanism that would make its funds available to cover the checks it wrote to its investors while preventing the Creditor Writs from reaching these funds.

32.   At the same time, by December 1999, the Four Star Managers, COMERICA and Smith each had actual knowledge of the following information:

(a)   The only potentially available source of cash flow for repaying the Anson/Garrett Line of Credit was from operations of Four Star.

(b)   Without regular new capital investments from Four Star investors, Four Star would not have the funds available to repay the Anson/Garrett Line of Credit.

(c)   Four Star was dependent upon the continuous inflow of new investor capital every month in order to fund its operations and remain in business.

(d)   Investors would continue to invest new capital only so long as Four Star could maintain the confidence of its investors by adhering to its long-standing practice of making distributions to investors on a regular basis.

(e)   If Four Star were to be unable to make its regularly scheduled investor distribution payments for even a single month, the inflow of new investor capital would likely stop due to a loss of investor confidence, resulting in Four Star's financial collapse.

(f)    Four Star was insolvent and had substantial creditor obligations, including the Creditor Writs, that could not be satisfied without materially interfering with Four Star's ability to make investor distributions.

(g)    The Four Star creditors holding judgments and/or prejudgment writs of attachment had no creditor rights against Anson or Garrett individually, as the judgments and/or writs were against Four Star alone.

33.    Taking into account the above facts, Four Star and COMERICA devised a mechanism (hereinafter referred to as the "**Banking Scheme**") that would make Four Star's funds available to cover checks to its investors while preventing the Creditor Writs from reaching those funds. The key to the Banking Scheme was the manipulation of Four Star's checking account at COMERICA (hereinafter referred to as the "**Four Star Comerica Account**") in order to make funds available to cover checks written on the account while preventing Creditor Writs from reaching the funds. This manipulation was performed through the following components:

(a)    **The Negative Balance:** On most banking days during the period from approximately December 1999 until Four Star ceased making investor distributions in or about October 2002, the Four Star Comerica Account began the day with a negative account balance as a result of the fact that the amount of all checks posted to the account during the previous night exceeded the prior day's ending balance. The negative balance served the critical function of preventing creditors from reaching Four Star's funds: Since a writ only reaches the funds in an account when the writ is levied, any Creditor Writs levied on the Four Star Comerica Account on a day where the account began with a negative balance did not reach any funds,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and COMERICA would respond to the writ by advising that no funds were in the account. This scenario occurred repeatedly during the above period of time.

(b)    **The Cash Report:** On banking days during the period from approximately December 1999 until Four Star ceased making investor distributions in or about October 2002, Four Star prepared a report called a Cash Report which showed the exact amount that needed to be deposited into the Four Star Comerica Account to clear all the checks that were posted during the previous night.

(c)    **Covering the Overdraft:** Using the information from the Cash Report, Four Star usually transferred just enough funds into the Four Star Comerica Account each day to eliminate the overdraft. The funds were transferred from a non-Four Star account, usually the Anson/Garrett Line of Credit. Sometimes the funds would come from an account at COMERICA in the name of another company controlled by the Four Star Managers. Sometimes the funds would be wired in. Once the funds were deposited into the Four Star Comerica Account, they would instantly be applied to the overdraft and disappear from the account, leaving the account balance at zero or near zero and thus once again immune from attacks by Creditor Writs.

(d)    **Instant Transfer of Other Deposits:** Checks from investors and other deposits into the Four Star Comerica Account that weren't needed to cover an overdraft on that day were generally transferred out immediately, before

they were even "collected". That is, when a check drawn on an account from another bank was deposited into the Four Star Comerica Account, the funds from the other account would ordinarily not be transferred to COMERICA for credit to the Four Star Comerica Account for several banking days. However, COMERICA would generally credit the Four Star Comerica Account with the funds immediately and then transfer the funds out of the account, leaving the account balance once again at zero or near zero and thus immune from attacks by Creditor Writs. Usually, the funds went to reduce the Anson/Garrett Line of Credit. Sometimes the funds went to an account at COMERICA in the name of another company controlled by Four Star's principals.

34.    Thus, by starting almost every day with a negative balance in the Four Star Comerica Account, depositing only enough funds to cover the overdraft, and having COMERICA quickly transfer out other deposits to non-Four Star accounts even before the funds had been "collected", Four Star was able to maintain control over the use of its funds despite millions of dollars of unpaid creditor obligations and repeated levies of Creditor Writs.

35.    The practice of starting the day with a negative balance in the Four Star Comerica Account also allowed Four Star, with COMERICA's cooperation, to control which checks were paid and which checks were returned on days where Four Star did not have sufficient funds available to clear all checks that had been presented for payment the previous night. Plaintiffs are informed and believe and thereon allege that this practice, which occurred on occasion during the period in question, i.e., approximately December 1999 through October 2002, was a violation of ordinary banking practices as well as COMERICA's own operational guidelines.

36.    As a proximate result of the Banking Scheme, COMERICA materially assisted Four Star in perpetuating the illusion of a profitable business to its investors, even though it was insolvent.

37.    Plaintiffs are informed and believe and thereon allege that throughout the Loss Period COMERICA and Smith willingly and knowingly assisted Four Star in the implementation and facilitation of the Banking Scheme.

38.    Based on the facts of which COMERICA had actual knowledge as alleged above, throughout the Loss Period COMERICA and Smith had actual knowledge that Four Star was insolvent.

39.    Plaintiffs are informed and believe and thereon allege that COMERICA and Smith also had actual knowledge throughout the Loss Period of Four Star's insolvency because, during said period, COMERICA and Smith regularly reviewed Four Star's financial statements as well as back-up documentation for said financial statements, which documentation disclosed the insolvent condition of Four Star.  On information and belief, during said period, COMERICA and Smith reviewed certain international bank guarantees on which Four Star was attempting to rely as an essential part of its overall financial solvency plan.  As a result of said review, upon information and belief COMERICA and Smith concluded that said guarantees were fraudulent and that Four Star was, therefore, insolvent.

40.    COMERICA and Smith conspired with the Four Star Managers to implement the Banking Scheme because COMERICA and Smith had concluded, on the basis of the information described in Paragraph 32 above, that the Banking Scheme, by enabling Four Star to continue operating notwithstanding its insolvent condition, provided the only possible way to prevent Anson and Garrett from defaulting on the terms of the Anson/Garrett Line of Credit.

COMERICA and Smith knew from the financial statements that Anson and Garrett had submitted in support of the loan that if Four Star ceased operations, Anson and Garrett would have no ability to make payments on the terms and conditions of the line of credit.

41.    Had Anson and Garrett defaulted on the line of credit for a period of 90 days, under federal regulations the loan would be deemed a nonaccrual loan and Comerica would have been required to discontinue accruing income on the loan.  Both COMERICA and Smith had strong motivations not to allow this event to occur."

42.    Smith had personal reasons not to allow the Anson/Garrett Line of Credit to become a nonaccrual loan.  First, the default of a multimillion dollar loan which Smith had personally arranged would constitute a blemish on Smith's professional career as a banking officer.  More significantly, if the loan could be retired without going into default, the facts that Smith had violated conflict of interest rules in arranging for a loan for business associates, and that the loan had violated good banking practices, federal loan regulations, and COMERICA's internal loan guidelines, might never come to light.

43.    COMERICA had financial reasons not to allow the Anson/Garrett Line of Credit to become a nonaccrual loan.  First, continuing to accrue income on assets which are in default as to principal and interest overstates a bank's assets, earnings and capital.  A bank's quarterly report to federal regulators, known as a Call Report, requires that accrual of income be discontinued unless the asset is well secured and in process of collection.  Second, banks are required to disclose their nonaccrual loans as nonperforming assets in their financial statements and quarterly reports to federal regulators.

44.    Moreover, COMERICA profited from the Banking Scheme.   The Banking Scheme enabled Four Star to pay tens of millions of dollars to COMERICA, money which Four

Star would not have been able to pay to COMERICA but for the Banking Scheme. These payments were used by COMERICA, in part, to pay down the outstanding balance owed to COMERICA on the Anson/Garrett Line of Credit and to pay accrued interest to COMERICA on that outstanding balance. At all times relevant to this Complaint, COMERICA had actual knowledge that payments which were made against the outstanding balance and accrued interest owed by Anson and Garrett to COMERICA on the Anson/Garrett Line of Credit were made by Four Star using funds which included Plaintiffs' investments in Four Star. At all times relevant to this Complaint, COMERICA had actual knowledge that Four Star had no obligation to COMERICA regarding the Anson/Garrett Line of Credit, such that payments made by Four Star to COMERICA on the Anson/Garrett Line of Credit constituted the conversion of Four Star funds in violation of the Four Star Managers' fiduciary duty to Plaintiffs.

