**EXHIBIT 18**

# THE WALL STREET JO

© 2004 Dow Jones & Company. All Rights Reserved

**DOWJONES**  TUESDAY, JUNE 15, 2004 - VOL. CCXLIII NO. 116 - ★★★★

---

## Luxury Vehicle
### An 18% Return? It Sounded Good To Rich Investors

Four Star Did Pay Off Well For Years—Then Stopped; 'Factoring' Phone-Sex Bills

Talk of a Big Arbitrage Play

*By Robert Tomsho*

LOS ANGELES—Morton Turndorf's friends bragged for years about their investments in Four Star Financial Services. They told the 66-year-old retired apparel maker about annual returns of up to 18%, paid out in monthly checks.

Finally, Mr. Turndorf visited Four Star's offices in a pink granite high-rise on Wilshire Boulevard to hear for himself how the firm turned investments in 900-number operators, their unpaid receivables and other telecom ventures into steady profits. "They explained to me what they did and said everything was fine," recalls Mr. Turndorf, who invested $100,000 in July 2002.

A month later, he got his first income check from Four Star. It turned out to be his last.

Now Four Star faces liquidation by a federal bankruptcy court here. Its trustee warns that as much as two-thirds of the $200 million that 500 investors put into the company is gone. Federal prosecutors and the Federal Bureau of Investigation are in the early stages of looking into how that money was raised and what happened to it, say attorneys familiar with the matter. An attorney for two of the three founders of Four Star said he doesn't believe his clients are targets of the probe. As for the third founder, San Francisco attorney Mark Cohn, his lawyer said the U.S. attorney's office in Los Angeles "has made it pretty clear that that he is a target of this investigation."

For nearly a decade, Four Star and a predecessor company made promised payments to investors, and former employees and business associates say many of the early financing ventures were profitable. But lawyers who recently have dug through company records say they found few liquid assets and a tangle of interests in assets ranging from dubious Argentinean securities

## What's News—

### Business and Finance

**B**OEING WON one of the Pentagon's biggest contracts of the year, beating Lockheed in a competition to supply the Navy with the next generation of submarine-hunting jets. The MMA program is valued at an estimated $3.9 billion in the development phase but potentially could be valued at over $15 billion.
(Article on Page A3)

■ MGM Mirage's $4.8 billion bid for Mandalay is expected to win approval from both companies' boards today, in the gambling industry's biggest acquisition ever.
(Article on Page A6)

■ The Supreme Court ruled that foreign customers can't sue international companies in U.S. courts alleging antitrust violations.
(Article on Page A3)

■ The U.S. trade deficit grew to a record $48.3 billion in April. Retail sales rose at a 1.2% pace in May, reversing April's drop.
(Article on Page A2)

■ The number of U.S. millionaires

### World-Wide

■ BAGHDAD ATTACKERS HIT foreign workers, killing three from GE.
Two guards also were part of the toll of 13, including an American, two Britons and a Frenchman, who died in the car bombing. A crowd chanting anti-U.S. slogans cheered the assault and danced by a charred body. The U.S. freed hundreds more prisoners from Abu Ghraib. Britain announced four soldiers face charges of abuse. Blair tried to steady Labour nerves after an Iraq-driven local-election drubbing. Documents show how Guantanamo interrogation techniques came to infect Iraq. (Pages A3, A4)
*The U.S. renewed its call for Americans to depart Saudi Arabia. There were 35,000 before a recent wave of attacks started. A U.S. report questions Saudi seriousness on al Qaeda.*

■ The Supreme Court voted 8-0, with recusal by Scalia, to uphold keeping "under God" in the Pledge of Allegiance, but the ruling was based on a technicality. Justices punted on the larger church-state issue. With the court's term winding down, rulings in big cases such as the Cheney task force, Guantanamo rights and detentions without trial are due. (Page A4)

■ Two Palestinian militants died in a West Bank Israeli helicopter attack. Land expropriations for Israel's wall

## For These Educators The Diet of Worms Isn't Just History

Pressed to Raise Test Scores Principals Are Resortin To New Gross-Out Stun

*By Thaddeus Herrick*

EL PASO, Texas—Last winter, P pal Karla Onick issued a challenge t students at L.B. Johnson Elemen School. If each grade met its goal in a reading contest, she would eat worn

On May 21, Ms. Onick stood up i school cafeteria and ate two 8-inch crawlers sauteed with mushrooms ar ions. The children squealed. Then / tant Principal Alberto Reyes plucke worms from a jar and ate them raw

"I bit the first one and it squirt over my mouth," he says. "So the s time, I just swallowed."

As state and federal pressure in fies on public schools, outrageous a teachers and administrators are b ing increasingly popular motiva



### Buyer Beware

Significant events in the history of Four Star:

- **October 1991:** Launch of 900 Capital Services Inc.
- **April 1996:** Formation of Four Star Financial Services LLC.
- **January 2001:** Federal investigators question Four Star co-founder Mark Cohn about Baltimore telemarketing scam.
- **July 2001:** Four Star, Mr. Cohn and others indicted in Baltimore on multiple federal fraud and conspiracy counts.
- **Fall 2002:** Four Star stops making payments to investors.
- **June 2003:** Four Star and Mr. Cohn found guilty in Baltimore case.
- **October 2003:** Investors force Four Star into federal bankruptcy proceedings.

