**EXHIBIT 20**

7 of 3

1   Alschuler Grossman Stein & Kahan LLP
    Michael J. Plonsker (No. 101235)
2   The Water Garden
    1620 26th Street
3   Fourth Floor, North Tower
    Santa Monica, CA 90404-4060
4   Telephone: 310-907-1000
    Facsimile: 310-907-2000
5
6   Attorneys for Plaintiffs
    MICHAEL J. PLONSKER, individually;
7   LISA PLONSKER, individually and as Trustee of the
    FAVERSHAM GRANDCHILDREN'S TRUST
8

FILED

DEC 19 2005

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY              Deputy Clerk

9              UNITED STATES BANKRUPTCY COURT

10      CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

11

12  In reply                              CASE NO. LA 03-37579 TD

13  FOUR STAR FINANCIAL SERVICES, LLC     Chapter 7 Case

14              Debtor.                   **DECLARATION OF MICHAEL J.**

15                                        **PLONSKER IN OPPOSITION TO**
                                          **MOTION OF TRUSTEE FOR**
16                                        **APPROVAL OF COMPROMISE OF**
                                          **CONTROVERSY; OBJECTIONS TO**
17                                        **DECLARATION OF RICHARD**
                                          **MARSHACK**
18

19                                        Hearing Date:   December 21, 2005
                                          Ctrm:           1345
20                                        Time:           1:00 p.m.

21

22

23

24

25

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

Declaration of Michael Plonsker

## DECLARATION OF MICHAEL PLONSKER

I, Michael J. Plonsker, declare as follows:

1.      I am an attorney at law licensed to practice before the Courts of the State of California and before this Court. I am a partner with the law firm of Alschuler Grossman Stein & Kahan LLP. I was an investor in 900 Capital Services and Four Star Financial Services, LLC and invested over $450,000, all of which was lost in Ron Anson's and others' so-called Ponzi scheme. I have personal knowledge of the matters stated herein, except where stated on information and belief, and if called as a witness, I would and could competently testify thereto.

2.      I submit this declaration in opposition to the motion of the Chapter 7 Trustee for Approval of Compromise of Controversy.

3.      Richard Marshack, the Chapter 7 Trustee, in his Declaration gives the following reasons in support of the proposed settlement with Ron Anson:

(a)     "Based on the ongoing analysis by my accountants of over a thousand boxes of books and records review of electronic data, depositions, and interview with various people associated with Debtor it appears that the Debtor [Four Star Financial Services, LLC] operated a Ponzi scheme and that there may be investor loss of more than $100,000,000;" Marshack Decl.; ¶3.

(b)     "Since my appointment, my counsel and I have met with Mr. Anson on a number of different occasions, both formally and informally, in order to obtain Mr. Anson's assistance in the administration of this estate in the investigation of the Debtor's financial affairs. Based on the investigation of the Debtor's books and records, the reviewed documents obtained from third parties, and meetings and depositions with a number of parties, including with Mr. Anson, as of the date of this declaration and based on this information, I believe that although Mr. Anson was grossly negligent in his role as a managing member of the Debtor, there is no evidence to prove that he knowingly engaged in fraudulent conduct or intentionally deceived any of the investors of their money." Marshack Decl., ¶5.

(c)     "Moreover, Ronald Anson and his wife have made extensive disclosures about their personal financial affairs in order to enable my professionals and I to make an

Declaration of Michael Plonsker

1  informed decision about the collectability of any money judgment that may be obtained against

2  them. Were I to pursue a pursuit of breach of fiduciary duty case against Mr. Anson to judgment,

3  I believe that the damages would be roughly equal to the investor loss cost by the lapses in duty."

4  Marshack Decl., ¶5.

5        (d)    "As a result of these meetings and the ongoing investigation into the assets

6  that are subject of this settlement, I have determined that proceeding with this settlement now is

7  in the best interest of the estate and that the estate's only hope of realizing any value from the

8  litigation against Mr. Anson. This is because several other creditors have long ago obtained

9  judgments against Mr. Anson in unrelated matters and have begun taking actions to enforce their

10  judgments against Mr. Anson and his assets. If we are to proceed to judgment against Mr. Anson,

11  the priority of any judgment would be subordinate to the liens of these creditors and would, as a

12  practical matter, render any judgment in favor of the estate, uncollectible." Marshack Decl., ¶6.

13        (e)    "Under the unique circumstances described above, I believe that the

14  settlement would be in the best interest of the estate because it provides the only hope that the

15  estate will realize any value from its claims against the Ansons, although this recovery is not

16  guaranteed because the assets that were transferred under the Agreement may be subject to a

17  charging order and/or a judgment debtor examination lien. Although I believe that it is more

18  likely than not that the estate would prevail on each of the three adversary proceedings,

19  particularly in the proceeding that alleges that Mr. Anson breached his fiduciary duties, collection

20  of any ensuing judgment would be fruitless because of the judgment creditors that would be

21  ahead in priority to any judgment liens held by the Debtors' Bankruptcy Estate." Marshack

22  Decl., ¶7.

23        (f)    "After investigating the Ansons' financial condition, I believe that the

24  assets being transferred are the only potentially unencumbered assets or valuable assets that the

25  Ansons have left, and I do not believe that a judgment of any size would yield an equal return,

26  much less a greater one. In addition, the settlement would spare the estate the further costs of

27  proceeding to judgment with the claims against the Ansons. Although it is possible that the assets

28  may ultimately be determined to be encumbered by a charging order or judgment debtor

-2-        Declaration of Michael Plonsker

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

1    (a)    On June 26, 1996 I received a letter from, among others, Mr. Anson. In it,

2    he makes representations about the nature of my investments (the long distance market and

3    smaller positions in the pay per call industry) and that "the most important factor contributing to

4    the successful increase has been our ability to properly and accurately assess the collectability of

5    large pools of accounts receivable." We now know this is not true. See Exhibit A, pg. 13.

6    (b)    In September 2002, I received a letter from Mr. Anson and Mr. Garrett. In

7    it, they state "specifically, we have shifted our investment focus from traditional long-term

8    factoring arrangements to shorter-term loans and investments which include what we have often

9    referred to as 'arbitrage' transactions. We believe that we have been quite successful in this

10    endeavor and we have not only been able to reduce the risk of the portfolio, but we have been

11    able to generate higher yields than previously achieved." We now know that this is not true. We

12    also now know that the transaction that is referred to in the letter has been reported to be a sham.

13    Mr. Anson even went so far as to say "we anticipate distributing a more significant profit

14    allocation to Four Star members than we have in the past." No money was ever distributed. See

15    Exhibit A, pg. 12.

16    (c)    On October 29, 2002, I received another letter from Mr. Anson and Mr.

17    Garrett. Again they talk about the so-called "Argentinean transaction" and make many

18    representations relating to the status and that investors would receive back their money. We now

19    know that the investors received nothing. See Exhibit A, pg. 13.

20    (d)    On December 20, 2002, I had a conversation with Jack Garrett. He advised

21    me that the "Argentinean transaction" was moving along. He was hopeful that it would close in

22    January and that I should have no worries. He even explained to me that if the transaction did not

23    close, Four Star would get its contracts back and that the investors would, at the very least, get

24    their principle back. See Exhibit A, pg. 16.

25    (e)    On January 6, 2003, I spoke to Jack Garrett. He told me the deal was going

26    to close in the first quarter, that money was in escrow and therefore, even if the deal didn't go

27    forward, we would get our money back. See Exhibit A, pg. 17.

28

1    (f)    I spoke to Jack Garrett on January 7, 2003. He said that the holdup in

2    closing the deal was that they needed approval in the United Kingdom and that Weil Gotshal

3    represented Four Star. He told me that the buyer had $40 billion in the bank. He told me that

4    there was collateral behind the deal and, therefore, there was nothing to worry about. See Exhibit

5    A, pg. 18.

6    (g)    On February 5, 2005, I spoke to Mr. Garrett. He told me the deal was

7    getting closer to closing. He said that something had not been done correctly and it had not been

8    cured. He again told me that my principle was not at risk and that Four Star's assets exceed the

9    principle. See Exhibit A, pg. 19.

10    (h)    On February 10, 2003, I spoke to Jack Garrett. He advised me that the

11    "arbitrage" deals were in telephone transactions. He told me that they sold the "arbitrage"

12    contacts" in Argentina and he said that there was no risk. He told me that the holdup was that the

13    buyer had put up cash collateral with an Argentinean bank and that the banks were shut down.

14    See Exhibit A, pg. 20.

15    (i)    On February 25, 2003, I had a conversation with Jack Garrett. Mr. Garrett

16    told me specifics about the "Argentinean transaction" which has now been reported to be a scam.

17    He said no one had ever done a transaction like this, that the attorney for the bank had gotten the

18    wrong insurance and that was the holdup, that now there was a new insurance policy waiting for

19    the Central Bank to accept and that Four Star was now going to profit. He further said that the

20    Argentinean contracts were throwing off cash flow. He further told me that my money was not at

21    risk and my money was still guaranteed. See Exhibit A, pg. 23.

22    (j)    In March 2003, I was of the opinion that I should not be required to pay

23    Anson & Garrett for accounting services in the amount of $2,400 in light of the fact that I had

24    over $450,000 (over $500,000 including unpaid interest) due to me from Four Star, Mr. Anson

25    and Mr. Garrett). Mr. Garrett made representations to me that the money was "almost" 100%

26    sure to be returned with interest. Accordingly, based upon this representation and Mr. Anson's

27    overbearing and threatening emails, I decided to pay the $2,400. See Exhibit A, pgs. 24-25, 29

28

-5-        Declaration of Michael Plonsker

1          (k)    On March 24, 2003, Mr. Anson told me that I would get my money back,

2    that the income stream in connection with the non-existent Argentinean transaction was to go to a

3    bank in the United Kingdom and the buyer had put up four times the collateral to secure the loan.

4    Mr. Anson said that selling Four Star's assets were done because it was "the right thing to do."

5    He said even if the Argentinean transaction did not go through, Four Star could rescind the

6    transaction and get all the money back. He said he had no doubt that I was going to get paid

7    back. See Exhibit A, pg. 26.

8          (l)    On March 25, 2003, Mr. Anson discussed information about the non-

9    existent Argentinean transaction. See Exhibit A, pg. 28.

10          (m)    On April 7, 2003 I received an email from Kenneth Pritikin, Four Star's

11    attorney, after Mr. Anson and Mr. Garrett represented to me that recoupment of my investment

12    would only be delayed. Mr. Pritikin advised me that he had "checked with Ron" and that I was

13    among the group of investors, like my mother, who did not receive distributions of interest

14    through September 1st. If that is true, then you will probably be getting some money out of the

15    $4.7 million loan, which is what you presumably were told." To my understanding, there was no

16    $4.7 million loan. I never received any money on return of my investment. See Exhibit A, pgs.

17    31-32.

18        8.    In March 2003, Mr. Anson told me that I should contact Four Star's attorney, Ken

19    Pritikin. Ultimately, I received copies of Mr. Pritikin's files and, attached hereto as Exhibit B are

20    true and correct copies of some of the documents that I received. These documents (primarily

21    emails) demonstrate Mr. Anson had significant knowledge of the transactions between the parties

22    and was providing his input regarding what message should be given to the investors. It is

23    inconceivable that Mr. Anson did not intentionally deceive any of the investors based upon the

24    knowledge that he clearly had.

25        9.    As a result of Mr. Anson's and his cohorts' actions, I filed a Complaint in the Los

26    Angeles Superior Court seeking recovery of my damages from Mr. Anson, Mr. Garrett and Mr.

27    Cohn. A true and correct copy of the Complaint is attached hereto as Exhibit B. Other investors

28    have also filed suit individually and as members of a class action. The cases have been

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

1    consolidated before Judge Anthony Mohr. We have not yet had an opportunity to depose Mr.

2    Anson, Mr. Garrett or Mr. Cohn or to present our evidence to the Court to establish to the Court

3    to establish liability. It would be unjust and unfair for the Court to approve a settlement with Mr.

4    Anson – that without an evidentiary hearing or a submission or any evidence whatsoever – that

5    "concludes" that Mr. Anson was just "grossly negligent."

6          10.    In 2002 and early 2003, Mr. Anson and Mr. Garrett both advised me that the return

7    of my investment might be delayed. Both Mr. Anson and Mr. Garrett repeatedly insisted in

8    discussions about the delay that the investments were safe and guaranteed and that I and the other

9    investors would receive all of our money back. In June 2003, I discovered by looking on the

10   Internet that Mr. Cohn and Four Star had been convicted in Maryland of fraud. Mr. Anson and

11   Mr. Garrett then retained lawyers and became much less communicative about what was

12   transpiring. Ultimately, Four Star was forced into bankruptcy and the alleged Ponzi scheme was

13   exposed. It is clear that Mr. Anson and Mr. Garrett made these representations to induce me and

14   other investors to delay pursuing claims against them.

15         11.    I also was a participant in a number of settlement discussions with Mr. Anson and

16   Mr. Garrett after the scheme was exposed. The Trustee or his attorneys were only present for

17   some of these discussions. It is unclear to me at this point whether I am at liberty to disclose to

18   those not present during the discussions what occurred during the discussions due to certain

19   statements regarding confidentiality. However, it is surprising to me that the Trustee could

20   conclude that Mr. Anson was really assisting in the investigation since the nature of his assets and

21   liabilities has changed each time we have spoken and Mr. Anson has been very verbal about his

22   motivations in these discussions: "I will do anything to keep myself out of the "greybar hotel".

23   Mr. Anson obviously has a great self interest in protecting "his" assets and in keeping himself out

24   of jail.

25         12.    I have known that Mr. Anson for many years and I do not believe that he has been

26   forthright, despite his protestations to the contrary. For example, the questions that still remain

27   include: Where did the money go? What money went to Mr. Anson's children? What money

28   went to his relatives? What money did he transfer into trusts or one of the approximate 50-70

                                                    -7-         Declaration of Michael Plonsker

1  entities in which he is somehow involved (see Exhibit C which is a true and correct copy of a

2  printout from the Secretary of State listing some of such entities). What exact knowledge did Mr.

3  Anson have? How is it that he could not have known that this was a Ponzi scheme? Was it not

4  Mr. Anson and Mr. Garrett and Mr. Cohen that collected the money? Was it not Mr. Anson that

5  made decisions about how the money would be utilized? See, for example, the email exchange (a

6  true and correct copy of which is attached hereto as Exhibit D) in which Mr. Anson directed that

7  money received from one investor would be paid to another investor. Is this only evidence of, as

8  the Trustee has concluded, "gross negligence?" Or does this demonstrate - since there is no other

9  conclusion - that Mr. Anson was complicit and participated in the alleged Ponzi scheme? On

10  what does the Trustee base his conclusion that it "appears" that Mr. Anson has no other assets of

11  any material value than the Red Mustang Limited Partnership and a hotel in Phoenix? Where is

12  the evidence? Under what circumstances did Mr. Anson settle with his very good friend, Jerry

1    15.    To my knowledge, the Ansons continue to live in their luxurious home in Del Mar,

2  California.

3    I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.

5    Executed this 16 day of _____ 2005, at

6

7

8    Michael A. Plonsker

9  866425_4.DOC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

-9-    Declaration of Michael Plonsker



RECEIVED

JUN 2 8 1996

LAVELY & SINGER

June 26, 1996

Mr. Michael Plonsker
Lavely and Singer
2049 Century Park East, Suite 2400
Los Angeles, CA 90067

Dear Michael:

Over the past five years, our business has expanded from a base of $300,000 to approximately $56 million. The most important constant factor contributing to this successful increase has been our ability to properly and accurately assess the collectibility of large pools of accounts receivable.

Based on the overall costs of operations, and the costs of our funds, we have had to insist on receiving yields in excess of 30% per annum. Because of these requirements, we have had to limit our entry into vast amounts of lower yielding markets of accounts receivable. These yields are between 15% and 25% per annum.

Because of the size and amount of our investor base, we have been advised by our counsel to transfer or convert 900 Capital Services, Inc. operating business into an entity more suitable to everyone's' medium and long-term objectives; specifically into an entity known as a "Limited Liability Company". These entities, which combine the liability protection of a corporation, with the favorable tax treatments of a partnership, are creations of each state, and have recently been approved by the State of California. This entity will allow us to methodically grow and provide our investors with maximum returns, without the negativity of double taxation found in corporations.

We have recently formed a new entity called "Four Star Financial Services, LLC". Four Star has applied for a commercial finance license similar to that of 900 Capital Services, Inc. When the licensing is complete, we will offer all investors newly created "membership units" in the LLC in exchange for their current debt instruments of 900 Capital Services, Inc. This will be done by way of a formal offer, which each investor can elect to accept or reject.

One of the features of the new entity, will be potential increased yields to the investors. The offer contained with the investment in Four Star will be that the total investor base receive a combination of (1) their current rate of interest, plus (2) 1% of net distributable cash up to $10 million, plus (3) 10% of distributable cash over $10 million. The current distributable cash of 900 Capital Services, Inc., is approximately $4.5 million. We anticipate that this number will grow significantly over the next few months.

In terms of our short term business plan, we have been working toward making our investment portfolio more diversified. We have been looking at having more significant investments in the currently growing "long-distance" market, and smaller positions in the pay-per-call industry. We have, so far, accumulated approximately $15 million of accounts receivable positions supported by long-distance paper. While our yields on these positions are good, most of the yields in the long-distance industry are less than 20% per annum. However, the potential market volume is unlimited. Obviously, if we are to receive lower yields, it is necessary for us to explore new avenues of borrowings below our current cost of funds.

Exh A

10

900 CAPITAL SERVICES, INC.

We recently began meetings with CS First Boston Company. They have recently spent several days at the offices of 900 Capital Services, Inc. doing due diligence with regard to our current systems and investments. We are very pleased to report to you that their conclusions are very favorable, and they shared our views as to the long-term potential of the long-distance market. They have accordingly, offered to provide 900 Capital Services, Inc., and subsequently, Four Star Financial, LLC., a debt facility commencing at $40 million and graduating to approximately $200 million within a twelve to eighteen month period. The cost of the loan will be four points on the first $40 million and one point above that, and interest at 350 basis points over the libor index for long-distance receivables, and three points over the prime rate for other receivables and investments. First Boston's objective is to find a major source for the origination and servicing of telecommunications paper.

In terms of cost of funds and operations, there are significant economies of scale. Notwithstanding the creation of a senior debt instrument, we believe that the expansion currently focused on the long-distance market place will result in greater security for all of our investors. The long-distance market is very stable and easier to verify than the more complicated pay-per-call market. Furthermore, our positions will become more diversified in terms of customers. These factors would, in our opinion, increase the overall safety and stability of the company. In addition, the availability of less expensive funds will also make the increase in yields to the investors more easily attainable.

It is likely that at some point in the next two to four months, you will be asked to sign a new agreement acknowledging and subordinating to the positions of First Boston. In the meantime, we will be pleased to answer any questions and provide you with an updated status. Jack Garrett will be on vacation until the middle of July, so if you have any questions in the meantime, please direct them to Ron Anson.

If any investor is not in full agreement with the discussed financing arrangements, then at the time that the financing is funded, we would be prepared to fully repay that investor his principal plus any accrued interest.

We hope that you view these developments as positively as we do, as we now feel these new opportunities will permit us to grow and therefore share more of the company's income with the investors.

Very truly yours,

Jack Garrett, President          Ronald I. Anson, CFO          Mark Cohn, Counsel

11

**FOUR STAR** Financial Services, LLC

9|02

11755 Wilshire Boulevard, Suite 1350
Los Angeles, CA 90025-1506
Tel: 310.477.5252  Fax: 310.312.3305

Dear Four Star Investor:

As many of you know, over the past few years we have made a concerted effort to reduce the overall risk of the Four Star portfolio. Specifically, we have shifted our investment focus from traditional long-term factoring arrangements to shorter-term loans and investments which include what we have often referred to as "arbitrage" transactions. We believe we have been quite successful in this endeavor in that we have not only been able to reduce the risk of the portfolio, but we have been able to generate higher yields than previously achieved.

