**EXHIBIT 21**

HIRSCHMANN & BARMANN LLP
Ralph F. Hirschmann, State Bar No. 81912
Bernard C. Barmann, Jr., State Bar No. 149890
Robin L. Diem, State Bar No. 204162
707 Wilshire Boulevard, Suite 4910
Los Angeles, California 90017
Tel. (213) 891-1700
Fax: (213) 891-1556

Attorneys for Plaintiffs

**FILED**
LOS ANGELES SUPERIOR COURT

MAY 1 0 2004

JOHN A. CLARKE, EXECUTIVE OFFICER/CLERK

BY PETER ONTIVEROS, DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

D 57

| | |
|---|---|
| JON and ARLEEN FERRARA, Individually and as Trustees of the Ferrara Living Trust, RODNEY GLISAN MINOTT, JR., Individually and as Trustee of the Rodney G. Minott Jr. Trust and as Assignee of the Polly Berry Kennedy Trust and the Frank Kennedy Trust A FBO Rodney G. Minott, Jr., <br><br> Plaintiffs, <br> vs. <br><br> GEORGINA ASSET MANAGEMENT, LLC, a California limited liability company, ROBERT LIPP, an individual, JOSEPH SEETOO, an individual, NANCY JACOB, an individual, WINDERMERE INVESTMENT ASSOCIATES, INC., an Oregon corporation, and DOES 2-20, inclusive, <br><br> Defendants. | Case No. BC304180 <br><br> SECOND AMENDED COMPLAINT FOR: <br><br> 1. VIOLATION OF CAL. CORP. CODE §25401, 25501 25504 AND 25504.1 <br><br> 2. VIOLATION OF CAL. CORP. CODE §§ 25400 AND 25500 <br><br> 3. FRAUD AND DECEIT <br><br> 4. NEGLIGENT MISREPRESENTATION UNDER COMMON LAW <br><br> 5. BREACH OF FIDUCIARY DUTY <br><br> 6. CONSPIRACY TO BREACH FIDUCIARY DUTY <br><br> 7. NEGLIGENCE |

Plaintiffs Jon and Arleen Ferrara, individually and as trustees of the Ferrara Living Trust (collectively: "**Ferraras**"), Plaintiff Rodney Glisan Minott, Jr. ("**Minott**"), individually and as trustee of the Rodney G. Minott, Jr. Trust and as assignee of the Polly Berry Kennedy Trust and the Frank Kennedy Trust A FBO Rodney G. Minott (collectively: "**Minotts**"), hereby allege claims against defendants Georgina Asset Management, LLC ("**GAM**"), Robert Lipp ("**Lipp**"), Joseph Seetoo

1

("Seetoo") (collectively: "**GAM Defendants**"), Nancy Jacob ("**Jacob**"), Windermere Investment Associates, Inc. ("**Windermere**") (Jacob and Windermere collectively: "**Windermere Defendants**"), and Does 2 through 20 (all defendants collectively: "**Defendants**"), as follows:

## I. The Parties

1.      Plaintiffs Jon and Arleen Ferrara are individuals residing in Los Angeles County. Plaintiffs Jon and Arleen Ferrara are the trustees of the Ferrara Living Trust, which was formed under the laws of the State of California.

2.      Plaintiff Rodney Minott is an individual residing in San Francisco County. Plaintiff Rodney Minott is the trustee of the Minott Trust. Plaintiff Rodney Minott is also the assignee of claims asserted herein of the Polly Berry Kennedy Trust and the Frank Kennedy Trust A FBO Rodney G. Minott, Jr.

3.      On information and belief, Defendant GAM is a California limited liability company with its principal place of business in Los Angeles County.

4.      Defendant Lipp is an individual residing in Los Angeles County and has been Defendant GAM's sole member and Managing Principal.

5.      On information and belief, Defendant Seetoo is an individual residing in Los Angeles County. Seetoo has held or used the title of "Director" of GAM with the consent of Defendants Lipp and GAM.

6.      Defendants Lipp and Seetoo formed Defendant GAM in or about March 2000 and registered it as an investment adviser with the United States Securities and Exchange Commission in or about June 2000. Lipp and Seetoo completely controlled the operations of GAM at all times herein mentioned. The GAM Defendants were agents, servants and employees of each other, and in doing the things herein alleged, each acted within the course and scope of said agency and employment and/or with full knowledge and consent of each of the others.

7.      Defendant Windermere is an Oregon corporation with its principal place of business in Portland, Oregon. At all relevant times, Defendant Windermere has been an investment adviser registered with the United States Securities and Exchange Commission

2

8.     Defendant Jacob is an individual residing in the state of Oregon. Jacob has been at all relevant times Windermere's Managing Principal and President. Jacob is the defendant identified as DOE 1 in the Complaint and First Amended Complaint.

9.     Jacob completely controlled the operations of Windermere at all times herein mentioned. The Windermere Defendants were agents, servants and employees of each other, and in doing the things herein alleged, each acted within the course and scope of said agency and employment and/or with full knowledge and consent of each of the others.

10.     The true names and capacities of DOES 2 through 20, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names, and Plaintiffs will amend this Complaint to show the true names and capacities thereof when the same have been ascertained.

11.     On information and belief, each of the Defendants, including those named as DOES, are the agents, servants and employees of each of the other Defendants, and in doing the things herein alleged, each acted within the course and scope of said agency and employment and/or with full knowledge and consent of each of the remaining Defendants.

## II. GAM's Discretionary Control Over Plaintiffs' Accounts.

12.     Until on or about December 21, 1999, Defendant Lipp was a Vice President, Principal and Financial Advisor at Sanford C. Bernstein & Co. ("**Sanford Bernstein**"), a national investment advisory firm. On information and belief, Sanford Bernstein terminated Lipp on or about December 21, 1999 for "violation of NYSE rules and firm policies." After his termination, Lipp solicited Sanford Bernstein clients to transfer their accounts to GAM.

13.     Plaintiff Rodney Minott was a client of Sanford Bernstein whose account had been handled by Lipp. Minott had retired from employment after Defendant Lipp represented to him that he could afford to do so. On or about June 14, 2001, Minott entered into an investment advisory agreement with GAM that provided GAM with full discretionary authority over the contents of his investment portfolio. As the GAM Defendants were fully aware at all relevant times, the Minotts trusted the GAM Defendants to manage their investments.

3

14.    The Ferraras were clients of Sanford Bernstein whose accounts had been handled by Lipp. On or about June 7, 2000, the Ferraras entered into an investment advisory agreement with GAM that provided GAM with full discretionary authority over the contents of their investment portfolio. As the GAM Defendants were fully aware, Jon Ferrara had recently retired and the Ferraras trusted the GAM Defendants to manage their investments.

## III.  GAM's Enlistment of the Windermere Defendants.

15.    The Ferraras were unwilling to move their accounts from Sanford Bernstein to GAM unless GAM's services were supplemented by an investment advisor with investment advisory resources and experience comparable to Sanford Bernstein's.

16.    In or about April 2000, therefore, the GAM Defendants represented to the Ferraras, with the full knowledge of the Windermere Defendants, that the Windermere Defendants would provide investment advisory services to the Ferraras.

17.    The Windermere Defendants acted as investment advisors to the Ferraras, and the Ferraras properly regarded them as such, for reasons including without limitation that: (1) the Ferraras refused to transfer their assets from Sanford Bernstein until after they were informed that the Windermere Defendants would provide them with investment advisory services; (2) on information and belief, the Windermere Defendants approved GAM's letter sent to the Ferraras in May 2000 stating that Windermere was "the premier consulting firm to the very wealthy," that Windermere would provide the Ferraras with "detailed asset allocation analysis, manager evaluation and selection and periodic (monthly and/or quarterly) asset allocation and performance reporting," that GAM and Windermere had a "strategic partnership," and that "Windermere and GAM have agreed to share a portion of the management fees" charged to the Ferraras; (3) GAM provided to the Ferraras its regulatory "Form ADV" pledging that it would "rely heavily on the use of models and recommendations supplied by [Windermere];" that Windermere's "[a]dvice [would] consist[] of recommendations concerning investment strategy and asset allocation, investment policy development, investment manager evaluation," and that "GAM will not utilize any specific method of analysis itself, but rely on [Windermere's] analysis, which include[s] returns-based manager style analysis and mean-variance portfolio optimization in addition to fundamental security analysis"; (4) the Windermere Defendants did

4

not qualify, modify, or disclaim the scope of its duties or services in any communication with the Ferraras; (5) Windermere publicly stated that it provided investment advice to GAM's *clients* in exchange for an asset-based fee arrangement; (6) Windermere was paid an asset-based fee, with a guaranteed minimum fee of $25,000 per year, for its services to the Ferraras; (7) in April 2000, the Windermere Defendants prepared for the Ferraras an "Asset Allocation Review" with detailed recommendations regarding the Ferraras' optimal portfolio allocations based on detailed information about the Ferraras' assets and needs; (8) the Ferraras granted Windermere access to their financial information at their securities custodian, Bankers Trust; (9) throughout their relationship with the Ferraras, the Windermere Defendants prepared in Windermere's name quarterly performance reports on the Ferraras' portfolio, intended for review by the Ferraras; (10) the Ferraras were interested in Windermere's performance reports. Windermere was fully aware of these facts and, on information and belief, referred to the Ferraras internally and in communications with the GAM Defendants as "joint clients" and "mutual clients" for months after the May 2000 letter and the GAM ADV were provided to the Ferraras.

18.    As inducement to the Windermere Defendants to act as the Ferraras' investment advisors, to provide the Ferraras with investment services, and to cooperate in the tortious acts alleged herein, the GAM Defendants: (1) paid Windermere an asset-based fee, with an guaranteed minimum of $25,000 per year for Windermere's services to the Ferraras; (2) told Windermere that they planned to send Windermere additional clients, including on information and belief, three new clients every three months, and wished to work with Windermere to secure major clients with assets far greater than the Ferraras'; and (3) on information and belief, in or about 2001, expressed interest to Windermere in combining substantial parts of GAM and Windermere's operations into a joint venture to operate a multi-manager "fund of funds" for profit for which the GAM Defendants would refer monthly approximately $5 million to $7.5 million in new assets under management. The foregoing payments and other inducements motivated the Windermere Defendants to cooperate with the GAM Defendants in the tortious acts alleged herein.

5

SECOND AMENDED COMPLAINT

## IV. **Plaintiffs' Investments in Four Star.**

19.      Four Star Financial Services, LLC ("**Four Star**") was an entity, which according to its purported "Confidential Private Placement Memorandum" ("**Private Placement Memorandum**"), concentrated on financing service and information businesses predominantly in the telecommunications industry. On information and belief, Four Star solicited and obtained investments of no less than $57 million from individuals and family trusts from in or about 1994 until in or about 2003.

20.      In fact, Four Star was operating a Ponzi scheme. A Ponzi scheme is a fraud in which the operators build a history of profitability by secretly distributing investment capital falsely represented as "profit." High profits lure more investors with additional capital that is in turn used to pay "profits" to both new and old investors.

21.      Four Star also misused the funds it obtained from investors by placing them in other tortious and fraudulent schemes, such as telemarketing scams in which thousands of consumers lost millions of dollars. Four Star and one of its principals, Mark Cohn, were convicted of mail fraud, wire fraud and conspiracy in the United States District Court for the District of Maryland in 2003, for which Four Star was fined $1 million and Cohn was sentenced to 57 months in federal custody, three years of supervised release and a fine of $150,000.

22.      The GAM Defendants maintained their offices in a suite occupied by Four Star located at 11755 Wilshire Blvd. Suite 1350, Los Angeles, an office in which two of the three admitted Four Star principals, Four Star's accountants and accounting personnel and most of its support staff were located. The GAM Defendants had direct daily communications with Four Star's principals, accountants and other personnel at 11755 Wilshire Blvd.

23.      The GAM Defendants commenced selling Four Star securities no later than early 2000. The GAM Defendants entered into incentive contracts with Four Star to sell Four Star securities including without limitation contracts in which GAM agreed to use "best efforts" and "super best efforts" to sell Four Star securities. Copies of certain of these agreements are attached hereto as **Exhibits A, B and C.** In or about March 2002, Defendant Lipp actively sought from Four Star an arrangement under which he would receive a ten percent equity interest in Four Star, minimum compensation of $200,000

6

per month plus continued finders' fees and interest, and the title of Executive Vice President of Four

Star, as further memorialized in the email attached hereto as **Exhibit D**.

24.    The GAM Defendants transferred Plaintiffs' money into two types of Four Star securities,

as further alleged below. The first was membership units referred to by Defendants as "**Regular Four**

**Star**." These were marketed in part by means of the Private Placement Memorandum which the GAM

Defendants provided to Plaintiffs before the GAM Defendants first transferred Plaintiffs into Four Star.

The second was investment contracts in which Four Star was obligated to invest Plaintiffs' funds in

arbitrage deals involving telecommunications capacity ("**Arbitrage Agreements**"). A copy of an

Arbitrage Agreement is attached hereto as **Exhibit E**.