**The Doctrines of Equitable Tolling and Equitable Estoppel Apply Because, Prior to October 2008, Plaintiffs Did Not Know and Could Not Have Known by the Exercise of Reasonable Diligence of the Existence of the Banking Scheme or of COMERICA's Role in the Four Star Ponzi Scheme**

45.    Prior to terminating investor distributions in or about October 2002, the Four Star Managers sought to maintain the Four Star Ponzi Scheme through a variety of means in addition to the Banking Scheme. The Four Star Managers created a series of complex transactions through attorney trust accounts and shell corporations to transfer money in and out of Four Star, which created the illusion of legitimate economic activity and prevented Plaintiffs from discovering that the primary source of investor distribution payments was the investments themselves. These activities also included the formation of FSF, LLC, a subsidiary of Four Star, which was created solely to set up a bank account in the name of an entity other than Four Star so that Four Star could deposit funds in that account that could not be reached by Four Star's judgment creditors. The Four Star Managers produced fraudulent financial statements for Four Star that concealed

material facts about the true financial condition of Four Star and falsely represented that Four Star had sufficient income and assets to support its ongoing operations and investor distributions. For example, the financial statements listed as assets of the company the full face value of millions of dollars of receivables that the Four Star Managers knew were largely or entirely uncollectible, and listed tangible assets of the company at the full face value of appraisals, which appraisals the Four Star Managers knew substantially overvalued the assets. Four Star also artificially controlled its bad debt write offs for many years. Further, as a result of Anson and Garrett's experience in managing their clients' assets through the operation of other multi-million dollar investment entities as previously alleged, Plaintiffs and other Four Star investors accepted without suspicion the representations of the Four Star Managers as to the financial performance and condition of Four Star. However, none of the foregoing efforts by the Four Star Managers would have been sufficient to maintain the Four Star Ponzi Scheme without the ability to make regular monthly investor distributions. It was the making of these regular investor distributions that ultimately gave Plaintiffs and the other investors the necessary assurance that Four Star was solvent and profitable, in that, by the terms of the written investment agreements with Plaintiffs, investor distributions could only be made if there was adequate cash flow to do so after meeting Four Star's obligations. It was Four Star's continued ability to make regular monthly investor distributions, notwithstanding its continuous insolvency, that was the key to inducing Plaintiffs and other investors to continue making new capital investments in Four Star during the period between approximately December 1999 and October 2002. Four Star would not have been able to make regular monthly investor distributions during this period but for the material and knowing assistance and active participation of COMERICA as hereinafter alleged.

46.    After Four Star stopped making investor distributions in or about October 2002, Four Star and the Four Star Managers attempted to mollify investor anxiety through written and oral communications, made via the mail and interstate wires, to Plaintiffs and other investors. In these communications, Four Star and the Four Star Managers characterized the termination as merely a temporary suspension in investor distributions, and they attributed the situation to an unforeseen delay in the completion of the sale of certain Four Star assets that had not previously been disclosed to Plaintiffs, i.e., receivables factoring contracts involving South American telecommunications services.

47.    Over the next 14 months, Four Star and the Four Star Managers sought to deflect growing investor concern over the safety of Four Star's investments by making periodic written disclosures to the investors via mail of the details of new "developments" in the ongoing saga of the stalled sale transaction. According to the disclosures made by Four Star and the Four Star Managers, the delay in completing the sale was due to the fact that the contract sale proceeds had been paid to Four Star in the form of Argentine government bonds, which Four Star had then been unable to sell due to the banking crisis that was then ongoing in Argentina. In the periodic disclosures to investors, Four Star and the Four Star Managers explained they were working with South American legal counsel in order to comply with complex new Argentine banking regulations that required Four Star to exchange the bonds for newly issued government bonds that could then be sold on a bond market. As part of the disclosures to investors, Four Star and the Four Star Managers produced documentation of the transaction that appeared to attest to its legitimacy. In fact, the entire scenario was a fraud. There had been no Latin American receivables factoring contracts, and the "Argentine government bonds" were forgeries that Four Star and the Four Star Managers had acquired from South American con artists in a desperate

1   attempt to generate additional funds to continue the Four Star Ponzi Scheme. The periodic reports

2   and disclosures made by Four Star and the Four Star Managers to Plaintiffs and the other investors

3   had the effect of inducing Plaintiffs and the other investors to refrain from taking any legal action

4   to recover their investments prior to October 24, 2003, when Four Star was placed in involuntary

5   bankruptcy under Chapter 11 of the Bankruptcy Code, *In re Four Star Financial Services, LLC,*

6   *Debtor*, U.S. Bankruptcy Court, Central District of California, Case No. LA 03-37579 TD.

7

8        48.    On March 17, 2004, the Four Star bankruptcy proceedings were converted to

9   Chapter 7.

10       49.    In furtherance of the conspiracy with COMERICA, the Four Star Managers

11  represented in bankruptcy court that Four Star only had $82.00 in the Four Star Comerica

12  Account. By doing this, the Four Star Managers concealed from the Plaintiffs, other Four Star

13  investors and the Four Star bankruptcy trustee that COMERICA had used Four Star money to

14  reduce the Anson/Garrett Line of Credit, which had a direct benefit to COMERICA.

15       50.    In an attempt to recover assets of the Four Star bankruptcy estate, the Four Star

16  bankruptcy trustee commenced several adversary proceedings in Bankruptcy Court, including

17  actions against the Four Star Managers for fraud and breach of fiduciary duty. In one of these

18  proceedings, against Four Star insider David Roberts, the court made a finding that Four Star was

19  a Ponzi scheme and that the Four Star Managers had defrauded Four Star investors.

20       51.    Upon information and belief, throughout the Four Star bankruptcy proceedings,

21  the Four Star Managers, COMERICA and Smith purposely concealed COMERICA's and Smith's

22  material and knowing assistance to Four Star in perpetrating the Four Star Managers' fraud and

23  breach of fiduciary duty to Plaintiffs and other investors of Four Star, as heretofore alleged.

24  COMERICA and Smith also knew that the reduction of the Anson/Garrett Line of Credit was

25

26

27

28

1    done with converted funds that belonged to Four Star, and thereafter to the Four Star bankruptcy

2    estate, but failed to stop it or to alert the Four Star bankruptcy trustee or anyone else to this fact.

3        52.    Several tens of million dollars were transferred out of the Four Star Comerica

4    Account and applied toward the Anson/Garrett Line of Credit even though COMERICA knew

5    that Four Star had substantial creditor obligations, that the funds belonged to investors and not

6    Anson or Garrett, and that Four Star was neither an account holder nor a guarantor on the Anson-

7    Garrett Line of Credit.    COMERICA and Smith purposely concealed these transfers from

8    government authorities by failing to report them which was in violation of their obligations to

9    report suspicious account activity under, inter alia, Title 12, § 21.11 of the Code of Federal

10   Regulations.  Under said section, COMERICA is obligated to file a Suspicious Activity Report for

11   any transaction which has no business or apparent lawful purpose and where COMERICA knows

12   of no reasonable explanation after examining the available facts.

13       53.    Plaintiffs are informed and believe and thereon allege that at all times prior to the

14   filing of this Complaint, Anson and Garrett were unwilling to cooperate with any investigations or

15   inquiries into the operation of Four Star, including without limitation investigations by the trustee

16   of the Four Star bankruptcy estate and others in connection with the Four Star bankruptcy, on the

17   ground that they, Anson and Garrett, were potential targets of criminal investigations regarding

18   their involvement in Four Star, and that any responses they might give to such investigative

19   inquiries could incriminate them.  Consequently, Plaintiffs have been unable, and would not have

20   been able with the exercise of reasonable diligence, to learn any facts from Anson or Garrett about

21   the existence of the Banking Scheme or COMERICA's or Smith's role in the Banking Scheme or

22   the Four Star Ponzi Scheme.

54.    In or about 2004, Cohn was sentenced to a five (5) year term in federal prison for his conviction in federal court for his role in connection with Four Star's operation of a credit card scheme that was unrelated to the Four Star Ponzi Scheme.  On October 1, 2007, while Cohn was still serving his prison sentence, the United States Attorney filed an Information (hereinafter, the "**Cohn Wire Fraud Information**") in *United States of America v. Mark Forest Cohn*, U.S. District Court, Central District of California, Case No. 07-01104-PSG (hereinafter the "**Cohn Wire Fraud Action**"), charging Cohn with federal criminal violations including conspiracy and wire fraud based on his role in the Four Star Ponzi Scheme.  Plaintiffs are informed and believe and thereon allege while Cohn was still serving his prison sentence described above, Cohn began cooperating with the United States Attorneys' office concerning Cohn's role in the Four Star's unlawful activities, as part of a plea bargain to the charges made in the Cohn Wire Fraud Information.  Plaintiffs are informed and believe and thereon allege that, in connection with such cooperation by Cohn, Cohn first disclosed to the United States Attorney the existence of the Banking Scheme, and COMERICA's and Smith's role in the Banking Scheme and the Four Star Ponzi Scheme.  On November 5, 2007, pursuant to the foregoing plea bargain, Cohn pleaded guilty to the Cohn Wire Fraud Information.  On September 3, 2008, the United States attorney filed a sentencing report in the Cohn Wire Fraud Action (hereinafter the "**Cohn Wire Fraud Sentencing Report**") which commended Cohn for his full cooperation in the United States Attorneys' investigation in connection with Four Star's activities, and recommended that Cohn's sentence for his guilty plea to the Cohn Wire Fraud Information consist of probation and home detention rather than a prison sentence.  On or about September 29, 2008, the Court in the Cohn Wire Fraud Action followed the recommendations of the United States Attorney in the Cohn Wire

1   Fraud Sentencing Report and sentenced Cohn to probation and home detention for his role in Four

2   Star's unlawful activities as alleged in the Cohn Wire Fraud Information.

3        55.    In or about October 2008, following his sentencing in the Cohn Wire Fraud

4   Action, Cohn disclosed for the first time to one of the Plaintiffs the existence of the Banking

5   Scheme and COMERICA's and Smith's roles in the Banking Scheme and the Four Star Ponzi

6   Scheme. Plaintiffs are informed and believe and thereon allege that, apart from any disclosures

7   that Cohn may have made to his criminal legal counsel, and/or to the United States Attorney or

8   other court-appointed representatives in connection with Cohn's cooperation as described in the

9   Cohn Wire Fraud Sentencing Report, Cohn had never previously disclosed to any person the

10  existence of the Banking Scheme or COMERICA's or Smith's roles in the Banking Scheme or

11  the Four Star Ponzi Scheme. Consequently, prior to October 2008 Plaintiffs were unable, and

12  would not have been able with the exercise of reasonable diligence, to learn any facts from Cohn

13  about the existence of the Banking Scheme or COMERICA's or Smith's role in the Banking

14  Scheme and the Four Star Ponzi Scheme.

15       56.    Plaintiffs did not know of or suspect COMERICA's and Smith's involvement in

16  the Four Star Ponzi Scheme, or of the existence of the Banking Scheme or any material part

17  thereof, until Cohn's disclosure in or about October 2008 as alleged above. Prior to

18  approximately October 2008, even with due diligence, it would have been impossible for

19  Plaintiffs to have discovered or suspected the existence of the Banking Scheme or COMERICA's

20  or Smith's involvement in the Banking Scheme, or the Four Star Ponzi Scheme or any material

21  part thereof. In addition to the facts alleged above, neither COMERICA nor Smith ever publicly

22  disclosed or acknowledged such participation or involvement, or the existence of the Banking

23  Scheme or any material part thereof. Furthermore, there were no publicly-available documents

1   which Plaintiffs could have accessed in the exercise of reasonable diligence that would have

2   disclosed or implied such participation or involvement, or the existence of the Banking Scheme or

3   any material part thereof.