Source: WSJ research

to X-rated bedroom videotapes of actress Pamela Anderson. "You have to scrape around pretty deep to find any real value," says Martin Zohn, a Los Angeles lawyer who represents one group of investors.

Four Star's fall reflects a growing risk to affluent investors, who are increasingly putting their money into thinly regulated investments like hedge funds and private-equity offerings. About 44% of the 650,000 American households with a net worth of at least $5 million had such investments in 2003, up from 20% in 2001, according to Spectrem Group, a Chicago consulting firm.

The air of high risk that once surrounded such investments has dissipated as major financial concerns have begun marketing them. Meanwhile, at a time when interest rates are low and the stock market unpredictable, many people are looking for investments with

Please Turn to Page A11, Column 1

# Investment's Returns Were Too Good to Be True

*Continued From First Page*

higher returns.

Securities regulators say the complexity of many alternative investments makes due diligence tough for even a sophisticated investor. It also "provides the ocean that fraudsters can swim in and not stand out as curiously unbelievable," says Mark Knops, an assistant Arizona attorney general specializing in financial fraud.

Investors lost $1 billion in private placement bonds bought from National Century Financial Enterprises, an Ohio company that saw two executives plead guilty to fraud charges in Columbus last year. Venture capitalists and high-tech entrepreneurs were among the losers of $240 million invested with Reed E. Slatkin. He pleaded guilty in 2002 to federal fraud, conspiracy and money-laundering charges after using falsified financial statements to convince investors he was a successful investment adviser.

For years, Four Star portrayed itself as a thriving financial-services firm. It made loans to small businesses and tried to profit by collecting through phone companies on the unpaid receivables of 900-number firms that offered premium priced pay-per-call telephone access to everything from phone-sex operators to psychic hotlines.

Doctors, accountants and investment advisers put money into the closely held firm, as did the likes of Sir Arthur Gilbert, a Los Angeles philanthropist and art collector who died in 2001, and Donald Passman, an entertainment attorney who represented singer Mariah Carey and the rock band R.E.M. Mr. Passman, through a spokeswoman, declined to comment. He filed a lawsuit against Four Star in state court in California last year.

### In the Dark

Four Star's troubles began with a downturn of the 900-number industry in the late 1990s, which left the firm scrambling to keep payouts to investors flowing. As its difficulties worsened, investors largely were left in the dark, except for occasional letters promising a complex multinational "arbitrage" transaction that would save the company.

Four Star investors heard little about one venture until it was too late—a Baltimore telemarketing scheme financed by the company. Last year, Four Star and Mr. Cohn were convicted of fraud and conspiracy in a federal court in Baltimore for their roles in the scam, which bilked 27,000 consumers with weak credit out of $3.3 million by promising them a new credit card. Four Star's other two founders, Los Angeles accountants Ronald I. Anson and Jack R. Garrett, who weren't charged in that or any other case, have acknowledged in interviews and letters to investors that some investments on their books are at least partially fictitious.

All three Four Star founders deny any wrongdoing. In a telephone interview, Mr. Garrett, 51 years old, a former Deloitte & Touche tax specialist, says he and Mr. Anson relied on Mr. Cohn to find, manage and provide information about Four Star's investments. "He was the guy who did all the deals and we believed what he told us," says Mr. Garrett.

Mr. Cohn, in a phone interview before he recently began serving a 57-month prison sentence in the Baltimore case, acknowledged the company had made some bad deals. He also said his partners were apprised of the details of all major ventures and wrote the checks to fund them. "I did not control the money," said Mr. Cohn, 49, who has an economics degree from Stanford University and a law degree from the University of California, Davis.

The son of a wealthy San Francisco developer, Mr. Cohn played the role of a hard-charging entrepreneur, former employees and associates say. Around the office, he juggled multiple phone calls

### Four Star's factoring business was in trouble by the late 1990s.

and didn't hesitate to dress down subordinates. He favored luxury cars like Lexuses and Infinitis, though he often came to work wearing the same dark pants and old black leather jacket.

In the years after his father's death in the late 1970s, Mr. Cohn largely gave up his law practice to try to expand his family's holdings, which included a scattering of office, retail and hotel properties. Beginning in the late 1980s, local officials in Burlingame, Calif., and Phoenix complained publicly about delinquent tax and utility payments from Cohn-family-owned hotels. In 1991, a family-controlled partnership that owned a historic Tennessee hotel filed for bankruptcy-court protection in Chattanooga. Two years later, Mr. Cohn personally filed for bankruptcy-court protection in San Francisco.

Mr. Anson met Mr. Cohn through a mutual acquaintance in the 1960s. Mr. Anson says he was aware of some of Mr. Cohn's business setbacks but his own early investments with Mr. Cohn routinely paid off as promised. "The symphony sounded like the music that was written," says Mr. Anson, who is 61.