Our unique ability to form complex arbitrage transactions has not gone unnoticed. In this regard, we are very pleased to announce that we have recently concluded contractual negotiations resulting in the sale of approximately $100 million of the $240 million Four Star asset base for a significant premium. This transaction with a large financial institution is subject to a very strict Non-Disclosure Agreement (NDA) and therefore limits the amount of detail we can present at this time. However, we can share the following highlights with you:

- The completion of the transaction is slated for the end of 2002/early in 2003;
- As part of the transaction, it is a requirement that the majority of Four Star cashflow be set aside and placed in escrow until it closes.
- We anticipate that monthly distributions will continue materially uninterrupted. However, excess funds (i.e. principal payments) may be unavailable until the transaction closes.
- The closing of the transaction will materially enhance the overall liquidity of Four Star.
- We intend to distribute back to investors a portion of their original investment.

As a result of the sale, we anticipate distributing a more significant profit allocation to Four Star members than we have in the past. We also believe that once the transaction closes the enhanced liquidity position will provide Four Star greater flexibility to take advantage of future opportunities.

In the meantime, it is business as usual.

Should you have any questions, please feel free to give Steve Wade a call at 310-477-5252.

Sincerely,

Ron Anson & Jack Garrett

12



**FOUR STAR** Financial Services, LLC

11755 Wilshire Boulevard, Suite 1350
Los Angeles, CA 90025-1506
Tel: 310.477.5252  Fax: 310.312.3305

October 29, 2002

Dear Four Star Investor:

We recently sent you a letter in mid-September announcing Four Star's plan to sell approximately $100 million of it's portfolio at a significant premium to asset cost. This transaction is still subject to a strict Non-Disclosure Agreement. The purpose of this letter is to further update you as to the progress. The following is the most current information we are allowed to share.

The transaction, which was initiated early this year with a large public financial institution, has taken longer then we originally expected primarily due to the red tape of dealing with large bureaucracies. We still anticipate its completion by year-end or first quarter 2003. The funding of the transaction should, in the medium term, provide for greater liquidity to Four Star. The negative component of the deal was that during a period of time, it would likely impact the cashflow of the Company.

It should be noted that our position has at all times been very well secured. The $100 million in assets that Four Star sold were exchanged for collateral in the form of government securities that have a value significantly greater than the value of our position. For reasons that are out of our Company's control, the government securities we received require a rather lengthy registration and holder approval process in order to become freely transferable. We will soon be in a position to liquidate a portion of the instruments.

As you know, the Company has a practice of making distributions to its unit and note holders who have requested it on a monthly basis. Making those distributions has become more difficult of late as a result of the limitations placed on our cash receipts. With this in mind, please note that it is possible that the timing of payments may be delayed, the amounts reduced or even completely interrupted during this period until the closing of all aspects of this transaction. The Company intends to make up for any missed or reduced payments immediately upon the full closing of the transaction.

Those of you who have been reinvesting your interest will continue to receive monthly statements. For all other investors, if at any time a payment is reduced or delayed the Company will send you a monthly statement showing the current balance.

We are very proud that Four Star and 900 Capital Services before it have been able to maintain an outstanding record of making high yield payments to our investors for nearly twelve years. We are confident that the decision we have made, which may require some interim sacrifice on behalf of our investors over the short term, will benefit the company financially and help us secure our ability to service your goals over the long term.

13


FOUR STAR FINANCIAL SERVICES, LLC

October 29, 2002
Page 2 of 2


We apologize in advance for any inconvenience this may temporarily cause. Should you have any questions, please feel free to give Steve Wade a call at 310-477-5252.

Thank you for your patience.

Sincerely,


Jack Garrett & Ron Anson

14



**FOUR STAR** Financial Services, LLC

11755 Wilshire Boulevard, Suite 1350
Los Angeles, CA 90025-1506
Tel: 310.477.5252  Fax: 310.312.3305

Rec'd
12/26/02

December 20, 2002

Dear Four Star Investor:

This letter will provide a further update regarding your Four Star investment.

In recent correspondence, we advised you of a large transaction which we has been pending. This transaction is proceeding much slower than originally anticipated; however, it is moving in a forward direction toward closing. We still anticipate that the final closing should be within the first quarter of 2003.   As has been previously mentioned, it is anticipated that there will be significant investor pay downs at that time.

With regard to other aspects of the portfolio, we are pleased to report that there has been significant progress. Specifically, other Four Star investments are beginning to produce increases in cash flows. However, it will take sometime to build up a cash surplus for the company, at which time distributions will recommence.

Four Star also continues to see positive development in many of the other opportunities it has invested in.   These include companies such as Gateway Credit, a company in which Four Star has controlling interest, which provides automobile financing. Gateway has begun to produce income and is currently in discussions with a public company to sell the company outright at a significant premium.

Four Star also has a sizable investment in *Direct One*.  This is a successful telephone reseller, which has entered into several joint ventures over the past year that has positioned the company to earn upwards of $10 million next year.  Four Star has been a secured lender for several years.  In addition to receiving all principal and interest payments from Direct One, Four Star has exercised its option and has acquired 40% of the company.

We are confident that the restructuring of the portfolio, which will require some interim sacrifice on behalf of our investors over the short term, will benefit the company financially and help us secure our ability to service your goals over the long term.

Should you have any questions, please feel free to give Steve Wade a call at 310-477-5252.

Have a healthy and safe New Year.

Sincerely,

Steve Wade
Vice President

15

12/20/02
Jack

4☆ = trans moving along
= meeting today!
— hopeful in January

— NO worries —

- if doesn't close get contracts back
- testg new deal + then
        want to buy it also —

— will at least get principle
        back

— 70% cash assets
- 30% other assets — still own
- arbitrage — prin pd ioned + then earnings
        — don't need to request.
- 18% → 13% | The catch up on % + the pm

16

1/6/03
Jack

for first quarter —

$ into escrow — therefore even if
deal doesn't go forward we get $ back —

1/7/85

Jack

need approval — UK
+ hold

[ Weil Gotshal in UK ]

Buyer — 40 billion bank
collateral behind deal.
= $
— other collateral —

18

2/5/03

Garrett

Deal getting closer — Something not done correct + says cured
Hopefully done soon — attrip hoping this week — next week
Investments   2/3 arbitrage — should have info
get back right away —

↳ bulk of what being sold
This is first money to be pd back

Prin Not at risk — [continuation]
Assets exceed principal   Arbitrage, in companies,
phone companies

Not less likely get $ if elect later to get $

[Ltd partnership — get me agreement ⓚ]

19

2/10/03
Jack

Call pick up at
end of week

- Arbitrage — in tel deals — confirmed
- Sold arb contracts in Argentina —
    - because in long run more $
    - I said I didn't understand
- Any risk? NOT on arbitrage
- Hold up? Buyer put up cash collateral CD
    w/ Argentina Bk —
    - Banks then shut down

Scotia Bk
then sold to
another bank

Gov't Now says deposits have to be
converted to bond —
- tradeable — collateral double on
open market —

Arbitrage . $ → used to buy phone time
→ all off shore w/ South Amer camp

Ken Pintican ind atty - verify call    Urgent Rosenthal

— if falls apart, get contracts &
$ in escrow —

   — Jack doesn't know what ~ escrow
     — more concerned w/ closing deal —
     — escrow ~ Argentina w/ Bho
     Frances —
     — bought Scotia —

   — Non disclosure —
     — I can see docs if sign

Ken Pritican —
    PRITIKIN —

NO pornography anymore

— 18% $ not ~ Argentina —
   — most of cash flow from arbitrage
   — tied up in companies & comp growing —
   — all investments made thru Y&&
   — this is how it worked internally —
   — — never asked —

21



2/13/08
Steve Wade )

- Arbitrage being pd off no matter what
Got letters —

Pd end of quarter
— just jttz bonds done —
— Not alot of letters re 18%

2/25/03
Jack Garrett — Ron said ins. comp is AIG.

I said never told us that getting us into deal like this
agreement re Argentine deal —

— get copies in LA — has cover contract not agreement
— says docs up North + doesn't have copies
— he will send non-disc. + then get me ogn.

— Buyer put up cash collateral — CD's
have value —
— insurance policy issued, but

— NO one ever did trans. like the the
— atty for bank got wrong ins. + that has
fixed up
— Now new ins. policy waiting for Central bk to
accept —
Who has ownership of contract? He will check. He thinks so, but
Cohen not going to profit — No diff agenda — Ken said contract already ??

contracts throws off cash flow, but needed to unwind

$ Not at risk — Jack and $ still guaranteed —
wants assets fd — I said as soon as paid — party he
check re take

23

**Michael Plonsker**

| | |
|---|---|
| **From:** | Michael Plonsker |
| **Sent:** | Friday, March 21, 2003 4:03 PM |
| **To:** | 'Ron Anson' |
| **Cc:** | Jack Garrett (E-mail) |
| **Subject:** | RE: PLSE SEE BELOW |

Ron:

Jack obviously did not relate our entire conversation to you and therefore your reaction I think is uncalled for and unfair. I hope that it can just be attributed to the stress that you are felling in light of the Four Star situation. Lisa and I are incredibly thankful for all that you have done for our kids and for us and for Harry. We are not looking past that even though we stand to lose over $500,000. But, as you can imagine the thought of losing that amount of money due to an investment that we never authorized is devastating to us. In truth, I am surprised, in light of our trust and confidence in you and Jack and our reliance on you in investing such a large sum of money, that the non payment of $2,400 would cause you to have such a strong reaction. In truth, I believe that we have been incredibly patient and have, without your knowledge, advised others to be patient rather than immediately commence a lawsuit. As I told Jack, I am more than happy to pay the money due, but since I have been put in such a precarious financial situation by you, I want to wait to see if I get my money back. The problem is that I am not getting any real information regarding the status and the information I do get keeps changing. I am sure that you can understand that feeling and hope that when you reflect, you will see your way to apologize for the hurtful statements that you have made.

In light of your letter, I am not sure whether Jack will continue to represent me as an accountant. I have expected that he would do so and request that if you are going to withdraw from my representation, you at least continue to advise me of the tax liability that I have for April 15 so that I am not damaged. I expect to get the financial information to Jack early next week. Please let me know how you intend to proceed.

Thank you.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Friday, March 21, 2003 3:18 PM
To: Michael Plonsker
Cc: Jack Garrett
Subject: PLSE SEE BELOW


DEAR MICHAEL,

I AM VERY DISAPPOINTED IN YOUR RECENT CONVERSATION WITH JACK GARRETT. HE INFORMS ME THAT YOU HAVE REFUSED TO PAY YOUR ACCOUNTING FEES FROM LAST YEAR (A MERE 2,400) BECAUSE YOU HAVE NOT BEEN GETTING MONEY FROM FOUR STAR CURRENTLY. IF YOU WANT TO NOT PAY FOR SERVICES WHICH ANSON, GARRETT & CO RENDERRED TO YOU, JUST SAY YOU ARE NOT GOING TO PAY US, AND WE WILL WRITE OFF YOUR BALANCE AS A BAD DEBT.

MANY PEOPLE HAVE A VERY SHORT MEMORY WHEN IT COMES TO ECONOMICS, BUT I DIDNT THINK YOU WERE ONE OF THOSE PEOPLE. I GUESS YOU FORGOT WHAT I WENT OUT OF MY WAY TO DO FOR YOUR CHILDREN, WHEN U HARDLY KNEW WHO YOU WERE. IF

1

24

I WERE YOUR ACCOUNTANT RATHER THAN JACK, I WOULD HAVE TOLD YOU TO PICK UP YOUR FILES AND GET A NEW CPA IMMEDIATELY. I HAVE TO SAY I AM VERY DISAPPOINTED IN YOUR ATTITUDE IN LIGHT OF OUR PAST FRIENDSHIP. SORRY, BUT JACK WOULDNT WRITE THIS LETTER. I GUESS YOU ARE JUST ANOTHER TYPICAL LAWYER, BUT SUSIE AND I THOUGHT MORE OF YOU!!!!!!!!!!

3/24/03
Carson

— Going to get $ back

— Sold income stream to Bh — UK

. Buyer put up Kx collateral to
  Secure —

— Sold assets because right thing to do

Can rescind trans + get $ back —

NO doubt going to get pd —

996 - 9380 — Ron —

26

3/24/03 Answ'
Ken Pritican       925-284-3020

Security of principal
If bonds not registered — prin not at
risk — # of recourses 48 will
take: ① CD —
        - valued per 4 * @ 2x value
          of ant contracts —
        - mature in 9/03 —
NO concern principal at risk —
    - but hasn't done due diligence

27

3/25/03

Anson

Custodia Bk — Banco de Fraces

Anson & Garrett/Four Star

---

## Michael Plonsker

**From:** Ron Anson [Ron@agcpa.com]
**Sent:** Wednesday, March 26, 2003 6:25 PM
**To:** Michael Plonsker
**Subject:** RE: Anson & Garrett/Four Star

It already is, Michael. Please call me when you want to talk "business" not accounting. Thnx for your help.

-----Original Message-----
**From:** Michael Plonsker [mailto:mplonsker@agsk.com]
**Sent:** Wednesday, March 26, 2003 11:51 AM
**To:** Ron Anson
**Cc:** Jack Garrett
**Subject:** Anson & Garrett/Four Star

Ron

Lisa and I have decided to pay Anson & Garrett the outstanding amount of $2,400. As I have advised you, we are very concerned that our money has been invested in a transaction that was never disclosed or authorized by us and is now at risk (regardless of how small you believe the risk is). You state that the money due to Anson & Garrett and due from Four Star are entirely separate and distinct. But, I disagree. Lisa and I relied on your (primarily Jack's) statements to us regarding how the money would be invested, that the principal was not at risk and that the only variables were the length of the deal and whether the rate of interest would have to be adjusted (from either 18% and 30% depending on the deal). It was based on these statements that we invested $450,000 plus additional amounts on behalf of our children. So, of course, the amounts are tied together. We owe you $2,400 and you owe us (and our children) with interest over $500,000. You are representatives of Four Star and cannot separate yourselves from it (nor do I think that you are trying to do so).

Nevertheless, based upon your (and Ken Pritikin's) statements to Harry and me in the last couple of days that the investment is "almost" 100% sure to be returned with interest in the near future, Lisa's and my need to have our taxes completed for 4/15/03 and, most importantly, our desire to continue to have trust and confidence in your decisions on our behalf, I will send you the $2,400 today.

Thank you for your continued friendship. I hope that this whole situation is behind us soon.

Michael J. Plonsker
310-255-9185 (direct)
310-907-2000 (Fax)
mplonsker@agsk.com

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ALSCHULER GROSSMAN STEIN & KAHAN LLP
ATTORNEYS AT LAW
www.agsk.com

The Water Garden
1620 26th Street

3/27/2003

Anson & Garrett/Four Star

Fourth Floor, North Tower
Santa Monica, CA 90404-4060
Tel:  310-907-1000
Fax:  310-907-2000

This transmission is intended only for the use
of the addressee and may contain information
that is privileged, confidential and exempt from
disclosure under applicable law. If you are not
the intended recipient, or the employee or agent
responsible for delivering the message to the
intended recipient, you are hereby notified that
any dissemination, distribution or copying of
this communication is strictly prohibited.

If you have received this communication
in error, please notify us immediately
via e-mail at postmaster@agsk.com or
by telephone at 310-907-1000. Thank you.

.............................................

3/27/2003

Status update

## Michael Plonsker

| | |
|---|---|
| **From:** | Kenneth W. Pritikin [kwp@foleymcintosh.com] [kwp@foleymcintosh.com] |
| **Sent:** | Monday, April 07, 2003 12:10 PM |
| **To:** | Michael Plonsker |

**Subject:** RE:

Michael,

I just checked with Ron; apparently you are among the group of investors, like my mother, who did not receive distributions of interest through September 1. If that is true, then you will probably be getting some money out of the $4.7 million loan, which is what you presumably were told. As I was telling you, Four Star had intended that some of the loan proceeds would be allocated to that group of investors whose distributions were curtailed prior to September 1, in order to bring them in line with the other investors who did receive distributions through September 1. The amount that will be allocated for this purpose will depend upon what is available after Four Star's immediate obligations are addressed; no decision on allocation can be made until that time.

Ken Pritikin

-----Original Message-----
**From:** Michael Plonsker [mailto:mplonsker@agsk.com]
**Sent:** Friday, April 04, 2003 4:38 PM
**To:** kwp@foleymcintosh.com
**Subject:**

So what more needs to be done regarding the confirmation of the bonds and what is the timing?

Once the financing on the loan is done and funded, what money is going to be distributed to the investors and when? Will it be distributed to all investors, i.e., 18% and 30% investors, or just one class?

Also, I sent you the signed confidentiality agreement a couple of weeks ago and still have not received any of the documents or your email with the PDF file. When can I expect to receive the information?

Thanks for your attention to this matter.

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Fri 4/4/2003 4:26 PM
**To:** boychek1@tampabay.rr.com; mrosenthal765@earthlink.net; rp50pritikin@aol.com; roblipp@gam-llc.com; dsp@gtrb.com; droberts01@aol.com; wwolfen@irell.com; wfwolfen@aol.com; jim@schragbaum.com; bblitz@gte.net; Michael Plonsker; colincop@aol.com; kwiser@optimumaq.com
**Cc:**
**Subject:** Status update

On Wednesday, April 2, the following report was received via fax from the attorney for the custodian bank:

"This letter shall confirm the status of the financing matter. It does not address the issues concerning confirming the bonds in Argentina, [that] update will happen separately.

All conditions concerning the financing have now been completely fulfilled. As you aware aware, there was a shortfall in pre-financing funding of

4/7/2003

approximately $317,000. Arrangements have been made for the balance, which will be confirmed tomorrow.

Further, I have personally confirmed today with the bank that they are now ready to proceed with the financing arrangement. They will be sending the required bank to bank confirmation Friday. Given that I don't have control of the bank, I can't commit that it will definitely occur on that day; however, if it doesn't, then I will personally go to the bank on Monday to ensure that it goes out that day. All coordinates concerning the bank to bank confirmations have been fully worked out.

The closing and funding should have occurred this week. I think it won't, but if it doesn't, then it will definitely close next week. I suggest again, that the closing of this component of business should allow other matters to occur in a more methodical fashion and certainly moot all outstanding issues.

As promised, concerning the Argentina matter, I will provide you with the names and phone numbers today. This will be provided with the understanding of complete confidence.

I do actually finally think that all hurdles have been crossed and that your group will have money in the next few days."

By way of explanation, the letter's reference to the financing matter is to the $4.7 million loan to Four Star which I have discussed in previous status updates. The reference to the $317,000 shortfall concerns an escrow account required by the lender, into which Four Star was required to deposit the estimated amount necessary to complete the registration of the bonds. The lender imposed this requirement because the bonds constitute the collateral for the loan. Four Star had arranged for the original estimated amount to be placed into the escrow account, but the estimate subsequently increased by $317,000. The reference to the bank to bank confirmation concerns the transactional arrangement between the lender and Four Star's bank in the U.S. where the funds will be wired. The reference to the names and phone numbers concerns our request that he provide us with the contact information of the persons he has been dealing with on the bond matter, including the persons at the Central Bank who are processing Four Star's application for confirmation of the bonds. In previous status updates, I have explained that, on the basis of the information provided by the attorney for the custodian bank, confirmation is the remaining requirement before the bonds can be registered, at which point the deal is poised to close.

Ken Pritikin

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ALSCHULER GROSSMAN STEIN & KAHAN LLP
ATTORNEYS AT LAW
www.agsk.com

The Water Garden
1620 26th Street
Fourth Floor, North Tower
Santa Monica, CA  90404-4060
Tel:  310-907-1000
Fax:  310-907-2000


This transmission is intended only for the use
of the addressee and may contain information

4/7/2003

that is privileged, confidential and exempt from
disclosure under applicable law. If you are not
the intended recipient, or the employee or agent
responsible for delivering the message to the
intended recipient, you are hereby notified that
any dissemination, distribution or copying of
this communication is strictly prohibited.

If you have received this communication
in error, please notify us immediately
via e-mail at postmaster@agsk.com or
by telephone at 310-907-1000. Thank you.

.........................................

4/7/2003

33

## Kenneth W. Pritikin

| | |
|---|---|
| **From:** | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| **Sent:** | Wednesday, December 11, 2002 5:04 PM |
| **To:** | 'mark@fsfs.com'; 'ron@agcpa.com'; 'Gronimof@aol.com' |
| **Subject:** | Revised draft of e-mail to investors |

Mark, Ron and Jack,

I have revised my draft e-mail a bit more. I want to stress the urgency of getting this e-mail out. On the basis of communications to me today (i.e. Steve Unger, Werner Wolfen, Jim Baum) and to Robert (i.e. Steve Unger), it appears that the news that I am being hired by Four Star resulted in expectations that there would be some sort of independent assessment of the situation, thus when people talk to me and realize that all I can do is tell them the same info that they've already heard, I am not providing any comfort; to the contrary, my inability to provide any new or meaningful information about what they already know is creating the opposite effect of raising the level of anxiety and frustration. The level of "chatter" among the investors about what they should be doing to protect themselves is definitely increasing, and while my role as a conduit for information and inquiries may serve some useful purpose, that role in and of itself is, it now appears, no longer sufficient.