25.    No later than June 2000, the GAM Defendants began transferring the Ferraras' assets into

Four Star securities. The GAM Defendants eventually invested the Ferraras' assets in Four Star

securities as follows:

| Approximate Date of Purchase | Purported Description of Investment | Approximate Investment Amount |
|---|---|---|
| 6/7/00 | Regular Four Star 16% | $700,685.87 |
| 6/14/00 | Regular Four Star 16% | $299,314.13 |
| 9/15/00 | Four Star Arbitrage - Canadian Deal #2 – 20% | $500,000.00 |
| 2/13/01 | Four Star Arbitrage #4 - 18% | $300,000.00 |
| 4/5/01 | Regular Four Star 16% | $500,000.00 |
| 5/8/01 | Four Star Arbitrage - Lipp Arb Deal #5 - 22% | $500,000.00 |
| 6/29/01 | Regular Four Star 16% | $750,000.00 |
| 6/29/01 | Four Star Arbitrage - Lipp Arbitrage Deal #5 - 22% | $750,000.00 |
| 9/7/01 | Four Star Arbitrage - Lipp Arbitrage Deal #6 - 18% | $400,000.00 |
| 9/21/01* | Four Star Arbitrage - Lipp Arbitrage Deal #6 - 18% | $800,000.00 |
| 10/12/01 | Four Star Arbitrage - Lipp Arbitrage Deal #5(b) – 24% | $2,000,000.00 |
| 12/6/01 | Four Star Arbitrage - Lipp Arbitrage Deal #7 - 24% | $500,000.00 |
| 3/19/02 | Regular Four Star 24% | $250,000.00 |
| 7/15/02 | Regular Four Star 16% | $350,000.00 |
| 7/16/02 | Regular Four Star 16% | $420,000.00 |
| 7/18/02 | Regular Four Star 16% | $200,000.00 |

7

SECOND AMENDED COMPLAINT

| | | |
|---|---|---|
| 7/19/02 | Regular Four Star 16% | $75,000.00 |
| 9/10/02 | Regular Four Star 16% | $100,000.00 |

**Total Ferrara Investments\*\***                                  $9,395,000.00

\*Reinvested in Four Star Arbitrage Deal #6 on 9/21/01; funds purportedly "rolled over" from Canadian Arbitrage Deal #3 investment made on 10/24/00.

\*\*In addition, Plaintiffs reinvested purported interest payments in Four Star securities.

26.    No later than December 2000, the GAM Defendants began selling Four Star securities to the Minotts. The GAM Defendants eventually invested the Minotts' assets in Four Star securities as follows:

| Approximate Date of Purchase | Purported Description of Investment | Approximate Investment Amount |
|---|---|---|
| 12/21/00 | Regular Four Star 16% | $400,000.00 |
| 2/15/01 | Four Star Arbitrage – Lipp Arbitrage Deal #4 – 17% | $115,000.00 |
| 7/2/01 | Four Star Arbitrage – Lipp Arbitrage Deal #5 – 17% | $200,000.00 |
| 7/2/01 | Four Star Arbitrage – Lipp Arbitrage Deal #5 – 17% | $75,000.00 |
| 8/10/01 | Four Star Arbitrage – Lipp Arbitrage Deal #5 – 17% | $400,000.00 |
| 7/2/01 | Regular Four Star 16% | $200,000.00 |
| 7/3/01 | Regular Four Star 16% | $72,345.00 |
| 8/10/01 | Regular Four Star 16% | $393,730.00 |
| 9/7/01 | Regular Four Star 16% | $190,000.00 |
| 9/7/01 | Four Star Arbitrage – Lipp Arbitrage Deal #6 – 18% | $300,000.00 |

**Total Minott Investments\***                                  $2,346,075.00

\*In addition, Plaintiffs reinvested purported interest payments in Four Star securities.

8

SECOND AMENDED COMPLAINT

27.    By December 31, 2002, Four Star comprised 67.44% of the Ferraras' portfolio, and approximately 38.25% of the Minotts' portfolio. The GAM Defendants had thus caused Plaintiffs to be overinvested in Four Star securities to an extent that breached any reasonable standard for portfolio diversification.

V. **Misrepresentations and Omissions by Defendants.**

28.    In the course of investing Plaintiffs in Four Star securities, the GAM Defendants made statements to Plaintiffs which included untrue statements of material fact and the GAM Defendants omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The GAM Defendants knew, or should have known, the truth about Four Star for reasons including without limitation that they maintained their offices in Four Star's suite and thus had direct access to Four Star's accounting department and principals, interacted on a daily basis with Four Star principals and employees, solicited and sold investments for Four Star, drafted and/or edited Four Star documents including the Arbitrage Agreements and guaranties of the Arbitrage Agreements, and drafted and/or edited critical correspondence with Four Star investors.

29.    Beginning in or about April 2000, the Windermere Defendants made or approved statements to Plaintiffs which included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The Windermere Defendants knew or should have known the truth concerning these misstatements and omissions.

30.    The untrue statements and omissions of material fact made by the GAM and Windermere Defendants included without limitation the following:

A.    **Misrepresentations About Risk of Regular Four Star.**

31.    The GAM Defendants provided the Ferraras and Minotts with Four Star's Private Placement Memorandum before Plaintiffs' respective first investments in Four Star securities. The Private Placement Memorandum contained a list of risk factors involving Regular Four Star and warnings that Regular Four Star was risky —although the Private Placement Memorandum thoroughly concealed that Four Star was operating a Ponzi scheme and investing capital in criminal enterprises.

9

32.    Beginning before the Plaintiffs' first investments in Four Star securities and continuing thereafter, Defendant Lipp stated orally to Plaintiffs that Plaintiffs should disregard the Private Placement Memorandum's risk factors and warnings. Lipp stated that the Memorandum contained risk factors and warnings only because Four Star was required by law to include them, that the warnings were incorrect and that investing in Regular Four Star was not risky and was in fact very safe. Defendant Lipp further stated that there was no risk to principal associated with Regular Four Star.

33.    These representations were false. Regular Four Star securities were even more risky than the Private Placement Memorandum disclosed. Regular Four Star had substantial principal risk.

34.    Lipp's misrepresentations were known or should have been known by Lipp to be false.

**B:    Misrepresentations and Omissions About Diversion of Capital.**

35.    The GAM Defendants failed to disclose and concealed from Plaintiffs that Four Star was operating a Ponzi scheme and that purported payments of interest and profit and repayments of principal to Four Star investors in fact were diversions of other investor capital.

36.    In or about May 2002, the GAM Defendants actively conspired with Four Star to divert funds invested in Four Star securities by a GAM client, the Rofe/Rothman Family Trust, to pay another Four Star investor, Ossie Sherman. Copies of certain emails through which the conspiracy was implemented are attached hereto as **Exhibit F.**

37.    The GAM Defendants failed to disclose and concealed from Plaintiffs the truth about the Rofe/Rothman-Sherman transactions and the fact that Four Star was operating a Ponzi scheme.

38.    The GAM Defendants knew or should have known that Four Star was a Ponzi scheme and that payments of "interest" and other purported profits and repayments of principal on Four Star securities were in fact diversions were in fact diversions of other investor capital and that the representations in the Private Placement Memorandum, Arbitrage Agreements and Guaranties were false.

**C.    Misrepresentations and Omissions Regarding Arbitrage Agreements.**

39.    The GAM Defendants falsely represented to Plaintiffs in connection with all transfers of Plaintiffs' assets into the Arbitrage Agreements that the representations contained in the Arbitrage

10

Agreements were accurate, including without limitation the following language in the September 2000 Arbitrage Agreement attached hereto as **Exhibit E**:

> Four Star has represented that while <u>the principal is safe</u>, the exact amount of yields generated might be speculative. Accordingly, while <u>Four Star does guarantee the return of principal from the investment activity</u>, it makes no guarantees or warranties concerning yield. [emphasis added.]

The Ferraras' Arbitrage Agreements dated 9/15/00, 2/31/01, 5/8/01, 6/29/01, 9/7/01, 9/21/01, 10/12/01 and 12/6/01 and the Minotts' Arbitrage Agreements dated 2/15/01, 7/2/01 (two), 8/10/01 and 9/7/01—all provided to Plaintiffs by the GAM Defendants—all contain the same or virtually identical language to that quoted above.

40.    The GAM Defendants further solicited Plaintiffs for the purchase of Arbitrage Agreements by means of meaningless, purported "Guaranties," executed by Four Star, of Four Star's *own* obligations in the Arbitrage Agreements. On information and belief, the GAM Defendants collaborated with Four Star and were heavily involved in the drafting of the Guaranties. Each Guaranty was filled with six paragraphs of formal-sounding but meaningless language and each Guaranty in fact did not provide *any* right of recovery on create *any* obligation that did not already exist under the related investment contract. The sole motivation of the GAM Defendants and Four Star in preparing and distributing these meaningless documents was to deceive Plaintiffs into believing that they had no principal risk when in fact their principal risk was great. The GAM Defendants repeatedly stated orally to Plaintiffs that Four Star securities were "guaranteed." The GAM Defendants provided the Guaranties to Plaintiffs in connection with the Ferraras' purchases of Four Star securities dated 5/8/01, 6/29/01, 9/7/01, 9/21/01, 10/12/01, and 12/6/01 and the Minotts' purchases of securities dated 7/2/01(both), 8/10/01, and 9/7/01. A copy of a Guaranty is attached as **Exhibit G**.

41.    On information and belief, the Windermere Defendants received a copy of one of the Ferraras' Arbitrage Agreements no later than April 2001. The Windermere Defendants reviewed the Arbitrage Agreement and were familiar with its terms.

42.    The GAM Defendants and the Windermere Defendants knew or should have known that the Arbitrage Agreement and the representations contained in it were fraudulent and/or that the

11

SECOND AMENDED COMPLAINT

1    Agreement bore substantial indications of fraud.  The Windermere Defendants also knew or should have

2    known that the Arbitrage Agreement was unsuitable for reasons including without limitation that its

3    terms were unreasonably vague.  The Windermere Defendants knew or should have known the foregoing

4    for reasons including without limitation that the Agreement:  (1) promised an 18 percent return with no

5    principal risk; (2) contained no provisions regarding default, such as definitions of events of default and

6    specifications of investor remedies upon default; (3) contained unrealistic and vague representations such

7    as that principal was "safe"; (4) contained a guarantee by Four Star of its own obligations; (5) contained

8    vague representations regarding risk such as that "the exact amount of yields generated might be

9    speculative"; (6) contained vague statements of its essential terms such as that interest would be paid

10   "approximately 60 days in arrears," that the investment "may conclude earlier than anticipated," and that

11   "the investment shall be tied up for the duration of the contracts," (7) contained further vague pseudo-

12   legalistic terminology such as "first money received," "prudently maximize yield," and "might be

13   speculative."

14       43.    The GAM Defendants and the Windermere Defendants failed to warn the Ferraras that the

15   Arbitrage Agreement and the representations contained in it were fraudulent and/or that the Agreement

16   bore substantial indications of fraud.  The GAM Defendants and the Windermere Defendants also failed

17   to warn the Ferraras that the Arbitrage Agreement was an unsuitable investment for reasons including

18   that its terms were unreasonably vague.

19       **D.    Concealment of Criminal Indictment Of Four Star And Cohn and Its Significance.**

20       44.    The GAM Defendants failed to disclose to Plaintiffs and actively concealed from them

21   that Four Star and one of its principals, Mark Cohn, were the subject of a criminal investigation by the

22   United States Attorneys' office in the District of Maryland, and that on July 10, 2001, Four Star and

23   Cohn were indicted by the United States Attorney's office in the District of Maryland on mail and wire

24   fraud counts in connection with a telemarketing fraud scheme.

25       45.    The GAM Defendants were aware of the criminal investigation no later than July 3, 2001.

26   On information and belief, the GAM Defendants were aware of the investigation before July 3, 2001 and

27   were aware of Four Star and Cohn's 2001 indictment on or about the date that the indictment was

28   returned.

12

SECOND AMENDED COMPLAINT

46.    No later than July 3, 2001, the GAM Defendants collaborated with Four Star in the preparation of a letter to Four Star investors concerning the criminal investigation of Four Star. The GAM Defendants approved the contents of the letter. Although the letter disclosed that there was an "investigation" of one of Four Star's borrowers, that Four Star was "subject to scrutiny," and that "it is possible that Four Star may be charged with certain telemarketing related offenses," the approved letter was replete with misrepresentations and omissions, which included its failure to state categorically that the investigation was a federal criminal investigation conducted out of the District of Maryland, that Four Star and Cohn were targets of the criminal investigation, that indictment was imminent, and that Four Star and Cohn had actively participated in telemarketing fraud and violation of federal mail fraud and wire fraud statutes. Copies of the letter, dated July 3, 2001, and the GAM Defendants' written approval of a draft of the letter are attached as **Exhibits H and I, respectively.**

47.    In or about the first week of July 2001, despite having approved the letter and despite the fact that the letter was a gross understatement of the status of the investigation, the GAM Defendants, through Defendant Seetoo, instructed Four Star *not* to mail the letter to GAM's clients, including Plaintiffs, in order to conceal the investigation and facilitate the sale of more Four Star securities. Four Star accordingly did not mail the letter to Plaintiffs and Plaintiffs did not receive it. Neither the GAM Defendants nor anyone else informed Plaintiffs about the investigation or the indictment. A copy of Four Star's acknowledgement that it honored the GAM Defendants' request not to mail the letter to GAM's clients is attached hereto as **Exhibit J.**

48.    In or about May 2002, plaintiff Rodney Minott discovered the indictment of Cohn and Four Star and promptly confronted the GAM Defendants about it. In a responsive email dated June 3, 2002, the GAM Defendants claimed falsely that Lipp "was only told of [the indictment on fraud charges] last week[.]" and downplayed the significance of the indictment:

> The only exposure Four Star has is financial. Ron [Anson, a principal of Four Star] believes that while Four Star and Mark have not done anything wrong, they may agree to settle for an some [sic] amount is now being discussed. Even if $3.3 million is the amount to be settled, it would still only represent less than 2% of the portfolios value. Mark has told me that there are many financial institutions that have been indicted on a similar arg[u]ment with none being successfully prosecuted. The government seems to have the idea that a lender is somehow responsible for the activities of the companies they lend money to. CityBank has been involved in no less than 100 such cases.