4
5   57.    Had the Four Star Managers, COMERICA and Smith not concealed the existence

6   of the Banking Scheme, Plaintiffs would not have been delayed in filing this claim.

7
8                            **FIRST CAUSE OF ACTION**
9                   **Aiding and Abetting Breach of Fiduciary Duty**
                            **(Against All Defendants)**
10
11  58.    Plaintiffs hereby incorporate by reference and re-allege all of the allegations

12  contained in Paragraphs 1 though 57 above.

13  59.    Each of the Plaintiffs invested the Loss Period Investments pursuant to the terms

14  of one or more of several written investment documents (collectively hereinafter, the "**Investment**

15  **Documents**") that were delivered to Plaintiffs by Four Star via fax and/or United States mail.  The

16  Investment Agreements included the Private Placement Memorandum, Subscription Agreement,

17  Cash Flow Notes and Arbitrage Agreements as defined below:

18
19          (a)     A private placement memorandum dated June 30, 1997 (hereinafter

20                  referred to as the "**Private Placement Memorandum**") which was

21                  distributed to many of the Plaintiffs by the Four Star Managers by mail

22                  and/or fax.   The Private Placement Memorandum contained numerous

23                  material representations, such as the following: (i) that payments would

24                  only be made from cash flowing from Four Star's operations; (ii) that

25                  capital would only be used to pay certain operating expenses and to fund

26                  telecommunications and bridge financing; (iii) that capital would only be

27

28

invested in positions secured by accounts receivable from companies in the telephone industry or in investments where the principal was guaranteed by a rated insurance company; (iv) that management's aggregate $750,000 annual fees would only be paid to the extent that the company had net income; (v) that the principal was "safe"; and (vi) that the return of the principal investment was unconditionally guaranteed. Pursuant to the offering described in the Private Placement Memorandum, investors were given the opportunity to purchase membership units in Four Star. The purchase of membership units was made pursuant to a "**Subscription Agreement**" that was distributed to investors by the Four Star Managers by mail and/or fax. Under the terms of the Subscription Agreement, holders of membership units would receive a "priority return" on their investment of between 13% and 18% per annum, subject to the condition that a priority return would be payable only from available cash flow. In reliance on the representations made in the Private Placement Memorandum, many of the Plaintiffs purchased membership units in Four Star.

(b)     Four Star raised money by issuing cash flow notes (hereinafter referred to as "**Cash Flow Notes**") to investors, which provided for payment of interest of 14% and 18% per annum. The Cash Flow Notes were distributed to investors by mail and/or fax. Like the Private Placement Memorandum, the Cash Flow Notes promised: (i) that payments would only be made from available cash flow from Four Star's operations; (ii)

that capital would only be invested in positions secured by accounts receivable from companies in the telephone industry or in investments where the principal was guaranteed; (iii) that the principal was "safe"; and (iv) that the return of the principal investment was unconditionally guaranteed. The numerous Cash Flow Notes, containing these representations, were distributed to investors between 1997 and 2002. Because of the Four Star Managers' regular and reliable history of making interest payments, several of the Plaintiffs invested in the Four Star Cash Flow Notes, and several of these Plaintiffs then re-invested interest received from the Cash Flow Notes into new Cash Flow Notes or other Four Star investment vehicles.

(c)    Between late 1999 and late 2002, Four Star raised investment capital through eight of what Four Star referred to as "arbitrage" transactions,[1] whereby several of the Plaintiffs were solicited to invest in specific transactions, identified as Arbitrage #1 through Arbitrage #8, which Four Star represented to these Plaintiffs to be "arbitrage" transactions in the telecommunications industry. Under the investment agreements for the "arbitrage" transactions (hereinafter referred to as "**Arbitrage Agreements**"), these Plaintiffs were promised up to a 30% yield based on income from the transactions, but only to the extent of available cash flow, and that principal was guaranteed to be safe. Relying on Four Star's

---

[1]  An arbitrage transaction is one where the investor takes advantage of price differences between two markets, striking a combination of matching deals that capitalize upon the imbalance, with the profit being the differences in the market price.

PRITIKIN v. COMERICA BANK ET. AL.
COMPLAINT                                                                                          Page 36

regular and reliable history of making interest payments, these Plaintiffs invested in these "arbitrage" transactions. The Arbitrage Agreements, which contained these representations, were transmitted to these Plaintiffs, by mail and fax, during the following periods of time: (1) Arbitrage #1, between late 1999 and March 2000; (2) Arbitrage #2, between March 2000 and September 2000; (3) Arbitrage #3, between September 2000 and November 2000; (4) Arbitrage #4, between January 2001 and March 2001; (5) Arbitrage #5, between May and August 2001; (60 Arbitrage #6,between September and October 2001; (7) Arbitrage #7, between December 2001 and January 2002;and (8) Arbitrage #8, between September and October 2002.

60. Notwithstanding that the Investment Documents expressly provided that any return on the principal investment would be from available cash flow only, Four Star maintained a regular practice of paying regular fixed monthly "returns" to investors, including without limitation Plaintiffs. Payment of returns were made via the U.S. mail or interstate wire. Anson and Garrett regularly referred to this history of regular fixed payments (said payments are hereinafter referred to as "**Investor Distributions**") when soliciting new investments in Four Star from potential investors, including many of the Plaintiffs, as evidence that Four Star's operations were "safe" and had been consistently able to provide a "stable" return on investment.

61. The payment of regular Investor Distributions constituted a continuing representation by Four Star to its investors, including Plaintiffs, that Four Star's investments were

continuing to generate sufficient cash flow to allow for the continued payment of distributions in accordance with the Investment Documents.

62.    The assurances and representations in the Private Placement Memorandum and in the Cash Flow Notes described in Paragraph 59 above, Anson's and Garrett's references to the history of Investor Distributions as evidence of the safety and stability of Four Star's operations as described in Paragraph 60 above, and the continuing representation based on the payment of regular Investor Distributions as described in Paragraph 61 above, are hereinafter collectively referred to as the "**Solicitation Representations**".

63.    The Solicitation Representations were materially false and designed to mislead. Plaintiffs allege that at the time the Private Placement Memorandum was issued and Cash Flow Notes were distributed, the Four Star Managers knew: (1) that Four Star would make Investor Distributions regardless of whether there was available cash flow, (2) that Four Star would not invest solely in secured positions, bridge financing, or accounts receivable in the telecommunications industry, and (3) that the investors' principal investment was not safe.

64.    Four Star did not earn a net profit in any year from 1998 forward, notwithstanding that it made regular Investor Distributions to Plaintiffs until approximately October of 2002. Moreover, almost all of the money for Investor Distributions came not from income or cash from operations of Four Star, but rather constituted re-distributions of capital, that is, new investment money obtained by Four Star was used to fund monthly Investor Distributions rather than being invested in legitimate business activities.

65.    Anson and Garrett made the Solicitation Representations to Plaintiffs with the actual intent to defraud and to induce them to invest in Four Star, to forbear from withdrawing investments and, finally, to reinvest their Investor Distributions in Four Star.

66.     The Four Star Managers made regular Investor Distributions with the actual intent to defraud Plaintiffs. The Investor Distributions were generally made to Plaintiffs by checks sent through the U.S. Mail. By making regular Investor Distributions, the Four Star Managers deliberately made a continuing false representation (hereinafter referred to as the "**Cash Flow Representation**") to Plaintiffs that Four Star was generating sufficient cash flow from its operations to allow for the payment of such Investor Distributions in accordance with the terms of the Investment Documents, and thus that Four Star was a safe operation providing a stable return on investment. The Four Star Managers made the Cash Flow Representation to Plaintiffs with the actual intent to defraud and to induce Plaintiffs to invest in Four Star, to forbear from withdrawing investments and, finally, to reinvest their Investor Distributions in Four Star.

67.     When Anson and Garrett made the Solicitation Representations and the Cash Flow Representation to Plaintiffs, there existed a special relationship of trust and confidence between Anson and Garrett, on the one hand, and Plaintiffs, on the other hand. For many Plaintiffs, this relationship of trust was based on the fact that Anson and Garrett had provided professional accounting services to those Plaintiffs for many years, and in that capacity had given investment advice to those Plaintiffs. For other Plaintiffs, this relationship was based on the fact that these Plaintiffs had been introduced to Anson and/or Garrett by mutual friends or business associates to whom Anson and/or Garrett had provided professional accounting services and/or investment advice for many years. In addition, when Anson and Garrett made the Solicitation Representations and the Cash Flow Representation to Plaintiffs, many of the Plaintiffs were aware of the fact that Anson and Garrett had managed for many years and were continuing to manage several multi-million dollar investment entities, including without limitation Phoenix Hotel Associates, Ltd., a California limited partnership, Intercoastal-Phoenix Associates, Ltd., a

California limited partnership, Roberts-O'Hare Limited Partnership, a California limited partnership, and Cal O'Hare Ltd., a California limited partnership, on behalf of many of their accounting clients as well as others. As a result of the foregoing, when Anson and Garrett made the Solicitation Representations and the Cash Flow Representation to Plaintiffs, Plaintiffs relied on the professional judgment and advice of Anson and/or Garrett with respect to Plaintiffs' investment decisions, Anson and Garrett intended that they so rely, and Anson and Garrett acted as investment advisors with respect to Plaintiffs. In such capacity as investment advisors, Anson and Garrett owed each of the Plaintiffs, who were in effect their clients, fiduciary duties.