In 1991, the two accountants, who had formed a partnership, teamed up with Mr. Cohn on a new venture. Dubbed 900 Capital Services Inc., it aimed to provide financing to small businesses, primarily 900-number providers. Sometimes 900 Capital made them short-term loans with high interest rates. Other times, 900 Capital engaged in "factoring," deals in which it would buy a cash-hungry 900 company's accounts receivable for as little as 80 cents on the dollar. Then it would try to profit by recovering the receivables' full value through major phone carriers such as AT&T Corp. and MCI Inc., which actually billed and collected from consumers.

Former employees and associates say many early factoring deals were profitable. To raise capital for expansion, Messrs. Anson and Garrett invited accounting clients to lend money to 900 Capital. In return, the clients got notes bearing annual interest rates of up to 18%, payable in monthly installments.

There was no advertising to attract new investors, but 900 Capital offered commissions to outside investment workers who brought in more money. Meanwhile, early investors often boasted of their returns at dinners and more-casual gatherings at Mr. Anson's Country French-style mansion in the tony Brentwood Park section of Los Angeles.

A 1997 private-placement memo offered those who had lent money to 900 Capital a chance to trade in their notes for ownership units in a new company, Four Star Financial Services. The memo warned that the units weren't registered securities and that holders might lose all of their money.

Many investors say they relied on assurances from Four Star executives that their money was safe. Colin Gilbert, son of Sir Arthur, says Mr. Garrett served as his late father's accountant for years. "I was always informed by Mr. Garrett that, although the interest rate may fluctuate, principal would be sacrosanct," says Mr. Gilbert, a real-estate developer who is now suing Messrs. Anson, Garrett and Cohn, alleging fraud and negligence in a state court in Los Angeles.

Los Angeles investment adviser Ken Wideltz met Mr. Cohn in 1998. He says Mr. Cohn used a blackboard to give a polished explanation of Four Star's factoring business and showed him a computer system that seemed capable of tracking 900-number-company receivables by area code and past payment problems of individual callers. "It was, I thought, extremely sophisticated," says Mr. Wideltz, who encouraged 18 clients and several members of his own family to invest.

By then, Four Star had diversified far beyond factoring and loans. Around 1996, it paid about $2 million to acquire a 50% stake in Seattle-based Internet Entertainment Group, described in Four Star's financial statement for that year as "a corporation that provides entertainment via the Internet."

IEG was soon garnering coverage by publications including Time and The Wall Street Journal. Fronted by a brash young entrepreneur named Seth Warshavsky, IEG marketed adult fare, such as videos of actress Pamela Anderson having sex with her then-husband, Mötley Crüe drummer Tommy Lee.

In published interviews in the late 1990s, Mr. Warshavsky claimed as much as $50 million in annual revenue, but some former IEG employees say this was exaggerated and the company was heavily reliant on Four Star's financial help. "When IEG wanted to make payroll and people were screaming because there was no money in the payroll account, Seth had to pick up the phone and call Four Star," says Eric Blank, a former lawyer for IEG. Mr. Warshavsky, who is said by former associates to be living in Thailand, couldn't be reached for comment.

At its peak, IEG was yielding $500,000 a month in payments to Four Star, says Ronald Nessim, the accountants' lawyer. But, hit by lawsuits from creditors, ex-employees and others, IEG was out of business by 2002, leaving Four Star to defend itself in various lawsuits because it was one of IEG's major investors.

Four Star's factoring business was in trouble by the late 1990s. Consumer complaints about rip-offs by 900-number outfits had sparked stiffer regulation. Some phone companies canceled charges for those who complained, making it harder for companies like Four Star to collect on receivables.

### Mounting Legal Costs

Suzanne Tikkanen, Four Star's former senior vice president of finance, says that by 2000, the company was increasingly desperate to raise money to make monthly payments to investors and pay mounting legal costs. Ms. Tikkanen testified against the company and Mr. Cohn in the criminal trial in Baltimore. She is suing Four Star's founders, alleging harassment and breach of contract, in a state court in Redwood City, Calif.

Four Star's financial statement for 2000 showed $143 million in assets. In a Jan. 4, 2001, letter to investors, Mr. Garrett wrote of the company's "steady growth and profitability."

Three weeks later, Mr. Cohn was in the U.S. attorney's office in Baltimore, being questioned about a telemarketing scam Four Star had taken over from a borrower who'd fallen behind on a loan. For prices ranging up to $199.95, the business offered consumers with poor credit histories a package that was said to include a preapproved credit card. Consumers complained when, instead of a credit card, they got coupons, credit-card applications and other goods of little value, according to court records. On July 10, 2001, a federal grand jury in Baltimore indicted Four Star, Mr. Cohn and five others on multiple related counts of fraud and conspiracy in

connection with the scheme.

Four Star's investors heard little about the company's troubles. In a letter to them dated July 3, 2001, the company said it was the subject of a criminal investigation. But it didn't tell investors that it or Mr. Cohn had been indicted until after they were convicted, nearly two years later. Meanwhile, investor money continued to flow in. Mr. Anson and Mr. Garrett say Mr. Cohn assured them that he would prevail in court.

In the fall of 2002, with Mr. Cohn awaiting trial, Four Star stopped making monthly payments to investors. It told them its funds were temporarily tied up in a huge transaction involving what was said to be a highly profitable sale of assets.