TEXT OF DRAFT:

It has become obvious that I need to clarify my role as Four Star's counsel with regard to due diligence and explain what options exist for investors regarding conducting due diligence.

First, I need to stress that there is not, and there has never been, an issue as to my access to documents. (I should note that Four Star has previously provided me with some documents, e.g. about a month ago I was provided with a PDF file about 80 pages long consisting of correspondence between Four Star and the escrow holder over a several month time period; however, I have not examined that file in detail.) The decision not to involve me in a due diligence review is strictly an issue of cost (i.e. who pays) and my own availability. If investors want to conduct their own due diligence, that is perfectly acceptable to Four Star just so long as it is understood that it will be at the investor's expense. Because of the demands of my litigation practice, I can't devote the necessary time for it for at least 30 days, and I suspect that those investors who want to go forward with a full due diligence would want to do so much sooner than that.

Second, it now seems clear to me, from the communications I have been having in the past 24 hours, that my assignment as counsel to Four Star generated expectations that did not correspond to the scope of my duties, with the result that frustration and anxiety have increased rather than decreased. I need to go back to the reason I am being hired, i.e. to give periodic (e.g. weekly) updates or as breaking news happens, plus consolidate questions via e-mail to Mark and respond to these questions on the updates. I have not yet provided a status update for the reason that I haven't yet had an opportunity to talk at length with Mark about what is happening; however, I expect to be able to provide an update by Friday. However, it is becoming clear now that it would be helpful for me to obtain and review the relevant documentation on particular issues on a case by case basis, and in that regard Four Star has agreed to pay for me to do that so long as the scope of inquiry remains narrow. For example:

1. A number of investors want me to look at the documentation relevant to the security of the arb transaction and the availability of non-litigation options in the event the deal does not proceed in accordance with its terms.

2. I have been asked about documentation regarding the existence of the escrow and the amount being held in escrow. Four Star has advised me that it has requested such an accounting from the escrow holder and will circulate it when it is received.

3. I have been asked about other Four Star transactions that could be a source of cash flow in the very short term. I am aware that there is an upcoming court hearing in connection with one of the non-arb assets, from which it is expected that an order is expected to be issued that would provide Four Star with a substantial amount of cash; this is money that is being held by the SEC but which requires a court order for distribution to Four Star. I spoke today with Four Star's outside attorney in that matter and he will be sending me the underlying documentation.

If anyone has a specific request for documentation on a particular issue, I will discuss that request with Four Star and if it is feasible from a cost- and time-standpoint to address it I will do that at Four Star's expense. At the same time, I am very concerned about getting bogged down into addressing a constant stream of questions and requests for documentation on a panoply of issues. Frankly, the time I have had to spend in the past two days on this has put a very difficult demand on my practice, and I am going to have to prioritize and limit what I do from this point forward.

1

000120

Exh B

34

Ken Pritikin

000121

35

**Kenneth W. Pritikin**

From:          Kenneth W. Pritikin [kwp@foleymcintosh.com]
Sent:          Thursday, December 12, 2002 9:13 AM
To:            'mark@fsfs.com'; 'Gronimof@aol.com'
Subject:       FW: Jim Baum


-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Thursday, December 12, 2002 9:09 AM
To: 'Steven Ungar'; 'Robert Pritikin'
Cc: 'Monroe Rosenthal'
Subject: RE: Jim Baum


I can say categorically that I NEVER told Baum that I don't know who the
credit enhancer is.  Of course I know who it is, but I can't disclose
the name to Baum due to the fact that I signed a Nondisclosure Agreement
that prohibits me from doing so.  While I believe I probably told Baum
about the Nondisclosure Agreement and the restrictions it places on my
ability to disclose the identity of the players, I don't have a specific
recollection and thus I can't swear that we talked about that point.

-----Original Message-----
From: Steven Ungar [mailto:boychek1@tampabay.rr.com]
Sent: Thursday, December 12, 2002 5:01 AM
To: Robert Pritikin; Kenneth Pritikin
Cc: Monroe Rosenthal
Subject: FW: Jim Baum



-----Original Message-----
From: Mark Cohn [mailto:Mark@FSFS.com]
Sent: Thursday, December 12, 2002 12:39 AM
To: Unger, Steve
Cc: Jack Garrett
Subject: Re: Jim Baum


Converation was ok. He wants a copy of all docs, which we will be
reluctant
to do without prior legal advice.

He did state that both u and ken claimed total ignorance of the credit
enhancement, including the identity of the issuer.  Jack and I expressed
skepticism re that statement.

He did state that he felt we should be sending out more frequent letters
to
investors. We did agree with this statement.  R u or someone working on
a
letter? If not, then I will, but I do think we should get something out
in
the next couple days.



-----Original Message-----
From: Unger, Steve <boychek1@tampabay.rr.com>

1

000115

36

To: Jack Garrett <Gronimof@aol.com>; Mark Cohn <Mark@FSFS.com>
Sent: Wed Dec 11 17:57:52 2002
Subject: Jim Baum

Please let me know how the conversation went with Jim.

Thanks

Steve

000116

Kenneth W. Pritikin

From:        Kenneth W. Pritikin [kwp@foleymcintosh.com]
Sent:        Thursday, December 12, 2002 10:29 AM
To:          'mrosenthal765@earthlink.net'; 'rp50pritikin@aol.com';
             'boychek1@tampabay.rr.com'; 'mrosenthal765@earthlink.net'; 'rp50pritikin@aol.com';
             'roblipp@gam-llc.com'; 'dsp@gtrb.com'; 'droberts01@aol.com'; 'wwolfen@irell.com';
             'wfwolfen@aol.com'; 'jim@schragbaum.com'
             'mark@fsfs.com'; 'ron@agcpa.com'; 'Gronimof@aol.com'
Cc:
Subject:     Clarification of my role

It has become obvious that I need to clarify my role as Four Star's counsel with regard to due diligence and explain what options exist for investors regarding conducting due diligence.

First, I need to stress that there is not, and there has never been, an issue as to my access to documents. (I should note that Four Star previously provided me a large PDF file of documents concerning the transaction, which I'll discuss below.) The decision not to involve me in a due diligence review is strictly an issue of cost (i.e. who pays) and my own availability. If investors want to conduct their own due diligence, that is perfectly acceptable to Four Star just so long as it is understood that it will be at the investor's expense. Because of the demands of my litigation practice, I can't devote the necessary time for it for at least 30 days, and I suspect that those investors who want to go forward with a full due diligence would want to do so much sooner than that.

Second, it now seems clear to me, from the communications I have been having in the past 24 hours, that my assignment as counsel to Four Star generated expectations that did not correspond to the scope of my duties, with the result that frustration and anxiety have increased rather than decreased. I need to go back to the reason I am being hired, i.e. to give periodic (e.g. weekly) updates or as breaking news happens (accompanied by relevant documentary confirmation), plus consolidate questions via e-mail to Four Star and respond to these questions on the updates. I have not yet provided a status update for the reason that I haven't yet had an opportunity to confer at length with Four Star about what is happening; however, I expect to be able to provide an update by Friday. However, it is becoming clear now that it would be helpful for me to obtain and review the relevant documentation on particular issues on a case by case basis, and in that regard Four Star has agreed to pay for me to do that. For example:

1. A number of investors want me to look at the documentation relevant to the security of the arb transaction and the availability of non-litigation options in the event the deal does not proceed in accordance with its terms. In this regard, about a month ago Four Star sent me a PDF file about 80 pages long, which from my cursory look showed that it consists mostly of correspondence between the custodian/escrow holder and Four Star over a several month period in 2002 concerning the status of the transaction; there may also be some transactional documents in there too, but frankly I have not examined the file in any meaningful detail because it was not an issue for me. However, I will now be looking at this file as well as any other documents I believe may be pertinent.

2. I have been asked about documentation regarding the existence of the escrow and the amount being held in escrow. Four Star has advised me that it has requested such an accounting from the escrow holder and will circulate it when it is received. As to the existence of the escrow, my cursory review of the PDF file mentioned above indicated to me that it largely consists of correspondence between Four Star and the escrow holder over a several month period in 2002 concerning the transaction. Again, when I review this file more closely I will have a more intelligent assessment of what is in it, but I have not done that yet. In the meantime, it may be helpful to clarify a point about the escrow that seems to have been a source of confusion among a number of people. According to the verbal summary of the transaction that I have been given by Four Star, when Four Star quitclaimed the arb contracts to the buyer, the CD's went directly to Four Star, they did not go into the escrow; then, due to the requirements imposed by the Argentine government, as an outgrowth of the economic situation there, it was necessary to exchange the CD's for bonds, and in that regard the government conditioned registration of the bonds on credit enhancement of the CD's (required as a result of the fact that the financial institution that issued the CD's was suspended by the Argentine government). As explained to me, the purpose of the escrow is simply to hold the revenues generated by the arb contracts pending completion of the transaction. Four Star has no claim to these revenues; they belong to the buyer but by the terms of the deal will not be released to the buyer until the transaction closes. The significance of the escrow is thus basically limited to the extent that it would incentivize the buyer to close the deal sooner rather than later (i.e. by purchasing the bonds or, if for some reason the credit enhancement were to fail, leaving the bonds nontradable, then by purchasing the CD's [note: even without the credit enhancement, Four Star believes that the CD's retain more than enough value to protect Four Star's position]) because the arb contract revenues are not released to the buyer until the deal closes. In other words, the escrow is irrelevant to the issue of Four Star's security for this transaction; Four Star's security is entirely in the CD's and the bonds, which are outside of the escrow and are already under Four Star's control.

1

000107



3. I have been asked about other Four Star transactions that could be a source of cash flow in the very short term. I am aware that there is an upcoming court hearing in connection with one of the non-arb assets, from which it is expected that an order is expected to be issued that would provide Four Star with a substantial amount of cash; this is money that is being held by the SEC but which requires a court order for distribution to Four Star. I spoke yesterday with Four Star's outside attorney in that matter, who verbally confirmed what Four Star had told me about the status of that transaction; he will be sending me the underlying documentation.

If anyone has a specific request for documentation on a particular issue, I will discuss that request with Four Star and if it is feasible from a cost- and time-standpoint to address it I will do that at Four Star's expense. At the same time, I am very concerned about getting bogged down into addressing a constant stream of questions and requests for documentation on a panoply of issues, which I have seen can swallow up my day very quickly. Although I devoted a full day yesterday to survey the situation and talk with investors, given the ongoing commitments of my current litigation practice, I can right now only allocate between one and two hours per day, emergencies excepted.

Ken Pritikin

2

000108

39

## Kenneth W. Pritikin

| | |
|---|---|
| From: | Mark Cohn [Mark@FSFS.com] |
| Sent: | Thursday, December 12, 2002 10:33 AM |
| To: | Wade, Steve |
| Cc: | Anson, Ronald; Jack Garrett; 'kwp@foleymcintosh.com' |
| Subject: | RE: Investor update |

i am getting a written update from the attorney today.  i think it will say
the following:

1.  central bank has approved.  formal sign off will happen anytime, and
expected no later than next week.
2.  re loan, a document is required (this isnt new) stating that bank can
forclose on designated part of the collateral.  I am advised that this
should be in place today.
3.  Loan (probably for more than the 700k) will occur right afterward.

pls call me with any questions before providing an update.

ken, ron and jack:  i am sending you a copy fyi.

-----Original Message-----
From: Wade, Steve
Sent: Thursday, December 12, 2002 9:30 AM
To: Mark Cohn
Subject: Investor update


Mark, I only come in Tuesdays and Thursdays. So when I call you, it doesn't
help me when you don't call back to 3pm. If there is not anything new thats
fine, but let me know. What do I tell the inverstors today Thursday December
12?

1

000106

2.of 3
03-37579

Kenneth W. Pritikin

| | |
|---|---|
| From: | Mark Cohn [Mark@FSFS.com] |
| Sent: | Friday, December 13, 2002 12:53 PM |
| To: | Anson, Ronald; "kwp@foleymcintosh.com"; 'Jack Garrett' |
| Subject: | RE: Revised draft to Werner Wolfen for your comments |


ok with me.
-----Original Message-----
From: Anson, Ronald
To: 'kwp@foleymcintosh.com'; Mark Cohn; Jack Garrett
Sent: 12/13/2002 12:43 PM
Subject: RE: Revised draft to Werner Wolfen for your comments

FINE WITH ME

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 13, 2002 2:46 PM
To: mark@fsfs.com; ron@agcpa.com; Gronimof@aol.com
Subject: Revised draft to Werner Wolfen for your comments


Werner,

I went over the arb contract revenue numbers with Mark Cohn that had
concerned you. According to Mark, Four Star's records show that cash
receipts for 2000 represented an annual return on investment of
approximately 87%, while cash receipts for 2001 represented an annual
return
on investment of approximately 43%. The relevant numbers are as follows
(note: Mark advises me that your accountant, Susan Frazin, should be in
a
position to verify these numbers, but if she wants to review Four Star's
books again for this purpose, that can be done):

2000:

1.  Cash receipts werre $7,187,500

2.  Investors' principal at the start of 2000 stood at $850,000

3.  Investors' principal at the end of 2000 stood at $15,660,000

4.  Average investors' principal in 2000 (i.e. for purposes of rough
calculation of return on investment, I am averaging the amounts for the
start and end of 2000) was $8,225,000

5.  Cash receipts of $7,187,500 represent an 87% return on $8,225,000


2001:

1.  Cash receipts were $8,500,000 (note: your memo lists cash receipts
for
2001 as $6,500,000; however, Mark advises that there was a $2,000,000
receipt at the very end of 2001 that you do not account for)

2.  Investors' principal at the start of 2001 stood at $15,660,000

3.  Investors' principal at the end of 2001 (as adjusted) stood at
$24,000,000 (note: the actual principal amount at the end of 2001 was
$42,000,000; however, this includes an investment of $18,000,000 that

1

000082

was
made in the 3rd quarter, which amount is excluded for the purpose of
calculating the percentage return on investment for 2001 because of the
several-month lag time between the time an investment is made until the
time
that it begins to generate any return)

4.  Average investors' principal in 2001 (i.e. for purposes of rough
calculation of return on investment, I am averaging the amount for the
start
of 2001 and the adjusted amount for the end of 2001) was $19,830,000

5.  Cash receipts of $8,500,000 represent a 42.86% return on $19,830,000
(note: even using your $6,500,000 figure for cash receipts in 2001,
there
would have been a 32.78% return on $19,830,000)

According to Mark, a 20% annual return in 2000 and 2001 would have been
sufficient to fund expected distributions to investors on the arb
contracts.

Mark agrees that the non-arb deals were underperforming during 2000 and
2001, the effect of which was that accross-the-board returns for Four
Star
investments in 2000 and 2001 were underperforming.  However, based on
the
above numbers, the arb contracts taken by themselves were performing
adequately.

If you have any questions about the numbers stated above, or if you want
me
to obtain further information/clarification concerning the performance
of
the arb contracts, please let me know.

2

000083

## Kenneth W. Pritikin

| | |
|---|---|
| **From:** | Ron Anson [Ron@agcpa.com] |
| **Sent:** | Friday, December 13, 2002 2:50 PM |
| **To:** | 'kwp@foleymcintosh.com'; Mark Cohn; Ron Anson; Jack Garrett |
| **Subject:** | RE: Draft status update for your comments |

I THINK YOU SHOULD NOT USE THE SPECIFIC AMOUNT OF THE SALE
PRICE......RATHER
AN ESTIMATED AMOUNT OF "BETWEEN 150, AND 200 MILLION"

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 13, 2002 4:52 PM
To: mark@fsfs.com; ron@agcpa.com; Gronimof@aol.com
Subject: Draft status update for your comments


A number of investors have asked that I explain the precise steps that
remain to complete the transaction following the Central Bank's formal
approval of the credit enhancement, and to explain Four Star's options
in
the event of nonperformance by the buyer.

According to Four Star, Central Bank approval of the credit enhancement
is
the sole remaining unsatisfied condition before the bonds can be
registered
by the Central Bank.  The attorney for the custodian/escrow holder has
assured Four Star that registration is a ministerial process that does
not
require approval or action by anyone in authority.  The attorney has
advised
that he can "walk through" the registration process and will do so the
instant Central Bank approval of the credit enhancement is obtained.

Registration of the bonds is significant for 2 reasons:

First, once the bonds are registered, there will be no further
conditions
precedent to the buyer's full performance, i.e. at that point the buyer
must
immediately purchase all of the bonds as required by the terms of the
deal.
Upon completion of the purchase of the bonds by the buyer, the
transaction
will be completed and Four Star will have all proceeds due to Four Star
for
the sale of the arb contracts.  Four Star will then formulate a
distribution
plan to its investors and proceed to implement that plan.

Second, registration of the bonds means that they are tradeable on the
bond
market (Euroclear system).  This is significant to Four Star only in the
event the buyer refuses to proceed with its contractual obligation to
buy
the bonds.  It should be noted that Four Star advises that it has
received
no indication that the buyer can't or won't proceed with its obligation
to
purchase the bonds.  However, in the event that the buyer did fail or
refuse
to proceed, Four Star would have two options: (i) commence litigation

1

000066

43

against the buyer to compel its performance; (ii) immediately proceed to
sell the bonds on the Euroclear system.  According to Four Star, there
is an
active market for the bonds.  However, because of the large amount of
bonds
which Four Star would be attempting to sell, the bonds could not be sold
all
at one time; it is anticipated that it would take several months to sell
all
of the bonds.  Thus there is a risk that during that time, the value of
the
bonds could decline.  According to Four Star, the current market value
of
the bonds is about 200% of the $170 million which the buyer is required
to
pay, thus Four Star could absorb a decline in value of 50% and still
recover
the entire purchase price for the arb assets.  Consequently, Four Star
believes that its position is well protected in the unforseen event that
the
buyer fails to perform.

Ken Pritikin

000067

44

# Kenneth W. Pritikin

| | |
|---|---|
| From: | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| Sent: | Friday, December 13, 2002 2:52 PM |
| To: | 'mark@fsfs.com'; 'ron@agcpa.com'; 'Gronimof@aol.com' |
| Subject: | Draft status update for your comments |

A number of investors have asked that I explain the precise steps that remain to complete the transaction following the Central Bank's formal approval of the credit enhancement, and to explain Four Star's options in the event of nonperformance by the buyer.

According to Four Star, Central Bank approval of the credit enhancement is the sole remaining unsatisfied condition before the bonds can be registered by the Central Bank. The attorney for the custodian/escrow holder has assured Four Star that registration is a ministerial process that does not require approval or action by anyone in authority. The attorney has advised that he can "walk through" the registration process and will do so the instant Central Bank approval of the credit enhancement is obtained.

Registration of the bonds is significant for 2 reasons:

First, once the bonds are registered, there will be no further conditions precedent to the buyer's full performance, i.e. at that point the buyer must immediately purchase all of the bonds as required by the terms of the deal. Upon completion of the purchase of the bonds by the buyer, the transaction will be completed and Four Star will have all proceeds due to Four Star for the sale of the erb contracts. Four Star will then formulate a distribution plan to its investors and proceed to implement that plan.

Second, registration of the bonds means that they are tradeable on the bond market (Euroclear system). This is significant to Four Star only in the event the buyer refuses to proceed with its contractual obligation to buy the bonds. It should be noted that Four Star advises that it has received no indication that the buyer can't or won't proceed with its obligation to purchase the bonds. However, in the event that the buyer did fail or refuse to proceed, Four Star would have two options: (i) commence litigation against the buyer to compel its performance; (ii) immediately proceed to sell the bonds on the Euroclear system. According to Four Star, there is an active market for the bonds. However, because of the large amount of bonds which Four Star would be attempting to sell, the bonds could not be sold all at one time; it is anticipated that it would take several months to sell all of the bonds. Thus there is a risk that during that time, the value of the bonds could decline. According to Four Star, the current market value of the bonds is about 200% of the $170 million which the buyer is required to pay, thus Four Star could absorb a decline in value of 50% and still recover the entire purchase price for the erb assets. Consequently, Four Star believes that its position is well protected in the unforseen event that the buyer fails to perform.