13

SECOND AMENDED COMPLAINT

> I think this issue is a bit more extreme than some of the past issues Mark and Four Star have had to address over the last 10 years operating in this telemarketing environment but not one to be overly concerned about.

A copy of the email is attached as **Exhibit K**.

49.    The GAM Defendants' June 3 email was false and misleading for reasons including that: (1) the indictment charged Cohn and Four Star with direct participation in the fraud, not with derivative liability based on lender status; (2) the email ignored the significance of Cohn's individual indictment; and (3) Four Star investors should have been deeply concerned about the indictment since it charged Four Star and its principal with active participation in federal wire and mail fraud offenses and called into question the integrity of an entity in which Minott had invested a substantial part of his net worth.

50.    Even after admitting knowledge of the indictment in June 2002, the GAM Defendants continued to conceal the indictment from the Ferraras while investing additional assets of the Ferraras in Four Star securities.

E.    **Failure To Disclose Windermere's Analysis of Regular Four Star.**

51.    In or about fall 2000, at the request of the GAM Defendants, the Windermere Defendants analyzed Regular Four Star. The analysis included without limitation an analysis of the Private Placement Memorandum and an interview of Mark Cohn. Jacob spent a disproportionately large amount of her time analyzing Regular Four Star, compared to her other securities analyses.

52.    In or about fall 2000, in the course of the analysis, the Windermere Defendants determined that Regular Four Star securities were unsuitable for Windermere's wealthy family or institutional investor clients. They also determined that they could not and would not prepare a positive Windermere research report on Regular Four Star. As a result of these determinations, and particularly in light of information acquired about the Ferraras in the course of preparation of a detailed asset allocation review for the Ferraras in April 2000, the Windermere Defendants knew or should have known that Four Star Regular was an unsuitable investment for the Ferraras.

53.    In or about fall 2000, the Windermere Defendants informed the GAM Defendants that Windermere had not and would not advise its wealthy family or institutional clients to invest in Four

14

Star, that Four Star was unsuitable for Windermere's clients for reasons including without limitation that it lacked liquidity, and that Windermere would not prepare a positive research report on Four Star.

54.    The Windermere Defendants failed to warn and failed to take steps to ensure that the GAM Defendants warned the Ferraras that Windermere affirmatively disapproved of Four Star and considered it an unsuitable investment, and that contrary to GAM's ADV, the GAM Defendants were not relying on, and in fact were disregarding, Windermere's advice.

55.    In connection with the sale of Four Star securities to Plaintiffs, the GAM Defendants failed to inform Plaintiffs and concealed from Plaintiffs that the GAM Defendants' advice to invest in Four Star contradicted Windermere's advice to the GAM Defendants, and that contrary to GAM's ADV, the GAM Defendants were not relying on, and in fact were disregarding, Windermere's advice that Four Star was unsuitable.

56.    The Windermere Defendants took further steps to conceal from the Ferraras their fall 2000 investigation of Four Star and their negative opinion of Four Star by including in their quarterly performance review reports for the Ferraras a deliberately misleading statement that "questions regarding this fund [i.e. Four Star] need to be directed to [GAM]." In fact, as the Windermere Defendants well knew, they were knowledgeable and qualified enough to express their opinion about Four Star, to answer questions about it and to opine to the Ferraras that Four Star was unsuitable.

F.    **Misrepresentations and Omissions Regarding Lack of Diversification.**

57.    The GAM Defendants were fully aware of the percentage of the Minotts' portfolios invested in Four Star securities.

58.    Throughout their relationship with the Minotts, the GAM Defendants falsely represented that the Minotts were adequately diversified and failed to state and concealed that the Minotts were greatly overallocated in Four Star securities and that the consequences of the overallocation could be severe.

59.    For example, on or about August 30, 2001, the Minotts asked the GAM Defendants whether the Minotts' investments were excessively concentrated in Four Star. The GAM Defendants stated falsely in response that the Minotts were well diversified, that the current allocation was safe, and

15

that the Minotts' split between Regular Four Star and Arbitrage Agreements was sufficient to address any diversification issues involving Four Star.

60.    The GAM Defendants and the Windermere Defendants were fully aware of the percentage of the Ferraras' portfolio invested in Four Star securities. The Windermere Defendants were fully aware in part because they prepared quarterly reports for the Ferraras specifying the contents of the Ferraras' portfolio.

61.    The Windermere Defendants were aware that the Ferraras were greatly overallocated in Four Star for reasons including that: (1) as a marketing tool in April 2000, the Windermere Defendants had prepared a lengthy "asset allocation review," containing a set of optimal asset allocations for the Ferraras based on specific personal information about the Ferraras' needs and constraints; (2) the Ferraras' investments in Four Star greatly exceeded target allocations for asset categories and subcategories, including target allocations specified in April 2000; and (3) in conversations with Windermere, the GAM Defendants were unable to defend that overallocation of the Ferraras in Four Star.

62.    Throughout their relationship with the Ferraras, the GAM Defendants falsely represented to the Ferraras that the Ferraras' investments were suitably diversified and concealed and omitted to state to the Ferraras that their portfolio was greatly overallocated in Four Star securities and that the potential consequences of the overallocation were severe. The GAM Defendants concealed from the Ferraras data that would reveal the extent and seriousness of the overallocation in Four Star in order that the GAM Defendants could continue to sell Four Star to the Ferraras.

63.    Throughout their relationship with the Ferraras, the Windermere Defendants failed to inform the Ferraras, and failed to ensure that the GAM Defendants inform the Ferraras, that the Ferraras were greatly overallocated in Four Star and that the over-allocation could have serious consequences. The Windermere Defendants also conspired with the GAM Defendants to manipulate the contents of Windermere's quarterly "performance reports" for the Ferraras to disguise the Ferraras' overallocation in Four Star. As part of the scheme, the Windermere Defendants, on direction from the GAM Defendants, manipulated the contents of the quarterly reports by: (1) failing to subclassify the so-called "fixed income" portions of the Ferraras' portfolio into "Tax-exempt Bonds," "US Government and Corporate

16

Bonds," "Non-US Government Bonds," and High Yield Debt"; (2) failing to subclassify the so-called "alternative" portions of the Ferraras' portfolio; (3) reclassifying Four Star securities from "alternative" to "fixed income" investments beginning in the performance report for the second quarter of 2001; (4) failing to include in the report "target" allocations for subclassifications of fixed income and alternative assets; and (5) increasing the target allocations for fixed income securities.

### G.    Misrepresentations Regarding Liquidity.

64.    Liquidity is the ability to buy or sell an asset quickly and in large volume without substantially affecting the asset's price. Shares in large blue-chip stocks like General Motors or General Electric are liquid, because they are actively traded and therefore the stock price will not be dramatically moved by a few buy or sell orders. However, shares in small companies with few shares outstanding, or commodity markets with limited activity, generally are not considered liquid, because one or two big orders can move the price up or down sharply. A high level of liquidity is a key characteristic of a good market for a security.

65.    Liquidity also refers to the ability to convert to cash quickly. For example, a money market mutual fund provides instant liquidity since shareholders can sell their shares at current market value back to the fund, without having to wait for another buyer. Other examples of liquid accounts include checking accounts, bank money market deposit accounts, passbook accounts, and Treasury bills.

66.    On information and belief, Plaintiffs' investments in Four Star were extremely illiquid for reasons including that: (1) they were not sold on any securities exchange, any over the counter securities market or in any other organized market; (2) on information and belief, there were no known secondary sales of Four Star securities; (3) according to the Private Placement Memorandum, the owners of Regular Four Star securities could only withdraw their investment upon giving prior notice 90 days to 12 months in advance, depending on the class of the units and the size of the withdrawal, and only if "such withdrawal would not cause the Company to be insolvent or in default under any net worth, debt-to-equity ratio, or similar financial test or covenant contained in, or otherwise violate or accelerate, any financing arrangement to which the Company is a party"; (4) on information and belief, the conditions for transfer of Plaintiffs' Four Star securities set forth in the Private Placement Memorandum were impossible to meet and/or effectively granted Four Star complete discretion whether to allow transfers of

17

Class B through Class G units; (5) the Arbitrage Agreements stated that "Investor has agreed that its investment shall be tied up for the duration of the contracts in which Four Star has entered into or will enter into"; (7) Four Star was a Ponzi scheme; and (8) Four Star and one of its principals were under indictment.

67.    The GAM Defendants were fully aware that Four Star securities were illiquid for the reasons set forth above and because the Windermere Defendants told them so.  The Windermere Defendants were aware that Four Star securities were not liquid for reasons including their analysis of Four Star in fall 2000.

68.    On multiple occasions including on or about July 31, 2000, in connection with their efforts to sell the Minotts Four Star securities, the GAM Defendants falsely represented to the Minotts that Four Star was "liquid" and that Minott could get withdraw his investment if he wished.  In or about December 2000, Defendant Lipp, in the course of soliciting the Minotts to invest in Four Star, the GAM Defendants sent the Minotts a "Recommended Asset Allocation" and a "Recommended Income Statement[,]" which falsely characterized Four Star as "Liquid[.]"  In numerous portfolio performance reports which the GAM Defendants prepared and delivered to the Minotts in 2001 through 2003, the GAM Defendants falsely listed all Four Star securities as "Liquid" assets.

69.    The GAM and Windermere Defendants failed to disclose to the Ferraras that Four Star securities were not liquid.

**H.    <u>Misrepresentations Regarding The Market Value Of Four Star Securities</u>.**

70.    The market value of a security is its last reported sale price (if it is traded on a securities exchange) or its current bid and ask prices (if it is traded over-the-counter).  In other words the market value of a security is its price as determined dynamically by buyers and sellers in an open market.

71.    On information and belief, Four Star securities had no market value and the concept of market value was inapplicable to them for the above-mentioned reason that these securities were illiquid.  In the alternative, the market value of Four Star securities was negligible.

72.    The GAM Defendants and the Windermere Defendants were aware that the Four Star securities had either no "market value" or a negligible one.

18

73.    The GAM Defendants concealed from the Minotts that Four Star securities did not have a market value or, in the alternative, that the market value was negligible. In reports to the Minotts, the GAM Defendants assigned Four Star securities an "asset value" equal to the price at which the Minotts purchased them plus interest purportedly accrued at a stated rate.

74.    The GAM Defendants concealed and caused and conspired with the Windermere Defendants to conceal from the Ferrara Plaintiffs that the Ferraras' Four Star securities did not have a market value or, in the alternative, that the market value was negligible. In portfolio performance reports for the Ferraras in 2000 through 2002, the GAM and Windermere Defendants made misstatements and omissions of material fact about the market value of Four Star securities including assigning to the securities a purported "market value" calculated simply as the cost of the Ferraras' investment (purchase price) plus interest accrued, without any explanation that no market value had in fact been determined.

**I.    Failure To Disclose Windermere's Actual Role.**

75.    The GAM Defendants, with the full knowledge and consent of the Windermere Defendants, represented to the Ferraras that Windermere would be generating models and making fundamental recommendations regarding the Ferraras' portfolio and that the GAM Defendants would abide by those recommendations.

76.    The Windermere Defendants approved GAM's letter sent to the Ferraras in May 2000 stating that Windermere would provide the Ferraras with "detailed asset allocation analysis, manager evaluation and selection, and monthly and/or quarterly asset allocation and performance reporting."

77.    In or about July 2000, the GAM Defendants represented to the Ferraras in the regulatory "Form ADV" that GAM provided to the Ferraras that Windermere would be generating models and making recommendations about the management of the Ferraras' assets and that GAM would rely heavily on those recommendations:

> GAM will rely heavily on the use of models and recommendations supplied by Windermere Investment Associates, Inc. (WIA), and/or other independent investment advisers, not affiliated with GAM. Advice consists of recommendations concerning investment strategy and asset allocation, investment policy development, investment manager evaluation. GAM will utilize Windermere in developing an efficient allocation of a client's investment resources but will customize these recommendations so that each portfolio reflects the individual needs and risk tolerance of the client.

* * *

19

... GAM will rely heavily on the use of models and recommendations supplied by Windermere Investment Associates, Inc. (WIA), and/or other independent investment advisers, not affiliated with GAM. Advice consists of recommendations concerning investment strategy and asset allocation, investment policy development, investment manager evaluation. Therefore, GAM will not utilize any specific method of analysis itself, but rely on WIA's analysis, which include returns-based manager style analysis and mean-variance portfolio optimization in addition to fundamental security analysis.

The Windermere Defendants were fully aware of this representation in the GAM ADV at or about the time it was made and consented to it.

78.    The Windermere Defendants acknowledged that they had a regulatory obligation to ensure that accurate disclosures had been made to the Ferraras and would continue to be made to the Ferraras about the role Windermere would play in management of their portfolio. The Windermere Defendants understood that the May 2000 letter and the above-quoted passages of the GAM ADV constituted the material part of the disclosures made to the Ferraras about Windermere's role.