68.     When Anson and Garrett made the Solicitation Representations and the Cash Flow Representation to Plaintiffs, Cohn was the attorney for Four Star, and in that capacity Cohn owed a fiduciary duty to Four Star and its members and investors, including each of the Plaintiffs.

69.     When Anson and Garrett made the Solicitation Representations and the Cash Flow Representation to Plaintiffs, Anson, Garrett and Cohn were managers of Four Star, a limited liability company, and in that capacity they each owed a fiduciary duty to Four Star and its members and investors, including each of the Plaintiffs.

70.     In inducing Plaintiffs to invest in Four Star, to forbear from withdrawing investments and to reinvest their Investor Distributions in Four Star by making the Solicitation Representations and the Cash Flow Representation, Anson, Garrett and Cohn breached their fiduciary duties to Plaintiffs. As a proximate result thereof, Plaintiffs have suffered losses as hereinafter set forth.

71.     Anson, Garrett and Cohn further breached their fiduciary duties to Plaintiffs by using Plaintiffs' investments in Four Star to personally benefit Anson and Garrett, in that said investments were used by the Four Star Managers to pay principal and interest owing by Anson

and Garrett to COMERICA on the Anson/Garrett Line of Credit, which was not a Four Star obligation.

72.    Defendants COMERICA and DOES 1-100, inclusive (each a "**Defendant**" and collectively "**DEFENDANTS**") at all material times had actual knowledge of Anson's, Garrett's and Cohn's fiduciary duties to Plaintiffs with respect to Plaintiffs' investments in Four Star. DEFENDANTS at all material times knew that the Four Star Managers were violating their fiduciary duties to Plaintiffs as alleged above, and actively participated in the operation of the Four Star Ponzi Scheme by enabling and facilitating the Banking Scheme as alleged above, including the application of Plaintiffs' investments to pay Anson's and Garrett's obligations on the Anson/Garrett Line of Credit. As alleged above, the Banking Scheme was a material and an essential component of the Four Star Ponzi Scheme. In acting and failing to act as alleged above, DEFENDANTS actively and affirmatively assisted in the Four Star Ponzi Scheme and helped conceal it from Plaintiffs. DEFENDANTS enabled the fraud to flourish and stay hidden from its victims.

73.    Without DEFENDANTS' aid, the Four Star Ponzi Scheme would not have grown as large, would not have become as pernicious as it did, nor would it have lasted beyond approximately December 1999, when, but for the initiation of the Banking Scheme at that time, the Creditor Writs would have preventing Four Star from continuing to make its regular monthly Investor Distributions and thus would have alerted Plaintiffs to Four Star's true insolvent condition.

74.    DEFENDANTS substantially assisted and aided and abetted Anson's, Garrett's and Cohn's breach of fiduciary duties with the specific intent to facilitate conduct, i.e., the Banking Scheme, which constituted a material part of said breach.

75.    As a proximate result of DEFENDANTS' conduct, Plaintiffs suffered economic damages in an amount exceeding $50 million.

76.    As a proximate result of DEFENDANTS' conduct, many of the Plaintiffs suffered severe emotional distress, including without limitation anxiety, nervousness, sleeplessness, humiliation, anguish, and physical distress.    As a result of such harm, such Plaintiffs have suffered such damages in an amount according to proof.

77.    DEFENDANTS' actions were malicious, fraudulent, oppressive, intended to injure Plaintiffs and/or in reckless disregard of Plaintiffs' rights.    Consequently, Plaintiffs are entitled to punitive damages.

78.    Several of the Plaintiffs are senior citizens and/or disabled persons as those terms are defined by California Civil Code § 3345.    Plaintiffs are informed and believe and thereon allege that one or more of the following are true: (a) when DEFENDANTS aided and abetted the unfair and/or deceptive acts of Anson, Garrett and Cohn as alleged above, DEFENDANTS knew or should have known that said acts were directed to one or more senior citizens; (b) said acts by DEFENDANTS caused one or more of said senior citizen Plaintiffs or disabled Plaintiffs to suffer one or more of the following: (i) loss or encumbrance of a primary residence, principal employment, or source of income; (ii) substantial loss of property set aside for retirement, or for personal or family care and maintenance; or (iii) substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of said Plaintiffs; (c) one or more of said senior citizen Plaintiffs or disabled Plaintiffs were substantially more vulnerable than other members of the public to DEFENDANTS' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from

1 DEFENDANTS' conduct. Accordingly, said senior citizen Plaintiffs and disabled Plaintiffs are

2 entitled to all of the remedies of Civil Code § 3345 against each of the DEFENDANTS, including

3 without limitation treble the amount of punitive damages to which said Plaintiffs would otherwise

4 be entitled. In addition, said Plaintiffs are entitled to recover their attorneys' fees under California

5 Welfare & Institutions Code § 15657.

6

7         WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

8

9                          **SECOND CAUSE OF ACTION**
10                          **Aiding and Abetting Fraud**
                            **(Against All Defendants)**
11

12         79.    Plaintiffs hereby incorporate by reference and re-allege all of the allegations

13 contained in Paragraphs 1 though 75 above.

14         80.    As alleged above, including without limitation in Paragraphs 59 through 62 and

15 Paragraph 66 above, Four Star and the Four Star Managers, through the fraudulent Solicitation

16 Representations and the fraudulent Cash Flow Representation, intentionally defrauded every

17 Plaintiff.

18

19         81.    Plaintiffs relied on the fraudulent Solicitation Representations and the fraudulent

20 Cash Flow Representation and suffered damages as a result.

21

22         82.    DEFENDANTS substantially assisted and aided and abetted Four Star's and the

23 Four Star Managers' fraud against Plaintiffs by virtue of DEFENDANTS' specific intent to

24 facilitate fraudulent conduct, i.e., the Banking Scheme. The Banking Scheme constituted a

25 material part of said fraud because it enabled Four Star to continue to make monthly distribution

26 payments to Plaintiffs notwithstanding Four Star's insolvency, thus giving Four Star the illusion

27 of viability that induced Plaintiffs to invest new funds in Four Star. DEFENDANTS at all

28

material times knew that Four Star and the Four Star Managers were engaging in fraud and willingly provided their assistance to Four Star and the Four Star Managers.

83.    As a proximate result of DEFENDANTS' conduct, Plaintiffs suffered economic damages in an amount exceeding $50 million.

84.    As a proximate result of DEFENDANTS' conduct, many of the Plaintiffs suffered severe emotional distress, including without limitation anxiety, nervousness, sleeplessness, humiliation, anguish, and physical distress. As a result of such harm, such Plaintiffs have suffered such damages in an amount according to proof.

85.    DEFENDANTS' actions were malicious, fraudulent, oppressive, intended to injure Plaintiffs, and/or in reckless disregard of Plaintiffs' rights. Consequently, Plaintiffs are entitled to punitive damages.

86.    Several of the Plaintiffs are senior citizens and/or disabled persons as those terms are defined by California Civil Code § 3345. Plaintiffs are informed and believe and thereon allege that one or more of the following are true: (a) when DEFENDANTS aided and abetted the unfair and/or deceptive acts of Four Star and the Four Star Managers as alleged above, DEFENDANTS knew or should have known that said acts were directed to one or more senior citizens; (b) said acts by DEFENDANTS caused one or more of said senior citizen Plaintiffs or disabled Plaintiffs to suffer one or more of the following: (i) loss or encumbrance of a primary residence, principal employment, or source of income; (ii) substantial loss of property set aside for retirement, or for personal or family care and maintenance; or (iii) substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of said Plaintiffs; (c) one or more of said senior citizen Plaintiffs or disabled Plaintiffs were substantially more vulnerable than other members of the public to

DEFENDANTS' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from DEFENDANTS' conduct.   Accordingly, said senior citizen Plaintiffs and disabled Plaintiffs are entitled to all of the remedies of Civil Code § 3345 against each of the DEFENDANTS, including without limitation treble the amount of punitive damages to which said Plaintiffs would otherwise be entitled.   In addition, said Plaintiffs are entitled to recover their attorneys' fees under California Welfare & Institutions Code § 15657.

WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Violation of Cal. Bus. & Prof. Code § 17200 et seq.**
**(Against All Defendants)**

87.    Plaintiffs hereby incorporate by reference and re-allege all of the allegations contained in Paragraphs 1 though 75 above.

88.    DEFENDANTS' conduct as previously alleged constitutes unlawful business acts or practices within the meaning of California Business & Professions Code § 17200, including without limitation the following:

> (a)    DEFENDANTS' conduct in facilitating and enabling the Banking Scheme as alleged above was intended to hinder and delay the rights of Four Star's creditors, by (i) concealing Four Star's funds from Four Star creditors holding Creditor Writs, (ii) improperly applying Four Star's funds to the payment of the Anson/Garrett Line of Credit, which payments had no legitimate business purpose and had the effect of depriving Four Star of funds that otherwise would have been available to satisfy Four Star's creditors, including without limitation creditors holding Creditor Writs,

and (iii) improperly applying Four Star's funds to the payment of Investor Distributions, which payments had the effect of depriving Four Star of funds that otherwise would have been available to satisfy Four Star's creditors, including without limitation creditors holding Creditor Writs, whose rights to Four Star's assets were superior as a matter of law to the rights of Four Star investors. The foregoing conduct by DEFENDANTS violates California's Uniform Fraudulent Transfer Act, Civil Code §§ 3439.01 – 3439.12.