In ensuing months, more letters told of a series of "arbitrage" transactions involving the purported purchase and resale of long-distance time. Investors who asked for details say they were told about transactions involving a Georgia broker, Saudi banks and certificates of deposit, purportedly valued at as much as $250 million. The CDs' release to Four Star, the company said, had been delayed by the failure of the Argentine bank that held them.

After a six-week trial last year, Mr. Cohn and Four Star were found guilty in Baltimore on 56 fraud and conspiracy charges. Mr. Cohn soon resigned from Four Star. He has appealed his conviction. Four Star was eventually hit with a $1 million criminal fine.

Facing pressure from investors who finally had been told about the convictions, Messrs. Anson and Garrett in July last year hired Stutman, Treister and Glatt, a Los Angeles law firm, to look into the long-delayed Argentine deal. In December, they sent investors a letter indicating that, based on their attorneys' investigation, they believed the Argentine transaction and certain related Four Star ventures to be "wholly or partially fictitious," adding that Mr. Cohn had been their source of information. "The fraud was on all of us," the accountants wrote.

In interviews and in letters to investors, Mr. Cohn has maintained that he was misled by lawyers and executives for other parties in those deals, and that the Argentine transaction wasn't big enough to cause all of Four Star's problems.

Richard Marshack, a bankruptcy trustee managing Four Star's assets, says he is investigating whether, in recent years, the company operated a Ponzi scheme, using money from new investors to pay existing ones. He estimates investors lost between $89 million and $134 million but says a precise calculation is still impossible, given the disarray of records and a lack of information from the founders.

Kurt Wolff, who is 78, hopes there is something left to salvage. The retired pastry chef married Mr. Cohn's widowed mother, Ethel, in 1992 and said in an interview he had about $1 million in his Four Star account when the company collapsed. Mr. Wolff says he and his wife are selling their sprawling Tudor mansion north of San Francisco, both to cut costs and to help finance an appeal of Mr. Cohn's conviction.

"My gut tells me some money will be coming," he said, as his wife cleared the patio to prepare for a real-estate photographer. "There has to be something there."

## Justices Limit Antitrust Scope

*Continued From Page A3*

hadn't addressed that argument in its ruling and so neither would the Supreme Court. In sending the case back to the appeals court for more work, Justice Breyer said the defendants "are free to ask the court of appeals to consider the claim."

Thomas Goldstein, the lawyer who argued the case at the Supreme Court on behalf of the plaintiffs, grasped that sentence as a victory. "We are quite pleased that the case now goes forward. Our principle argument is that you can't separate the harm done in this country from the harm done in other countries, and now we are going to get to prove that," he said.

The case centered around a 1982 Reagan-era law intended to help U.S. exporters by narrowing the reach of U.S. antitrust law. But in a ruling that surprised business interests, the appeals court interpreted the 1982 statute in a way that extended the reach of U.S. law. Justice Breyer concluded that the lower court's decision doesn't apply because the vitamin buyers' claim rested on harm that occurred overseas, independent of any harm felt in the U.S.

In a filing with the Supreme Court, a brief by the governments of Germany and Belgium warned that the court of appeals decision "will do grave harm to the antitrust enforcement efforts of the international community." Many such investigations rely on corporate informers who help antitrust enforcers make their case by providing evidence in exchange for amnesty.

But several foreign nations as well as the Justice Department warned it would be more difficult to persuade corporate snitches to talk, if they feared being hauled into U.S. courts in private lawsuits, despite their government's pledge of amnesty.

Peter Rubin, a constitutional law professor at Georgetown University Law Center who filed a friend-of-the-court brief on the vitamin buyers' side, offered a simple solution to would-be cartel members: "All they have to do is comply with each other and not collude, and everybody would be happy."

*—Marcela Rocha et al. contributed to this article.*

**EXHIBIT 19**

FILED

BOHM, FRANCIS, KEGEL & AGUILERA, LLP
James G. Bohm, Esq. (Bar No. 132430)
A. Eric Aguilera, Esq. (Bar No. 192390)
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
Telephone: (714) 384-6500
Fax: (714) 384-6501

04 SEP -1 PM 2: 36

Attorneys for Plaintiff

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA- LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. LA 03-37579 TD |
| | Chapter 7 |
| FOUR STAR FINANCIAL SERVICES, LLC., a corporate entity, | Adversary No. 04-02002 |
| | **FIRST AMENDED COMPLAINT FOR:** |
| Debtor. | |
| | 1. **BREACH OF FIDUCIARY DUTY OF CARE;** |
| RICHARD A. MARSHACK, Chapter 7 Trustee for Four Star Financial Services, LLC. | 2. **BREACH OF FIDUCIARY DUTY OF LOYALTY; AND** |
| | 3. **ACCOUNTING** |
| Plaintiff, | |
| vs. | Summons Issued _____ |
| RONALD I. ANSON, an individual, and JACK E. GARRETT, an individual, | Answer Date _____ |
| Defendants. | Hearing Date _____ at _____ |

1.  The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 151, 152 and 157, 11 U.S.C. §§ 323, 547, 549 and 550 and pursuant to the Order of Referral by the United States District Court in this District, General Order No. 266 dated October 9, 1984.