Ken Pritikin

1

**Kenneth W. Pritikin**

From:          Gronimof@aol.com
Sent:          Friday, December 13, 2002 10:53 PM
To:           kwp@foleymcintosh.com
Subject:     Re: Status update

<PRE>this is jack garrett, thanksfor all your time ,i think this is a
very good
update!

**Kenneth W. Pritikin**

From:          Mark Cohn [Mark@FSFS.com]
Sent:          Friday, December 20, 2002 11:51 AM
To:            'kwp@foleymcintosh.com'
Subject:       RE: Status update

ok. add that four star was just advised of the meeting yesterday.

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 20, 2002 11:37 AM
To: Mark Cohn
Subject: FW: Status update


Mark,

Are you ok with me sending out a status update with the info on why you are
not at the meeting?   Proposed text:

Several investors have inquired whether Four Star is participating in
today's meeting with the credit enhancer. Four Star has advised that this
is an internal meeting going through their own checklists, etc.; Four Star
was advised of the meeting as a courtesy.   In the event that Four Star needs
to be brought in at any point, that will be done via teleconference.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Friday, December 20, 2002 11:24 AM
To: 'kwp@foleymcintosh.com'
Cc: Mark Cohn
Subject: RE: Status update


KEN, I THINK YOU SHOULD ADVISE THE OTHERS OF WHY WE WERE NOT IN
ATTENDENCE.
BUT ITS UP TO YOU!!!HAVE A HEALTHY AND HAPPY HOLIDAY.  BU THE WAY, I
THINK U
ARE DOING A GREAT JOB.....ron

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 20, 2002 11:28 AM
To: ron@agcpa.com
Subject: FW: Status update



-----Original Message-----
From: Mark Cohn [mailto:Mark@FSFS.com]
Sent: Friday, December 20, 2002 11:20 AM
To: 'kwp@foleymcintosh.com'
Subject: RE: Status update


the meeting was just called yesterday. it is internal ie going thru their
own checklists, etc. I was advised of it as a courtesy being that it is

                                        1

considered an important meeting, but we are neither a necessary party or
a
desired party.  in the event that I am needed to participate, then they
are
to call.

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 20, 2002 11:15 AM
To: Mark Cohn
Subject: FW: Status update


Mark,

Can you get back to me on this?

Ken

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 20, 2002 11:14 AM
To: 'Ron Anson'
Subject: RE: Status update


I believe he is participating by phone, but I'll double check.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Friday, December 20, 2002 11:05 AM
To: 'kwp@foleymcintosh.com'
Subject: RE: Status update


SEVERAL PEOPLE HAVE ASKED WHY MARK WASNT THERE, DO U KNOW?

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Friday, December 20, 2002 9:20 AM
To: boychek1@tampabay.rr.com; mrosenthal765@earthlink.net;
rp50pritikin@aol.com; roblipp@gam-llc.com; dsp@gtrb.com;
droberts01@aol.com; wwolfen@irell.com; wfwolfen@aol.com;
jim@schragbaum.com
Cc: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: Status update


Four Star advises that the bank which is providing the proposed credit
enhancement, and which is also coordinating the pending $4.7 million
loan,
is participating in a meeting today at which it is expected that all
outstanding issues, relating to both the credit enhancement and the
loan,
will be addressed.  The meeting is expected to go most of the day today.
We
expect to be able to provide an update no later than Monday.

Ken Pritikin

000297

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| Sent: | Monday, December 23, 2002 9:40 AM |
| To: | 'mark@fsfs.com' |
| Cc: | 'ron@agcpa.com'; 'jack@agcpa.com' |
| Subject: | FW: Investor questions |

-----Original Message-----
From: Steven Ungar [mailto:boychek1@tampabay.rr.com]
Sent: Sunday, December 22, 2002 1:58 PM
To: Kenneth Pritikin
Cc: Monroe Rosenthal
Subject: RE: Investor questions


Monroe and I have several first time investors in Arb. 8. Please find out
what is going on with
that deal. 4 Star signed 6 month notes with that group of investors, which
will be due in March.
Please find out who is holding there Capital, and if it is protected.

Thanks, Steve

PS: Ron told me that Tony is watching Arb.8 ? What ever that means.

-----Original Message-----
From: Monroe Rosenthal [mailto:mrosenthal765@earthlink.net]
Sent: Sunday, December 22, 2002 3:34 PM
To: Ungar; rp50pritikin@aol.com
Subject: [Fwd: Investor questions from Monroe]

1

000277

49

**Kenneth W. Pritikin**

| | |
|---|---|
| **From:** | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| **Sent:** | Monday, January 06, 2003 5:18 PM |
| **To:** | 'Jack Garrett' |
| **Subject:** | RE: Robert Briskin |

Do you want me to talk with you before I call him?

Re documents I have seen, there are no specific documents I would have a
problem with, but the documents that were given to me do not button down
all the issues in the deal.  For example, the documents I have indicate
that the deal was extended to a close date that has already come and
gone, so in the absence of additional documents extending the close date
(which I haven't seen), one could conclude that the buyer no longer is
obligated to close.  I haven't worried about reviewing the entire file
to fill in those kinds of gaps, but if I were to just turn over to
Briskin everything I have, he will realize that the file is incomplete.
That is only a problem if you would not want to give him access to the
entire file on the transaction, i.e. documents that I haven't seen.

-----Original Message-----
From: Jack Garrett [mailto:Jack@agcpa.com]
Sent: Monday, January 06, 2003 5:03 PM
To: 'kwp@foleymcintosh.com'
Subject: RE: Robert Briskin


I need you to dicuss with him the overall deal, and what you have seen
as
far as documents are concerned. He has very little knowledge of the
deal, he
representts an investor and client of mine, basic framework and that it
is a
real deal, and how it works , the collataral etc, I will call you
tomorrow,
briskins number is 13102010507 thanks. I told him he could have someone
sign
the nda and go to marks to review documents , have you seen any
documents
that you have a problem with?

        -----Original Message-----
        From: Kenneth W. Pritikin [SMTP:kwp@foleymcintosh.com]
        Sent: Monday, January 06, 2003 4:41 PM
        To:   jack@agcpa.com
        Cc:   mark@fsfs.com; ron@agcpa.com
        Subject:   Robert Briskin

        Jack,

            I got your message re speaking with investors' attorney Robert
Briskin.  I
            don't have any problem speaking with him except that I have no
updated
            information since I last spoke with Mark on December 27, and the
last info I
            have from Mark re the status of the credit enhancement was not
yet
for
            public consumption.  I would feel better if I knew what the
latest
status is
            before I speak with him.

                                        1

000269

Ken Pritikin

000270

## Kenneth W. Pritikin



| | |
|---|---|
| **From:** | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| **Sent:** | Tuesday, January 07, 2003 5:03 PM |
| **To:** | 'mark@fsfs.com'; 'ron@agcpa.com'; 'jack@agcpa.com'; 'Gronimof@aol.com' |
| **Subject:** | Status |

Mark, Ron and Jack,

I have had no information on the status of the transaction since I spoke with Mark on December 27 before I left on vacation. I have been trying to reach Mark without success for the past two days to get an update. In the meantime, Robert has been taking calls from Monroe and Ungar who are (as usual) frantic about what is going on, and David Roberts e-mailed me Saturday and again yesterday asking me for an update. However, I have nothing to tell anyone until Mark gives me an update and we can then discuss what to disclose.

The whole point of my being retained was to create a structure for communications so that certain investors would stop calling Mark all the time, as well as to interface with "problem" investors (e.g. Wolfen) who had raised alarms about the transaction. If I cannot provide regular information updates then this structure will collapse. I should note that I just got off the phone with Robert Briskin, an attorney representing an investor whom Jack asked me to call, who wants to know what's going on and can't understand why no one has sued Four Star yet. We had to cut the call short because he was going to a meeting, and I'll talk to him in the morning, but if I can't tell him anything concrete about what has transpired in the past two weeks, I can guarantee that it will not be reassuring to him. The problem is exacerbated by the fact that when I came in, I went out of my way to be responsive and communicative (which had the effect I think of calming the high level of anxiety at that time), so now the total silence from me is going to be interpreted to mean that something bad is happening and that Four Star is trying to hide it.

This is not a feasible situation for me. If you no longer feel the need to maintain the current communication structure, then I have no problem with that, but in that event I need to immediately resign as counsel and that fact needs to be communicated to the investors I have been reporting to. If you want to keep my role, then I immediately need to know what's going on.

Ken

1

000266

52

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| Sent: | Tuesday, January 07, 2003 5:18 PM |
| To: | 'Ron Anson' |
| Subject: | RE: Status |

Ron, we just need to get them some information.  This is what 2 weeks
out of the loop does to them.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Tuesday, January 07, 2003 5:10 PM
To: 'kwp@foleymcintosh.com'
Subject: RE: Status


Why are monroe and ungar so alarmed, everything is fine, the deal should
fund the down payment this week.......i think steve needs a job!!!

        -----Original Message-----
        From: Kenneth W. Pritikin [SMTP:kwp@foleymcintosh.com]
        Sent: Tuesday, January 07, 2003 5:16 PM
        To:    'Ron Anson'
        Subject:    RE: Status

        I only spoke with him for a few minutes and then he had to run,
but
he kept
        saying that the whole thing (e.g. the deal is in South America,
it
was
        supposed to close months ago, etc.) sounds to him like a house
of
cards. He
        said several times that he can't believe no one has sued; he is
going to do
        an on-line search to check if any lawsuits have been filed.  I
told
him that
        what I need to do is to spend some time with him to explain the
deal
(he has
        very little idea of what is going on), and then if he still has
questions or
        concerns I will try to address them.  He seemed satisfied for
the
moment,
        but he is clearly suffering from an acute case of paranoid lack
of
        information.

        -----Original Message-----
        From: Ron Anson [mailto:Ron@agcpa.com]
        Sent: Tuesday, January 07, 2003 5:03 PM
        To: 'kwp@foleymcintosh.com'
        Subject: RE: Status


        By the way, briskin is an idiot, why would anyone sue fourstar,
they
havent
        done anything wrong...

1

000263

53

-----Original Message-----
From: Kenneth W. Pritikin [SMTP:kwp@foleymcintosh.com]
Sent: Tuesday, January 07, 2003 5:03 PM
To:   mark@fsfs.com; ron@agcpa.com; jack@agcpa.com;
Gronimof@aol.com
Subject:    Status

Mark, Ron and Jack,

          I have had no information on the status of the transaction
since I
          spoke
          with Mark on December 27 before I left on vacation. I
have
been
          trying to
          reach Mark without success for the past two days to get
an
update.
          In the
          meantime, Robert has been taking calls from Monroe and
Ungar
who are
          (as
          usual) frantic about what is going on, and David Roberts
e-mailed me
          Saturday and again yesterday asking me for an update.
However, I
          have
          nothing to tell anyone until Mark gives me an update and
we
can then
          discuss
          what to disclose.

          The whole point of my being retained was to create a
structure for
          communications so that certain investors would stop
calling
Mark all
          the
          time, as well as to interface with "problem" investors
(e.g.
Wolfen)
          who had
          raised alarms about the transaction.  If I cannot
provide
regular
          information updates then this structure will collapse.
I
should
          note that I
          just got off the phone with Robert Briskin, an attorney
representing
          an
          investor whom Jack asked me to call, who wants to know
what's going
          on and
          can't understand why no one has sued Four Star yet.  We
had
to cut
          the call
          short because he was going to a meeting, and I'll talk
to
him in the
          morning, but if I can't tell him anything concrete about

2

what has
        transpired
                in the past two weeks, I can guarantee that it will not
be
        reassuring to
                him.  The problem is exacerbated by the fact that when I
came in, I
        went out
                of my way to be responsive and communicative (which had
the
effect I
        think
                of calming the high level of anxiety at that time), so
now
the total
        silence
                from me is going to be interpreted to mean that
something
bad is
        happening
                and that Four Star is trying to hide it.

                This is not a feasible situation for me.  If you no
longer
feel the
        need to
                maintain the current communication structure, then I
have no
problem
        with
                that, but in that event I need to immediately resign as
counsel and
        that
                fact needs to be communicated to the investors I have
been
reporting
        to.  If
                you want to keep my role, then I immediately need to
know
what's
        going on.

                Ken

3

000265

55

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| Sent: | Tuesday, January 07, 2003 5:16 PM |
| To: | 'Ron Anson' |
| Subject: | RE: Status |

I only spoke with him for a few minutes and then he had to run, but he kept saying that the whole thing (e.g. the deal is in South America, it was supposed to close months ago, etc.) sounds to him like a house of cards. He said several times that he can't believe no one has sued; he is going to do an on-line search to check if any lawsuits have been filed. I told him that what I need to do is to spend some time with him to explain the deal (he has very little idea of what is going on), and then if he still has questions or concerns I will try to address them. He seemed satisfied for the moment, but he is clearly suffering from an acute case of paranoid lack of information.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Tuesday, January 07, 2003 5:03 PM
To: 'kwp@foleymcintosh.com'
Subject: RE: Status


By the way, briskin is an idiot, why would anyone sue fourstar, they havent
done anything wrong...

        -----Original Message-----
        From: Kenneth W. Pritikin [SMTP:kwp@foleymcintosh.com]
        Sent: Tuesday, January 07, 2003 5:03 PM
        To:    mark@fsfs.com; ron@agcpa.com; jack@agcpa.com;
Gronimof@aol.com
        Subject:    Status

        Mark, Ron and Jack,

        I have had no information on the status of the transaction since
I
spoke
        with Mark on December 27 before I left on vacation. I have been
trying to
        reach Mark without success for the past two days to get an
update.
In the
        meantime, Robert has been taking calls from Monroe and Ungar who
are
(as
        usual) frantic about what is going on, and David Roberts
e-mailed me
        Saturday and again yesterday asking me for an update.  However,
I
have
        nothing to tell anyone until Mark gives me an update and we can
then
discuss
        what to disclose.

        The whole point of my being retained was to create a structure
for
        communications so that certain investors would stop calling Mark
all
the

1

time, as well as to interface with "problem" investors (e.g. Wolfen)
who had
raised alarms about the transaction. If I cannot provide regular
information updates then this structure will collapse. I should note that I
just got off the phone with Robert Briskin, an attorney representing
an
investor whom Jack asked me to call, who wants to know what's going
on and
can't understand why no one has sued Four Star yet. We had to cut
the call
short because he was going to a meeting, and I'll talk to him in the
morning, but if I can't tell him anything concrete about what has
transpired
in the past two weeks, I can guarantee that it will not be reassuring to
him. The problem is exacerbated by the fact that when I came in, I
went out
of my way to be responsive and communicative (which had the effect I
think
of calming the high level of anxiety at that time), so now the total
silence
from me is going to be interpreted to mean that something bad is
happening
and that Four Star is trying to hide it.

This is not a feasible situation for me. If you no longer feel the
need to
maintain the current communication structure, then I have no problem
with
that, but in that event I need to immediately resign as counsel and
that
fact needs to be communicated to the investors I have been reporting
to. If
you want to keep my role, then I immediately need to know what's
going on.

Ken

000262

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Wednesday, January 08, 2003 8:43 AM |
| To: | Mark Cohn; 'kwp@foleymcintosh.com' |
| Cc: | Ron Anson |
| Subject: | RE: |

mark is in error, briskin's client does have 100,000 in one arb, and 100,000
in regular

-----Original Message-----
From: Mark Cohn [mailto:Mark@FSFS.com]
Sent: Wednesday, January 08, 2003 10:37 AM
To: 'kwp@foleymcintosh.com'
Cc: Anson, Ronald
Subject:


After our conversation of yesterday, ron and I had a follow up talk re
Briskin. We do have a couple of concerns and thoughts. fiirst, it should
be noted that all of the investors with whom we have shared any documents
are large seven to eight figure investors. briskin's client has 200k in the
deal. I believe that our providing documents against an NDA may well be a
violation of our NDA. given the size of the investments of the investors
with whom we have shared, we have concluded that our risk of sharing is
outweighed by their huge vested interest. However, upon reflection, we are
at least reluctant to lower the bar to the point of making the docs
available to the smaller investors. Once we open that door, we will not be
able to close it. I think that you can explain that to briskin in a very
candid, objective fashion. While he may not like that, I think that you
could note that we are not trying to hide anything as evidenced by the fact
that we have shared with the larger investors and that there are substantial
risks to us in sharing all docs with all investors (I do think that if we
lower the bar to include him, then we would have a difficult time witholding
from anybody). first, there is the risk of breaching the nda. second is
the probability that if we share enough documents with enough investors,
then some investors are going to take it upon themselves to get involved and
start making direct calls. (Steve Unger syndrome). The impact of that would
be speculative, but I dont think that we need to go there. Last, and maybe
most important, is the fact that the only people to whom we have given
documents have money invested in that particular deal. briskin's client
doesnt, and therefore, his right to look at these documents is not as direct
or strong. Again, this would constitute opening a door which we dont want
to open.

1

000257

58

In your conversation with briskin, please take note that he seems to think
that we are somehow in default of an obligation. this needs to be clarified
to him in no uncertain terms. Not only isnt there an event of default, but
we may well be obligated to not make distributions at this time. MCI, Enron, etc get into trouble for overstating their income. we wish to be conservative and make sure that the company doesnt over extend or over distribute. That is absolutely no different than electing not to pay a dividend in a given quarter. that is not something to bring a lawsuit about. he needs to become familiar with what the investment is in the first instance.

Too much emphasis is being put on south america, as evidenced by briskin's
conern that we are doing business in south america in the first instance.
over the years we have done and continue to do the bulk of our activity domestically. while many of the investments were made for appreciation rather than immediate cash flow, they can be and are good investments.

the prospectus is the operative document in this instance, as opposed to the
other investors with whom you are dealing. after briskin is made to understand the nature of the investment, his rights of inspection should flow from that document. it would be dangerous to make case by case exceptions, and, he as a lawyer, will or should understand that.

call me to confirm that you get this email. try the number that you have
been given, and if u dont get thru, leave a voice mail. i pick them up all
the time.

2

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Wednesday, January 08, 2003 10:54 AM |
| To: | 'Kenneth W. Pritikin'; Mark Cohn |
| Cc: | Jack Garrett |
| Subject: | jack and i just had a VERY good call with bob briskin, he thinks we should both go with mark the next trip. i said ok...... |

1

000254

## Kenneth W. Pritikin

**From:**        Ron Anson [Ron@agcpa.com]
**Sent:**        Wednesday, January 08, 2003 11:06 AM
**To:**          'kwp@foleymcintosh.com'
**Subject:**     RE: Draft e-mail to Briskin for your review

plse let bob know that we have employed an afiliate of holland and
knight in
brazil. he wanted to know the firm name, i forgot it...the rest is ok...

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Wednesday, January 08, 2003 1:05 PM
To: ron@agcpa.com
Subject: Draft e-mail to Briskin for your review


Bob,

Responding to your specific questions relating to the arbitrage
transaction:

1.  The specific steps remaining to complete the transaction are as
follows:

        a.  Approval of the credit enhancement of the certificates of
deposit by
. the Central Bank of Argentina.  This has now been accomplished.

        b.  Registration of the bonds.  This is in process and should be
completed
very shortly.

        c.  Payment by the buyer of the arbitrage contracts.  Payment is
required
when the bonds are registered.

        d.  Transfer of payment amount to Four Star.  This is the
process
that
requires the background check of the Four Star principals (Ron, Jack and
Mark).  This is solely a requirement of the British government, due to
the
fact that the transaction flows through a British bank.  The inquiry is
limited to whether this is drug money.  This process is well underway,
and a
U.S. congressman is acting on behalf of Four Star to push the process
through..  Four Star has been advised that there will be no difficulty
in
meeting this requirement.

2.  Does Mark speak Spanish?  No, but that is not an issue, for 2
reasons:
(i) the bank which is acting as the escrow is located in Brazil (where
the
language is Portuguese), not in Argentina; (ii) everyone in the bank
speaks
English.

3.  The next time Mark goes anywhere in connection with the arbitrage
transaction, will someone else accompany him?  Yes, Ron advises me that
he
just spoke with you and confirmed that he and Jack will absolutely

1

000252

accompany
him on the next trip.