79.    As the GAM and Windermere Defendants were fully aware, the disclosures were false and materially misleading and failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading for reasons including without limitation that:

    a.    Windermere did not consider itself to be a financial advisor to the Ferraras or to have any advisory role in the Ferrara's financial affairs;

    b.    Windermere did not consider itself to have any obligation to provide services to the Ferraras unless specifically requested by GAM;

    c.    In its purchases of Four Star securities for the Ferraras, the GAM Defendants thoroughly disregarded and materially violated Windermere's advice, recommendations and modeling including with respect to investment strategy and asset allocation;

    d.    Windermere did not consider itself to have any obligation to disclose to the Ferraras that the GAM Defendants thoroughly disregarded and materially violated Windermere's advice, recommendations and modeling results;

    e.    Windermere did not prepare asset allocation reviews for the Ferraras on a monthly or quarterly basis, or at any time after April 2000, and did not consider itself

20

SECOND AMENDED COMPLAINT

obligated to prepare asset allocation reviews unless specifically requested by GAM;

f.  Changes in the target allocations for the Ferraras' portfolio, including highly significant changes to those targets in or about spring 2001, were dictated by GAM without any material analysis, advice, recommendations or modeling by Windermere;

g.  Windermere did not perform an independent review of the performance of the Ferraras' investments in Four Star, made no independent inquiry into or analysis of the existence of a secondary market for Four Star securities or the market value of those securities, and simply input in its performance reviews whatever values the GAM Defendants supplied;

h.  Windermere excluded from its performance reviews essentially any information the GAM Defendants wished to exclude, including information vital to a proper assessment of portfolio performance and status;

i.  The GAM Defendants' motivation in representing to the Ferraras that Windermere was providing them with investment advisory services was to infuse the GAM Defendants with the credibility necessary to facilitate additional sales of Four Star.

80.  The GAM and Windermere Defendants failed to disclose to the Ferraras these facts regarding the actual role of Windermere.

**J.  Failure To Disclose the GAM Defendants' Incentives To Sell Four Star.**

81.  The GAM Defendants made misrepresentations and omissions or material facts to all Plaintiffs regarding the commissions, incentives and other compensation to which they were entitled and or which were paid or promised to the GAM Defendants in connection with the sale of Four Star securities to Plaintiffs.

82.  The GAM Defendants stated to Plaintiffs in GAM's ADV that GAM would receive "a finders fee ranging from 1% to 5% of the value of the assets invested" and a "financial interest in the investment vehicle" for investing Plaintiffs' assets in Four Star.  The GAM Defendants further represented to Plaintiffs in the GAM ADV that although these fees and financial interests constituted a

21

conflict of interest. GAM and Lipp would "endeavor at all times to put the interest of the clients first as part of GAM's fiduciary duty[.]"

83.    These representations were false and materially misleading and omitted to state material facts necessary to make the statement not misleading for reasons including without limitation the following: (1) the GAM Defendants were agents and salesmen for Four Star and as such were receiving commissions, not "finders fees"; (2) GAM was contractually obligated to use its "best efforts" and "super best efforts" to place Plaintiffs in as much Four Star securities as possible, pursuant to contracts such as **Exhibits A, B and C**; (3) the GAM Defendants expected and received salary and draw from Four Star; (4) the GAM Defendants expected and received expense reimbursement from Four Star; (5) the GAM Defendants expected an equity participation as high as 25 percent in Four Star's arbitrage offerings; (6) GAM expected and received equity participations in Four Star in connection with Plaintiffs' investments in Four Star that were related inversely to the interest rates Four Star was obligated to pay Plaintiffs on their investments; and (7) Defendant Lipp expected additional compensation from Four Star on the terms set forth in **Exhibit D.** The foregoing incentives, including GAM's contractual "best efforts" and "super best efforts" obligations to Four Star, precluded the GAM Defendants from putting Plaintiffs' interests first and from honoring their fiduciary duties to Plaintiffs.

   **K.**    **Material Misrepresentations And Omissions Regarding Four Star's Financial Position.**

84.    No later than in or about late 2001 and in 2002, the GAM Defendants were aware that Four Star would default on its obligations to investors and would collapse unless Four Star was able to sell additional securities. As Lipp expressed it in the email to Four Star attached as **Exhibit L,** he had been forced to invest his and his family's funds in Four Star to "keep it alive."

85.    The GAM Defendants failed to disclose this risk of default to Plaintiffs and failed to disclose to Plaintiffs that they were investing the Lipp family's money in Four Star to keep Four Star alive.    At a time when the GAM Defendants were aware of Four Star's actual financial condition, they affirmatively misrepresented Four Star's financial posture to Plaintiffs by stating that Four Star was "doing great" and had "plenty of cash."

22

SECOND AMENDED COMPLAINT

**L.**    **Misrepresentations and Omissions Regarding Anson Garrett & Co.'s Accounting Services.**

86.    Anson, Garrett & Co. was an accounting firm operated by two Four Star principals: Ron Anson and Jack Garrett. Anson, Garrett & Co. shared office space with Four Star and GAM at 11755 Wilshire Blvd. Suite 1350, Los Angeles. Anson, Garrett & Co. were aware at all relevant times that Four Star was operating a Ponzi scheme and that material representations set forth in offering documents for the Four Star securities were false.

87.    The Ferraras hired Anson, Garrett & Co. as their tax accountants based on the encouragement and recommendation of the GAM Defendants. When the Ferraras told the GAM Defendants that they were considering hiring another tax accountant, the GAM Defendants discouraged the Ferraras from leaving Anson Garrett & Co., and the Ferraras therefore continued to use Anson Garrett & Co. as their accountants. Defendant Lipp stated to the Ferraras that maintaining Anson Garret & Co. as accountants would enhance the Ferraras' opportunities to participate in future Four Star securities offerings.

88.    On or about August 30, 2001, in a meeting in Los Angeles, the GAM Defendants advised the Minotts to hire Anson, Garrett & Co. as their CPA. The Minotts did so in reliance on Lipp's advice.

89.    On information and belief, the GAM Defendants encouraged Plaintiffs to employ Anson Garrett & Co. in order to preclude Plaintiffs from receiving advice from a professional unaffiliated with Four Star not to buy Four Star securities and to sell or seek a basis to rescind the transactions placing Four Star securities in their portfolio. The GAM Defendants concealed their true reasons from Plaintiffs.

## FIRST CAUSE OF ACTION

**For Rescission or Rescissory Damages For Violations Of California Corporations Code Sections 25401, 25501, 25504, and 25504.1**

**(By All Plaintiffs Against All Defendants Except Windermere and Jacob)**

90.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

23

91.     Defendants' statements constituted an offer to sell in California or a solicitation in California of an offer to buy the offered securities, and the untrue statements and omissions of material facts were made in the course of the offering to sell or a solicitation of an offer to buy the securities.

92.     By reason of the above facts, Defendants violated California Corporations Code Section 25401.

93.     By reason of the Defendants' violation of California Corporations Code Section 25401, Plaintiffs are entitled under California Corporations Code Section 25501 to all relief provided therefor in the California Corporations Code including without limitation to recover from all Defendants the consideration paid by Plaintiffs for the securities, plus interest at the legal rate, less any income received by Plaintiffs on the purchased securities, upon tender by Plaintiffs of the securities.  Or in the alternative, Plaintiffs are entitled under Corporations Code Section 25501 to all relief provided therefor in the California Corporations Code and including without limitation to rescissory damages from the Defendants who qualify as statutory "sellers" in an amount calculated as the difference between (a) the price at which the securities were bought plus interest at the legal rate from the date of purchase and (b) the value of the securities as of the date of this complaint herein plus the amounts of any income received on the securities by Plaintiffs.

94.     To the extent that any Defendant was not a statutory "seller" for Plaintiffs' purchases of the securities, such Defendant (i) directly or indirectly controlled the statutory "seller," (ii) was a person occupying a status with a statutory "seller" in which the person performed functions similar to that of a principal executive officer or director of a corporation, (iii) was an employee of a statutory "seller" who materially aided in the act or transaction constituting the violation, and/or (iv) was a broker-dealer or agent who materially aided in the act or transaction constituting the violation.  By reason of the above facts, each such Defendant is jointly and severally liable with the statutory "seller" under California Corporations Code Section 25504 for the violation of Section 25401.  Plaintiffs are therefore entitled to all relief provided therefor in the California Corporations Code from all Defendants including without limitation, rescission, or in the alternative, to rescissory damages as described above in an amount no less than the jurisdictional limit of this Court, from all Defendants not merely the statutory "seller" from whom Plaintiffs purchased the securities.

24

SECOND AMENDED COMPLAINT

95.    To the extent that certain Defendants (including Does 2 through 20) were not statutory "sellers" for Plaintiffs' purchases, each such Defendant materially assisted the statutory "seller" in each violation of Section 25401 with the intent to deceive or defraud.  By reason of the above facts, each such Defendant is jointly and severally liable with the statutory "seller" Defendants under Corporations Code Section 25504.1 for the violation of Sections 25401.  Plaintiffs are therefore entitled to rescissory damages as described above from all Defendants, not merely the statutory "sellers."

## SECOND CAUSE OF ACTION

### For Statutory Damages For Violations of California Corporations Code Sections 25400 and 25500

### (By All Plaintiffs Against All Defendants Except Windermere and Jacob)

96.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

97.    In the course of the offer and sale of the securities identified above, Defendants (including Does 2 through 20) made statements about Four Star which included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which Defendants knew or had reasonable ground to believe were so false or misleading.

98.    Defendants' statements constituted an offer to sell in California or a solicitation in California of an offer to buy the offered securities, and the untrue statements and omissions of material facts were made in the course of the issuance and offering to sell or a solicitation of an offer to buy the securities.

99.    By reason of the above facts, Defendants violated California Corporations Code Section 25400 in the offering and sale to investors, including Plaintiffs, of the Four Star securities.

100.    Defendants willfully participated in the above-described acts in violation of Section 25400.  All of Plaintiffs' purchases were affected by the above-described acts.

101.    Under Section 25500, Defendants are therefore liable to Plaintiffs for damages measured by the difference between the price at which Plaintiffs purchased the securities and the market value that the securities would have had at the time of the purchases in the absence of the above-described acts.

25

102.   Plaintiffs have suffered damages in an amount no less than the jurisdictional limit of this Court.

## THIRD CAUSE OF ACTION

**For Fraud and Deceit Under Common Law And California Civil Code Sections 1709 and 1710**

**(By All Plaintiffs Against All Defendants Except Windermere and Jacob)**

103.   Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

104.   Defendants knowingly and willingly made, or participated in the making of, material false representations to Plaintiffs including the false representations alleged above. Defendants also suppressed and concealed and omitted to disclose to Plaintiffs material facts regarding Four Star that they had a duty to disclose.

105.   Defendants made the misrepresentations and suppressed and concealed and omitted to disclose the material facts as alleged above knowing that the statements made were false and misleading at the time that they were made with the intent to induce Plaintiffs to alter their position to their injury or risk. Alternatively, Defendants made the misrepresentations recklessly without knowing whether they were true or false. Defendants knew or should have known that their statements and omissions would and in fact did affect and cause Plaintiffs' decision to purchase and hold Four Star securities.

106.   Plaintiffs were unaware of the falsity of Defendants' misrepresentations and the material facts that the Defendants suppressed and concealed. Plaintiffs purchased the securities in justifiable reliance upon Defendants' misrepresentations and omissions. Plaintiffs would not have purchased the securities had they known the truth regarding Defendants' misrepresentations and omissions. As a proximate result of the actions of Defendants, Plaintiffs have suffered damages in an amount no less than the jurisdictional limit of this Court.

107.   In making the intentional misrepresentations and suppressing, concealing and omitting to disclose to Plaintiffs material facts, Defendants, and each of them, acted with oppression, fraud and malice, in conscious derogation of Plaintiffs' rights under applicable law. Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial, that are appropriate to punish or set an example of the Defendants, and each of them.

26

SECOND AMENDED COMPLAINT

## FOURTH CAUSE OF ACTION

### For Negligent Misrepresentation Under Common Law

### (By All Plaintiffs Against All Defendants Except Windermere and Jacob)

108.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

109.    Defendants made misrepresentations as alleged above without reasonable grounds for believing them to be true at the time that they were made, and with the intent to induce Plaintiffs to purchase and hold Four Star securities.

110.    Plaintiffs were unaware of the falsity of Defendants' misrepresentations. Plaintiffs purchased the securities in justifiable reliance upon Defendants' misrepresentations. Plaintiffs would not have purchased the securities had they known that Defendants' representations were false.

111.    As a proximate result of the actions of Defendants, Plaintiffs have suffered damages in an amount no less than the jurisdictional minimum of this Court.

## FIFTH CAUSE OF ACTION

### Breach Of Fiduciary Duty

### (By All Plaintiffs Against All Defendants Except Windermere and Jacob)

112.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

113.    There existed at all relevant times a fiduciary relationship between the GAM Defendants, on the one hand, and Plaintiffs, on the other hand. The GAM Defendants were investment advisors to Plaintiffs, and Plaintiffs relied on Defendants to advise them and invest their money prudently. Plaintiffs further relied on Defendants to execute that strategy in a manner that achieved Plaintiffs' long-term goals. Defendants had a duty to use such skill, prudence and diligence as investment advisors would commonly possess in providing advice and making investment decisions for Plaintiffs.

114.    Defendants breached their fiduciary duty to Plaintiffs by their actions, failures to act, misrepresentations and omissions of material fact alleged above leading to Plaintiffs' investments in Four Star. Defendants further breached their fiduciary duties by: (1) failing to invest Plaintiffs' money in sufficiently secure investments; (2) causing Plaintiffs' money to be invested and overallocated in Four Star securities; (3) failing to report accurately on Four Star and its securities; (4) failing to take corrective

27

action when it would have been apparent to other reasonable investment advisors that Plaintiffs' portfolios should be reallocated; and (5) ignoring Plaintiffs' concerns and needs about avoiding risk.

115.    Defendants Lipp and Seetoo knowingly and intentionally directed and controlled GAM's actions, failures to act, misrepresentations and omissions of material fact constituting GAM's breach of fiduciary duty.

116.    As a result of Defendants' breaches, Plaintiffs suffered damages in an amount no less than the jurisdictional limit of this Court.