(b)     COMERICA's failure to report to government authorities  the material elements of the Banking Scheme as alleged above, including without limitation (i) the large daily negative balance in the Four Star Comerica Account, (ii) the regular deposit of funds from non-Four Star accounts into the Four Star Comerica Account in amounts sufficient to cover that day's checks but then leaving the account balance at zero or near-zero, and (iii) the regular transfer of funds from the Four Star Comerica Account to non-Four Star accounts including the Anson/Garrett Line of Credit, constitutes a violation of Title 12, § 21.11 of the Code of Federal Regulations. Under said section, COMERICA was obligated to file a Suspicious Activity Report for such transfers because said activities had no apparent legitimate business or lawful purpose, and there was no reasonable explanation for said activities except as a mechanism to hinder and delay Four Star's creditors.

(c)    The investments made by Plaintiffs in Four Star during the Loss Period constitute "securities" within the meaning of California Corporations Code § 25401.  By virtue of the conduct of Anson, Garrett, and Cohn in connection with the making of these investments, as alleged in Paragraphs 59 through 62 above, Anson, Garrett, and Cohn solicited the sale of securities through the making of false representations in violation of said code section.  DEFENDANTS' conduct in facilitating and enabling the Banking Scheme as alleged in Paragraphs 32 through 37 above constitutes a violation of California Corporations Code § 25403(b), which provides: "Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order there under shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided."

(d)    COMERICA's conduct alleged in Paragraphs 33 through 37 above violated safety and soundness standards applicable to COMERICA's banking activities as prescribed by 12 U.S.C. § 1831p-1 and Title 12, Part 30 of the Code of Federal Regulations.

(e)    COMERICA's conduct permitting its banking operations to facilitate the material elements of the Banking Scheme as alleged in Paragraphs 33 through 37 above constitutes a violation of audit and reporting standards applicable to COMERICA's banking activities as prescribed by Title 12, Part 363 of the Code of Federal Regulations.

89.    DEFENDANTS' conduct as previously alleged, including without limitation as alleged in Paragraph 88 above, constitutes unfair business acts or practices within the meaning of California Business & Professions Code § 17200.

90.    DEFENDANTS' conduct as previously alleged, including without limitation as alleged in Paragraph 87 above, constitutes fraudulent business acts or practices within the meaning of California Business & Professions Code § 17200.    DEFENDANTS knowingly assisted the Four Star Managers in a fraudulent scheme, i.e., the Banking Scheme, in order to hinder and delay Four Star creditors holding Creditor Writs, and to thereby facilitate the Four Star Ponzi Scheme.    The Banking Scheme and the Four Star Ponzi Scheme each constitutes a *per se* fraudulent business practice.

91.    DEFENDANTS' unlawful, unfair and/or fraudulent acts in enabling and facilitating the Banking Scheme as described above constitutes unfair competition within the meaning of California Business & Professions Code § 17200.  Plaintiffs lost money, i.e., the Loss Period Investments, as a result of said unfair competition.  Accordingly, Plaintiffs may obtain against DEFENDANTS all remedies and penalties authorized by California Business & Professions Code § 17203, including without limitation restitution, disgorgement, and other relief for each illegal, unfair and fraudulent business act or practice, and attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and the Court's equitable powers, in an amount subject to proof.

92.    Several of the Plaintiffs are senior citizens and/or disabled persons as those term are defined by California Civil Code § 3345.  Plaintiffs are informed and believe and thereon allege that one or more of the following are true: (a) when DEFENDANTS were engaged in the unfair and/or deceptive acts as alleged above, DEFENDANTS knew or should have known that

1   said acts were directed to one or more senior citizens; (b) said acts by DEFENDANTS caused one

2   or more of said senior citizen Plaintiffs or disabled Plaintiffs to suffer one or more of the

3   following: (i) loss or encumbrance of a primary residence, principal employment, or source of

4   income; (ii) substantial loss of property set aside for retirement, or for personal or family care and

5   maintenance; or (iii) substantial loss of payments received under a pension or retirement plan or a

6   government benefits program, or assets essential to the health or welfare of said Plaintiffs; (c) one

7   or more of said senior citizen Plaintiffs or disabled Plaintiffs were substantially more vulnerable

8   than other members of the public to DEFENDANTS' conduct because of age, poor health or

9   infirmity, impaired understanding, restricted mobility, or disability, and actually suffered

10  substantial physical, emotional, or economic damage resulting from DEFENDANTS' conduct.

11  Accordingly, and in view of the fact that a purpose or effect of the restitution remedy under

12  California Business & Profession Code § 17203 is to punish and/or deter unfair and/or deceptive

13  conduct proscribed by California Business & Profession Code § 17200,  said senior citizen

14  Plaintiffs and disabled Plaintiffs are entitled to all of the remedies of Civil Code § 3345 against

15  each of the DEFENDANTS, including without limitation treble the amount of restitution or other

16  relief to which said Plaintiffs would otherwise be entitled under California Business & Professions

17  Code § 17203.  In addition, said Plaintiffs are entitled to recover their attorneys' fees under

18  California Welfare & Institutions Code § 15657.

19          WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

20  //

21  //

22  //

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOURTH CAUSE OF ACTION**
**Aiding and Abetting Violation of Cal. Bus. & Prof. Code § 17200 et seq.**
**(Against All Defendants)**

93.    Plaintiffs hereby incorporate by reference and re-allege all of the allegations contained in Paragraphs 1 though 75 above.

94.    The conduct of Four Star and the Four Star Managers as previously alleged constitute unlawful business acts or practices within the meaning of California Business & Professions Code § 17200, including without limitation the following:

(a)    Said conduct was intended to hinder and delay the rights of Four Star's creditors, by (i) concealing Four Star's funds from Four Star creditors holding Creditor Writs, (ii) improperly applying Four Star's funds to the payment of the Anson/Garrett Line of Credit, which payments had no legitimate business purpose and had the effect of depriving Four Star of funds that would otherwise have been available to satisfy Four Star's creditors, including without limitation creditors holding Creditor Writs, and (iii) improperly applying Four Star's funds to the payment of Investor Distributions, which payments had the effect of depriving Four Star of funds that would otherwise have been available to satisfy Four Star's creditors, including without limitation creditors holding Creditor Writs, whose rights to Four Star's assets were superior as a matter of law to the rights of Four Star investors. The foregoing conduct violates California's Uniform Fraudulent Transfer Act, Civil Code §§ 3439.01 – 3439.12.

(b)    The investments made by Plaintiffs during the Loss Period constitute "securities" within the meaning of California Corporations Code § 25401. By virtue of the conduct of Four Star and the Four Star Managers in connection with the making of these investments, as alleged in Paragraphs 59 through 62 and Paragraph 66 above, Four Star and the Four Star Managers solicited the sale of securities through the making of false representations in violation of said code section. Said conduct constitutes a violation of California Corporations Code § 25401, which provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

(c)    The conduct of Four Star and the Four Star Managers as previously alleged constitutes a violation of §§ 10(b) and 12(a)(2) of the Securities Exchange Act of 1934. Section 10(b) makes it "unlawful for any person, ... [t]o use and employ ... any manipulative or deceptive device or contrivance" to violate rules and regulations of the Securities and Exchange Commission. (15 U.S.C. § 78j(b).) Rule 10b-5 promulgated under this section prohibits any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit." (17 C.F.R. § 240.10b-5.) Section 12(a)(2) imposes liability for selling a security by means of a prospectus or oral

communication containing an untrue statement of a material fact or a material omission of a fact needed to make the statement not misleading. The term "seller" for purposes of section 12 includes "participants" whose acts are "both necessary to and a substantial factor in the sale transaction." (*Admiralty Fund v. Jones*, 677 F.2d 1289, 1294 (9th Cir. 1982).) A defendant is a substantial factor in the sale transaction when "the injury to the plaintiff flowed directly and proximately from the actions of the defendant." (*Id.*) Four Star and the Four Star Managers, by their conduct as herein alleged, defrauded and deceived Plaintiffs by creating the illusion of a profitable business when in fact Four Star was insolvent and unable to lawfully make distributions to Plaintiffs during the Loss Period.

(d)    The conduct of Four Star and the Four Star Managers, as alleged above, constitutes a violation of 18 U.S.C. § 1341 (mail fraud) in that they knowingly used the U.S. Postal Service to transmit fraudulent and misleading documents, including without limitation the Solicitation Representations as described in Paragraphs 59 through 62 above and the Cash Flow Representation as described in Paragraph 66 above.

(e)    The conduct of Four Star and the Four Star Managers, as alleged above, constitutes a violation of 18 U.S.C. § 1343 (wire fraud), in that they knowingly used interstate wires to transfer funds between the Four Star Comerica Account and non-Four Star accounts including without limitation the Anson/Garrett Line of Credit, in order to conceal Four Star

1  funds from Four Star creditors holding Creditor Writs and to further the

2  Banking Scheme and the Four Star Ponzi Scheme as previously described.

3  (f)  The conduct of Four Star and the Four Star Managers, as alleged above,

4

5  constitutes a violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Promotional

6  Money Laundering), in that they knowingly conducted financial

7  transactions involving the proceeds of specified unlawful activity, namely,

8  mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343,

9

10  knowing that the property involved in the financial transactions

11  represented the proceeds of some form of unlawful activity, and with the

12  intent to promote the carrying on of such specified unlawful activity;

13  (g)  The conduct of Four Star and the Four Star Managers, as alleged in

14  subparagraphs (d), (e) and (f) in this paragraph, constitutes a violation of

15  18 U.S.C. § 1962 (RICO), in that said conduct constituted a pattern of

16

17  racketeering activity in furtherance of an enterprise.