2.  The instant adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (K) and (O).

**ORIGINAL**

Bohm, Francis, Kegel & Aguilera, LLP
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
(714) 384-6500

1

FIRST AMENDED COMPLAINT

3. Venue properly lies in this judicial district in that this civil proceeding arises under Title 11 of the United States Code as provided for in 28 U.S.C. § 1409.

4. The adversary proceeding arises out of and is related to the Chapter 7 Bankruptcy case of In re Four Star Financial Services, Case No. LA 03-37579 TD commenced on October 24, 2003, currently pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division. By the filing of an involuntary case pay order entered March 18, 2004 the case was converted to one under Chapter 7.

## STATEMENT OF STANDING

5. Plaintiff, as Chapter 7 Trustee, has standing to bring this action pursuant to 11 U.S.C. §§ 323, 547, 549 and 550.

## THE PARTIES

6. Plaintiff is the duly appointed, qualified and acting Chapter 7 Trustee of the bankruptcy estate of Four Star Financial Services, LLC. ("FOUR STAR").

7. Defendant RONALD I. ANSON ("ANSON") and JACK E. GARRETT ("GARRETT") at all times herein mentioned were FOUR STAR corporate officers possessing discretionary and corporate management authority to act on behalf of and to bind FOUR STAR.

8. FOUR STAR incorporated on April 23, 1996 and began operating as an investment and financing company around September 24, 1996.

9. ANSON and GARRETT (hereinafter ANSON and GARRETT shall collectively be referred to as "DEFENDANTS" unless otherwise specified), collectively created and managed FOUR STAR at all relevant times herein alleged.

10. ANSON acted as FOUR STAR's Chief Financial Officer, and GARRETT as FOUR STAR's President.

## GENERAL ALLEGATIONS

11. DEFENDANTS, by way of their corporate officers' status owed FOUR STAR and its shareholders a fiduciary duty of care and loyalty.

12. Plaintiff is informed and believes DEFENDANTS breached said fiduciary duties by mismanaging corporate funds; failing to conduct diligent research of all material facts available to

them prior to engaging in a transaction on FOUR STAR's behalf and engaging in interested transactions.

13. As a result of DEFENDANTS' fiduciary breach, FOUR STAR's assets were depleted forcing FOUR STAR into an involuntary Chapter 7 bankruptcy.

14. During DEFENDANTS' mismanagement they authorized and/or ratified highly speculative investments including investments in Argentinean bank paper, South American leases in emerald mines, Teenage Mutant Ninja Turtles and Speed Racer animation art and others presently unknown to Plaintiff, without first conducting a diligent and prudent investigation as to all material facts available to them. Due to these investments, FOUR STAR suffered millions of dollars in losses.

15. DEFENDANTS also authorized and/or ratified, on FOUR STAR's behalf, various fraudulent arbitrage telecommunication investment schemes and investors suffered economic harm and FOUR STAR's reputation was tarnished.

16. In 1999 Mark Cohn ("COHN"), FOUR STAR's former Executive Vice-President and general counsel, authorized several large monetary distributions from FOUR STAR's capital to Joel Katz, a known FOUR STAR debtor, knowing that as of 1998 Joel Katz personally or through his corporate entities owed FOUR STAR approximately $6,000,000.00.

17. As a result of the 1999 cash advances Joel Katz utilized said funds to set up an elaborate telemarketing fraud scheme which COHN, using his FOUR STAR corporate authority, knowingly participated in.

18. COHN knew the telemarketing scheme was fraudulent and yet continued to participate in it and actively manage it, using FOUR STAR's corporate identity and capital.

19. In 2003, FOUR STAR and COHN were convicted in federal court of wire fraud, mail fraud and conspiracy in violation of 18 U.S.C. §371, in the case brought by the U.S. Attorney General's Office titled <u>United States of America v. Four Star Financial Services, LLC.</u>, filed in the United States District Court for the District of Maryland, Northern Division, Docket Number AMD-01-0374, due to the elaborate telemarketing scheme orchestrated and perpetuated by COHN in FOUR STAR's name. This elaborate fraudulent telemarketing scheme commenced in 1999 and

Bohm, Francis, Kegel & Aguilera, LLP
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
(714) 384-6500

continued through approximately 2001. As a consequence of the fraudulent telemarketing scheme millions of dollars were fraudulently debited from about 27,000 consumers' bank accounts resulting in losses to consumers believed to be in excess of $3,300,000.00.

20. Throughout the life of the fraudulent telemarketing scheme ANSON and GARRETT engaged in an unexcused pattern of inattention, tantamount to gross negligence, and failed to diligently and/or prudently investigate and/or monitor COHN's actions taken on FOUR STAR's behalf. Said gross inattention amounted to an abdication of their officers' fiduciary duties.

21. Due to their unexcused inattention and failure to investigate, thousands of consumers were defrauded by COHN in FOUR STAR's name and FOUR STAR was convicted of mail fraud, wire fraud and conspiracy.