With regard to Four Star generally, you expressed concern that all
investment information flows through Mark.  That is incorrect.  Ron
advises
me that the arbitrage transaction is the sole Four Star investment in
which
Ron and Jack have no independent knowledge, i.e. where all of their
knowledge comes from Mark.  Ron and Jack are directly involved in all
other
Four Star transactions and they are not relying on Mark for their
information as to these other transactions.  (I should note that I was
previously aware that this is the case with respect to the specific
transactions in which the Pritikin family is invested, but Ron assures
me
that this is also the case for all other Four Star investments,
excepting
the arb investment.)

Ken Pritikin

2

## Kenneth W. Pritikin

From:           Kenneth W. Pritikin [kwp@foleymcintosh.com]
Sent:           Wednesday, January 08, 2003 11:20 AM
To:             'mark@fsfs.com'; 'ron@agcpa.com'; 'jack@agcpa.com'
Subject:        FW: Four Star


-----Original Message-----
From:       Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent:       Wednesday, January 08, 2003 11:19 AM
To:         'rbriskin@rablegal.com'
Subject:    Four Star

Bob,

Responding to your specific questions relating to the arbitrage transaction:

1. The specific steps remaining to complete the transaction are as follows:

    a. Approval of the credit enhancement of the certificates of deposit by the Central Bank of Argentina. This has now been accomplished.

    b. Registration of the bonds. This is in process and should be completed very shortly.

    c. Payment by the buyer of the arbitrage contracts. Payment is required when the bonds are registered.

    d. Transfer of payment amount to Four Star. This is the process that requires the background check of the Four Star principals (Ron, Jack and Mark). This is solely a requirement of the British government, due to the fact that the transaction flows through a British bank. The inquiry is limited to whether this is drug money. This process is well underway, and a U.S. congressman is acting on behalf of Four Star to push the process through.. Four Star has been advised that there will be no difficulty in meeting this requirement.

2. Does Mark speak Spanish? No, but that is not an issue, for 2 reasons: (i) the bank which is acting as the escrow is located in Brazil (where the language is Portuguese), not in Argentina; (ii) everyone in the bank speaks English.

3. The next time Mark goes anywhere in connection with the arbitrage transaction, will someone else accompany him? Yes, Ron advises me that he just spoke with you and confirmed that he and Jack will absolutely accompany him on the next trip. In addition, Four Star has retained Holland & Knight's office in Brazil to assist in the transaction. (Ron said he mentioned to you that a firm had been retained but he didn't recall the name.)

With regard to Four Star generally, you expressed concern that all investment information flows through Mark. That is incorrect. Ron advises me that the arbitrage transaction is the sole Four Star investment in which Ron and Jack have no independent knowledge, i.e. where all of their knowledge comes from Mark. Ron and Jack are directly involved in all other Four Star transactions and they are not relying on Mark for their information as to these other transactions. (I should note that I was previously aware that this is the case with respect to the specific transactions in which the Pritikin family is invested, but Ron assures me that this is also-the case for all other Four Star investments, excepting the arb investment.)

Ken Pritikin


1


000251

63

## Kenneth W. Pritikin

| | |
|---|---|
| From: | Kenneth W. Pritikin [kwp@foleymcintosh.com] |
| Sent: | Monday, January 13, 2003 10:16 AM |
| To: | 'Ron Anson' |
| Cc: | 'Mark Cohn' |
| Subject: | RE: Status update |

I've got the Dec. 16 letter from BRJ Bank, which must be what you are
referring to. No need to fax it. The sentence I assume you are
referring to is where it says: "For your information all parties in this
transaction have agreed in principle." However, I read the context of
that sentence to be referring only to the loan, not to the credit
enhancement. In other words, I read "all parties" to mean only the
lender and the borrower, but not the Central Bank. Although the next
sentence refers to the change of the President of the Central Bank; I
understood that to be relating only to the fact that a condition of the
loan is Central Bank approval of the credit enhancement; and that
fulfillment of that condition had been delayed because of that change.
However, unless I am misreading the "all parties" reference in the
previous sentence, and I don't think I am, there is nothing in the
letter which states that the Central Bank has approved the credit
enhancement in principle.

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Monday, January 13, 2003 9:59 AM
To: 'kwp@foleymcintosh.com'
Cc: Mark Cohn
Subject: RE: Status update
Importance: High


IN A LATE DECEMBER LETTER FROM BRJ WHICH U SHOULD HAVE IN YOUR FILES,
PLSE
CHECK, MARK WILL REFAX TODAY, IF U DONT HAVE IT

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Monday, January 13, 2003 12:04 PM
To: 'Ron Anson'; mark@fsfs.com
Subject: RE: Status update


Ron, I don't have anything in writing from BRJ bank. Mark, if this is
something new, can you fax it to me at 925-284-3029? Ken

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Monday, January 13, 2003 9:54 AM
To: 'kwp@foleymcintosh.com'
Subject: RE: Status update


PER MARK, IN WRITING FROM BRJ BANK. YOU HAVE A COPY OF IT, PER
MARK.....ADVISE BAUM, BUT DONT GIVE HIM THE NAME.

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Monday, January 13, 2003 11:12 AM
To: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: FW: Status update

1

```
-----Original Message-----
From: James Baum [mailto:jsbaum@pacbell.net]
Sent: Friday, January 10, 2003 5:53 PM
To: kwp@foleymcintosh.com; boychek1@tampabay.rr.com;
mrosenthal765@earthlink.net; rp50pritikin@aol.com; roblipp@gam-llc.com;
dsp@gtrb.com; droberts01@aol.com; wwolfen@irell.com; wfwolfen@aol.com;
jim@schragbaum.com
Subject: Re: Status update
```

Who is the person who has assured Four Star that there is Central Bank
approval in principal?  Was it in writing or orally?  If in writing by
what
document; if orally to whom and when?  Please pass these questions to
the
Four Star personnel from whom you received your information.  I would
like
an answer to these questions Monday.  Thank you.

```
----- Original Message -----
From: "Kenneth W. Pritikin" <kwp@foleymcintosh.com>
To: <boychek1@tampabay.rr.com>; <mrosenthal765@earthlink.net>;
<rp50pritikin@aol.com>; <roblipp@gam-llc.com>; <dsp@gtrb.com>;
<droberts01@aol.com>; <wwolfen@irell.com>; <wfwolfen@aol.com>;
<jim@schragbaum.com>
Sent: Friday, January 10, 2003 4:47 PM
Subject: Status update
```

> I am advised by Four Star that it has been in communication today with
the
> bank which is acting as the credit enhancer as well as the lender for
the
> $4.7 million loan.  The loan documents have now been approved as to
form.
> In order for the loan to close, the bank is requiring certain
documents
> relating to the corporate entity that Four Star has established which
will
> be the recipient of the loan funds (formation documents, certificates
of
> good standing, etc.), which documents will be supplied in the next few
> working days.  Certain documents concerning Four Star may also be
required.
> The bank is also stating that its participant bank must sign off, but
it
is
> possible that this requirement may be waived.  In view of the
foregoing,
the
> close is expected to take place by the end of next week or early the
> following week.  As to Central Bank approval of the credit
enhancement,
Four
> Star has again been assured today that there is approval in principal;
> formal sign-off is expected to be imminent but we have no specific
> timeframe.
>
> Ken Pritikin
>
>

000233

**Kenneth W. Pritikin**

| From: | Ron Anson [Ron@agcpa.com] |
|---|---|
| Sent: | Monday, January 13, 2003 12:52 PM |
| To: | 'kwp@foleymcintosh.com'; Mark Cohn; Jack Garrett |
| Subject: | RE: Two afterthoughts |

I THOGUHT THE CD'S MATURE ON SEPT 30TH,2003, NOT DECEMBER.....

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Monday, January 13, 2003 2:57 PM
To: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: FW: Two afterthoughts




-----Original Message-----
From: Monroe Rosenthal [mailto:mrosenthal765@earthlink.net]
Sent: Monday, January 13, 2003 1:02 PM
To: Ken Pritikin; Ungar
Subject: Two afterthoughts


Ken  Two last thoughts. What happens if we need to wait until the CD's
mature in December of 2003.  What is there value at todays exchange rate
and how difficult is it  to get the money out of Argentina?

If there is no progress by Friday I would like to have a conference call
with Mark ,Steve, Robert, Ken ect.scheduled Tuesday the 21st  early pm.
If prior to the conference call this phase closes we can cancel the call
on Tuesday. Thanks. Monroe

1

000228

1/16/03

Question from Baum:

He wants to know why he was told in April 2002 that he'd get his principal back in 90 days and then didn't get it.

Ron's response:

All Four Star investments are in a single fund. In June or July 2002 Four Star was required to escrow all its proceeds from the arbs due to the terms of the sale. This meant no principal could be paid out. The timing to Baum was unfortunate.

Question for Mark:

When did Four Star know that this escrow would be required? Presumably it wasn't known in April when Baum was told he'd get his $ in 90 days.

*also, conf. call to brj to re-send my the letter?*

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Thursday, January 16, 2003 11:09 AM |
| To: | 'kwp@foleymcintosh.com' |
| Subject: | RE: Baum was out; I left a message asking him to call me. |

i think your sincerity about us, and your offer to extend yourself to call,
along with the info that i have talked to the others independently should
defuse him...

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Thursday, January 16, 2003 12:46 PM
To: ron@agcpa.com
Subject: Baum was out; I left a message asking him to call me.

1

000224

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Wednesday, January 22, 2003 1:29 PM |
| To: | 'kwp@foleymcintosh.com' |
| Subject: | RE: Draft status update for your review |

Importance:    High

INSTEAD OF "FUNDING" INSERT "MATTER IS FINALIZED"

AFTER "SIGNOFF" INSERT "THE ATTORNEY CONFIRMED THAT WE HAD PROVIDED THE BANK
WITH ALL REQUIRED INFORMATION." AND ELIMINATE FROM i. e. TO THE END.

PLSE SEND ME CORRECTED COPY BEFORE DISTRIBUTION...

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Wednesday, January 22, 2003 3:07 PM
To: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: Draft status update for your review


Mark, Ron and Jack: Here is my draft status update for your review and
comment.  I chose to specifically identify the three of you as participating
in this call in order to allay concerns which have been voiced to me that
Mark has been the sole conduit of status information.   Ken

I am informed that Four Star principals Mark Cohn, Ron Anson and Jack
Garrett all participated in a teleconference today with the attorney for the
custodian bank.  The attorney advised that the lender bank is now ready to
fund the $4.7 million loan and is awaiting only the participating bank's
signoff.  The attorney advised that immediately after the funding, he will
go to Argentina (the attorney's principal office is in Brazil) to assist in
expediting the remaining bond issues, i.e. Central Bank approval of the
credit enhancement and bond registration.

Ken Pritikin

1

000196

69

## Kenneth W. Pritikin

**From:** Ron Anson [Ron@agcpa.com]

**Sent:** Wednesday, January 22, 2003 12:13 PM

**To:** 'kwp@foleymcintosh.com'

**Subject:** RE: 4 star

BOTH JACK AND I SPOKE WITH ANTONIO MONTENERIO, ALONG WITH MARK TODAY. HE CONFIRMED THAT BRJ WAS READY TO FUND, AWAITING BANK OF BRAZIL SIGNOFF. HE ALSO SAID THAT IMMEDIATELY AFTER FUNDING THE BRJ LOAN, HE WILL GO TO ARGENTINA TO ASSIST IN BOND VERIFICATION. AS U DEEM APPROPRIATE PLSE TRANSMIT TO PEOPLE, VIA EMAIL..........GOOD LUCK

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Wednesday, January 22, 2003 12:04 AM
**To:** mark@fsfs.com
**Cc:** ron@agcpa.com
**Subject:** FW: 4 star

Mark, I talked to Ron re Baum's inquiry last week, but I needed to get one clarification from you before I responded, which is: When did Four Star learn that it would be required to escrow its arb contract revenues? This comes up because apparently in April 2001 Ron told Baum that he could be cashed out in 90 days, and then that didn't happen because of the requirement to escrow revenues. I want to be sure I can tell Baum that when Ron told Baum he could be cashed out in 90 days, Four Star didn't know of the escrow requirement.

Ken

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Tuesday, January 21, 2003 10:02 PM
**To:** 'James Baum'
**Subject:** RE: 4 star

Jim,

I have obtained some information from Four Star in response to your inquiry but I needed some clarification which I am still trying to get. I do expect to get a response to you no later than early next week. Part of the problem has been that my schedule has been extremely hectic this week (I am at the office now, working on a brief), and Mark Cohn has been on the road quite a bit in the past week, so we just haven't been able to hook up (in addition to your inquiry, I have numerous other matters to go over with him, so it isn't a matter of a quick phone conversation, unfortunately.

Ken Pritikin

-----Original Message-----
**From:** James Baum [mailto:jsbaum@pacbell.net]
**Sent:** Tuesday, January 21, 2003 9:56 PM
**To:** Kenneth Pritikin
**Subject:** 4 star

Dear Ken,

I infer from your silence that you are unable to obtain an explanation for the failure to return my

000198

non-arb 4 star funds requested last April.  Thanks for trying.

Jim

## Kenneth W. Pritikin

| | |
|---|---|
| **From:** | Ron Anson [Ron@agcpa.com] |
| **Sent:** | Wednesday, January 22, 2003 8:42 AM |
| **To:** | 'kwp@foleymcintosh.com'; Mark Cohn |
| **Cc:** | Ron Anson |
| **Subject:** | RE: 4 star |

i am sure we did not know when i told him.....i think we found out in late june, but im not sure of the exact timing

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Wednesday, January 22, 2003 12:04 AM
**To:** mark@fsfs.com
**Cc:** ron@agcpa.com
**Subject:** FW: 4 star

Mark, I talked to Ron re Baum's inquiry last week, but I needed to get one clarification from you before I responded, which is: When did Four Star learn that it would be required to escrow its arb contract revenues? This comes up because apparently in April 2001 Ron told Baum that he could be cashed out in 90 days, and then that didn't happen because of the requirement to escrow revenues. I want to be sure I can tell Baum that when Ron told Baum he could be cashed out in 90 days, Four Star didn't know of the escrow requirement.

Ken

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Tuesday, January 21, 2003 10:02 PM
**To:** 'James Baum'
**Subject:** RE: 4 star

Jim,

I have obtained some information from Four Star in response to your inquiry but I needed some clarification which I am still trying to get. I do expect to get a response to you no later than early next week. Part of the problem has been that my schedule has been extremely hectic this week (I am at the office now, working on a brief), and Mark Cohn has been on the road quite a bit in the past week, so we just haven't been able to hook up (in addition to your inquiry, I have numerous other matters to go over with him, so it isn't a matter of a quick phone conversation, unfortunately).

Ken Pritikin

-----Original Message-----
**From:** James Baum [mailto:jsbaum@pacbell.net]
**Sent:** Tuesday, January 21, 2003 9:56 PM
**To:** Kenneth Pritikin
**Subject:** 4 star

Dear Ken,

I infer from your silence that you are unable to obtain an explanation for the failure to return my non-arb 4 star funds requested last April. Thanks for trying.

000200

1/22/2003

Jim

## Kenneth W. Pritikin

**From:** Ron Anson [Ron@agcpa.com]

**Sent:** Wednesday, January 22, 2003 8:46 AM

**To:** 'kwp@foleymcintosh.com'

**Subject:** RE: 4 star

by the way, many other people were also told of the 90 days and later were unable to be paid for the same reason...

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Wednesday, January 22, 2003 12:04 AM
**To:** mark@fsfs.com
**Cc:** ron@agcpa.com
**Subject:** FW: 4 star

Mark, I talked to Ron re Baum's inquiry last week, but I needed to get one clarification from you before I responded, which is: When did Four Star learn that it would be required to escrow its arb contract revenues? This comes up because apparently in April 2001 Ron told Baum that he could be cashed out in 90 days, and then that didn't happen because of the requirement to escrow revenues. I want to be sure I can tell Baum that when Ron told Baum he could be cashed out in 90 days, Four Star didn't know of the escrow requirement.

Ken

-----Original Message-----
**From:** Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
**Sent:** Tuesday, January 21, 2003 10:02 PM
**To:** 'James Baum'
**Subject:** RE: 4 star

Jim,

I have obtained some information from Four Star in response to your inquiry but I needed some clarification which I am still trying to get. I do expect to get a response to you no later than early next week. Part of the problem has been that my schedule has been extremely hectic this week (I am at the office now, working on a brief), and Mark Cohn has been on the road quite a bit in the past week, so we just haven't been able to hook up (in addition to your inquiry, I have numerous other matters to go over with him, so it isn't a matter of a quick phone conversation, unfortunately.

Ken Pritikin

-----Original Message-----
**From:** James Baum [mailto:jsbaum@pacbell.net]
**Sent:** Tuesday, January 21, 2003 9:56 PM
**To:** Kenneth Pritikin
**Subject:** 4 star

Dear Ken,

I infer from your silence that you are unable to obtain an explanation for the failure to return my non-arb 4 star funds requested last April. Thanks for trying.

Jim

1/22/2003                                                                    000202

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Tuesday, January 28, 2003 5:31 PM |
| To: | 'kwp@foleymcintosh.com' |
| Cc: | Mark Cohn |
| Subject: | RE: Frustration in lack of adaquate response to multiple questions |

none fro m me, ask mark

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Tuesday, January 28, 2003 5:36 PM
To: 'Ron Anson'
Subject: RE: Frustration in lack of adaquate response to multiple
questions

Thanks.  Other comments?

-----Original Message-----
From: Ron Anson [mailto:Ron@agcpa.com]
Sent: Tuesday, January 28, 2003 5:27 PM
To: 'kwp@foleymcintosh.com'
Subject: RE: Frustration in lack of adaquate response to multiple
questions

we pay for credit enhancement, but it was already paid

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Tuesday, January 28, 2003 5:29 PM
To: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: FW: Frustration in lack of adaquate response to multiple
questions

Draft response to Monroe (note: I need to know the answer to question #2
regarding who pays for the credit enhancement):

Monroe,

I have reviewed your four emails of December 8 and January 12, 13 and
20, as
well as a fifth email you sent on December 23.  Some of the questions
you
asked were answered to the extent possible, others I thought I had
discussed
with you or else with Steve Ungar (with the expectation that the info
would
be passed on to you), but I may have been mistaken.  In any event, here
are
the issues you have raised and here is what I can tell you:

1.  Confirmation of the credit enhancement process.  On December 12, I
sent
a status update quoting verbatim from a letter Four Star had provided to
me
from counsel for the custodian bank, stating that the Central Bank of
Argentina has approved the credit enhancement in principle.

2.  Who pays for the credit enhancement?  NEED ANSWER.

1

000469

3.   What about the $1.4 million AIG premium that Four Star paid for? I am advised that Four Star has retained counsel in Brazil to expedite the return of those funds.

4.   Confirmation of the value of the CD's.  I am attempting to independently verify the status and value of the CD's.  I hope to have more information on my efforts by next week.

5.   Why is the loan important?  The reason is that Four Star has long anticipated that, even after the arb deal closes, there will be a delay in transferring the money out of Argentina, due to compliance with British banking regulations.  Thus, last fall Four Star commenced the process to secure the loan, so that the loan funds would be available pending receipt of the arb sale proceeds.  The loan is earmarked for certain items that Four Star wants to pay without delay, including attorney's fees, some stipulated settlements, and payments to some investors whose distributions were stopped prior to other investors (in order that all investors would then be on an even plane with one antoher).

6.   When will Mark agree that he needs "major" help, e.g. an M&A firm?  Four Star has employed counsel when and to the extent it believes it to be appropriate.  For example, as previously noted, Four Star has counsel in Brazil with respect to securing the return of the AIG premium, and Four Star has retained counsel in England (the Weil, Gotshal firm) and in Argentina (an affiliate of Weil, Gotshal) to deal with different aspects of the transaction.  It is Four Star's judgment that sufficient legal counsel has been retained at this time.

7.   What about updates on other Four Star assets, and in particular Arb #8? Given the immediate issue of closing the loan and the arb deal, as well as all of the other activities that Four Star is dealing with at the moment, it is simply not feasible to do a report on the status of other assets right now.  Since you have signed the Nondisclosure Agreement, you are welcome at any time to examine Four Star's books with regard to the performance and status of its investments.  With specific regard to Arb #8, I had previously checked with Four Star, at the request of Steve Ungar, to confirm that the funds from this investment are segregated from other Four Star funds, such that the performance and safety of the investment would not be affected by the status of other Four Star assets, and Four Star has assured me that that is the case.