117.    In making the intentional misrepresentations and suppressing, concealing and omitting to disclose to Plaintiffs material facts, and in otherwise breaching their fiduciary duty as set forth above, Defendants, and each of them, acted with oppression, fraud and malice, in conscious derogation of Plaintiffs' rights under applicable law.  Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial, that are appropriate to punish or set an example of the Defendants, and each of them.

## SIXTH CAUSE OF ACTION

### For Negligence

### (By All Plaintiffs Against All Defendants Except Windermere and Jacob)

118.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

119.    Defendants provided investment advice to Plaintiffs.  Defendants had a duty to use such skill, prudence and diligence as investment advisors would commonly posses in handling the funds and investment decisions of clients such as Plaintiffs.

120.    The Defendants, and each of them, breached that duty by their actions, failures to act, misrepresentations and omissions of material fact alleged above leading to Plaintiffs' investments in Four Star.  The Defendants, and each of them, breached that duty by negligently: (1) failing to invest Plaintiffs' money in sufficiently secure investments; (2) causing Plaintiffs' money to be invested and overallocated in Four Star securities; (3) failing to report accurately on Four Star and its securities; and (4) failing to take corrective action when it would have been apparent to other reasonable investment advisors that Plaintiffs' portfolios should be reallocated.

SECOND AMENDED COMPLAINT

121.    The Defendants' breaches of their duties to Plaintiffs proximately caused injuries to Plaintiffs, and each of them in an amount no less than the jurisdictional limit of this Court.

## SEVENTH CAUSE OF ACTION

### Breach Of Fiduciary Duty

### (By the Ferraras Against all Defendants Except the GAM Defendants)

122.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

123.    There existed at all relevant times a fiduciary relationship between the Windermere Defendants, on the one hand, and the Ferraras, on the other hand.  The Windermere Defendants were investment advisors to the Ferraras, and the Ferraras trusted and relied on the Windermere Defendants to advise them and invest their money prudently, and the Windermere Defendants accepted that trust.  The Ferraras further relied on Defendants to execute that strategy in a manner that achieved the Ferraras' long-term goals, and the Windermere Defendants accepted that trust.  Defendants had a duty to use such skill, prudence and diligence as investment advisors would commonly possess in providing advice and making investment decisions for the Ferraras.

124.    Windermere received a portion of the fees the Ferraras paid for investment management services, and the Windermere Defendants agreed to provide investment advisory services to GAM's clients including the Ferraras specifically.

125.    Defendants breached their fiduciary duty to the Ferraras by their actions, failures to act, and misrepresentations and omissions of material fact alleged above leading to the Ferraras' investments in Four Star and their losses on those investments and by: (1) failing to invest the Ferraras' money in sufficiently secure investments; (2) causing the Ferraras' money to be invested and overallocated in Four Star securities; (3) failing to report accurately on Four Star and its securities; and (4) failing to take corrective action when it would have been apparent to other reasonable investment advisors that the Ferraras' portfolios should be reallocated.

126.    Defendant Jacob, the President and Managing Principal of Windermere, knowingly and intentionally directed and controlled Windermere's actions, failures to act, misrepresentations and omissions of material fact constituting Windermere's breach of fiduciary duty.

29

127.    As a result of Defendants' breaches and acts, the Ferraras suffered damages in an amount no less than the jurisdictional limit of this Court.

128.    In making the intentional misrepresentations and suppressing, concealing and omitting to disclose to the Ferraras' material facts and in otherwise breaching their fiduciary duty as alleged above, Defendants, and each of them, acted with oppression, fraud and malice, in conscious derogation of the Ferraras' rights under applicable law. The Ferraras are therefore entitled to punitive damages in an amount to be determined at trial, that are appropriate to punish or set an example of the Defendants, and each of them.

## EIGHTH CAUSE OF ACTION

### Conspiracy to Breach Fiduciary Duty

### (By the Ferraras Against All Defendants)

129.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

130.    There existed at all relevant times a fiduciary relationship between the GAM Defendants, on the one hand, and the Ferraras, on the other hand. The Windermere Defendants were fully aware that the GAM Defendants owed the Ferraras a fiduciary duty.

131.    There existed at all relevant times a fiduciary relationship between the Windermere Defendants, on the one hand, and the Ferraras, on the other hand. The GAM Defendants were fully aware that the Windermere Defendants owed the Ferraras a fiduciary duty.

132.    The GAM Defendants, on the one hand, and the Windermere Defendants, on the other hand, had a duty not to conspire with each other to breach the others' fiduciary duty to the Ferraras and a duty not to act in furtherance of such conspiracy.

133.    The GAM Defendants, on the one hand, and the Windermere Defendants, on the other hand, were fully aware that the others were breaching their duty as alleged above. The GAM Defendants and the Windermere Defendants entered into an agreement under which the GAM Defendants and the Windermere Defendants, acting in concert, agreed and knowingly and willfully conspired among themselves to breach the fiduciary duty of the others to the Ferraras. The actions, failures to act, misrepresentations and omissions of material fact by the GAM Defendants and the Windermere Defendants alleged above were pursuant to and in furtherance of this conspiracy.

30

SECOND AMENDED COMPLAINT

134.    Defendants Lipp and Seetoo knowingly and intentionally directed and controlled GAM's actions, failures to act, misrepresentations and omissions of material fact constituting the acts of conspiracy. As a result of Defendants' breaches and acts, the Ferraras suffered damages in an amount no less than the jurisdictional limit of this Court.

135.    Defendant Jacob knowingly and intentionally directed and controlled Windermere's actions, failures to act, misrepresentations and omissions of material fact constituting the acts of conspiracy.

136.    As a result of Defendants' breaches and acts, the Ferraras suffered damages in an amount no less than the jurisdictional limit of this Court.

137.    In participating in the conspiracy as alleged herein, Defendants, and each of them, acted with oppression, fraud and malice, in conscious derogation of the Ferraras' rights under applicable law. The Ferraras are therefore entitled to punitive damages in an amount to be determined at trial, that are appropriate to punish or set an example of the Defendants, and each of them.

## NINTH CAUSE OF ACTION

### For Negligence

### (By the Ferraras Against All Defendants Except the GAM Defendants)

138.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

139.    Defendants provided investment advice to the Ferraras. Defendants had a duty to use such skill, prudence and diligence as investment advisors would commonly possess in handling the funds and investment decisions of clients such as the Ferraras.

140.    Defendants breached that duty by the actions, failures to act, representations and omissions alleged above. Defendants further breached that duty by negligently: (1) causing the Ferraras' money to be invested and overallocated in Four Star securities; (2) failing to report accurately on Four Star and its securities; and (3) failing to take corrective action when it would have been apparent to other reasonable investment advisors that the Ferraras' portfolio should be reallocated.

141.    The Defendants' breaches of their duties to the Ferraras proximately caused injuries to the Ferraras, and each of them in an amount no less than the jurisdictional limit of this Court.

31

## TENTH CAUSE OF ACTION

**For Fraud and Deceit Under Common Law And California Civil Code Sections 1709 and 1710**

**(By the Ferraras Against All Defendants Except the GAM Defendants)**

142. Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

143. Defendants knowingly and willingly made, or participated in the making of, material false representations to the Ferraras including the false representations alleged above. Defendants also suppressed and concealed and omitted to disclose to the Ferraras material facts regarding Four Star that they had a duty to disclose.

144. Defendants made the misrepresentations and suppressed and concealed and omitted to disclose the material facts as alleged above knowing that the statements made were false and misleading at the time that they were made with the intent to induce the Ferraras to alter their position to their injury or risk. Alternatively, Defendants made the misrepresentations recklessly without knowing whether they were true or false. Defendants knew or should have known that their statements and omissions would and in fact did affect and cause the Ferraras' decision to purchase and hold Four Star securities.

145. The Ferraras were unaware of the falsity of Defendants' misrepresentations and the material facts that the Defendants suppressed and concealed. The Ferraras purchased the securities in justifiable reliance upon Defendants' misrepresentations and omissions. The Ferraras would not have purchased the securities had they known the truth regarding Defendants' misrepresentations and omissions. As a proximate result of the actions of Defendants, the Ferraras have suffered damages in an amount no less than the jurisdictional limit of this Court.

146. In making the intentional misrepresentations and suppressing, concealing and omitting to disclose to the Ferraras material facts, Defendants, and each of them, acted with oppression, fraud and malice, in conscious derogation of the Ferraras' rights under applicable law. The Ferraras are therefore entitled to punitive damages in an amount to be determined at trial, that are appropriate to punish or set an example of the Defendants, and each of them.

32

## ELEVENTH CAUSE OF ACTION

### For Negligent Misrepresentation Under Common Law

### (By the Ferraras Against All Defendants Except the GAM Defendants)

147.    Plaintiffs incorporate by reference the substantive paragraphs of this Complaint.

148.    Defendants made misrepresentations as alleged above without reasonable grounds for believing them to be true at the time that they were made, and with the intent to induce the Ferraras to purchase and hold Four Star securities.

149.    The Ferraras were unaware of the falsity of Defendants' misrepresentations. The Ferraras purchased the securities in justifiable reliance upon Defendants' misrepresentations. The Ferraras would not have purchased the securities had they known that Defendants' representations were false.

150.    As a proximate result of the actions of Defendants, the Ferraras have suffered damages in an amount no less than the jurisdictional minimum of this Court.

WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

FOR THE FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.    For a judgment awarding rescission, or in the alternative, rescissory damages against the Defendants according to proof and according to the formula set forth in California Corporations Code § 25501, but no less than the jurisdictional limit of this court.

2.    All other relief as justice and equity require to return the Plaintiffs to their positions prior to the purchases of the Four Star securities and to deprive the Defendants of any unjust enrichment.

FOR THE SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.    For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

33

SECOND AMENDED COMPLAINT

FOR THE THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

2.     For an award of punitive and exemplary damages.

FOR THE FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

FOR THE FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

2.     For an award of punitive and exemplary damages.

FOR THE SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS EXCEPT WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

FOR THE SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

2.     For an award of punitive and exemplary damages.

FOR THE EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS WINDERMERE AND JACOB:

1.     For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

2.     For an award of punitive and exemplary damages.

34

SECOND AMENDED COMPLAINT

**FOR THE NINTH CAUSE OF ACTION AGAINST DEFENDANTS WINDERMERE AND JACOB:**

1.      For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

**FOR THE TENTH CAUSE OF ACTION AGAINST DEFENDANTS WINDERMERE AND JACOB:**

1.      For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

2.      For an award of punitive and exemplary damages.

**FOR THE ELEVENTH CAUSE OF ACTION AGAINST DEFENDANTS WINDERMERE AND JACOB:**

1.      For a judgment awarding damages against the Defendants according to proof but no less than the jurisdictional limit of this court.

**FOR ALL CAUSES OF ACTION AGAINST ALL DEFENDANTS:**

1.      For interest thereon at the legal rate and according to proof;

2.      For a return of all monies paid for services to any of the Defendants;

3.      For costs of suit;

4.      For attorney's fees; and

5.      For such other and further relief as the Court may deem just and proper.

DATED: May 10, 2004                    HIRSCHMANN & BARMANN LLP


By: _____
Robin L. Diem
Attorneys for Plaintiffs

35

SECOND AMENDED COMPLAINT

## MEMORANDUM

TO:        RON ANSON, JACK GARRETT & MARK COHN

FROM:      ROBERT LIPP & JOE SEETOO

SUBJECT:   FOUR STAR

DATE:      03/28/01

CC:

This memo will outline our understanding of the relationship between Georgina Asset Management, LLC ("GAM") and Four Star Financial Services, LLC ("Four Star").

Over the next 12 months, GAM will use its best efforts to raise $12 million for Four Star. In consideration for its efforts, Four Star agrees to pay GAM $30,000 per month commencing April 1, 2001 for a period of 12 months; 50% ($15,000) of which is salary and 50% of which is a draw against future fees for assets procured by Georgina. When GAM procures $10 million or more, Four Star will pay GAM a 1% bonus. Any reasonable expenses incurred by GAM will be reimbursed by Four Star.

Four Star agrees to pay GAM a finder's fee (based on the asset value) for all assets placed with Four Star commencing April 1, 2001.

Finder's Fee Schedule is attached as Exhibit A.

AGREED & ACKNOWLEDGED:


FOUR STAR FINANCIAL SERVICES, LLC


By: _____
Jack Garrett



GEORGINA ASSET MANAGEMENT, LLC


By: _____
Robert H. Lipp

36

EXH — A

## Exhibit A: Finders Fee Schedule

| Account: | Fee |
|---|---|
| $100,000-$250,000 | 5% |
| $250,000-$500,000 | 4% |
| $500,000-$1,000,000 | 3% |
| $1,000,000 - over | 2% |

# MEMORANDUM

TO:        RON ANSON, JACK GARRETT & MARK COHN
FROM:      ROBERT LIPP & JOE SEETOO
SUBJECT:   RAY & ROSS DEAL
DATE:      03/28/01
CC:

This memo will outline our understanding of the relationship between Georgina Asset Management, LLC ("GAM") and Four Star Financial Services, LLC ("Four Star") regarding the "Ray & Ross" deal.

GAM will use its "super-best efforts" to raise $3.2 million for Four Star by June 1, 2001. Each $100,000 raised (or portion thereof) by GAM will equate to 1.0415% of equity participation for GAM in the Ray & Ross deal. Four Star agrees to pay GAM its typical fee (based on asset value) for all assets placed with Four Star. Any reasonable expenses incurred by GAM will be reimbursed by Four Star.

Attached as Exhibit A is the Finder's Fee Schedule.