18  95.  The conduct of Four Star and the Four Star Managers, as previously alleged,

19 constitutes unfair business acts or practices within the meaning of California Business &

20 Professions Code § 17200.

21

22  96.  The conduct of Four Star and the Four Star Managers, as previously alleged,

23 constitutes fraudulent business acts or practices within the meaning of California Business &

24 Professions Code § 17200.   DEFENDANTS knowingly operated the Banking Scheme intended

25 to deceive Four Star creditors holding Creditor Writs, and a Ponzi scheme intended to mislead

26 Plaintiffs, each of which schemes is a *per se* fraudulent business practice.

27

28

97.     The unlawful, unfair and/or fraudulent acts of Four Star and the Four Star Managers in operating the Banking Scheme and the Four Star Ponzi Scheme as described above constitute unfair competition within the meaning of California Business & Professions Code § 17200.   Plaintiffs lost money, i.e., the Loss Period Investments, as a result of said unfair competition.    DEFENDANTS, by their conduct as previously alleged, including without limitation Paragraphs 33 through 37, substantially aided and abetted Four Star and the Four Star Managers in the commission of such unfair competition.  DEFENDANTS aided and abetted the unfair competition of Four Star and the Four Star Managers with actual knowledge of certain specific acts constituting said unfair competition, i.e., those acts of Four Star and the Four Star Managers which pertained to the Banking Scheme as alleged in Paragraphs 32 through 37 above, and with the specific intent to facilitate said acts.  Accordingly, Plaintiffs may obtain against DEFENDANTS all remedies and penalties authorized by California Business & Professions Code § 17203, including without limitation restitution, disgorgement, and other penalties for each illegal, unfair and fraudulent business act or practice, and attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and the Court's equitable powers, in an amount subject to proof.

98.     Several of the Plaintiffs are senior citizens and/or disabled persons as those term are defined by California Civil Code § 3345.  Plaintiffs are informed and believe and thereon allege that one or more of the following are true: (a) when DEFENDANTS aided and abetted the unfair and/or deceptive acts of Four Star and the Four Star Managers as alleged above, DEFENDANTS knew or should have known that said acts were directed to one or more senior citizens and/or disabled persons; (b) said acts of Four Star and the Four Star Managers which were aided and abetted by DEFENDANTS caused one or more of said senior citizen Plaintiffs or

1   disabled Plaintiffs to suffer one or more of the following: (i) loss or encumbrance of a primary

2   residence, principal employment, or source of income; (ii) substantial loss of property set aside for

3   retirement, or for personal or family care and maintenance; or (iii) substantial loss of payments

4   received under a pension or retirement plan or a government benefits program, or assets essential

5   to the health or welfare of said Plaintiffs; (c) one or more of said senior citizen Plaintiffs or

6   disabled Plaintiffs was substantially more vulnerable than other members of the public to said acts

7   of Four Star and the Four Star Managers which were aided and abetted by DEFENDANTS

8   because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability,

9   and actually suffered substantial physical, emotional, or economic damage resulting from said acts

10  of Four Star and the Four Star Managers. Accordingly, and in view of the fact that a purpose or

11  effect of the restitution remedy under California Business & Profession Code § 17203 is to punish

12  and/or deter unfair and/or deceptive conduct proscribed by California Business & Profession Code

13  § 17200, said senior citizen Plaintiffs and disabled Plaintiffs are entitled to all of the remedies of

14  Civil Code § 3345 against each of the DEFENDANTS, including without limitation trebling of

15  the amount of restitution to which said Plaintiffs would otherwise be entitled under California

16  Business & Professions Code § 17203. In addition, said Plaintiffs are entitled to recover their

17  attorneys' fees under California Welfare & Institutions Code § 15657.

WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

### FIFTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1961(c)(d) (RICO)
### (Against All Defendants)

99.   Plaintiffs hereby incorporate by reference and re-allege all of the allegations

contained in Paragraphs 1 though 75 above.

100.   Each of the Defendants is a "person" within the meaning of that term as used in 18

U.S.C. § 1962.

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

101.    At all times relevant to this Complaint, Four Star, the Four Star Managers, Smith and COMERICA collectively constituted an "enterprise" (hereinafter referred to as the "**Four Star Enterprise**") within the meaning of that term as used in 18 U.S.C. § 1962.  Upon information and belief, at all times relevant to this Complaint the Four Star Enterprise was an ongoing association that functioned as a continuing unit for the purposes of acts of racketeering as hereinafter alleged, in furtherance of the fraud, the Four Star Ponzi Scheme and the Banking Scheme alleged in Paragraphs 29 through 37 above.

102.    At all times relevant to this Complaint, the Four Star Enterprise engaged in interstate commerce, and the activities of the enterprise affected interstate commerce.

103.    At all times relevant to this Complaint, each of the DEFENDANTS was associated with the Four Star Enterprise.

104.    Upon information and belief, and as described in the General Allegations above, DEFENDANTS engaged in a pattern of racketeering activity in furtherance of the Four Star Enterprise, consisting of numerous related and continuous acts of wire fraud, as that term is defined in 18 U.S.C. § 1343, mail fraud, as the term is defined in 18 U.S.C. § 1341, and money laundering, as the term is defined in 18 U.S.C. § 1956, and committed these acts willfully or with actual knowledge of the illegal activities.  These acts include, but are not limited to the following:

        (a)    DEFENDANTS knowingly caused funds from the Four Star Comerica Account to be transmitted on numerous occasions during the Loss Period by means of wire in interstate commerce within the meaning of 18 U.S.C. § 1343 to the Anson/Garrett Line of Credit for the purposes of concealing said funds from Four Star creditors holding Creditor Writs and furthering the Four Star Enterprise through the operation of the Banking Scheme as

alleged in Paragraphs 32 through 37 above.    Specifically, but without limitation, Plaintiffs allege that DEFENDANTS transferred monies from the Four Star Comerica Account to the Anson/Garrett Line of Credit on or around the following dates: 7/27/00, 10/24/00, 12/22/00, 1/25/01, 5/15/01, 8/13/01, 8/17/01, 11/28/01, 12/28/01, 1/24/02; 1/25/02; 01/28/02; 3/9/02; 3/11/02; 4/23/.02; 5/21/02; 6/27/02.  In total between 2000 and 2002 alone DEFENDANTS transferred approximately $37,014,885 out of the Four Star Comerica Account into the Anson/Garrett Line of Credit.  Plaintiffs allege that each of these transfers required information to be processed across state lines.    The records of these transactions are in the possession of COMERICA and Richard Marshack, the Bankruptcy Trustee for the Four Star bankruptcy estate.  As such, the forgoing is just a small sample of the transfers.

(b)    On numerous occasions during the Loss Period, DEFENDANTS deliberately did not return unpaid to the payee's bank checks drawn on the Four Star Comerica Account when there were insufficient funds in that account to honor the check, contrary to COMERICA's ordinary banking practice for the handling of insufficient funds checks.    Instead, DEFENDANTS facilitated the transfer of sufficient funds into that account from a non-Four Star account, and then paid the check.  DEFENDANTS took these actions with the specific intent to enable and facilitate the Banking Scheme in furtherance of the Four Star Enterprise as alleged in Paragraphs 32 through 37 above. To accomplish this, the DEFENDANTS

transferred funds from the Anson/Garrett Line of Credit into the Four Star Comerica Account by means of wire in interstate commerce within the meaning of 18 U.S.C. § 1343.    Specifically, but without limitation, Plaintiffs allege that DEFENDANTS transferred monies from the Anson/Garrett Line of Credit to the Four Star Comerica Account on the following dates: 5/21/01,11/05/01, 11/06/01, 11/29/01, 12/31/01, 01/08/02, 01/09/02, 01/10/02, 02/12/02, 02/15/02, 03/13/02,12/09/02, and 12/11/02. In total between 2000 and 2002 alone DEFENDANTS transferred approximately $42,524,551 from the Anson/Garrett Line of Credit into the Four Star Comerica Account.  Plaintiffs allege that each of these transfers required information to be processed across state lines.    The records of these transactions are in the possession of COMERICA and Richard Marshack, the Bankruptcy Trustee for the Four Star bankruptcy estate.  As such, the forgoing is just a small sample of the transfers.

(c)    COMERICA accepted numerous money transfers during the Loss Period by means of wire in interstate commerce within the meaning of 18 U.S.C. § 1343 to the Four Star Comerica Account, and then allowed said funds to be transferred almost immediately to non-Four Star accounts, thus maintaining the balance of the Four Star Comerica Account below zero, at zero or near-zero.  These actions were done for the purpose of furthering the Banking Scheme, which was an integral component of the Four Star Enterprise, as alleged in Paragraphs 29 through 37 above.  Plaintiffs do not know the full extent of transfers as the records of these transactions are

1             in the possession of COMERICA and Richard Marshack, the Bankruptcy

2             Trustee for the Four Star bankruptcy estate.

3       (d)    COMERICA accepted numerous wired money transfers during the Loss

4   Period by means of wire in interstate commerce within the meaning of 18

5   U.S.C. § 1343 to the Four Star Comerica Account of funds from non-Four

6   Star accounts controlled by the Four Star Managers and/or from other

7   accounts where the transfer of funds was directed by the Four Star

8   Managers, and which funds, once transferred to the Four Star Comerica

9   Account, were then used by Four Star to further the Banking Scheme and

10  the Four Star Enterprise.  This includes funds transferred from the Four

11  Star Comerica Account to an account for FSF, LLC, which was an entity

12  created and controlled by the Four Star Managers for the specific purpose

13  of hiding Four Star funds from Four Star creditors holding Creditor Writs.