22. DEFENDANTS' collective and/or individual failure to diligently and prudently investigate all matters engaged in on FOUR STAR's behalf, coupled with their inattention, and failure to monitor each other's actions with respect to FOUR STAR's assets or interests shows a clear and inexcusable pattern of reckless disregard of their fiduciary duties. As a result of said gross recklessness FOUR STAR suffered and will continue to suffer substantial monetary losses.

23. DEFENDANTS also breached their fiduciary duties of loyalty.

24. Plaintiff is informed and believes DEFENDANTS' approved for each other unreasonable, unjustified and excessive compensation, wasting FOUR STAR's capital.

25. DEFENDANTS also siphoned off large amounts of FOUR STAR's capital for their own personal use and advantage disguised as disbursements for management fees or expense reimbursements for services rendered by other corporations controlled by ANSON, GARRETT, and/or their respective family members.

26. FOUR STAR entered into a contractual relationship with Condor Investments, a California corporation, controlled by COHN and his family members. It is believed that Condor Investments received from FOUR STAR millions of dollars in expense reimbursements and management fees for purported services provided to FOUR STAR.

27. The fees provided to Condor Investments were unnecessary and excessive providing an unfair, unjustified and unreasonable profit and/or advantage to COHN and/or his respective

Bohm, Francis, Kegel & Aguilera, LLP
695 Town Center Drive, Ste 700
Costa Mesa, CA 92626
(714) 384-6500

family members, at FOUR STAR's expense.

28.  ANSON and GARRETT also entered into numerous contracts on FOUR STAR's behalf with various companies which they owned or held partnership interests in, including Garrett, Anson Investment Corporation and Anson, Garrett & Co. It is believed that between January 1, 2002 and January 26, 2003, Garrett, Anson Investment Corporation received from FOUR STAR two hundred eight-four thousand, six hundred fifty dollars ($284,650.00) in purported management fees and expense reimbursements which were unjustified and unreasonable, providing a personal advantage to ANSON and GARRETT at FOUR STAR's expense.

29.  DEFENDANTS collectively and individually were or should have been aware, in their ordinary course of performing their officers' duties, that the circumstances herein alleged created or would create a serious risk of injury to FOUR STAR and/or its shareholders. As a proximate result of breaching their fiduciary duties, FOUR STAR suffered and will continue to suffer damages.

### FIRST CAUSE OF ACTION FOR BREACH OF DUTY OF CARE

(By Plaintiff FOUR STAR Against Defendants ANSON and GARRETT).

30.  Plaintiff FOUR STAR incorporates by reference all allegations contained in paragraphs 1 through 29 of this Complaint as though fully set forth herein.

31.  Unless otherwise specified, for purposes of this cause of action "DEFENDANTS" shall mean and refer to ANSON and GARRETT.

32.  DEFENDANTS at all times herein mentioned, as FOUR STAR corporate officers, owed FOUR STAR and its shareholders a fiduciary duty of care.

33.  Plaintiff is informed and believes that DEFENDANTS breached their duty of care to FOUR STAR and/or its shareholders by failing to perform their corporate duties in good faith, in the best interest of the corporation and with the requisite degree of prudence and diligence that is required of corporate officers.

34.  DEFENDANTS breached their duty of care by, among other things, failing to diligently and/or prudently investigate questionable actions taken on behalf of or to the detriment of FOUR STAR and/or failing to properly inform themselves of all material information available to

Bohm, Francis, Kegel &
Aguilera, LLP
695 Town Center Drive, Ste. 700
Costa Mesa, CA 92626
(714) 384-6500

them prior to making a business decision on behalf of or affecting FOUR STAR.

35. DEFENDANTS entered into numerous highly speculative investment activities including but not limited to investments in Argentinean bank paper, South American leases in emerald mines, and Teenage Mutant Ninja Turtles and Speed Racer animation art, before conducting due diligence and researching all material information available to them and authorized and/or ratified various Ponzi like Arbitrage telecommunication investment schemes, knowingly making material misrepresentations to induce investors.

36. DEFENDANTS' willful failure to investigate and/or monitor COHN's fraudulent activities when he knowingly lent FOUR STAR's capital in 1999 to a known debtor, Joel Katz, who personally or through his corporations, had an outstanding debt owed to FOUR STAR of approximately $6,000,000.00, constitutes a reckless disregard of their fiduciary duties and an unexcused pattern of inattention amounting to an abdication of their officers' duties to FOUR STAR and/or its shareholders.

37. DEFENDANTS collectively and individually also failed to act in good faith and with FOUR STAR's best interests when they engaged in the interested transactions herein alleged utilizing FOUR STAR's assets. They personally proffered, at FOUR STAR's expense, from the contractual relationships they authorized and/or ratified, between FOUR STAR, and companies in which they held a partnership or ownership interest in.

38. DEFENDANTS had a fiduciary status and a duty to act with the utmost loyalty and fidelity with respect to FOUR STAR, which included a duty to protect, preserve and safeguard the rights of FOUR STAR and to commit no act which would harm FOUR STAR or its shareholders, but willfully failed to do so.