I believe that this covers all of the issues that you had raised.

2

Ken Pritikin

-----Original Message-----
From: Monroe Rosenthal [mailto:mrosenthal765@earthlink.net]
Sent: Sunday, January 26, 2003 8:41 PM
To: Ken Pritikin; Mark Cohn
Subject: Frustration in lack of adaquate response to multiple questions

Ken; I know you are trying! But the current system is NOT working. I
have  sent  you four emails Dec 8 ,Jan 12, Jan 13 ,and Jan 20.The
responses I get  consist of segments of correspondence you are being
given by Mark not necessarily related to my questions. There is always
an excuse that there is no time for Mark  and you to set  up a time  (
ie  a scheduled conference call )to adequately respond. In my last Email
I requested a conference call be set up last week for some of the
investors to speak directly with Mark as we did last November. I got no
response!

Mark and you need to try harder to make the investors feel  their
concerns are being addressed. AND it is possible that some of these
question if dealt with may bring out issues Mark has not thought of or
introduce other approches to existing problems.Please discuss these
issues with Mark and try to impress upon him that as the weeks and
months pass by without what many feel is  subtantive progress he needs
to be MORE active in his communication EVEN of there is less to report.
Thanks for your efforts . Monroe

3

000471

77

**Kenneth W. Pritikin**

| | |
|---|---|
| From: | Ron Anson [Ron@agcpa.com] |
| Sent: | Tuesday, January 28, 2003 4:41 PM |
| To: | 'kwp@foleymcintosh.com' |
| Subject: | RE: Curious |

good

-----Original Message-----
From: Kenneth W. Pritikin [mailto:kwp@foleymcintosh.com]
Sent: Tuesday, January 28, 2003 6:43 PM
To: mark@fsfs.com; ron@agcpa.com; jack@agcpa.com
Subject: FW: Curious

Draft response to Craig Bramscher for your review and comment:

Craig,

I am sorry that I did not get back to you earlier; I've been extremely busy
with my own practice in the past week.

In response to your inquiry, Four Star advises as follows:

First, as you may know, Four Star has approximately 500 assets in its
portfolio; only eight of these assets are being sold in the transaction to
which the loan pertains (albeit these eight assets do constitute a
disproportionately large share of the total asset value of Four Star). As
a group, the remaining (non-arb) assets continue to generate significant
cash flow to Four Star; however, early in 2002 Four Star made the decision
to retain this cash flow rather than to distribute it (for example, some of
the cash flow was used to reduce Four Star's debt in certain of these
assets, thereby increasing the percentage of future cash flow that would be
distributable to investors), pending the close of the arb deal. This
decision has been made, in accordance with Four Star's duty as manager of
the assets, in order to conserve the value of the entire portfolio to the
benefit of all investors.  The purpose of the loan is to secure additional
funds, pending the close of the arb deal, that Four Star has earmarked for
certain expenses and payments.

Ken Pritikin

-----Original Message-----
From: Steven Ungar [mailto:boychek1@tampabay.rr.com]
Sent: Tuesday, January 21, 2003 11:37 AM
To: Kenneth Pritikin
Subject: FW: Curious

I told him I would forward his question to you.

Thanks,
Steve

1

000476

```
-----Original Message-----
From: Craig Bramscher [mailto:craig@bramscher.com]
Sent: Tuesday, January 21, 2003 2:29 PM
To: 'Steven Ungar'
Subject: Curious
```

Steven,

Thanks for the updates as usual.

It seems odd that everything is held up for such a small loan with such a
large amount in Four Star's kitty?  Is it simply that they are continuing
the existing business but temporarily using the monthly proceeds to fund
this loan?   It is so confusing!

Hope all is well with you.

Best,

Craig

2

000477

1   ALSCHULER GROSSMAN STEIN & KAHAN LLP
    Michael J. Plonsker (No. 101235)
2   The Water Garden
    1620 26th Street
3   Fourth Floor, North Tower
    Santa Monica, California 90404-4060
4   Telephone: 310-907-1000
    Fax: 310-907-2000
5
    Attorneys for Plaintiffs
6   MICHAEL J. PLONSKER and LISA PLONSKER

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

OCT 1 0 2003

John A. Clarke, Executive Officer/Clerk

By D. Geter, Deputy

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                COUNTY OF LOS ANGELES - WEST DISTRICT

10

11  MICHAEL J. PLONSKER, individually;         CASE NO.  SC079281
    LISA PLONSKER, individually and as
12  trustee of the Faversham Grandchildren's   **COMPLAINT FOR:**
    Trust,
13                                             1. **BREACH OF CONTRACT;**
                  Plaintiffs,                  2. **FRAUDULENT**
14                                                **MISREPRESENTATION;**
        vs.                                    3. **NEGLIGENT MISREPRESENTATION;**
15                                             4. **FRAUDULENT CONCEALMENT;**
    FOUR STAR FINANCIAL SERVICES,              5. **BREACH OF FIDUCIARY DUTY;**
16  LLC, a California limited liability        6. **NEGLIGENCE;**
    company; 900 CAPITAL SERVICES,             7. **CONVERSION; AND**
17  INC., a California corporation; F.S.F. LLC, 8. **SETTING ASIDE FRAUDULENT**
    a California limited liability company;       **TRANSFER AND CONSTRUCTIVE**
18  ANSON, GARRETT & CO., a California            **TRUST**
    accountancy corporation; RON ANSON,
19  an individual; JACK GARRETT, an            ALLAN J. GOODMAN
    individual; GRONIMOF ALPER, LTD., an       Judge_____ Dept. _H_
20  California limited partnership; GARRETT    Initial Status Conference &
    & ANSON INVESTMENT COMPANY, a              OSC Re: Proof of Service Set ___ JAN 2 2 2004 at 8:30 a.m.
21  California corporation; MARK COHN, an       1633 Purdue Ave., West Los Angeles Courthouse
    individual; GAIL CATO, an individual;
22  DOES 1 through 500, inclusive,

23                Defendants.

24

25          Plaintiffs, Michael J. Plonsker and Lisa Plonsker ("Plaintiffs") complain as

26  follows:

27  ///

28  ///

                    COMPLAINT FOR BREACH OF CONTRACT, ETC.                    80

                                Exh C

## PARTIES

1. Plaintiffs Michael J. Plonsker and Lisa Plonsker (husband and wife) are, and at all times hereto were, individuals residing in the County of Los Angeles, State of California. Plaintiff Lisa Plonsker is, and at all times mentioned herein was, a trustee of the Faversham Grandchildren's Trust ("Trust").

2. Plaintiffs are informed and believe, and thereon allege, that Defendant Four Star Financial Services, LLC ("Four Star") is, and at all times hereto was, a California limited liability company duly organized and doing business in the State of California, County of Los Angeles.

3. Plaintiffs are informed and believe, and thereon allege, that Defendant 900 Capital Services, Inc. ("900 Capital") is, and at all times hereto was, a California corporation duly organized and doing business in the State of California, County of Los Angeles. Plaintiffs are informed and believe, and thereon allege, that Four Star is a successor to all right, title and interest in 900 Capital's assets. Hereinafter 900 Capital shall also be referred to as "Four Star."

4. Plaintiffs are informed and believe, and thereon allege, that Defendant F.S.F. LLC ("FSF") is, and at all times hereto was, a California limited liability company duly organized and doing business in the State of California, County of Los Angeles and is owned in whole or in part by Four Star.

5. Plaintiffs are informed and believe, and thereon allege, that Defendant Anson, Garrett & Co. ("Anson & Garrett") is, and at all times hereto was, a California accountancy corporation duly organized and doing business in the State of California, County of Los Angeles.

///

2

1        6.    Plaintiffs are informed and believe, and thereon allege, that Defendant

2  Gronimof Alper Ltd. ("Gronimof") is, and at all times hereto was, a California limited liability

3  company duly organized and doing business in the State of California, County of Los Angeles.

4        7.    Plaintiffs are informed and believe, and thereon allege, that Garrett &

5  Anson Investment Company ("G&A") is, and at all times hereto was, a California corporation,

6  duly organized and doing business in the State of California, County of Los Angeles.

7        8.    Plaintiffs are informed and believe, and thereon allege, that Defendant Ron

8  Anson ("Anson") all times hereto was, an individual, a resident of Los Angeles County, State of

9  California, and a shareholder, officer, member and/or manager of Four Star, FSF, 900 Capital,

10  Anson & Garrett and G&A.

11        9.    Plaintiffs are informed and believe, and thereon allege, that Defendant Jack

12  Garrett ("Garrett") is, and at all times hereto was, an individual, a resident of Los Angeles

13  County, State of California, and a shareholder, officer, member, general partner and/or manager

14  of Four Star, FSF, 900 Capital, Anson & Garret, G&A and Gronimof.

15        10.    Plaintiffs are informed and believe, and thereon allege, that Defendant

16  Mark Cohn ("Cohn"), is, and at all times mentioned hereto was, an individual, a resident of the

17  State of California, county unknown, and a shareholder, officer, member and/or manager of Four

18  Star, FSF, 900 Capital and G&A and doing business in the County of Los Angeles, State of

19  California.

20        11.    Plaintiffs are informed and believe, and thereon allege, that Defendant Gail

21  Cato ("Cato") is, and at all times hereto was, an individual, a resident of the State of Georgia and

22  doing business in the County of Los Angeles, State of California.

23        12.    Plaintiffs are informed and believe, and thereon allege, pursuant to

24  California Code of Civil Procedure § 474, that the fictitiously named Defendants sued herein as

25  Does 1 through 500, inclusive, and each of them, were in some manner responsible or legally

26  liable for the actions, events, transactions and circumstances alleged herein.  The true names and

27  capacities of such fictitiously named Defendants, whether individual, corporate, associate or

28  otherwise, are presently unknown to Plaintiffs and Plaintiffs will seek leave of court to amend this

3

1   complaint to assert the true names and capacities of such fictitiously named Defendants when the

2   same have been ascertained. For convenience, each reference to a named Defendant herein shall

3   also refer to the Doe Defendants, and each of them.

4           13.    Plaintiffs are informed and believe, and thereon allege, that Defendants,

5   and each of them, were the agents, employees, partners, joint venturers, co-conspirators, owners,

6   principals, and employers of the remaining Defendants, and each of them, and are, and at all

7   times herein mentioned were, acting within the course and scope of that agency, partnership,

8   employment, conspiracy, ownership, or joint venture. Plaintiffs are further informed and believe

9   and thereon allege that the acts and conduct herein alleged of each such Defendant were known

10  to, authorized by, and/or ratified by the other Defendants, and each of them.

11          14.    Plaintiffs are informed and believe, and thereon allege, that Defendants

12  Anson, Garrett and Cohn, are, and at all times material hereto were, the controlling shareholders,

13  general partners, and/or members of Defendants Four Star, FSF, Gronimof, G&A and/or Anson &

14  Garrett and Does 1 through 250, inclusive, and that Defendants Anson, Garrett and/or Cohn at all

15  times directly controlled each or all of such Defendants. Plaintiffs are further informed and

16  believe, and thereon allege that Defendants Four Star, FSF, Gronimof, G&A, Anson & Garrett

17  and Does 1 through 250, inclusive, are, and at all times relevant hereto have been, mere shells and

18  shams without sufficient capital or assets to meet their debts, obligations and liabilities. Plaintiffs

19  are further informed and believe and thereon allege, that all times material hereto, Defendants

20  Four Star, FSF, Gronimof, G&A and/or Anson & Garrett, and Does 1 through 250, inclusive, and

21  each of them, failed to maintain a corporate identity separate and distinct from Defendants Anson,

22  Garrett and/or Cohn, or from each other, and that they have been the business conduit and alter

23  ego of such Defendants, and each other, and that adherence to the fiction of the separate legal

24  existence of such Defendants as entities distinct from one another would permit an abuse of the

25  corporate privilege, would promote injustice and would sanction a fraud upon Plaintiffs.

26          15.    Plaintiffs are informed and believe, and thereon allege, that Defendants

27  Anson, Garrett and/or Cohn completely owned, controlled, dominated, used, managed and

28  operated Defendants Four Star, FSF, Gronimof, G&A and/or Anson & Garret, and Does 1

4

1  through 250, inclusive, or each of them, and, therefore, any obligation, duty or liability of one

2  Defendant as alleged herein should be deemed to similarly be an obligation, duty and liability of

3  each and every other Defendant.

4          16.    Plaintiffs are informed and believe, and thereon allege, that Defendants

5  Four Star, FSF, Gronimof, G&A, and/or Anson & Garrett and Does 1 through 250, inclusive, and

6  each of them, are, and at all times material hereto, were, the alter egos of each other and the other

7  defendants and there exists and at all times material hereto has existed a unity of interest and

8  ownership of all such Defendants such that any separateness has ceased to exist in that each of the

9  Defendants used assets of the other Defendants for their separate, individual purposes and caused

10  assets to be transferred to each other without adequate consideration.  Plaintiffs are informed and

11  believe and thereon allege, that Defendants, and each of them, have improperly commingled

12  funds and/or participated in, engaged in and/or performed various stock or other financial

13  manipulations, transfers and/or assets without adequate consideration and/or without adequate

14  accounting.

15                            **GENERAL ALLEGATIONS**

16          17.    Beginning in or about 1985, Plaintiffs engaged Defendants Anson &

17  Garrett, Anson and Garrett to act as their accountants and said Defendants acted as Plaintiffs'

18  accountants through and including July 2003, at which time Plaintiffs terminated said Defendants

19  as their accountants.

20          18.    In or about 1995, Anson and Garrett, on behalf of themselves and on behalf

21  of Four Star, Cohn and Anson & Garrett represented to Plaintiff Michael Plonsker (and through

22  him, to Plaintiff Lisa Plonsker) that they had created an investment opportunity for their clients

23  and friends which involved "factoring" accounts receivables due to telephone company customers

24  and that by doing so they could make a significant profit and pass that profit on to investors.

25  Anson and Garrett represented to Plaintiff Michael Plonsker that if he and his wife, Plaintiff Lisa

26  Plonsker, would like to invest in this investment opportunity, they would be paid interest on their

27  investment in the amount of between fifteen percent (15%) and eighteen percent (18%) of their

28  principal investment, which interest payments would be paid to Plaintiffs on a monthly basis.

1   Plaintiff Michael Plonsker advised Anson and Garrett that Plaintiffs were risk adverse (for

2   example, Plaintiffs had never invested in the stock market) and did not want to in any way

3   jeopardize or "put at risk" the principal that they invested in this investment opportunity. Anson

4   and Garrett represented that Plaintiffs' principal was not at risk in any manner whatsoever

5   because major well-known telephone companies owed the accounts receivable and the only

6   portion of the investment that was even possibly at risk was the amount of interest that would be

7   paid. Anson and Garrett further represented to Plaintiff Michael Plonsker that, as Plaintiffs'

8   accountants and friends, they recommended that Plaintiffs invest in this investment opportunity

9   and "guaranteed" that the principal was not at risk.

10          19.     Based on the representations of Anson and Garrett, which representations

11  were made on behalf of themselves individually, and on behalf of Cohn and Four Star (then

12  known as 900 Capital), on or about January 20, 1995, Michael Plonsker and 900 Capital entered

13  into a written agreement ("Investor Agreement #1") pursuant to which, among other things:

14          (a)     Plaintiff Michael Plonsker delivered a check in the amount of Fifty

15                  Thousand Dollars to Garrett of Anson & Garrett on behalf of 900 Capital;

16          (b)     Plaintiff Michael Plonsker was to be paid 15% interest on his investment

17                  (which later was increased to 18% interest) on a monthly basis; and

18

19          (c)     Plaintiff Michael Plonsker could request repayment of the principal amount

20                  and accrued interest upon providing thirty (30) days written notice.

21  A true and correct copy of Investor Agreement #1 is attached hereto as Exhibit A and

22  incorporated herein as if set forth in full.

23          20.     In or about October 1998, Anson and Garrett, on behalf of themselves and

24  on behalf of Four Star, Cohn and Anson & Garrett, made further representations to Plaintiff

25  Michael Plonsker (and through him to Plaintiff Lisa Plonsker) which were, among other things,

26  that their accounts receivable factoring business was performing beyond expectations, that they

27  had both individually invested a significant amount of money in Four Star, that Plaintiffs should

28

                                                6

                        COMPLAINT FOR BREACH OF CONTRACT, ETC.                        85

1   invest additional sums (especially since they did not invest in the stock market) and that they

2   guaranteed that the principal invested would not be at risk.

3          21.    Based upon such representations, on or about October 5, 1998, Plaintiff

4   Michael Plonsker entered into a second written agreement with Four Star ("Cash Flow Note #1"),

5   pursuant to which, among other things:

6          (a)    Plaintiff Michael Plonsker delivered a check in the amount of One Hundred

7                 Thousand Dollars ($100,000) to Garrett of Anson & Garrett on behalf of

8                 Four Star;

9          (b)    Interest was to be paid to Plaintiff Michael Plonsker at a rate of eighteen

10                percent (18%) per annum, with said interest being paid on a monthly basis;

11                and

12

13         (c)    At any time, upon ninety (90) days notice to Four Star, Plaintiff Michael

14                Plonsker could demand payment in full of the principal amount and any

15                interest accrued but unpaid.

16  A true and correct copy of the Cash Flow Note #1 is attached hereto as Exhibit B and

17  incorporated herein by reference as if set forth in full.

18         22.    In or about February 2000, April 2001 and January 2002, and at many

19  other times throughout the years, Anson and Garrett, individually and on behalf of Four Star,

20  FSF, Cohn and Anson & Garrett, made similar representations to Plaintiff Michael Plonsker (and

21  through him to Plaintiff Lisa Plonsker) as set forth in paragraphs 18 and 20 above, and in addition

22  represented that Four Star was performing extremely well, that over $100 million had been

23  invested in the Company by very sophisticated investors and that, in addition to the "factoring"

24  investments, they had created another type of "risk free" investment, which they described as

25  "arbitrage" investments.  Said Defendants further represented and "guaranteed," among other

26  things, that the principal to be invested would not be at risk in any manner whatsoever because

27  Four Star purchased telephone long distance time from large telephone companies at a significant

28  discount and sold such time to other significant telephone companies.

7

**COMPLAINT FOR BREACH OF CONTRACT, ETC.**

1    23.    Based upon such representations, Plaintiffs invested the following

2    additional sums and entered into the following written contracts:

3    (a)    On or about April 5, 2000, Plaintiffs Michael Plonsker and Lisa Plonsker

4    entered into a written Investor Agreement with Four Star ("Arbitrage

5    Agreement #1") pursuant to which, among other things:

6    (i)    Plaintiffs delivered to Four Star, through Garrett of Anson &

7    Garrett, the sum of One Hundred Thousand Dollars ($100,000)

8    which was to be invested in a specified "arbitrage" transaction

9    referred to as the "Canadian Deal;"

10

11    (ii)    Four Star shall make payments to Plaintiffs out of money first

12    received from said investment until Plaintiffs received an annual

13    yield of thirty percent (30%), payable monthly;

14    (iii)    Plaintiffs agreed that said investment would be tied up for a

15    minimum of 40 weeks and that Plaintiffs could thereafter demand

16    return of the investment on six weeks notice; and

17    (iv)    Four Star represented that "while the principal invested is safe, the

18    exact amount of yields generated might be speculative.

19    Accordingly, while Four Star does guarantee the return of principal

20    from the investment activity, it makes no guarantees or warranties

21    concerning yield."

22    (b)    On or about June 15, 2001, Plaintiffs Michael Plonsker and Lisa Plonsker

23    entered into a written Investor Agreement with Four Star ("Arbitrage

24    Agreement #2") pursuant to which, among other things:

25

26    (i)    Plaintiffs delivered to Four Star, through Garrett of Anson &

27    Garrett, the sum of One Hundred Thousand Dollars ($100,000),

28    which was to be invested in a specified "arbitrage" transaction

8

1    referred to as "Arbitrage #4;"

2    (ii)    Four Star shall make payments to Plaintiffs, until Four Star located

3    an acceptable "arbitrage" investment, of interest at a rate of

4    eighteen percent (18%) per annum and, once an acceptable

5    "arbitrage" investment was located, interest would be paid at a rate

6    of thirty percent (30%) per annum, with all such interest payments

7    being made monthly;

8    (iii)   Plaintiffs agreed that their investment shall be tied up for the

9    duration of the contracts in which Four Star has entered or will

10    enter into concerning the acceptable investment, which Four Star

11    represented would be approximately one year in duration; and

12    (iv)    Four Star represented that "while the principal invested is safe, the

13    exact amount of yields generated might be speculative.