AGREED & ACKNOWLEDGED:

FOUR STAR FINANCIAL SERVICES, LLC

By:
Jack Garrett

GEORGINA ASSET MANAGEMENT, LLC

By:
Robert H. Lipp

38

EXH - B

## Exhibit A: Finders Fee Schedule

| Account: | Fee |
|---|---|
| $100,000-$250,000 | 5% |
| $250,000-$500,000 | 4% |
| $500,000-$1,000,000 | 3% |
| $1,000,000 – over | 2% |

# MEMORANDUM

TO:        RON ANSON, JACK GARRETT & MARK COHN

FROM:      ROBERT LIPP & JOE SEETOO

SUBJECT:   FOUR STAR ARBITRAGE DEALS

DATE:      03/28/01

CC:

This memo will outline our understanding of the relationship between Georgina Asset Management, LLC ("GAM") and Four Star Financial Services, LLC ("Four Star") specifically with regard to future *Arbitrage deals*.

- GAM will have a first right of refusal.

- Any reasonable expenses incurred by GAM will be reimbursed by Four Star.

- The interest paid to GAM's investors will be deducted from GAM's equity participation.

- In general, GAM will participate as an equity partner in the deal by earning a 25% participation on funds raised. Below is a schedule for your review:

| $ Raised | % Participation in the deal |
|----------|------------------------------|
| 100%     | 25.00%                       |
| 90%      | 22.50%                       |
| 80%      | 20.00%                       |
| 70%      | 17.50%                       |
| 60%      | 15.00%                       |
| 50%      | 12.50%                       |
| 40%      | 10.00%                       |
| 30%      | 7.50%                        |
| 20%      | 5.00%                        |
| 10%      | 2.50%                        |

Per Ron and Rob's conversation, this will remain somewhat subjective, but the above Memo outlines the general understanding on future arbitrage deals.

EXH - C

AGREED & ACKNOWLEDGED:

FOUR STAR FINANCIAL SERVICES, LLC

By
Jack Garrett

GEORGINA ASSET MANAGEMENT, LLC

By
Robert H. Lipp

41

2

| | |
|---|---|
| **From:** | Rob Lipp |
| **Sent:** | Wednesday, March 20, 2002 12:57 PM |
| **To:** | 'mcohn@fsfs.com'; 'jack@agcpa.com'; 'Ron@AGCPA.com' |
| **Cc:** | 'Roblipp@gam-llc.com' |
| **Subject:** | Lipp Partnership |

I am leaving on Thursday, March 21st and returning Thursday March 28th.  I will be at Whistler Mountain in Canada and can be reached by cell most of the time.

I wanted to thank you each again for inviting me into the Four Star partnership.  It means a lot  to me personally and professionally and I am excited about the prospects of us all working closely together.  As Joe let you know by email we have received or are expecting $550k in the next week and 100-200k in the next two weeks and 100k in the next month thus far.

I thought it might be helpful to outline our understanding regarding the terms of my joining the partnership.  If possible, it would be great if you can have an attorney draft a document that I can review with my attorneys when I return.
Lipp to become 10% equity partner as of May 1, 2002.
All prior investments made by Four Star until the effective date of my purchase (in the form of a non recourse promissory note in the amount of $1 million issued May 1, 2002 with interest at 8% per annum) are valued at zero.
Finders fees and interest to continue without interruption or adjustment.
 This is subject to Lipp's deferral based on cash flow situation of Four Star.  However, Lipp to receive a minimum of $200k per month which will replace the $30,000 monthly consulting fee and $25,000 monthly advances against profit participation on Arb.#7.(Rob has already provided memo's confirming the terms of all current agreements.)
An example of how this would work is a s follows  The company receives $10 million from investments generated after lipp becomes a partner May 1st.  (Earnings from Scotia Bank funds are assumed to be included in Lipps earnings) Assumed costs of G&A expenses and running the company are $4 million (an example only, to be agreed upon from time to time), leaving income for the period of $6 million> 10% deducted for A/Partners.  Net income for the period for this purpose is $5.4 million.  Assuming Lipp has 10% ownership, Lipp earns $540K for the period.  He would only be able to withdraw $100k (in addition to the $200k received monthly) and will be required to reinvest the difference.  Any additional withdrawals will be done in the percentage of ownership of the company.
Lipp would agree to be an officer, Director and manager of Four Star.  Suggested title would be Executive Vice President.
The purchase price will be in the form of a $1million non recourse promissory note at 8% to be paid our of 10% profits participation above the $200k per month.
If Lipp needs additional people for help in his duties, Four Star will review such requests with a view to help build a more substantial company.
Lipp to receive a signed indemnification document by all current partners.

**42**

1

*/EXH - 2O*

Arb #2

## Investment Agreement

Whereas, Four Star has determined to invest in what is commonly referred to in the telecommunications industry as arbitrage;

Whereas, Four Star has considerable experience in such investments;

Whereas, <u>Ferrara Living Trust dated 4/30/99</u> ("Investor") has agreed to invest <u>Five Hundred Thousand Dollars</u> ($500,000) in Four Star to allow Four Star to make such investments;

It is, therefore, agreed as follows:

1. On a monthly basis, Four Star shall make payments to Investor out of first money received from said investment until Investor has received an amount that equates to an annual yield of 20%, which payments will be made approximately in 60 days in arrears starting from September 25, 2000.

2. Investor has agreed that its investment shall be tied up for the duration of the contracts in which Four Star has in or will enter in to.

3. It is understood that the investment may conclude earlier than anticipated by Four Star. In that event, Four Star may and will return Investor's money as soon as it then becomes available from the investment.

4. During times that the dollars may for short periods not be utilized for the designated investments, Four Star reserves the right to invest said money as it deems fit so as to prudently maximize yield.

5. Four Star has represented that while the principal invested is safe, the exact amount of yields generated might be speculative. Accordingly, while Four Star does guarantee the return of principal from the investment activity, it makes no guarantees or warranties concerning yield.

**1**



EXH — E



## Investment Agreement

**Agreed to by:**

**Four Star Financial Services, LLC**                    **Ferrara Living Trust**
                                                         **Dated 4/30/99**

**2**

| From: | Joe Seetoo [joeseetoo@gam-llc.com] |
|---|---|
| Sent: | Friday, May 10, 2002 1:32 PM |
| To: | 'Christina Wong' |
| Subject: | RE: Rofe/Rothman Family Trust |

Thanks.  The client will earn 15%, reinvest the interest and is a
member.

Joe Seetoo
Director
Georgina Asset Management, LLC

-----Original Message-----
From: Christina Wong [SMTP:Christin@agcpa.com]
Sent: Friday, May 10, 2002 1:27 PM
To:    Ron Anson; 'joeseetoo@gam-llc.com'; Rita B. Fernandez; Jack
Garrett; 'mark@agcpa.com'
Cc:    'roblipp@gam-llc.com'; Christina Wong
Subject:    RE: Rofe/Rothman Family Trust

just received $350,000 from Rofe/Rothman Family Trust to comerica-4
st-ckg.
thanks.

-----Original Message-----
From: Ron Anson
Sent: Friday, May 10, 2002 10:00 AM
To: 'joeseetoo@gam-llc.com'; Christina Wong; Rita B. Fernandez; Jack
Garrett; 'mark@agcpa.com'; Ron Anson
Cc: 'roblipp@gam-llc.com'
Subject: RE: Rofe/Rothman Family Trust


PLSE PUT THIS ASIDE FOR THE OSSIE SHERMAN PAYMENT, PUT INTO MM ACCOUNT
WHEN
IT COMES IN

-----Original Message-----
From: Joe Seetoo [mailto:joeseetoo@gam-llc.com]
Sent: Friday, May 10, 2002 11:59 AM
To: 'christin@agcpa.com'; 'rita@agcpa.com'; 'jack@agcpa.com';
'mark@agcpa.com'; 'ron@agcpa.com'
Cc: 'roblipp@gam-llc.com'
Subject: Rofe/Rothman Family Trust


Rita and Christina:

Please expect a wire in the amount of $350,000 on behalf of the
Rofe/Rothman
Family Trust into Four Star.

Please let me know when you receive it.

Thank you,

Joe Seetoo
Director
Georgina Asset Management, LLC

1

EXH - F

# GUARANTY

In consideration of, and as an inducement for The Ferrara Living Trust ("Investor") to enter into that certain Investment Agreement, dated as of September 7, 2001 with Four Star Financial Services, LLC. ("Four Star"), Four Star hereby guarantees the return of the principal amount invested ("Principal") by Investor pursuant to the Investment Agreement.

Subject to the terms and provisions herein set forth, this Guaranty is continuing, absolute and unconditional, except as to the legal rights and defenses of Four Star under the Investment Agreement. Notice of acceptance of this Guaranty is hereby waived, and this Guaranty shall remain in full force and effect up to and including the expiration of the Investment Agreement.

Four Star waives any and all demand for payment, any notice of credits extended and made hereunder, and all other notices whatsoever. Four Star consents to any extensions of time for the payment of said account, to any changes in the terms of any settlement or adjustment thereof and to any changes in the terms of any agreement. No delays on your part in the exercise by Four Star of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy. No actions by you that are permitted hereunder shall in any way impair or affect this Guaranty.

Upon termination, expiration or a material default in the performance of the Investment Agreement, Four Star shall pay upon demand (i) the Principal, (ii) any damages, costs and expenses entitled to be recovered from Four Star by reason of such material default, and (iii) reasonable attorneys' fees and all costs and other expenses incurred as a result of any such material default or in enforcing this Guaranty. This Guaranty is a guarantee of payment of Principal and not of collection and no action need be brought against Four Star, as a precondition to the enforcement of this Guaranty.

This Guaranty shall be binding upon Four Star and its successors and assigns and shall be for the benefit of the person named above, its successors and assigns. Should any one or more of the provisions of this Guaranty be determined by a court of competent jurisdiction to be illegal or unenforceable, all other provisions shall remain effective.

The parties agree that any actions or proceedings arising in connection with this Guaranty shall be tried and litigated only in the state and federal courts located in the State of California. This Guaranty shall be interpreted in accordance with the laws of the State of California.

IN WITNESS WHEREOF, this Guaranty has been duly executed this 7th day of September, 2001.

FOUR STAR FINANCIAL SERVICES, LLC

By: _____

Title: _____

THE FERRARA LIVING TRUST

By: _____

Title: _____

#37679

1

47

*EXH — G*

**Rita B. Fernandez**

| | |
|---|---|
| **From:** | Ron Anson |
| **Sent:** | Tuesday, July 03, 2001 12:33 PM |
| **To:** | Rita B. Fernandez |
| **Cc:** | 'joeseetoo@gam-llc.com' |
| **Subject:** | FW: |

**Importance:**       High



Doc5___.doc

                    CORRECTION FINAL LETTER

--------
From: Joe Seetoo
Sent: July  3, 2001 11:20 AM
To:   'mcohn@fsfs.com'
Cc:   'ron@agcpa.com'
Subject:


I think this will work.

Best regards,

Joe Seetoo

1

48

*EXH - H*

July 3, 2001

Dear Investor:

I hope this letter finds you well.

As you know, Four Star Financial Services, LLC is a licensed finance company in the state of California. As a course of ordinary business, Four Star extends loans and revolving credit lines to companies who finance their trade receivables (i.e. telecommunication companies, telemarketers, etc.). In exchange for financing, Four Star implements a repayment plan predicated on a borrower's accounts receivable base. On some occasions, Four Star will seek additional collateral for a loan.

We have been advised that one of Four Star's former Borrowers is currently under investigation for it's sales practices. Specifically, the Borrower was engaged in telemarketing various products to consumers. Four Star financed certain of the Borrower's telemarketing programs.. In connection with its financing arrangements with the Borrower, Four Star, as is its customary practice, did take a security interest and assignment of proceeds of the Borrowers assets and activities, including the telemarketing programs at issue.

During the course of our financing relationship with the Borrower, certain disputes arose concerning the manner in which the Borrower was complying with our security interests and financing arrangements. In particular, the Borrower attempted on more than one occasion to circumvent Four Star's security interest. Secondly, the Borrower was not paying its obligations to Four Star as they matured. After several months of endeavoring to work constructively with the Borrower, Four Star concluded that it had no choice but to cease doing business with this company. We terminated our relationship with this Borrower and, with the advice and assistance of legal counsel, executed our rights under the financing arrangements, and seized the Borrower's business..

Recently, we have been advised that the ongoing investigation of the Borrower has now expanded to include a review of its relationship with Four Star.. Four Star believed and still believes that at all times it acted appropriately in its business relationships the Borrower. As with any investigation, related parties are subject to scrutiny. It is suggested that while working with the Borrower, and continuing after Four Star exercised its rights under the security agreements Four Star owed a duty to the consumers and did nothing to protect the interests of the consumers. Four Star takes strong issue with these suggestions. In an attempt to convince the Borrower to follow appropriate consumer policies, Four Star invested tens of thousands of dollars requiring the implementation of various consumer protection mechanisms. Apparently, the Borrower refused to follow many of our recommendations. After exercising our security

49

*EXH - I*

interests, Four Star appointed a team to address any known deficiencies and further implemented other changes in assuming the business operations.

At all times, Four Star's management team worked diligently to ensure that the business was run properly. In this regard, Four Star sought and followed the advice of legal counsel, who confirmed that the company acted appropriately. Nevertheless, Four Star may be charged with various telemarketing related offenses. In the event that Four Star is charged with any offenses, we will take all appropriate steps to aggressively protect and defend Four Star's position. Further, it should be underscored that in no event will this issue impair Four Star's financial stability or its ability to conduct business as it has in the past. In the event that Four Star is found to have violated any applicable law or regulation, then it would be subject to the imposition of monetary fines. Those fines, if imposed, would not have a material adverse effect on Four Star's business operations.