14  Plaintiffs allege that the DEFENDANTS allowed an account to be opened

15  in the name of FSF, LLC, knowing that it was created by the Four Star

16  Managers for said purpose.  The DEFENDANTS allowed funds to be

17  transferred between the Four Star Comerica Account and FSF, LLC

18  account on the following dates:   2/20/01; 2/21/01; 2/23/01; 3/01/01;

19  3/07/01.  Plaintiffs allege that each of these transfers required information

20  to be processed across state lines.  The records of these transactions are in

21  the possession of COMERICA and Richard Marshack, the Bankruptcy

22  Trustee for the Four Star bankruptcy estate.  As such, the forgoing is just a

23  small sample of the transfers.

(e)    On numerous occasions during the Loss Period COMERICA was served by Four Star creditors with Creditor Writs. On numerous occasions during said period COMERICA did knowingly cause to be transmitted by mail via interstate carriers and/or wire, communications which represented that Four Star had little or no funds in accounts maintained at COMERICA. These representations were false and/or materially misleading in that COMERICA knew that Four Star's funds were in fact being concealed in accounts held in other names but controlled by Four Star. COMERICA made these representations for the purposes of concealing Four Star funds from said creditors and furthering the Banking Scheme and the Four Star Enterprise. Said actions constituted unlawful mail fraud and wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343. The records of these transactions are in the possession of COMERICA.

(f)    Throughout the Loss Period, every time one of the Plaintiffs deposited a Four Star check into said Plaintiff's personal bank account, communications would occur between COMERICA and the Plaintiff's bank, and monies would be transferred. These communications and money transfers were transmitted via wire in interstate commerce within the meaning of 18 U.S.C. § 1343, or mail within the meaning of 18 U.S.C. § 1341. Communications and money transfers between COMERICA and the banks of Plaintiffs occurred on hundreds of occasions. These actions were done for the purpose of furthering the Banking Scheme and the Four Star Enterprise.

1

2

3

4

5

6

7

8

9

10

   (g)  COMERICA carried out the acts alleged above with the specific intent to promote the Banking Scheme, which was an integral component of the Four Star Enterprise, and at all times relevant to this Complaint knew the transactions described above were designed to further the Banking Scheme by concealing the nature, location, source and ownership of Four Star funds and monies invested into Four Star from Four Star creditors holding Creditor Writs. Said actions constituted unlawful money laundering within the meaning of 18 U.S.C. § 1956(a).

11

12

13

14

15

16

  105. Upon information and belief, COMERICA received income derived directly or indirectly from the pattern of racketeering activity alleged above because, as a result of the transfer of funds from the Four Star Comerica Account to the Anson/Garrett Line of Credit, a portion of the outstanding balance owed to COMERICA on said line of credit, including accrued interest owing to COMERICA, was thereby satisfied.

17

18

19

20

21

22

23

24

25

26

27

28

  106. Upon information and belief, COMERICA used, directly or indirectly, a portion of the income it received from the pattern of racketeering activity by virtue of the fact that, subsequent to transfers of funds from the Four Star Comerica Account to the Anson/Garrett Line of Credit, COMERICA caused funds to be transferred from said line of credit to the Four Star Comerica Account, with the knowledge and intent that a portion of said funds were to be used, and were in fact used, to honor the payment of Investor Distribution checks issued by Four Star to Plaintiffs, and to honor the payment of checks issued by Four Star to selected creditors of Four Star, all in furtherance of the Banking Scheme and the Four Star Enterprise.

107.    DEFENDANTS' continuous and repeated violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1956, as alleged above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

108.    Upon information and belief, DEFENDANTS' violations of 18 U.S.C. § 1962(c) injured Plaintiffs in that these acts aided, abetted, and perpetrated the Banking Scheme and the Four Star Enterprise as alleged in Paragraphs 29 through 37 above.

109.    DEFENDANTS' continuous and repeated acts in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. §1956, which acts were performed by DEFENDANTS with the intent to assist, facilitate and further the Banking Scheme and the Four Star Enterprise, constitute a conspiracy to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

110.    Upon information and belief, DEFENDANTS' violations of 18 U.S.C. § 1962(d) injured Plaintiffs in that these acts aided, abetted, and perpetrated the Banking Scheme and the Four Star Enterprise.

111.    By reason of the foregoing, Plaintiffs have been, and will continue to be, injured in their business and property in an amount exceeding $50 million.  Plaintiffs are entitled to damages according to proof, treble damages and litigation costs including attorneys' fees.

WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

### SIXTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1961(d) (RICO)
### (Against All Defendants)

112.    Plaintiffs hereby incorporate by reference and re-allege all of the general allegations contained in Paragraphs 1 though 75 above.

113.    Each of the DEFENDANTS is a "person" within the meaning of that term as used in 18 U.S.C. § 1962.

114.    At all times relevant to this Complaint, Four Star, the Four Star Managers, and Smith collectively constituted an "enterprise", i.e., the Four Star Enterprise, within the meaning of that term as used in 18 U.S.C. § 1962. Upon information and belief, at all times relevant to this Complaint the Four Star Enterprise was an ongoing association that functioned as a continuing unit for the purposes of acts of racketeering as hereinafter alleged in furtherance of the fraud, the Four Star Ponzi Scheme and the Banking Scheme alleged in Paragraphs 29 through 37 above.

115.    At all times relevant to this Complaint, the Four Star Enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce.

116.    As previously alleged, Four Star and the Four Star Managers operated a Ponzi scheme, i.e., Four Star Ponzi Scheme. In order to maintain said scheme, Four Star, the Four Star Managers and Smith engaged in a pattern of racketeering activity in furtherance of the Four Star Enterprise, consisting of numerous related and continuous acts of mail fraud, as the term is defined in 18 U.S.C. § 1341, wire fraud, as that term is defined in 18 U.S.C. § 1343, and money laundering, as the term is defined in 18 U.S.C. § 1956, and committed these acts willfully or with actual knowledge of the illegal activities. Acts in furtherance of the Four Star Enterprise include, but are not limited to the following:

(a)    On numerous occasions during the Loss Period, Four Star and the Four Star Managers used the mail, as defined by 18 U.S.C. § 1341 to make Investor Distributions from the Four Star Comerica Account. During this period Four Star did not have significant income or other source of cash flow other than new investments, and these distributions were made entirely or almost entirely from new investments. These distributions were made to further the Four Star Ponzi Scheme and the Banking

Scheme by fraudulently representing to investors, including Plaintiffs, that Four Star was solvent and profitable, the Cash Flow Representation. Specific examples of transfers include: 3/31/02, 4/30/02, 5/31/02 payments to Plaintiff O'MALLEY in the amount of $5,000 each month; a 1/1/02 payment to Plaintiff PRITIKIN in the amount of $11,382; a 1/31/02 Plaintiff PRITIKIN in the amount of $13,605, and 2/28/02, 3/31/02, 4/30/02 payments in the amount of $9,882 each to Plaintiff PRITIKIN. Records of these transactions are in the possession of Richard Marshack, the Bankruptcy Trustee for the Four Star bankruptcy estate. Said actions constitute unlawful mail fraud within the meaning of 18 U.S.C. § 1341.

(b)     On numerous occasions during the Loss Period, Four Star, the Four Star Managers and Smith used the mail, as defined by 18 U.S.C. § 1341, and interstate wires, as defined by 18 U.S.C. §1343, to receive funds invested by Plaintiffs. These investments were made by Plaintiffs in reliance on the Solicitation Representations and the Cash Flow Representation made by Four Star and the Four Star Managers. Records of such transactions are in the possession of Richard Marshack, the Bankruptcy Trustee for the Four Star bankruptcy estate. Said actions constitute unlawful mail fraud within the meaning of 18 U.S.C. § 1341, and unlawful wire fraud within the meaning of 18 U.S.C. § 1343.

(c)     On or around November 5, 2007, Cohn pleaded guilty to wire fraud within the meaning of 18 U.S.C. § 1341, in regards to a transfer made on

or around October 12, 2001 of $2,000,000 into a Four Star Citi Bank Account by a Four Star investor in reliance on a false promise that said funds would be used in Arbitrage #5.

(d)    Both prior to and during the Loss Period, Four Star and the Four Star Managers used the mail, as defined by 18 U.S.C. § 1341, and interstate wires, as defined by 18 U.S.C. § 1343, to send numerous correspondence, including the Solicitation Representations and the Cash Flow Representation as described in Paragraphs 59 through 62 and Paragraph 66 above, for the purposes of defrauding, and obtaining money by false pretenses from the Four Star investors, including the Plaintiffs.    Said actions constitute unlawful mail fraud within the meaning of 18 U.S.C. § 1341 and unlawful wire fraud within the meaning of 18 U.S.C. § 1343.

(e)    Four Star, the Four Star Managers and Smith assisted in causing the transfers between Four Star Comerica Account and the Anson/Garrett Line of Credit as alleged in parts (a), (b), (c) and (d) of Paragraph 104 above, which allegations are incorporated herein by reference.    Said actions constitute unlawful wire fraud within the meaning of 18 U.S.C. § 1343.

(f)    At all material times herein alleged, Four Star and the Four Star Managers knowingly conducted financial transactions involving the proceeds of specified unlawful activity, namely, mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, knowing that the

monies involved in the financial transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of such specified unlawful activity. Said actions constitute Promotional Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

117.    Four Star's, the Four Star Managers' and Smith's continuous and repeated violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1956 constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

118.    Upon information and belief, Four Star's, the Four Star Managers' and Smith's violations of 18 U.S.C. § 1962(c) injured Plaintiffs.

119.    As alleged in Paragraphs 32 through 37 above, DEFENDANTS knowingly conspired, and substantially assisted and aided and abetted Four Star, the Four Star Managers and Smith in committing the violations of 18 U.S.C. § 1962(c) by enabling and facilitating Four Star's and the Four Star Managers' operation of the Banking Scheme. Said actions constitute a violation of 18 U.S.C. § 1962(d). DEFENDANTS' violations of 18 U.S.C. § 1962(d) injured Plaintiffs in that these acts aided, abetted, and perpetrated the Banking Scheme and the Four Star Enterprise.