39. As a proximate result of DEFENDANTS' conduct, Plaintiff FOUR STAR has suffered, and will continue to suffer in the future, damages in amounts undetermined but subject to proof at time of trial.

40. In doing the acts herein alleged, DEFENDANTS acted with oppression, fraud and malice and with the deliberate intent to injure FOUR STAR, with both a conscious disregard and reckless indifference for FOUR STAR's rights. Specifically, at all times herein alleged,

DEFENDANTS were aware that their self-interested transactions and Cohn's fraudulent conduct, were siphoning away FOUR STAR assets, knowing that such assets were necessary for the continued operation of the business. This conscious depletion of FOUR STAR's assets, created an undercapitalization that DEFENDANTS knew would cause the company to be insolvent and force FOUR STAR into bankruptcy in the near future. Despite this knowledge, DEFENDANTS continued to take capital out of FOUR STAR for their personal gain above the interest of the company. This conscious disregard for FOUR STAR's rights and the rights of FOUR STAR's investors was done with malice. Accordingly, Plaintiff is entitled to punitive damages from DEFENDANTS in an amount sufficient to punish DEFENDANTS and to deter future conduct of this type.

## SECOND CAUSE OF ACTION FOR BREACH OF DUTY OF LOYALTY

(By Plaintiff FOUR STAR Against Defendants ANSON and GARRETT).

41. Plaintiff FOUR STAR incorporates by reference all allegations contained in paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42. Unless otherwise specified, for purposes of this cause of action "DEFENDANTS" shall mean and refer to ANSON and GARRETT.

43. Plaintiff is informed and believes DEFENDANTS, as FOUR STAR corporate officers, owed FOUR STAR and its shareholders a duty of loyalty.

44. DEFENDANTS breached said duty of loyalty by approving for themselves unreasonable and excessive compensation from FOUR STAR's corporate assets in excess of millions of dollars.

45. DEFENDANTS' further breached their duty of loyalty by siphoning off large amounts of FOUR STAR's capital for their own personal use and advantage, disguised as disbursements for fees or expense reimbursements for services rendered by other business entities controlled by DEFENDANTS and/or their respective family members.

46. As a result of these interested transactions, DEFENDANTS obtained personal gain at FOUR STAR's expense in breach of their fiduciary duty of loyalty.

47. In doing the acts herein alleged, DEFENDANTS acted with oppression, fraud and

malice and with the deliberate intent to injure FOUR STAR, with both a conscious disregard and reckless indifference for FOUR STAR's rights. Specifically, at all times herein alleged, DEFENDANTS were aware that their self-interested transactions and Cohn's fraudulent conduct, were siphoning away FOUR STAR assets, knowing that such assets were necessary for the continued operation of the business. This conscious depletion of FOUR STAR's assets, created an undercapitalization that DEFENDANTS knew would cause the company to be insolvent and force FOUR STAR into bankruptcy in the near future. Despite this knowledge, DEFENDANTS continued to take capital out of FOUR STAR for their personal gain above the interest of the company. This conscious disregard for FOUR STAR's rights and the rights of FOUR STAR's investors was done with malice. Accordingly, Plaintiff is entitled to punitive damages from DEFENDANTS in an amount sufficient to punish DEFENDANTS and to deter future conduct of this type.

48.   As a proximate result of DEFENDANTS' actions, FOUR STAR and its shareholders have suffered damages in an amount more according to proof at trial.

### THIRD CAUSE OF ACTION FOR ACCOUNTING

(By Plaintiff FOUR STAR Against Defendant COHN and

Does 1-100 inclusive),

49.   Plaintiff FOUR STAR incorporates by reference all allegations contained in paragraphs 1 through 48 of this Complaint as though fully set forth herein.

50.   DEFENDANTS as FOUR STAR's corporate officers have a duty by way of their fiduciary relationship to provide FOUR STAR an accounting of all transactions conducted on FOUR STAR's behalf.

51.   Plaintiff is informed and believes that DEFENDANTS' breached their fiduciary duties of care and loyalty by among other things misusing and wasting corporate assets; investing FOUR STAR's assets in speculative ventures without first conducting a diligent and prudent investigation of all material facts available; and engaging in interested transactions, at FOUR STAR's expense, with business enterprises in which they held an ownership interest in and/or managed. As a result of DEFENDANTS breaching their fiduciary duties, FOUR STAR suffered

substantial economic losses.

52. Richard A. Marshack, the duly appointed chapter 11 trustee, through his agents, has requested that ANSON, GARRETT and COHN provide an accounting of all the actions taken on FOUR STAR's behalf during their management. To date, DEFENDANTS' cooperation in achieving said accounting has been minimal.

53. Plaintiff is unaware of the extent of FOUR STAR's economic losses attributable to DEFENDANTS' mismanagement and waste. The economic losses can only be ascertained by a full accounting of all transactions taken on behalf of FOUR STAR from its incorporation through the present. DEFENDANTS, from incorporation through the Trustee's appointment, managed and were responsible for overseeing and monitoring FOUR STAR's activities. As such, they possess information and documentation that would enable Plaintiff to ascertain the economic losses it encountered by way of DEFENANTS' fiduciary breaches.