14    Accordingly, while Four Star does guarantee the return of principal

15    from the investment activity, it makes no guarantees or warranties

16    concerning yield."

17

18    (c)    On or about January 28, 2002, Plaintiff Michael Plonsker and Four Star

19    entered into a written Investor Agreement with Four Star ("Arbitrage

20    Agreement #3") pursuant to which, among other things:

21    (i)    Plaintiff Michael Plonsker delivered to Four Star, FSF, through

22    Garrett of FSF and Anson & Garrett, the sum of One Hundred

23    Thousand Dollars ($100,000) which was to be invested in a

24    specified "arbitrage" transaction referred to as "Arbitrage #7;"

25    (ii)   Four Star shall make payments to Plaintiff, until Four Star located

26    an acceptable "arbitrage" investment, of interest at a rate of

27    eighteen percent (18%) per annum and, once an acceptable

28

9

"arbitrage" investment was located, interest would be paid at a rate of thirty percent (30%) per annum, with all such interest payments being made monthly;

(iii)    Plaintiff agreed that his investment shall be tied up for the duration of the contracts in which Four Star has entered or will enter into concerning the acceptable investment, which Four Star represented would be approximately one year in duration; and

(iv)    Four Star represented that "while the principal invested is safe, the exact amount of yields generated might be speculative. Accordingly, while Four Star does guarantee the return of principal from the investment activity, it makes no guarantees or warranties concerning yield."

True and correct copies of Arbitrage Agreement #1, Arbitrage Agreement #2 and Arbitrage Agreement #3 are attached hereto as Exhibits C, D and E, respectively, and incorporated herein as if set forth in full.

24.    Based on the representations set forth hereinabove, Plaintiff Lisa Plonsker, as trustee of the Trust, entered into the following written contracts:

(a)    On or about June 23, 2000, Plaintiff Lisa Plonsker, on behalf of the Trust, and Four Star entered into a written Cash Flow Note with Four Star ("Cash Flow Note #2"), pursuant to which, among other things:

(i)    The Trust delivered to Four Star, through Garrett of Anson & Garrett, the sum of Ten Thousand Dollars ($10,000.00);

(ii)    Interest was to be paid to the Trust at a rate of eighteen percent (18%) per annum with said interest being accrued on a monthly basis; and

(iii)    At any time upon ninety (90) days' notice to Four Star, the Trust

10

**COMPLAINT FOR BREACH OF CONTRACT, ETC.**

89

1    could demand payment in full of the principal amount and any

2    interest accrued but unpaid.

3    (b)    On or about April 23, 2001, Plaintiff Lisa Plonsker, on behalf of the Trust,

4    entered into a written Investor Agreement with Four Star ("Arbitrage

5    Agreement #4") pursuant to which, among other things:

6    (i)    The Trust delivered to Four Star, through Garrett of Anson &

7    Garrett, the sum of Seven Thousand Five Hundred Dollars

8    ($7,500.00) which was to be invested in a specified "Arbitrage"

9    transaction;

10

11    (ii)    Four Star shall make payments to the Trust until Four Star located

12    an acceptable "Arbitrage" investment, of interest at a rate of

13    eighteen percent (18%) per annum, and once an acceptable

14    "Arbitrage" investment was located, interest would be paid at a rate

15    of thirty percent (30%) per annum, with all such interest payments

16    being accrued monthly;

17    (iii)    Plaintiffs agreed that their investment shall be tied up for the

18    duration of the contracts in which Four Star has entered or will

19    enter in to concerning the acceptable investment, which Four Star

20    represented would be approximately one year in duration; and

21    (iv)    Four Star represented that "while the principal invested is safe, the

22    exact amount of yields generated might be speculative.

23    Accordingly, while Four Star does guarantee the return of principal

24    from the investment activity, it makes no guarantees or warranties

25    concerning yield."

26    (c)    On or about June 2, 2001, Plaintiff Lisa Plonsker, on behalf of the Trust,

27    and Four Star entered into a written Cash Flow Note with Four Star ("Cash

28

11

COMPLAINT FOR BREACH OF CONTRACT, ETC.

Flow Note #3"), pursuant to which, among other things:

    (i)    The Trust delivered to Four Star, through Garrett of Anson & Garrett, the sum of Five Thousand Five Hundred Dollars ($5,500.00);

    (ii)    Interest was to be paid to the Trust at a rate of eighteen percent (18%) per annum with said interest being accrued on a monthly basis; and

    (iii)    At any time upon ninety (90) days' notice to Four Star, the Trust could demand payment in full of the principal amount and any interest accrued but unpaid.

(d)    On or about May 8, 2002, Plaintiff Lisa Plonsker, on behalf of the Trust, and Four Star entered into a written Cash Flow Note with Four Star ("Cash Flow Note #4"), pursuant to which, among other things:

    (i)    The Trust delivered to Four Star, through Garrett of Anson & Garrett, the sum of Six Thousand Dollars ($6,000.00);

    (ii)    Interest was to be paid to the Trust at a rate of eighteen percent (18%) per annum with said interest being accrued on a monthly basis; and

    (iii)    At any time upon ninety (90) days' notice to Four Star, the Trust could demand payment in full of the principal amount and any interest accrued but unpaid.

(e)    On or about June 27, 2002, Plaintiff Lisa Plonsker, on behalf of the Trust, and Four Star entered into a written Cash Flow Note with Four Star ("Cash Flow Note #5"), pursuant to which, among other things:

    (i)    The Trust delivered to Four Star, through Garrett of Anson & Garrett, the sum of Five Thousand Dollars ($5,000.00);

12

1
2
3

        (ii)    Interest was to be paid to the Trust at a rate of eighteen percent (18%) per annum with said interest being accrued on a monthly basis; and

4
5
6

        (iii)   At any time upon ninety (90) days' notice to Four Star, the Trust could demand payment in full of the principal amount and any interest accrued but unpaid.

7
8
9

      25.    True and correct copies of Cash Flow Note #2, Arbitrage Agreement #4, Cash Flow Note #3, Cash Flow Note #4, Cash Flow Note #5, are attached hereto as Exhibits F, G, H, I and J, respectively, and incorporated herein as if set forth in full.

10
11
12
13

      26.    Hereafter, the agreements referred to as Investor Agreement #1, Cash Flow Note #1, Cash Flow Note #2, Cash Flow Note #3, Cash Flow Note #4, Cash Flow Note #5, Arbitrage Agreement #1, Arbitrage Agreement #2, Arbitrage Agreement #3 and Arbitrage Agreement #4 shall be collectively referred to as "the Agreements."

14

### FIRST CAUSE OF ACTION

15
16
17

**(For Breach of Written Contracts Against Four Star, FSF, Anson, Garrett, Cohn,**

**Gronimof, G&A, Anson & Garrett,**

**and Does 1 through 250, inclusive)**

18
19

      27.    Plaintiffs repeat and reallege as if fully set forth herein each and every allegation contained in paragraphs 1 through 26, inclusive, of this Complaint.

20
21

      28.    Plaintiffs have fully performed all of the conditions and each and every act required to be performed on their part in accordance with the terms of the Agreements.

22
23
24

      29.    On or about February 11, 2003, Plaintiffs demanded that Four Star pay in full all amounts owed to Plaintiffs pursuant to the Agreements and all interest due pursuant to the terms thereof. Four Star has failed and refused to make such payments to Plaintiffs.

25
26
27

      30.    Plaintiffs have been damaged as a result of Defendants' breach of the Agreements in the amount of Four Hundred Eighty-Four Thousand Dollars ($484,000.00), plus all accrued interest with daily interest accruing thereon pursuant to the terms of the Agreements.

28
///

13

## SECOND CAUSE OF ACTION

### (For Fraudulent Misrepresentation and Conspiracy Against All Defendants and Does 1 through 500, inclusive)

31.    Plaintiffs repeat and reallege as if fully set forth herein each and every allegation contained in paragraphs 1 through 30, inclusive, of this Complaint.

32.    Plaintiffs are informed and believe and thereon allege as more particularly alleged in paragraphs 18, 20 and 22, above, that Defendants Anson, Garrett and Anson & Garrett, and each of them, on behalf of themselves individually and on behalf of, as alter egos of or in conspiracy with the other Defendants, and each of them, intentionally misrepresented material facts concerning Four Star's business activities, legal status, financial condition, investment activities and intentions with respect to the Agreements entered into by Plaintiffs. The misrepresentations by said Defendants include, but are not limited to, the allegations set forth above, as well as additional representation over the years at numerous times that Four Star was and had engaged in only lawful business activities, was financially sound and successful, was not subject to any legal actions, would utilize the funds loaned by Plaintiffs for investment in the specified telecommunications activities and would repay funds loaned by Plaintiffs, with interest thereon, on demand by Plaintiffs.

33.    Plaintiffs are informed and believe and thereon allege, that between 1995 and 2000, Defendant Cato began conspiring with Defendants Anson, Cohen, Garrett, Four Star and/or FSF to make the misrepresentations to investors, including Plaintiffs, that are set forth herein for the purpose of inducing investors like Plaintiffs to invest money in Four Star and FSF so that said money could be diverted for their own benefits.

34.    Plaintiffs are informed and believe and thereon allege, contrary to the representations made to Plaintiffs by Defendants, that:

(a)    Defendants never intended to invest Plaintiffs' money in the investments represented;

14

COMPLAINT FOR BREACH OF CONTRACT, ETC.

(b)  Defendants never intended to guarantee Plaintiffs' principal investment or
that the principal investment would not be at risk;

(c)  Defendants intended to divert Plaintiffs' investments to their own benefit
and the benefit of companies owned and controlled by them;

(d)  Defendants did not have the experience, competence and/or intent to
manage a large investment fund;

(e)  Defendants had engaged in mail and wire fraud in connection with a
telemarketing scheme whereby thousands of consumers were defrauded of
tens of millions of dollars;

(f)  Four Star was not financially sound and was not able to guarantee the
repayment of principal amounts invested and was subject to significant
legal actions;

(g)  Defendants knew that they were under investigation by federal and state
authorities in connection with a fraudulent telemarketing scheme;

(h)  In or about 2001, Four Star, Cohn and several of Four Star's business
associates were indicted for mail and wire fraud in connection with a
telemarketing scheme by a federal grand jury in Maryland;

(i)  Four Star was not financially sound and successful, Four Star was insolvent
and unable, or on the verge of being unable, to pay its obligations as they
became due; Four Star's assets were relatively worthless; and Four Star had
no revenues and no reasonable prospects of generating any revenues;

(j)  Defendants secretly had been engaged in a fraudulent transaction referred
to by them as the "Argentinean transaction." Through the Argentinean
transaction, Defendants have undertaken to convert the assets of Four Star
through an elaborate ruse ostensibly involving the transfer of tens of
millions of dollars of investment in Four Star (including Plaintiffs'

15

COMPLAINT FOR BREACH OF CONTRACT, ETC.                              94

1   investments) through banks and other entities allegedly located in England,

2   Canada, Saudi Arabia, Georgia and Argentina; the death of a Virginia

3   attorney in a hotel room in Buenas Aires; and Cato.  Defendants, on behalf

4   of themselves and each other, represented that there was a veil of secrecy

5   surrounding the Argentinean Transaction and warned Plaintiffs and other

6   investors that if anyone tried to directly confirm the existence of the

7   transaction, the transaction and all the money would be lost;

8   (k)   Defendants, or each of them, were secretly engaged in a "Ponsi scheme"

9   whereby they illegally and fraudulently solicited, obtained and used money

10   provided by new investors in Four Star, including Plaintiffs, to pay interest

11   and returns to prior investors in Four Star;

12   (l)   Four Star utilized Plaintiffs' money in furtherance of and to defend its

13   unlawful schemes; and

14

15   (m)   Defendants had no intention to repay Plaintiffs' money to them and knew

16   that Four Star had no reasonable prospect of being able to repay such

17   investments.

18   35.   In or about June 2003, Four Star and Cohn were convicted on more than 50

19   counts of mail fraud, wire fraud and conspiracy.

20   36.   Defendants, and each of them, acting as agents for and on behalf of or as

21   alter egos of each other, made the above representations with the intent that Plaintiffs would rely

22   on the representations.  At the time Defendants made the above representations and/or

23   concealments, they knew the representations were false and made the representations with the

24   intent of inducing Plaintiffs to enter into the Agreements.

25   37.   In entering each of the Agreements, in forbearing on demanding earlier

26   repayment and in forbearing on taking earlier legal action, Plaintiffs did, in fact, rely upon the

27   representations, and each of them, and reasonably believed that the representations were true.

28

16

COMPLAINT FOR BREACH OF CONTRACT, ETC.

1  Had Plaintiffs known the above representations were false, they would not have taken such
2  actions.

3          38.    As a direct and proximate result of the above-described fraudulent and
4  deceitful representations made by Defendants, and each of them, on behalf of themselves and
5  each other, Plaintiffs have been damaged in an amount in excess of the jurisdictional limits of this
6  Court, the exact amount to be proven at the time of trial.

7          39.    The above-described conduct of the Defendants, and each of them, was
8  made individually on behalf of each other and in conspiracy with each of the other Defendants
9  and in the course and scope of their employment as officers, members, directors and/or managing
10  agents of the other Defendants.  Further, the above-described conduct of Defendants, and each of
11  them, and such conduct was expressly or implicitly ratified as agent for and on behalf of the other
12  Defendants, was willful and intentional and done with fraud, oppression and malice, and was
13  done with a conscious disregard of Plaintiffs' rights and interests, such that the conduct warrants
14  the imposition of punitive damages against Defendants, and each of them, in a sum appropriate to
15  punish Defendants, and each of them, and to deter them from engaging in future similar
16  misconduct, the actual sum subject to proof at the time of trial.

17                          **THIRD CAUSE OF ACTION**
18     **(For Negligent Misrepresentation Against All Defendants (except Cato) and**
19                      **Does 1 through 500, inclusive)**

20          40.    Plaintiffs repeat and reallege as if fully set forth herein each and every
21  allegation contained in paragraphs 1 through 39, inclusive, of this Complaint.

22          41.    Defendants, and each of them, acting as agents for and on behalf of or as
23  alter egos of each other, owed Plaintiffs a duty to provide Plaintiffs with information that was not
24  false and misleading based upon their relationship with Plaintiffs.

25          42.    Defendants, and each of them, knew, or should have known, that Plaintiffs
26  would rely upon the information provided to them by Defendants, and each of them.

27          43.    As a direct and proximate result of the above-described representations
28  made by Defendants, and each of them, on behalf of themselves and each other, Plaintiffs have

                                17

                COMPLAINT FOR BREACH OF CONTRACT, ETC.

1  been damaged in an amount in excess of the jurisdictional limits of this Court, the exact amount

2  to be proven at the time of trial.

3  ## FOURTH CAUSE OF ACTION

4  ### (For Fraudulent Concealment and Conspiracy Against All Defendants and

5  ### Does 1 through 500, inclusive)

6      44.    Plaintiffs repeat and reallege as if fully set forth herein each and every

7  allegation contained in paragraphs 1 through 43, inclusive, of this Complaint.

8      45.    Beginning at an uncertain time in or after 1995 and continuing through and

9  including 2003, Defendants Anson, Garrett, Anson & Garrett, and each of them, individually and

10  on behalf of, as alter egos of or in conspiracy with the other Defendants, in addition to the facts

11  alleged in paragraph 34 above, concealed the following facts from Plaintiffs:

12      (a)    The criminal conduct of Four Star and its managing agents;

13

14      (b)    The criminal indictment of Four Star and Mark Cohn;

15      (c)    The cash flow and liquidity problems of Four Star;

16      (d)    The investment of Plaintiffs' and other investors' money by Defendants in

17              investments other than the telecommunications transactions discussed

18              above;

19      (e)    The Argentinean transaction was a fraud;

20

21      (f)    The investments received from Plaintiffs would not be used for purposes

22              expressly explained by Defendants, and each of them, but instead would be

23              diverted to meet other non-disclosed liabilities and liquidity shortfalls.

24      (g)    Defendants, and each of them, were receiving significant sums from Four

25              Star;

26      (h)    Four Star had many civil claims against it;

27

28

COMPLAINT FOR BREACH OF CONTRACT, ETC.

(i)    Investors had withdrawn or attempted to withdraw their money based upon facts that they discovered and/or the deteriorating financial condition of Four Star;

(j)    In or about 2002, another of Four Star's co-defendants in the Maryland criminal action was convicted of mail and wire fraud, money laundering and criminal conspiracy, and another co-defendant was convicted of mail and wire fraud and of criminal conspiracy; and

(k)    Four Star claimed that it was insolvent to certain creditors.

46.    Plaintiffs are informed and believe, and thereon allege that at all relevant times Defendants, and each of them, acting on behalf of themselves and each of the other Defendants, knew that Plaintiffs were not aware of the facts concealed as alleged hereinabove. Defendants allowed and encouraged Plaintiffs to believe that their investments were safe and were not at risk.

47.    Plaintiffs are informed and believe, and thereon allege that at the time Defendants made the foregoing representations and concealed the foregoing facts, Defendants knew that said representations and concealments were material and were false in that, among other things, Plaintiffs' investments were at risk, new money invested by Plaintiffs was being paid as interest to other investors and the chance of Plaintiffs recovering the principal amount of their investment was in jeopardy.

48.    Plaintiffs are informed and believe, and thereon allege that the Defendants were aware that Defendants had superior knowledge compared to Plaintiffs and that Defendants knew and intended that Plaintiffs would rely on Defendants' misrepresentations and omissions in investing additional sums as well as in not demanding return of the principal that they had previously invested. As Defendants expected and intended, Plaintiffs relied upon Defendants' misrepresentations and omissions.

49.    Until approximately June 2003, based upon Defendants' concealment of the true facts and their true intentions, Plaintiffs understood and believed Defendants' promises

19

1 | and representations and were unaware of Defendants' true intent to deceive and defraud

2 | Plaintiffs.

3 |         50.     Plaintiffs' reliance on Defendants' misrepresentations and omissions was

4 | reasonable under the circumstances in that Plaintiffs had no knowledge of Defendants' true intent

5 | and had no reason to disbelieve Defendants.

6 |         51.     As a direct and proximate result of Defendants', and each of their,

7 | fraudulent representations and concealments, Plaintiffs have been damaged in an amount in

8 | excess of the jurisdictional limits of this Court the exact amount to be proven at trial.

9 |         52.     The above-described conduct of the Defendants, and each of them, was

10 | made individually on behalf of each other and in conspiracy with each of the other Defendants

11 | and in the course and scope of their employment as officers, members, directors and/or managing

12 | agents of the other Defendants and such conduct was expressly or implicitly ratified as agent for

13 | and on behalf of the other Defendants. Further, the above-described conduct of Defendants, and

14 | each of them, was willful and intentional and done with fraud, oppression and malice, and was

15 | done with a conscious disregard of Plaintiffs' rights and interests, such that the conduct warrants

16 | the imposition of punitive damages against Defendants, and each of them, in a sum appropriate to

17 | punish Defendants, and each of them, and to deter them from engaging in future similar

18 | misconduct, the actual sum subject to proof at the time of trial.

19 | **FIFTH CAUSE OF ACTION**

20 | **(For Breach of Fiduciary Duty Against Anson, Garrett, Anson & Garrett and Four Star,**

21 | **FSF, Gronimof, G&A and Does 1 through 500, inclusive)**

22 |         53.     Plaintiffs repeat and reallege as if fully set forth herein each and every

23 | allegation contained in paragraphs 1 through 52, inclusive, of this Complaint.

24 |         54.     Anson, Garrett and Anson & Garrett are Plaintiffs' fiduciaries by reason of

25 | their representation of Plaintiffs as their accountants.

26 |         55.     Plaintiffs are informed and believe, and thereon allege that Defendants

27 | Anson, Garrett and Anson & Garrett have breached their fiduciary duties to Plaintiffs by

28 | advancing their interests at the expense of Plaintiffs as hereinabove alleged.

20

---

COMPLAINT FOR BREACH OF CONTRACT, ETC.