We are advised that if Four Star is charged with any offense, then the government may issue a press release and that it may be picked up and reported by various wire services. We felt it was appropriate that you learn of this investigation and our position concerning it before possibly reading about it in the press. .

Should you have any questions concerning the above, please don't hesitate to contact me at (310) 477-5252.

Jack Garrett
President

**'on Ferrara**

From:        Rita B. Fernandez
Sent:        Tuesday, July 10, 2001 3:47 PM
To:          Christina Wong; Claudia Amezcua
Cc:          Jack Garrett
Subject:     Letter of knowledge to Investors dtd 7/3/01

This is to inform you that we did not mail out the above letter to Robert Lipp/Georgina Asset Management LLC. **clients.**
Joe Seetoo stated that he was going to take care of them.
Thank you

EXH - J

## rod minott

| | |
|---|---|
| **From:** | "Rob Lipp" <roblipp@gam-llc.com> |
| **To:** | "'rodminott@hotmail.com'" <rodminott@hotmail.com> |
| **Cc:** | "'Ron@AGCPA.com'" <Ron@AGCPA.com>; "'jack@agcpa.com'" <jack@agcpa.com>; "'mcohn@fsfs.com'" <mcohn@fsfs.com> |
| **Sent:** | Monday, June 03, 2002 1:15 PM |
| **Subject:** | FW: Four Star |

[Rob Lipp]  Rod attached are my comments and those of Mark.

While I could say a lot, I have to be limited in my comments. The investor should be made aware that there was no money laundering charge brought against myself or four star and that piece of the article is erroneous. When the govt. was made aware of the error, they immediately corrected their press release. To request a retraction would have only doubled the amount of bad press, so we didnt do that.

In the second matter, we have no principal loss at all.

Rod, I was only told of this last week myself.

Four Star was advised not to discuss the pending trial or its details with me. It is true that Four Star and Mark were named defendants in the telemarketing suit. My understanding is that Four Star had made an investment in the company (as is their business) and that the activities, which are in essence, very aggressive telemarketing sales are being questioned by the government. Mark maintains that the principals may not even be at fault and that changes Four Star suggested actually addressed the governments concerns. The company Four Star lent money to was foreclosed on by Four Star and Four Star made out quite well receiving all there principal funds back and a substantial return. It is important to note, that Mark and Four Star were successful at bifurcating themselves from being grouped with the owners in the complaint about ten days ago. That's when Ron told me. Mark believes that the case actually going to trial is unlikely and even if it goes forward as it relates to Mark and/of Four Star it is now put off for one year.

The only exposure Four Star has is financial. Ron believes that while Four Star and Mark have not done anything wrong, they may agree to settle for an some amount that is now being discussed. Even if $3.3 million is the amount to be settled, it would still only represent less then 2% of the portfolios value.

Mark has also told me that there are many financial institutions that have been indicted on a similar arguement with none being successfully

10/7/02

52

*EXH - K*

prosecuted. The government seems to have the idea that a lender is somehow responsible for the activities of the companies they lend money to. CitiBank has been invovled in no less than 100 such cases.

I think this issue is a bit more extreme then some of the past issues Mark and Four
Star have had to address over the last 10 years operating in this telemarketing environment  but not one to be overly concerned about. I have sent a cc to Mark, Ron and Jack for them to be able to answer any questions you may have.

I am not familiar with Four Star's investment in the Treasury Fund, but Mark has indicated to me that Four Star experienced no loss of capital and expects to earn a premium by participating in an action against the fund.

Please feel free to give me a call or to email or call Mark to answer any further questions.

Sorry, I missed you last week. Rob

-----Original Message-----
From: rod minott [SMTP:rodminott@hotmail.com]
Sent: Wednesday, May 29, 2002 2:19 PM
To: Rob Lipp
Subject: Four Star


Rob,

I've come across several very disturbing articles, documents on Four Star. In one dated two weeks ago (May 14) it mentions that Mark Cohn and Four Star were indicted last year on charges that include fraud and money laundering in a telemarketing operation in Maryland that allegedly bilked 27,000 people of more than $3.3 million. The article mentions that Four Star and Mark Cohn will be tried at an undetermined date.

In another article, dated April 2002, the SEC charged a Dreyfus Corp. fund director with participating in a $52 million fraud in which investors were promised high returns on Treasury bills. According to the suit, five investors in the fund, including Four Star, were defrauded between 1999 and 2001.

I will be calling you for answers about these cases (including why I wasn't made aware of them) and, most importantly, bottom line answers on the safety and protection of my substantial principal invested in Four Star.

Rod Get more from the Web. FREE MSN Explorer download :

10/7/02

53

http://explorer.msn.com
<< File: ATT00000.htm >>



10/7/02

| | |
|---|---|
| **From:** | rob lipp |
| **Sent:** | Saturday, November 30, 2002 10:47 AM |
| **To:** | Ron@AGCPA. com (E-mail) |
| **Cc:** | jack@agcpa. com (E-mail); mcohn@fsfs. com (E-mail) |
| **Subject:** | Lipp/270 18th St |

Ron, it is Saturday morning and I just received notice from the contractor that I am now in default on our contract regarding the building of my home. Due to the 4s issues, in particular the construction funds I lent to 4s for my construction budget that Mark assurred me would be available, the contractor is now looking for a 10k default fee and is now charging me 1.5%/ month interest on the outstanding balance of $120,000. He has threated legal action. As you know, I had to halt all construction Nov 1 due to insufficient funds.

I spoke to Jack on Wednesday, and he told me to get in touch with you regarding these matters and discussing carving out some funds from the 700k to address my most immediate issues. I am now literally down to my last $10,000 in cash from all sources. I have no stocks or bonds. I will also have to send my mother $8000 per month until the deal finalizes beginning Dec 15th.

Ron, I have no where else to turn for funds at this point. I need you, Mark and Jack to help me out...

I have looked at the liablities carefully and based on what is owed and cost just to keep Geogina alive and the lights on at home, I suggest the following: First, carve out 50k advance from the 700k until the next traunch of funds come in. Second, when the $4.6 million comes in advance 130k plus whatever interest is accrued on the construction bills up until then to avoid additional interest costs and an additional 150k which will to hold me over until the deal closes, assuming you feel it will close in the next 60 days. Georgina cost 45K, i need 30k personally and legal costs associated that matter I discussed with you are 20-30k per month. Beginning in Jan, I will also have to start sending an additional $3500 to my sister and $5000 to my mother-in-lawin addition to the $8000 i will have to start sending to my mother. I have used my discretion over their funds to help keep 4s alive as well. They have no where else to turn but to me.

As my accountants and partners, you know my situation. You only have to look at my balance sheet and to see that I have depleted all my savings to keeping 4s alive and now I need you help to keep myself alive.

Please get back to me as soon as you can on these matters.

Thank you in advance for your understanding.

**55**

1

*EXH - L*

**PROOF OF SERVICE**

I am employed in the County of Los Angeles. I am over the age of eighteen years and not a party to this action. My business address is 707 Wilshire Boulevard, Suite 4910, Los Angeles, California 90017.

On May 10, 2004, I served the below listed document(s) described as:

**SECOND AMENDED COMPLAINT FOR: 1) VIOLATION OF CAL. CORP. CODE §25401, 25501, 25504 AND 25504.1; 2) VIOLATION OF CAL. CORP. CODE §§ 25400 AND 25500; 3) FRAUD AND DECEIT; 4) NEGLIGENT MISREPRESENTATION UNDER COMMON LAW; 5) BREACH OF FIDUCIARY DUTY; 6) CONSPIRACY TO BREACH FIDUCIARY DUTY; AND 7) NEGLIGENCE**

on all parties in this action by placing a true copy of the above document enclosed in a sealed envelope addressed as follows:

**VIA FEDEX OVERNIGHT:**
Andrew R. Hall, Esq.
Davis Wright Tremaine LLP
865 South Figueroa Street
Suite 2400
Los Angeles, CA 90017
**Attorneys for Windermere Investment Associates, Inc.**

**VIA FEDEX OVERNIGHT:**
Richard A. Schirtzer, Esq.
John Gordon, Esq.
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10 Floor
Los Angeles, CA 90017

I am readily familiar with the office practice of the Hirschmann & Barmann LLP, which practice is that when correspondence is deposited with the Hirschmann & Barmann LLP personnel responsible for delivering correspondence to the appropriate courier service, such correspondence is delivered to or picked up by the appropriate courier service that same day in the course of business.

For copies served by Federal Express, I am familiar with the office practices of the Hirschmann & Barmann LLP, which practice is that when correspondence is deposited with the Hirschmann & Barmannn LLP personnel responsible for delivering correspondence to the appropriate courier service, such correspondence is delivered to the appropriate courier service that same day in the course of business.

For copies served by U. S. Mail I am familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice it would be deposited with the United States Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after day of deposit for mailing in affidavit.

1     I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct.

3     Executed on May 10, 2004, at Los Angeles, California.

4

5             David Trejo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 22**



# FOURSTARFRAUD .COM

home

news archive

background

documents

media summary

links & assistance

---

**NOTICE OF UPCOMING COURT HEARING**

*Wednesday July 28, 2004*
3 P.M. 600 South Commonwealth Avenue, Dept. 309, Los Angeles Superior Court
Presiding Judge: Anthony Mohr, Central Civil West Courthouse
Judge Mohr's phone: (213) 351-8590

Status hearing regarding pending lawsuits against Four Star, et al. Attorneys representing defendants Anson, Garrett, Cohn and Lipp will be present.

---

**Disclaimer:** The "Four Star Financial Services, LLC" entity referred to throughout this site is in no way associated with "Four Star Financial, Inc." - the Indiana mortgage broker.

---

The purpose of this website is to educate and empower Four Star⑤ investors. The site has been created as a resource and communication tool that will enable the sharing and reviewing of information. The legal documents posted here are publicly available as court records.

Four Star is a complex case. To help victims fully understand its intricacies and to stay informed, it is hoped that a centralized place with access to relevant information will allow investors to uncover the truth.

Please keep checking back for updates.

If you have any information such as documents, tips or leads that might help in the investigation of Four Star, please contact info@fourstarfraud.com.

---

## NEWS

*JUNE 23, 2004*

### Pinup Celebrity Key To Four Star's Downfall?

According to a weekly paper in San Francisco, actress Pamela Anderson may have played a starring role in the collapse of Four Star. For more details, read here.

permanant link to this story

---

*JUNE 20, 2004*

### Class Action Update

Attorneys for Ron Anson and Jack Garrett have filed a demurrer against the investors' class action lawsuit. The Boies, Schiller & Flexner law firm is representing investors in the class action. The demurrer is a legal tactic aimed at getting the complaint tossed out of court. A hearing on the motion is scheduled for July 28th in Los Angeles Superior Court before Judge Anthony Mohr.

Boies attorneys notified Judge Mohr that they plan to start issuing subpoenas against Third Parties to produce records related to Four Star. Boies also plans to begin Third Party depositions in the near future.

Papers have been filed by several Plaintiff attorneys to depose Four Star principal Jack Garrett on possible fraudulent conveyance of assets. In a case status court hearing on June 17th, Plaintiff attorneys said that Garrett plans to move to Florida, a state in which laws are more protective of assets (especially homes) against legal complaints.

permanant link to this story

## Bankruptcy Trustee Update

The Bankruptcy Trustee has gained court orders compelling a number of attorneys and other individuals to answer questions and provide documents related to the disappearance of tens of millions of dollars invested in Four Star. The trust accounts of several Four Star attorneys were allegedly used to funnel investor funds. According to documents filed by the Trustee, some of the attorneys are refusing to cooperate with investigators. Depositions are slated to start in July.

According to court records, the Trustee has now identified up to 120 business entities connected to Four Star and its three principals, Mark Cohn, Ron Anson and Jack Garrett. The Trustee says many Four Star records remain missing, making it difficult to trace lost funds.

The Trustee has filed suit against Mark Cohn, Ron Anson and Jack Garrett in an adversary proceeding to recover assets. The suit alleges fraud and deceit; breach of duty of care; breach of duty of loyalty; and legal malpractice.

Bankruptcy Trustee litigator Eric Aguilera slammed Anson and Garrett attorneys over a recent quote in the *Wall Street Journal*. Aguilera called claims that Anson and Garrett are not targets of criminal investigation "a complete lie." Aguilera has told investors and creditors he has been reassured by the U.S. Attorney that Anson and Garrett remain under criminal investigation.

permanant link to this story

*JUNE 15, 2004*

## Wall Street Journal on Four Star Financial (Front Page)

**Luxury Vehicle: An 18% Return? It Sounded Good To Rich Investors**
**Four Star Did Pay Off Well For Years**
**Then Stopped; 'Factoring' Phone-Sex Bills**
**Talk of a Big Arbitrage Play**

*By Robert Tomsho*

Morton Turndorf's friends bragged for years about their investments in Four Star Financial Services. They told the 66-year-old retired apparel maker about annual returns of up to 18%, paid out in monthly checks.

Finally, Mr. Turndorf visited Four Star's offices in a pink granite high-rise on Wilshire Boulevard to hear for himself how the firm turned investments in 900-number operators, their unpaid receivables and other telecom ventures into steady profits. "They explained to me what they did and said everything was fine," recalls Mr. Turndorf, who

invested $100,000 in July 2002.

A month later, he got his first income check from Four Star. It turned out to be his last.

continue reading "Wall Street Journal on Four Star Financial (Front Page)"

permanant link to this story

---

### Document Update

Just posted on this site are court exhibits related to the Gail Cato case, including Cato's emails, felony records and copies of the bogus Argentina C.D.s.