120.    By reason of the foregoing, Plaintiffs have been, and will continue to be, injured in their business and property in an amount exceeding $50 million. Plaintiffs are entitled to damages according to proof, treble damages and litigation costs including attorneys' fees.

WHEREFORE, Plaintiffs pray judgments against DEFENDANTS as hereinafter set forth.

//

//

### SEVENTH CAUSE OF ACTION
### Civil Conspiracy
### (Against All Defendants)

121.    Plaintiffs hereby incorporate by reference and re-allege all of the allegations and specific causes of action 1 through 6 above contained in Paragraphs 1 though 120 above.

122.    Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned, each of the DEFENDANTS was the agent and/or employee of each of the remaining DEFENDANTS, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and/or employment, and that all DEFENDANTS acted at all times with the knowledge of the actions of each of the remaining DEFENDANTS.

123.    As more fully set forth above, Plaintiffs allege on information and belief that, during the Loss Period, DEFENDANTS, and each of them, knowingly and willfully conspired and agreed among themselves and with Four Star, the Four Star Managers and Smith, or in the alternative, later joined the ongoing conspiracy and fully ratified all material past actions and the purpose of the conspiracy and agreed, *inter alia*, as follows:

      (a)      To form the Four Star Enterprise for the purpose of assisting, facilitating and furthering the Banking Scheme as alleged above;

      (b)      To misappropriate and convert the monies invested by Plaintiffs in Four Star during the Loss Period;

      (c)      To defraud Plaintiffs of their investments and to breach duties owed to Plaintiffs;

      (d)      To derive other profits and benefits through the pattern of racketeering activity and other fraud alleged above.

124.    DEFENDANTS, and each of them, did the acts and things alleged above pursuant to, and in furtherance of, said conspiracy and the above-alleged agreement.

125.    As alleged in more detail above, each of the DEFENDANTS furthered the conspiracy by cooperating with, lending aid, money and encouragement to, and/or ratifying and adopting the acts of each of the other DEFENDANTS in enabling and facilitating the Banking Scheme.  Each of the DEFENDANTS had knowledge not only of the actions of each of the other DEFENDANTS in connection with the Banking Scheme, but also of the conspiracy itself and its unlawful and tortious purpose.  The last known act of the conspiracy is believed to have occurred no earlier than 2004 when Four Star informed the Bankruptcy Trustee that its only remaining funds held by COMERICA consisted of $82.00 in the Four Star Comerica Account.

126.    As a direct and proximate cause of said conspiracy and the wrongful acts alleged herein, Plaintiffs suffered economic damages in an amount exceeding $50 million.

127.    As a proximate result of DEFENDANTS' conduct, many of the Plaintiffs suffered severe emotional distress, including without limitation anxiety, nervousness, sleeplessness, humiliation, anguish, and physical distress.   As a result of such harm, such Plaintiffs have suffered such damages in an amount according to proof.

128.    DEFENDANTS' actions were malicious, fraudulent, oppressive, intended to injure Plaintiffs and/or in reckless disregard of Plaintiffs' rights.   Consequently, Plaintiffs are entitled to punitive damages.

129.    Several of the Plaintiffs are senior citizens and/or disabled persons as those terms are defined by California Civil Code § 3345.  Plaintiffs are informed and believe and thereon allege that one or more of the following are true: (a) when DEFENDANTS aided and abetted the unfair and/or deceptive acts of Four Star, the Four Star Managers and Smith as alleged above,

DEFENDANTS knew or should have known that said acts were directed to one or more senior citizen Plaintiffs and/or disabled Plaintiffs; (b) said acts by DEFENDANTS caused one or more of said senior citizen Plaintiffs or disabled Plaintiffs to suffer one or more of the following: (i) loss or encumbrance of a primary residence, principal employment, or source of income; (ii) substantial loss of property set aside for retirement, or for personal or family care and maintenance; or (iii) substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of said Plaintiffs; (c) one or more of said senior citizen Plaintiffs or disabled Plaintiffs were substantially more vulnerable than other members of the public to DEFENDANTS' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility or disability, and actually suffered substantial physical, emotional and/or economic damage. Accordingly, said senior citizen Plaintiffs and disabled Plaintiffs are entitled to all of the remedies of Civil Code § 3345 against each of the DEFENDANTS, including without limitation treble the amount of punitive damages to which said Plaintiffs would otherwise be entitled. In addition, said Plaintiffs are entitled to recover their attorneys' fees under California Welfare & Institutions Code § 15657.

WHEREFORE, Plaintiffs pray judgments against DEFENDANTS, and each of them, as follows:

(1)    For aiding and abetting breach of fiduciary duty, compensatory damages for economic loss in an amount to be proven at trial but believed to exceed $50 million, interest on that amount, including prejudgment interest, at the legal rate, compensatory damages for severe emotional and physical distress, and punitive damages pursuant to California Code of Civil Procedure § 3294, and, in addition, for those Plaintiffs who were senior citizens and/or disabled persons within the meaning of California Civil Code § 3345 at the time DEFENDANTS aided

1  and abetted unfair or deceptive acts of Anson, Garrett and Cohn in violation of their fiduciary

2  duties to said Plaintiffs, all remedies authorized under California Civil Code § 3345, including

3  without limitation treble the amount of punitive damages to which said Plaintiffs would otherwise

4
5  be entitled, and attorneys' fees under California Welfare & Institutions Code § 15657.

6       (2)    For aiding and abetting fraud, compensatory damages for economic loss in an

7  amount to be proven at trial but believed to exceed $50 million, interest on that amount, including

8  prejudgment interest, at the legal rate, compensatory damages for severe emotional and physical

9
10  distress, and punitive damages pursuant to California Code of Civil Procedure § 3294, and, in

11  addition, for those Plaintiffs who were senior citizens and/or disabled persons within the meaning

12  of California Civil Code § 3345 at the time DEFENDANTS aided and abetted fraudulent acts

13  against said Plaintiffs, all remedies authorized under California Civil Code § 3345, including

14  without limitation treble the amount of punitive damages to which said Plaintiffs would otherwise

15
16  be entitled, and attorneys' fees under California Welfare & Institutions Code § 15657.

17       (3)    For violation of California Business and Professions Code § 17200, all remedies

18  to which Plaintiffs are entitled under California Business and Professions Code § 17203, including

19  without limitation restitution, disgorgement, and penalties for each illegal, unfair and/or fraudulent

20  business act or practice, and attorneys' fees pursuant to California Code of Civil Procedure §

21
22  1021.5 and the Court's equitable powers, in an amount according to proof, and, in addition, for

23  those Plaintiffs who were senior citizens and/or disabled persons within the meaning of California

24  Civil Code § 3345 at the time of DEFENDANTS' unfair or deceptive acts against said Plaintiffs

25  in violation of California Business and Professions Code § 17200, all remedies authorized under

26  California Civil Code § 3345, including without limitation treble the amount of restitution or other

27
28

1   relief to which said Plaintiffs would otherwise be entitled under California Business & Professions

2   Code § 17203, and attorneys' fees under California Welfare & Institutions Code § 15657.

3           (4)     For aiding and abetting violation of California Business and Professions Code §

4
    17200, all remedies to which Plaintiffs are entitled under California Business and Professions
5
6   Code § 17203, including without limitation restitution, disgorgement, and penalties for each

7   illegal, unfair and/or fraudulent business act or practice, and attorneys' fees pursuant to California

8   Code of Civil Procedure § 1021.5 and the Court's equitable powers, in an amount according to

9
    proof, and, in addition, for those Plaintiffs who were senior citizens and/or disabled persons
10
11  within the meaning of California Civil Code § 3345 at the time DEFENDANTS aided and abetted

12  unfair or deceptive acts against said Plaintiffs in violation of California Business and Professions

13  Code § 17200, all remedies authorized under California Civil Code § 3345, including without

14
    limitation treble the amount of restitution or other relief to which said Plaintiffs would otherwise
15
16  be entitled under California Business & Professions Code § 17203, and attorneys' fees under

17  California Welfare & Institutions Code § 15657.

18          (5)     For violation of 18 U.S.C. § 1961 *et seq.* (RICO), compensatory damages in an

19  amount to be proven at trial but believed to exceed $50 million, trebling of those damages, interest

20
    on that amount, and attorneys' fees.
21
22          (6)     For civil conspiracy, economic damages in an amount to be proven at trial but

23  believed to exceed $50 million; interest on that amount, including prejudgment interest, at the

24  legal rate; compensatory damages for severe emotional and physical distress; and punitive

25  damages pursuant to California Code of Civil Procedure § 3294, and, in addition, for those

26
    Plaintiffs who were senior citizens and/or disabled persons within the meaning of California Civil
27
28  Code § 3345 at the time DEFENDANTS conspired to engage in unfair or deceptive acts against

1  said Plaintiffs, all remedies authorized under California Civil Code § 3345, including without

2  limitation treble the amount of punitive damages to which said Plaintiffs would otherwise be

3  entitled, and attorneys' fees under California Welfare & Institutions Code § 15657.

4         (7)     For costs of suit herein.

5

6         (8)     For an award to Plaintiffs of such other and further relief as this Court deems just

7  and proper.

8  **JURY DEMAND**

9     Pursuant to Fed. R. Civ. Proc. 38 the Plaintiffs hereby demand a jury.

10

11

12  DATED: July 20, 2009

13

14                         LAW OFFICE OF ROBERT LUBIN

15                         LAW OFFICE OF KENNETH PRITIKIN

16

17                         ROBERT LUBIN

18                         KENNETH PRITIKIN
                       JOSEPH CAMENZIND, IV

19                         Attorneys for the Plaintiffs.

20

21

22

23

24

25

26

27

28