54. FOUR STAR thereby requests that DEFENDANTS be ordered to render an account of all activities, money transfers, loans, payments, compensation payments, withdrawals, deposits, fees, and investments performed on behalf of, or for FOUR STAR, between 1996 and the present in order to ascertain the exact losses FOUR STAR suffered.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff FOUR STAR FINANCIAL SERVICES, LLC. prays for judgment against Defendants ANSON and GARRETT:

### ON THE FIRST CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY OF CARE

1. For compensatory damages in an amount to be proven at trial;
2. For punitive damages in an amount sufficient to punish each Defendant and to deter future misconduct;
3. For consequential damages according to proof;
4. For incidental and special damages according to proof; and
5. For prejudgment interest.

## ON THE SECOND CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY OF LOYALTY

1. For compensatory damages in an amount to be proven at trial;
2. For punitive damages in an amount sufficient to punish each Defendant and to deter future misconduct;
3. For consequential damages according to proof;
4. For incidental and special damages according to proof; and
5. For prejudgment interest.

## ON THE THIRD CAUSE OF ACTION FOR ACCOUNTING

1. For a Court-ordered accounting for the purpose of determining and restoring to Plaintiff the proceeds that it has been improperly deprived of because of DEFENDANTS' fiduciary breaches;
2. For DEFENDANTS to have a judgment entered against them for whatever ever sum found due and owing to Plaintiff under the accounting.

## ON ALL CAUSES OF ACTIONS

1. For costs of suit herein incurred;
2. For interest at the legal rate from the dates more according to proof at the time of trial and
3. For such and other further relief as this Court deems just and proper.

Dated: August 31, 2004

BOHM, FRANCIS, KEGEL & AGUILERA, LLP
James G. Bohm
A. Eric Aguilera

By: _____
A. Eric Aguilera
Attorneys for Richard A. Marshack, Chapter 7 Trustee
for Four Star Financial Services, LLC

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the City of Costa Mesa, County of Orange, State of California. I am over the age of 18 years and not a party to the within action. My business address is 695 Town Center Drive, Ste. 700, Costa Mesa, CA 92626. On September 1, 2004 I served the documents named below on the parties in this action as follows:

DOCUMENT(S) SERVED: **FIRST AMENDED COMPLAINT FOR (1) BREACH OF FIDUCIARY DUTY OF CARE; (2) BREACH OF FIDUCIARY DUTY OF LOYALTY; AND (3) ACCOUNTING**

SERVED UPON: **SEE ATTACHED SERVICE LIST**

[X] (BY MAIL) I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Costa Mesa, California. I am readily familiar with the practice of Bohm, Francis, Kegel & Aguilera, LLP for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] (BY PERSONAL SERVICE) I delivered to an authorized courier or driver authorized by U.S. Delivery Systems to receive documents to be delivered on the same date. A proof of service signed by the authorized courier will be filed forthwith.

[ ] (BY FEDERAL EXPRESS) I am readily familiar with the practice of Bohm, Francis, Kegel & Aguilera, LLP for the collection and processing of correspondence for overnight delivery and known that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express for overnight delivery.

[ ] (BY FACSIMILE WHERE INDICATED) The above-referenced document was transmitted by facsimile transmission and the transmission was reported as complete and without error. Pursuant to C.R.C. 2009(I), I caused the transmitting facsimile machine to issue properly a transmission report, a copy of which is attached to this Declaration.

[ ] (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X] (FEDERAL) I declare that I am employed in the office of a member of the bar of this court, at whose direction this service was made.

Executed on September 1, 2004, at Costa Mesa, California.

Kym M. Smith

PROOF OF SERVICE

<u>Service List</u>
*In re Four Star Financial Services, LLC,*
*Case No. LA 03-37579 TD*
*Marshack v. Ronald Anson & Jack Garrett*
*Adversary Proceeding No. 04-02002*

| | |
|---|---|
| Arthur A. Greenberg, Esq.<br>Greenberg & Bass<br>16000 Ventura Boulevard, Ste. 1000<br>Encino, CA 91436<br>(818) 382-6200 tel | **Attorneys for Debtor,**<br>**FOUR STAR FINANCIAL SERVICES, LLC** |
| John K. Rubiner, Esq.<br>Bird, Marella, Boxer & Wolpert<br>1875 Century Park East, 23rd Floor<br>Los Angeles, CA 90067-2561<br>(310) 201-2100 tel | **Attorneys for Defendants,**<br>**RONALD I. ANSON and JACK E. GARRETT** |
| Office of the U.S. Trustee<br>Ernst & Young Plaza<br>725 South Figueroa Street, 26th Floor<br>Los Angeles, CA 90017 | **U.S. Trustee** |
| Richard A. Marshack, Esq.<br>26632 Towne Center Drive, Ste. 300<br>Foothill Ranch, CA 92610 | **Bankruptcy Trustee** |
| C. Brent Parker, Esq.<br>Spolin Silverman Cohen & Bartlett LLP<br>The Water Garden<br>1620 26th Street, Ste. 2000 North<br>Santa Monica, CA 90404 | **Attorneys for Defendants,**<br>**RONALD I. ANSON and JACK E. GARRETT** |