56.    As a direct and proximate result of the breaches of fiduciary duty by Defendants Anson, Garrett and Anson & Garrett, as alleged hereinabove, Plaintiffs have been damaged in an amount, which is in excess of the jurisdictional limits of the Court, the exact amount to be proven at trial.

57.    The above-described conduct of the Defendants, and each of them, was made individually on behalf of each other and in conspiracy with each of the other Defendants and in the course and scope of their employment as officers, members, directors and/or managing agents of the other Defendants, and such conduct was expressly or implicitly ratified as agent for and on behalf of the other Defendants.  Further, the above-described conduct of Defendants, and each of them, was willful and intentional and done with fraud, oppression and malice, and was done with a conscious disregard of Plaintiffs' rights and interests, such that the conduct warrants the imposition of punitive damages against Defendants, and each of them, in a sum appropriate to punish Defendants, and each of them, and to deter them from engaging in future similar misconduct, the actual sum subject to proof at the time of trial.

## SIXTH CAUSE OF ACTION

**(For Negligence Against Defendants Anson, Garrett, Anson & Garret, Gronimof, Four Star, FSF, G&A and Does 1 through 500, inclusive)**

58.    Plaintiffs repeat and reallege as if fully set forth herein each and every allegation contained in paragraphs 1 through 57, inclusive, of this Complaint.

59.    As accountants in an accounting firm providing services to Plaintiffs, Defendants Anson, Garrett and Anson & Garrett at all relevant times owed a duty to Plaintiffs to use reasonable care and professional competence.

60.    Defendants Anson, Garrett and Anson & Garrett made certain representations to Plaintiffs without any reasonable basis for believing them to be true at the time that they were made and, in addition, failed to take corrective action when the untruth became manifested as alleged herein.

61.    Defendants Anson, Garrett and Anson & Garrett breached their duties to Plaintiffs.

21

COMPLAINT FOR BREACH OF CONTRACT, ETC.

100

1         62.    Plaintiffs reasonably relied upon the representations of said Defendants and

2 invested the money hereinabove alleged.

3         63.    As a direct and proximate result of Defendants', and each of their, actions,

4 Plaintiffs have been damaged in an amount, which is in excess of jurisdictional limits of the

5 Court, the exact amount to be proven at trial.

6                             **SEVENTH CAUSE OF ACTION**

7         **(For Conversion and Conspiracy to Convert Against All Defendants,**

8                   **and Does 1 through 100, inclusive)**

9         64.    Plaintiffs repeat and reallege as if fully set forth herein each and every

10 allegation contained in paragraphs 1 through 63, inclusive of this Complaint.

11         65.    Plaintiffs invested specified sums of money with Defendant Four Star.

12         66.    Beginning at an unknown time and continuing through the present,

13 Defendants, and each of them, misappropriated and converted for their own use and possession,

14 without Plaintiffs' consent, specific amounts entrusted to them in the amount of Four Hundred

15 Eighty-Four Thousand Dollars ($484,000.00).

16         67.    Plaintiffs have the right to immediate possession of the specific funds

17 invested.

18         68.    As a direct and proximate result of Defendants' conversion of the specific

19 funds of Plaintiffs, Plaintiffs have been damaged in the amount of Four Hundred Eighty-Four

20 Thousand Dollars ($484,000.00), plus interest.

21         69.    The above-described conduct of the Defendants, and each of them, was

22 made individually on behalf of each other and in conspiracy with each of the other Defendants

23 and in the course and scope of their employment as officers, members, directors and/or managing

24 agents of the other Defendants, and such conduct was expressly or implicitly ratified as agent for

25 and on behalf of the other Defendants. Further, the above-described conduct of Defendants, and

26 each of them, was willful and intentional and done with fraud, oppression and malice, and was

27 done with a conscious disregard of Plaintiffs' rights and interests, such that the conduct warrants

28 the imposition of punitive damages against Defendants, and each of them, in a sum appropriate to

22

1  punish Defendants, and each of them, and to deter them from engaging in future similar

2  misconduct, the actual sum subject to proof at the time of trial.

3  **EIGHTH CAUSE OF ACTION**

4  **(To Set Aside Fraudulent Transfer Against All Defendants (except Cato), and**

5  **Does 1 through 100, inclusive)**

6         70.    Plaintiffs repeat and reallege as if fully set forth herein each and every

7  allegation contained in paragraphs 1 through 69, inclusive of this Complaint.

8         71.    Plaintiffs are informed and believe and thereon allege that Defendants, or

9  each of them, transferred money or other assets to each other or Does 1 through 500, inclusive,

10  and that such transfers are fraudulent as to Plaintiffs since such transfers were made without

11  receiving a reasonably equivalent value in exchange for the transfer and/or since Defendants, or

12  each of them, were insolvent at the time or became insolvent as a result of such transfers.

13         72.    Plaintiffs are informed and believe and thereon allege that said transfers

14  were made with knowledge and were intended to hinder, delay or defraud the collection of

15  Plaintiffs' claims.

16         WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them,

17  as follows:

18  **AS TO THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT:**

19         1.    For compensatory damages according to proof at trial, plus interest.

20  **AS TO THE SECOND CAUSE OF ACTION FOR FRAUDULENT**

21  **MISREPRESENTATION:**

22         2.    For compensatory damages according to proof at trial, plus interest.

23         3.    For punitive or exemplary damages in an appropriate amount to be

24  determined at trial.

25  **AS TO THE THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION:**

26         4.    For compensatory damages according to proof at trial, plus interest.

27  **AS TO THE FOURTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT:**

28         5.    For compensatory damages according to proof at trial, plus interest.

23

1    6.    For punitive or exemplary damages in an appropriate amount to be

2    determined at trial.

3    **AS TO THE FIFTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION:**

4    7.    For compensatory damages according to proof at trial, plus interest.

5    **AS TO THE SIXTH CAUSE OF ACTION FOR NEGLIGENCE:**

6    8.    For compensatory damages according to proof at trial, plus interest.

7    **AS TO THE SEVENTH CAUSE OF ACTION FOR CONVERSION:**

8    9.    For the value of the property converted in the amount of Four Hundred

9    Eighty-Four Thousand Dollars ($484,000.00), plus interest;

10    10.    For punitive or exemplary damages in an amount to be determined at trial.

11    **AS TO THE EIGHTH CAUSE OF ACTION TO SET ASIDE FRAUDULENT**

12    **TRANSFER:**

13    11.    For an order that the money or any other assets transferred be set aside to

14    the extent necessary to satisfy Plaintiffs' claim;

15    12.    That a temporary retraining order and preliminary injunction be issued

16    prohibiting further disposition by Defendants, or each of them, or their transferees, or both, of the

17    amount claimed for herein;

18    13.    That an order be made declaring that Defendants FSF, Anson, Garrett,

19    Cohn, Anson & Garrett, Gronimof and G&A hold the funds described above in trust.

20    **ON ALL CAUSES OF ACTION:**

21    14.    For reasonable attorneys' fees according to proof;

22    15.    For costs of suit herein; and

23    16.    For such other and further relief as the Court may deem just and proper.

24    DATED: October/___, 2003          ALSCHULER GROSSMAN STEIN & KAHAN LLP

25

26                                                    By:

27                                                          Michael J. Plonsker
                                                        Attorneys for Plaintiffs MICHAEL J. PLONSKER and
28                                                        LISA PLONSKER
                                                        24

───────────────────────────────────────────────────

COMPLAINT FOR BREACH OF CONTRACT, ETC.                    **103**

## Michael Plonsker

| | |
|---|---|
| **From:** | Jdrothman@aol.com |
| **Sent:** | Wednesday, October 26, 2005 6:25 PM |
| **To:** | EAguilera@bfka-law.com |
| **Cc:** | rmarshack@mshblaw.com; jgolden@wgllp.com |
| **Subject:** | Ron Anson |
| **Attachments:** | 4 star emails.pdf |

Eric,

Attached are copies of the emails in which Ron Anson instructed his bookkeeper to "put aside" our Four Star investment as "payback" to Ossie Sherman, a previous Four Star investor. Between his two emails, Ron Anson directed $550,000 of our life savings to Sherman. That figure included our sons' entire college funds.

The fact that our Four Star money was not invested in anything and instead used as "payback" for an earlier investor is evidence that Ron Anson engaged in a Ponzi transaction. That is fraudulent conduct, not just gross negligence. We find it absolutely shocking that the Trustee came to the conclusion that Anson "did not commit fraud or intentionally deceive any of the investors'.

Thank you for rescheduling the hearing. We are anxious to share our evidence with the judge. Please keep us informed of future date changes.

Judith Rothman and Peter Rofé
(310) 829-7646

In a message dated 10/26/2005 2:07:55 PM Pacific Daylight Time, EAguilera@bfka-law.com writes:

> FYI:
>
>
> The hearing for approval of the settlement agreement has been moved to November 3, 2005 at 11:00 a.m. and will most likely be pushed back another month in the next few days to deal with all of the issues being presented.
>
>
> A. Eric Aguilera, Esq.
>
> Bohm, Matsen, Kegel & Aguilera, LLP
>
> 695 Town Center Drive, Suite 700
>
> Costa Mesa, California 92626
>
> Tel: (714) 384-6500
>
> Fax: (714) 384-6501
>
> eaguilera@bfka-law.com

12/16/2005

Exh D

**104**

*Note: The information contained in this message is absolutely confidential and may be legally privileged and protected from disclosure and is intended only for the use of the individual or entity named above. If the reader of this transmission is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this transmission is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the sender and deleting it from your computer. Thank you*

---

**From:** Jdrothman@aol.com [mailto:Jdrothman@aol.com]
**Sent:** Wednesday, October 26, 2005 2:00 PM
**To:** KKraus@loeb.com; TAXREVUE@aol.com; Runem25@aol.com; Mdt42@aol.com; jon@ferraras.net; Nonienjack@aol.com; mplonsker@agsk.com; A. Eric Aguilera; davidsmalet@hotmail.com; sidcrossley@mindspring.com; pbass1040@adelphia.net; cmpinc@pacbell.net; Rob.Tomsho@wsj.com; DrJaffe1@aol.com; ryan@lapiduslaw.com; widelitz@gte.net; PhylCKlein@aol.com; BGlackin@BSFLLP.com; mzohn@proskauer.com; RHYOUNGER@aol.com; ejbender@earthlink.net; gstanbury@stanfish.com; Tony@Benplaninc.com; NRothenberg@2Be.com; KBarry@BSFLLP.com; mjacobs@lmjinc.com; cspencer@szrlaw.com; rdelacruz13@mac.com; W6ATC@aol.com; wkaplan@kaplancpa.com; jeffathome@lithcoinc.com; jbecker@wbac.com; jim@fccp-cpas.com; slfeins@yahoo.com; arthohmann@comcast.net; aliwades@msn.com; ssimon@lithcoinc.com; DRuss811@aol.com; mike@wirelesswatchdogs.com; ALFNANCE@aol.com
**Subject:** Re: more info-oops

Ken - I will try to attend the hearing, but I too was hoping that one of the attorneys could be present. In May 2002 Ron directed that our Four Star investment money be sent directly to another investor. That proves Ron was involved in a Ponzi scheme, which is fraud (not just negligence).

In a message dated 10/26/2005 8:10:00 AM Pacific Daylight Time, KKraus@loeb.com writes:

> I hope one of the lawyer/Four Star investor recipients of this email would be willing to file an objection (and I'd certainly be willing to sign anything necessary [via fax as I'm in Tennessee] to indicate my wife and I join in the objection) to this settlement as I believe any acknowledgement that Anson did not commit a crime against the investors will damage all of those who have filed for refunds from the IRS. Thanks.
>
>
>
>
> **Kenneth L. Kraus, Esq.**
> Loeb and Loeb
> 1906 Acklen Ave.
> Nashville, Tennessee 37212
> Phone: (615) 749-8300
> Fax: (615) 749-8308
> Email: kkraus@loeb.com
>
>         -----Original Message-----

**From:** TAXREVUE@aol.com [mailto:TAXREVUE@aol.com]
**Sent:** Wednesday, October 26, 2005 9:25 AM
**To:** Runem25@aol.com; Mdt42@aol.com; jon@ferraras.net; Nonienjack@aol.com; mplonsker@agsk.com; eaguilera@bfka-law.com; davidsmalet@hotmail.com; sidcrossley@mindspring.com; pbass1040@adelphia.net; cmpinc@pacbell.net; Rob.Tomsho@wsj.com; DrJaffe1@aol.com; ryan@lapiduslaw.com; widelitz@gte.net; PhylCKlein@aol.com; BGlackin@BSFLLP.com; mzohn@proskauer.com; RHYOUNGER@aol.com; ejbender@earthlink.net; gstanbury@stanfish.com; Tony@Benplaninc.com; NRothenberg@2Be.com; KBarry@BSFLLP.com; mjacobs@lmjinc.com; cspencer@szrlaw.com; rdelacruz13@mac.com; W6ATC@aol.com; wkaplan@kaplancpa.com; jeffathome@lithcoinc.com; jbecker@wbac.com; jim@fccp-cpas.com; Jdrothman@aol.com; slfeins@yahoo.com; Kenneth Kraus; arthohmann@comcast.net; allwades@msn.com; ssimon@lithcoinc.com; DRuss811@aol.com; mike@wirelesswatchdogs.com; ALFNANCE@aol.com
**Subject:** more info-oops

Hearing: October 27 at 1:00 pm, Courtroom 1345, at 255 East Temple Street. The court would appreciate any opposition to be provided in writing and delivered prior to the scheduled hearing. Written opposition will be accepted at the time of the hearing.

Jeffrey Golden is the Trustee's attorney on this. His phone: 714-966-1000

Golden is with the Weiland, Golden, Smiley law firm.

CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender.  Please destroy the original transmission and its attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.

CONFIDENTIALITY NOTICE:  This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged.  If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender.  Please destroy the original transmission and its attachments without reading or saving in any manner.  Thank you, Loeb & Loeb LLP.

## Rita B. Fernandez

| | |
|---|---|
| From: | Joe Seetoo [joeseetoo@gam-llc.com] |
| Sent: | Wednesday, May 08, 2002 11:13 AM |
| To: | 'christin@agcpa.com'; 'rita@agcpa.com' |
| Cc: | 'ron@agcpa.com'; 'roblipp@gam-llc.com' |
| Subject: | Four Star In Coming Wires |

Dear Rita:

Please expect the following in-coming wires today for Four Star:

$100,000 for the David Brody & Goldie Brody Trust FBO Brooke Brody-Waite
$100,000 for the David Brody & Goldie Brody Trust FBO Michael Brody-Waite
$120,000 for the Judith Rothman Custodian for Leo Rofe CUTMA
$80,000 for the Judith Rothman Custodian for Ian Rofe CUTMA

Per Ron and Rob's conversation, please hold this money aside for the payback to Ozzie Sherman.

Please speak with Ron if you have any questions.

Best regards,

Joe Seetoo
Director
Georgina Asset Management, LLC

1

108

## Rita B. Fernandez

| | |
|---|---|
| From: | Joe Seetoo [joeseetoo@gam-llc.com] |
| Sent: | Monday, May 13, 2002 8:46 AM |
| To: | 'Christina Wong' |
| Cc: | 'rita@agcpa.com' |
| Subject: | RE: Rofe/Rothman Family Trust |

The client would like checks to be issued rather than reinvest:

Charles Schwab & Co., Inc.
Rofe/Rothman Family Trust #4303-7316
4722 North 24th Street
Phoenix, AZ 85016

Thank you,

Joe Seetoo
Director
Georgina Asset Management, LLC

-----Original Message-----
From:   Christina Wong [SMTP:Christin@agcpa.com]
Sent:    Friday, May 10, 2002 1:27 PM
To: Ron Anson; 'joeseetoo@gam-llc.com'; Rita B. Fernandez; Jack Garrett; 'mark@agcpa.com'
Cc: 'roblipp@gam-llc.com'; Christina Wong
Subject:RE: Rofe/Rothman Family Trust

just received $350,000 from Rofe/Rothman Family Trust to comerica-4 st-ckg.
thanks.

-----Original Message-----
From: Ron Anson
Sent: Friday, May 10, 2002 10:00 AM
To: 'joeseetoo@gam-llc.com'; Christina Wong; Rita B. Fernandez; Jack
Garrett; 'mark@agcpa.com'; Ron Anson
Cc: 'roblipp@gam-llc.com'
Subject: RE: Rofe/Rothman Family Trust

PLSE PUT THIS ASIDE FOR THE OSSIE SHERMAN PAYMENT, PUT INTO MM ACCOUNT WHEN
IT COMES IN

-----Original Message-----
From: Joe Seetoo [mailto:joeseetoo@gam-llc.com]
Sent: Friday, May 10, 2002 11:59 AM
To: 'christin@agcpa.com'; 'rita@agcpa.com'; 'jack@agcpa.com';
'mark@agcpa.com'; 'ron@agcpa.com'
Cc: 'roblipp@gam-llc.com'
Subject: Rofe/Rothman Family Trust

Rita and Christina:

Please expect a wire in the amount of $350,000 on behalf of the Rofe/Rothman
Family Trust into Four Star.

Please let me know when you receive it.

Thank you,

Joe Seetoo
Director
Georgina Asset Management, LLC

1

1

**PROOF OF SERVICE**

2         I am a resident of the State of California, over the age of eighteen
years, and not a party to the within action. My business address is Alschuler

3  Grossman Stein & Kahan LLP, The Water Garden, 1620 26th Street, Fourth Floor,
North Tower, Santa Monica, California 90404-4060. On this 19ᵗʰ day of

4  December, 2005, I served a true copy of the within documents:

5               **DECLARATION OF MICHAEL J. PLONSKER IN
               OPPOSITION TO MOTION OF TRUSTEE FOR**

6               **APPROVAL OF COMPROMISE OF
               CONTROVERSY; OBJECTIONS OF TO**

7               **DECLARATION OF RICHARD MARSHACK**

8

9        ..      by transmitting via facsimile the document(s) listed above to the fax
             number(s) set forth below on this date before 5:00 p.m.

10        The above transmission was reported as complete and without error.
             Attached hereto is a copy of the respective transmission report, which

11        was properly issued by the transmitting facsimile machine.

12      "X      by placing the document(s) listed above in a sealed envelope with
             postage thereon fully prepaid, in the United States mail at Santa

13        Monica, California, addressed as set forth below.

14       ..      by placing the document(s) listed above in a sealed envelope, with the
             overnight delivery charge prepaid, addressed as set forth below, and

15        deposited in a box or facility regularly maintained by the overnight
             delivery service carrier, _____.

16

17    SEE ATTACHED SERVICE LIST

18         I am readily familiar with the firm's practice of collection and
processing correspondence for mailing. Under that practice it would be deposited

19  with the U.S. Postal Service on that same day with postage thereon fully prepaid in
the ordinary course of business. I am aware that on motion of the party served,

20  service is presumed invalid if postal cancellation date or postage meter date is more
than one day after date of deposit for mailing in affidavit.

21
         I declare that I am employed in the office of a member of the bar of

22  this court at whose direction the service was made.

23         I declare under penalty of perjury under the laws of the State of
California that the above is true and correct.

24

25      Executed on this 19th day of December, 2005.

26

27                                           Annette M. Saulet

28

ALSCHULER
GROSSMAN
STEIN &
KAHAN LLP

## SERVICE LIST

United States Trustee
725 S. Figueroa St., 26th Floor
Los Angeles, CA 90017

Richard A. Marshack
c/o Luis Salazar, Esq.
Greenberg, Taurig, P.A.
1221 Brickell Ave.
Miami, FL 33131

Members of Plaintiff Class
c/o Boies Schiller & Flexner, LLP
1999 Harrison Street, #900
Oakland, CA 94612

Richard A. Marshack Trustee
c/o Bohm Frances Kegel &
Aguilara LLP
James A. Bohm, Esq.
695 Town Center Dr. #700
Costa Mesa, CA 92626

Richard A. Marshack, Trustee
c/o Albert, Weiland & Golden, LLP
Jeffrey I. Golden, Esq.
650 Town Center Dr., #950
Costa Mesa, CA 92626

Credit Suisse Boston
c/o Joel G. Samuels, Esq.
Sidley Austin Brown & Wood LLP
555 West Fifth Street, #4000
Los Angeles, CA 90013

Spolin, Silverman & Cohen
100 W. Wilshire Blvd., #1400
Santa Monica, CA 90401