Also newly posted are transcripts from Mark Cohn's January 2004 sentencing hearing. Cohn and Four Star were both convicted of telemarketing fraud in 2003.

The U.S. Attorney in the case states Four Star became a Ponzi scheme and sent out "lulling letters" to dupe its own investors into believing it was a legitimate and profitable company. The Judge, Andre Davis, calls Mark Cohn a manipulative "con man." The Judge is stunned at learning of instances where Four Star investor funds were allegedly wired through attorney trust accounts and then "flipped" back to the company for distribution of payments. The transcript includes references to a number of "character witnesses" who testified in support of Cohn. These include some of the very *same* Four Star attorneys whose trust accounts were used to allegedly funnel investor funds.

Miles Woodlief, Mark Cohn's attorney, appears at the hearing and is sharply questioned by the U.S. Attorney about Four Star "arbitrage" funds allegedly funneled through his trust account. The sentencing transcript shows Four Star principals Ron Anson and Jack Garrett claiming they knew nothing of the telemarketing scam.

permanant link to this story

---

### New Bankruptcy Judge

Investors were recently informed by mail that the 900 Capital case has been reassigned to Bankruptcy Judge Thomas B. Donovan for all further proceedings. This links the case to Four Star.

permanant link to this story

---

*JUNE 10, 2004*

### What is a Ponzi Scheme?

The term *Ponzi Scheme* refers to a criminal enterprise operating under the guise of a successful investment program. Money obtained from later investors is paid to earlier investors giving the appearance that the program is a success, when in fact it is steadily losing money. Because

Ponzi Schemes do not usually conduct any form of legitimate business, it is inevitable that they will ultimately collapse, often times in bankruptcy, causing huge losses to investors.

permanant link to this story

*MARCH 23, 2004*

**Business Crimes Bulletin
Lending Executive Sentenced for Role in
Telemarketing Scheme**

Mark Forrest Cohn, the former executive vice president and general counsel of Four Star Financial Services, LLC [Four Star], was sentenced for his role in a telemarketing scheme after being convicted on charges of mail fraud, wire fraud, and conspiracy. Cohn was sentenced to 57 months in prison followed by 3 years of supervised release, and a criminal fine of $150,000.

continue reading "Business Crimes Bulletin
Lending Executive Sentenced for Role in Telemarketing
Scheme"

permanant link to this story

| site powered by



# FOURSTARFRAUD

home
news archive
background
documents
media summary
links & assistance

**NOTICE OF UPCOMING COURT HEARING**

*Wednesday July 28, 2004*
3 P.M. 600 South Commonwealth Avenue, Dept. 309, Los Angeles Superior Court
Presiding Judge: Anthony Mohr, Central Civil West Courthouse
Judge Mohr's phone: (213) 351-8590

Status hearing regarding pending lawsuits against Four Star, et al. Attorneys representing defendants Anson, Garrett, Cohn and Lipp will be present.

**Disclaimer**: The "Four Star Financial Services, LLC" entity referred to throughout this site is in no way associated with "Four Star Financial, Inc." - the Indiana mortgage broker.

## DOCUMENTS

### COMPLAINTS

*2004 May* - Gilbert, Klein, Kraus, Gibson, Simon, Singer, White v. Cohn, Garrett, Anson, Lipp, Wade, Condor Investments, Anson, Garrett and Co., Cato, Georgina Asset Management, Capital One Investment Group, Inc., Ethel Wolfe, Steven Cohn, Alexis Cohn, First Community Bancorp, Pacific Western National Bank [pdf]
Amended Class Action - California Superior Court

*2004 May* - Court Exhibits, including emails and "finders fee schedules", from complaints filed against Georgina Asset Management (Robert Lipp, Joe Seetoo) and Four Star Financial Services (Mark Cohn, Ron Anson, Jack Garrett)

*2004 February* - Gilbert, Klein, Kraus, Gibson, Simon, Singer v. Cohn, Garrett, Anson, Lipp, Condor Investments, Cohn America, Georgina Asset Management [pdf]
Class Action - California Superior Court

*NEW (6/28/04) -> 2004 February 17* - Gantz v. Cohn, Anson, Garrett - California Superior Court

*2003 November* - Shapiro v. Anson, Garrett & Co. [pdf]
California Superior Court

*2003 October* - Michael Plonsker v. Four Star Financial, Anson, Garrett, Cohn, Cato [pdf] - California Superior Court

*2003 September* - Four Star Financial v. Global Endeavors, Gail Cato, et al. [pdf]
Exhibits: **A-C | D-I | J-S** (Containing Cato's felony record, copies of the bogus Argentina CD's, emails with Cato, etc. Some of the documents are virtually unreadable because of poor scanning.) - Georgia Superior Court

*NEW (6/22/04) -> 2003 August* - Gevirtz v. Cohn, Anson, Garrett, Four Star - U.S. District Court - Central District of California (Federal)

*2003 July* - Norman Rips v. Four Star Financial, 900 Capital Services, Anson, Garrett, Wade, Cohn [pdf] - California Superior Court

*2003 May* - Donald Passman v. Robert Lipp, Georgina Asset Management, Ryan Kavanaugh, Four Star Financial [pdf] - California Superior Court

## DOJ PRESS RELEASES

*2004 February* - Cohn & Four Star sentenced [pdf]
*2003 October* - Cohn Hatfield [pdf]
*2003 June* - Cohn verdict [pdf]
*2002 August* - Joel Katz
*2002 June* - Joel Katz
*2001 July* - Eight Indicted in Telemarketing

## Court Orders

**NEW** *(6/20/04) -> June 2004* - Court orders initiated by the Trustee to compel attorneys and other individuals hired by Four Star to produce documents and be deposed. The orders are substantively alike, but each order is available here nonetheless:
Sapperstein, Woodlief, Taggart, Jarblum, Fornari, Evans, Emerson, Beeton, Baron, Kogel, Capital One Investments [all PDFs]

## OTHER

**NEW** *(6/21/04) -> 2004 June* - Stipulation between Trustee and Ronald Anson & Jack Garrett for Anson and Garrett's cooperation with Trustee's investigation

Mark Cohn's prison address

*2004 May* - Trustee's Supplemental Status Conference Statement

*2004 May* - Trustee's status report (Part A [pdf] -- Part B [pdf])

**NEW** *(6/20/04) ->* January 2004 - Mark Cohn Sentencing Transcript & Index for Sentencing Transcript

2004 January - Testimony of Miles Woodlief, Mark Cohn's attorney. Woodlief testified as a character witness for Cohn at his sentencing on January 30, 2004. Woodlief is questioned by the US Attorney about the Four Star "arbitrage" funds which were funneled through trust accounts belonging to Woodlief (and other attorneys).

| site powered by

**EXHIBIT 23**

FORM B6 (6/90) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re *FOUR STAR FINANCIAL SERVICES, LLC,,*
*a California Corporation*

Case No. *LA 03-37579-EC*
Chapter *11*

_____ / Debtor

# SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages on each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | Attached (Yes/No) | No. of Sheets | AMOUNTS SCHEDULED | | |
|---|---|---|---|---|---|
| | | | ASSETS | LIABILITIES | OTHER |
| A-Real Property | *Yes* | *1* | $ 0.00 | | |
| B-Personal Property | *Yes* | *5* | $ 860,893.00 | | |
| C-Property Claimed as Exempt | *No* | *0* | | | |
| D-Creditors Holding Secured Claims | *Yes* | *3* | | $ 9,326,845.00 | |
| E-Creditors Holding Unsecured Priority Claims | *Yes* | *3* | | $ 0.00 | |
| F-Creditors Holding Unsecured Nonpriority Claims | *Yes* | *139* | | $ 7,698,384.54 | |
| G-Executory Contracts and Unexpired Leases | *Yes* | *1* | | | |
| H-Codebtors | *Yes* | *1* | | | |
| I-Current Income of Individual Debtor(s) | *No* | *0* | | | $ 0.00 |
| J-Current Expenditures of Individual Debtor(s) | *No* | *0* | | | $ 0.00 |
| Total Number of Sheets in All Schedules ► | | *153* | | | |
| Total Assets ► | | | $ 860,893.00 | | |
| Total Liabilities ► | | | | $ 17,025,229.54 | |

FORM B6B (10/89) West Group, Rochester, NY

In re _FOUR STAR FINANCIAL SERVICES, LLC,_ _____ / Debtor   Case No. _LA 03-37579-EC_

(if known)

## SCHEDULE B-PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C-Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases in this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases. If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | None | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand. | X | | | |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | _Comerica Acct # 1891-5152-70_ _Location: In debtor's possession_ | | $ 82.00 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | X | | | |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | X | | | |
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | | _See item # 13 below for all interests_ _Location: In debtor's possession_ | | _Unknown_ |
| 13. Interests in partnerships or joint ventures. Itemize. | | _2nd Mkt.Com, LLC_ _Tax ID: 95-4775347_ _Four Star is investor_ _Location: In debtor's possession_ | | _Unknown_ |

FORM B6B (10/89) West Group, Rochester, NY

In re _FOUR STAR FINANCIAL SERVICES, LLC,_____ / Debtor    Case No. _LA 03-37579-EC_

(if known)

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, In Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Animation Communications, LLC<br>Tax ID: 94-3278449   % owned: 50%<br>Location: In debtor's possession | | Unknown |
| | | Awesome Internet Services, LLC<br>Tax ID: 94-3389357   % owned: 75%<br>Location: In debtor's possession | | Unknown |
| | | CFC Investment, LLC<br>Tax ID: 94-3242284   % owned: 99.5%<br>Location: In debtor's possession | | Unknown |
| | | Community Benefit Alliance, LLC.<br>Tax ID: 94-3293213<br>Part of Animation Communications (50%)<br><br>Location: In debtor's possession | | Unknown |
| | | Consumer Finance America, LLC<br>Tax ID: 94-3330263   % owned: 99.5%<br>Location: In debtor's possession | | Unknown |
| | | Currituck Resort Shores, LLC<br>Tax ID: 56-1999405   % owned: 99%<br>Location: In debtor's possession | | Unknown |
| | | Direct One, LLC<br>Tax ID: 33-0967249   % owned: 35%<br>Location: In debtor's possession | | Unknown |
| | | FSF, LLC<br>% owned: 100%<br>Location: In debtor's possession | | Unknown |

FORM B6B (10/89) West Group, Rochester, NY

In re *FOUR STAR FINANCIAL SERVICES, LLC,* _____ / Debtor    Case No. *LA 03-37579-EC*

(if known)

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | *Gateway Credit Holdings, Inc.* *Tax ID: 94-3326627    % owned: 80%* *Location: In debtor's possession* | | Unknown |
| | | *Red Mustang, Ltd* *Tax ID: 95-2772474* *Receives approx., $2,000 per quarter* *Location: In debtor's possession* | | Unknown |
| | | *Scientific Research Funding Group, L.P.* *Tax ID: 95-4482701* *Four Star is investor* *Location: In debtor's possession* | | Unknown |
| | | *Sentinel Acceptance LTD., L.P.* *Tax ID: 65-0606172    % owned: 99%* *Location: In debtor's possession* | | Unknown |
| | | *Victoria Road, LLC* *Tax ID: 95-4859010* *Location: In debtor's possession* | | Unknown |
| 14. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 15. Accounts Receivable. | | *Notes Receivable and Accounts Receivable* *Location: In debtor's possession* | | Unknown |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |

FORM B6B (10/89) West Group, Rochester, NY

In re _FOUR STAR FINANCIAL SERVICES, LLC,_ _____ / Debtor    Case No. _LA 03-37579-EC_
(if known)

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband--H Wife--W Joint--J Community--C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | | Animation Artwork<br>Location: Hollywood warehouse & Iron Mtn | | Unknown |
| | | Potential claim against Proskauer for return of funds transferred for benefit of creditors<br>Location: In debtor's possession | | $ 250,000.00 |
| | | Judgment against Golden Phoenix/Blackburn<br>Location: In debtor's possession | | Unknown |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | | software system for telephone funding program for 2nd Mkt.Com<br>Location: In debtor's possession | | Unknown |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers and other vehicles. | X | | | |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | | Property and Equipment, at cost, net of accumulated depreciation (from 2002 tax return)<br>Location: In debtor's possession | | $ 610,811.00 |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |

Page __4__ of __5__

FORM B6B (10/89) West Group, Rochester, NY

In re *FOUR STAR FINANCIAL SERVICES, LLC,* _____ / Debtor    Case No. *LA 03-37579-EC*
                                                                                                    (if known)

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | | Husband--H Wife--W Joint--J Community--C | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. Itemize. | | *Possible receivable from STEFAN GOTHE and DIRK GOTHE pending ruling on dischargeablity of these debts in their Chapter 7 currently being litigated* *Location: In debtor's possession* | | *Unknown* |
| | | | Total ➡ | $ *860,893.00* |

(Report total also on Summary of Schedules.)
Include amounts from any continuation sheets attached.

DEC 18 2000 1:01PM    HP LASERJET 3200          858 720 9595          p.4

12-18-2003  11:59AM  FROM-GREENBERG    IS @          +8169866594      T-953  P.004/007  F-487

In re FOUR STAR FINANCIAL SERVICES, LLC,,          / Debtor    Case No. LA 03-37579-BC
    a California Corporation                                              (if known)

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

## DECLARATION UNDER PENALTY ON BEHALF OF A LLC

RONALD ANSON          JACK GARRETT          of the LLC
I,_____
named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of ___156__ sheets,
and that they are true and correct to the best of my knowledge, information, and belief.

Date: __12/19/03__

Signature _____
Name: RONALD ANSON  CFO
Title: JACK GARRETT , CEO

[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]