**EXHIBIT 24**

1  DUANE M. GECK (State Bar No. 114823)
   DONALD H. CRAM (State Bar No. 164001)
2  DAVID E. PINCH (State Bar No. 124851)
   SEVERSON & WERSON
3  A Professional Corporation
   One Embarcadero Center, Suite 2600
4  San Francisco, CA 94111
   Telephone: (415) 398-3344
5  Facsimile: (415) 956-0439

6  Attorneys for Plaintiff
   RESERVOIR CAPITAL
7  CORPORATION

**FILED**

AUG 1 1 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                 SAN FRANCISCO DIVISION

12 | RESERVOIR CAPITAL           )  No.  FJ02-002 MJJ (JCS)
   | CORPORATION, A Maryland     )
13 | Corporation,                )  00-CV-3626
   |                             )
14 |            Plaintiff,       )  **DECLARATION OF DUANE M.**
   |                             )  **GECK IN SUPPORT OF MOTION**
15 |    vs.                      )  **AND MOTION FOR ORDER TO**
   |                             )  **AMEND JUDGMENT TO**
16 | FOUR STAR FINANCIAL SERVICES,)  **INCLUDE ALTER EGOS**
   | LLC. a California Limited Liability )
17 | Company,                    )  Hearing—
   |                             )
18 |            Defendant.       )  Date: September 19, 2003
   | _____)  Time: 9:30 a.m.
19                                  Judge: The Hon. Joseph Spero

20

21    I, DUANE M. GECK, declare and state:

22    1.    I am an attorney at law with the law firm of Severson & Werson, A

23 Professional Corporation. I am licensed to practice law and am in good standing

24 with the State Bar for the State of California and with the District Court for the

25 Northern District of California. I am counsel of record for Reservoir Capital

26 Corporation, a Maryland Corporation ("Reservoir").

27    2.    Reservoir is a judgment creditor of Four Star Financial Services, LLC

28

11073/0001/427666 1

**ORIGINAL**

DECLARATION OF DUANE M. GECK IN SUPPORT OF
MOTION AND MOTION FOR ORDER TO AMEND
JUDGMENT TO INCLUDE ALTER EGOS

1    ("Four Star").  Four Star is a limited liability company that is active and in good

2    standing with the State of California.  Four Star's principal place of business is at

3    11755 Wilshire Boulevard, Suite 1350, Los Angeles, California  90025.

4        3.    Reservoir filed a breach of contract action against Four Star in the

5    United States District Court for the District of Maryland as Case No.  CCB-000-

6    CV-3626.  On July 16, 2001, Reservoir and Four Star filed a Stipulation and Order

7    for Settlement of Suit in the Maryland District Court under which Four Star

8    stipulated to pay Reservoir $1,250,000.00 no later than September 12, 2001.

9    Reservoir agreed to accept a discounted sum of $1,250,000.00 in full satisfaction of

10   Four Star's obligations if Four Star would pay that amount by September 12, 2001.

11   In the event that Four Star failed to make a timely payment, the stipulation entitled

12   Reservoir to apply ex parte for a judgment $1,866,995.57 as the full amount due.

13   A copy of that Stipulation as filed in the District Court for the District of Maryland

14   on July 16, 2001, is appended to Reservoir's Request to Take Judicial Notice as

15   Exhibit "A."

16       4.    Dana L. Pierson executed the settlement agreement as vice-president

17   of Four Star.

18       5.    Four Star defaulted and failed to tender the payment by September 12,

19   2001.

20       6.    On October 18, 2001, Reservoir obtained a judgment for

21   $1,866,995.57 against Four Star in the United States District Court for the District

22   of Maryland (the "Judgment"). A copy of that District Court for the District of

23   Maryland Judgment is appended to Reservoir's Request to Take Judicial Notice as

24   Exhibit "B."

25       7.    Reservoir registered the Judgment in the District Court for the

26   Northern District of California on January 11, 2002. A copy of the Certification of

27   Judgment for Registration in Another District is appended to Reservoir's Request

28

1    to Take Judicial Notice as Exhibit "C."

2    8.    On July 20, 2002, Reservoir and Four Star agreed in writing to modify

3    the Judgment.  The Judgment as modified allowed Four Star to make installment

4    payments on the Judgment.  The parties filed an agreement entitled "Stipulation

5    Modifying Judgments and Order Thereon" (referred to as "Modified Judgment")

6    with this District Court.  A copy of the Modified Judgment is appended to

7    Reservoir's Request to Take Judicial Notice as Exhibit "D."

8    9.    Under the Modified Judgment, Four Star agreed to pay interest on the

9    unpaid Judgment balance from and after June 24, 2002, at 15% interest per annum.

10   While Four Star made initial payments under that Modified Judgment, it has again

11   defaulted.   The balance due and owing on the Modified Judgment as of May 27,

12   2003, is $1,089,455.00.

13   10.    Reservoir has demanded post judgment production of documents in

14   aid of its efforts to enforce its Judgment and has been conducting an on-going

15   judgment debtor's examination of Four Star since February 2003.

16   11.    Four Star has been reluctant and dilatory in producing responsive

17   records regarding its assets and liabilities.  Reservoir has sought the assistance of

18   this Court on five separate occasions to enforce its rights to inspect documents and

19   to produce witnesses at various Orders for Examination.

20          a.  On February 28, 2003, this Court issued an Order compelling Four

21              Star to complete production of documents by March, 4, 2003; Four

22              Star failed to comply.

23          b.  On March 7, 2003, this Court issued an Order requiring parties to meet

24              and confer re: production of loan documents and requiring production

25              of bank statements and requiring Four Star to execute an affidavit that

26              it had no further records or minute books for the limited liability

27              company; Four Star failed to comply.

28

DECLARATION OF DUANE M. GECK IN SUPPORT OF
MOTION AND MOTION FOR ORDER TO AMEND
JUDGMENT TO INCLUDE ALTER EGOS

1      c.  On March 14, 2003, this Court issued an Order requiring loan

2         documents to be produced by March 19, 2003, and to produce Rick

3         Saperstein's accounting work papers and to produce Telephone

4         Arbitrage Contracts and documents establishing ownership of

5         animation art cels;  Four Star failed to comply.

6      d.  On March 28, 2003, the Court issued another Order requiring

7         production of all Telephone Arbitrage Contracts by April 4, 2003;

8         Four Star failed to comply.

9      e.  On April 11, 2003, the Court issued a fifth Order requiring production

10        of all Telephone Arbitrage Contracts and title to the Animation Art

11        Cels by April 18, 2003.

12    13.    On March 7, 2003, I began a debtor's examination of Four Star.  Four

13  Star produced Rick Saperstein as the person most knowledgeable of its financial

14  condition and assets.  Saperstein is a Certified Public Accountant with an

15  accountancy firm known as "Anson Garrett & Co."  (See Ex. "O" hereto –

16  Transcript of Saperstein Examination, page 5, lines 7-25 to page 6, lines 1-4).[1]

17    14.    Anson Garrett & Co. is an accounting corporation.  It maintains the

18  books and records of Four Star.   Anson Garrett & Co. operates out of the same

19  offices as Four Star at 11755 Wilshire Boulevard, Suite 1350, Los Angeles,

20  California 90025. I have looked up Anson Garrett & Co. on an internet yellow

21  page service which disclosed this address.  The internet yellow page listings for

22  Four Star and Anson Garrett & Co. are attached as Exhibits "E" and "F" to

23  Reservoir's Request to Take Judicial Notice.

24    15.    Anson Garrett & Co.'s principal owners, Ron Anson and Jack Garrett

25  are also the managing members of Four Star.   A certified copy of the Limited

26  Liability Company Articles of Organization is attached to the Request for Judicial

27

28

---

[1] Henceforth, "TR Saperstein").

DECLARATION OF DUANE M. GECK IN SUPPORT OF
MOTION AND MOTION FOR ORDER TO AMEND
JUDGMENT TO INCLUDE ALTER EGOS

1    Notice as Exhibit "G."

2        16.    Saperstein is the CPA with Anson Garrett & Co. who is primarily

3    responsible for overseeing the books and records of Four Star. (Ex. "P", TR

4    Saperstein page 10, line 3-13).

5        17.    Saperstein produced Four Star's Financial Statements for the Nine

6    Months Ended September 30, 2002, as prepared by Anson Garrett & Co. ("Anson

7    Garrett Financial Report"). (Ex. "Q", TR Saperstein page 43, lines 23-25 to page

8    44, lines 1-12).  A copy of the Anson  Garrett & Co. Financial Report is attached

9    hereto as Exhibit "R."

10        18.    Through inspection of the Anson Garrett Financial Report,  Reservoir

11    has learned that Four Star wholly owns two subsidiary limited liability companies

12    known as FSF, L.L.C. ("FSF") and Community Benefit Alliance, L.L.C. ("CBA").

13    (Ex. "S", TR Saperstein, page 176, lines 1-23).

14        19.    Despite Four Star's limited and coerced compliance with the discovery

15    demands, Reservoir has uncovered information that FSF and CBA now owns Four

16    Star's primary assets which could be used to satisfy the Judgment debt.  The two

17    largest assets are Telephone Arbitrage Contracts valued at $100 million and

18    Animation Art Cels valued between $100,000,000.00 and $272,000,000.00.

19    (Identified below in greater detail).

20        20.    Under Reservoir's examination of Saperstein regarding the Anson

21    Garrett Financial Report,  Reservoir first learned of the existence of Telephone

22    Arbitrage Contracts on or about March 7, 2003.  (Ex. "T", TR Saperstein pages 44-

23    47; See also Ex. "R" at page 4).

24        21.    Saperstein advised that Four Star was negotiating an asset sale for a

25    gross sales price in excess of $100,000,000.00.  At the time of the March 7, 2003,

26    debtor's examination, Reservoir believed and was led to believe that Four Star

27    owned the Telephone Arbitrage Contracts and that it would be conducting the sale.

28

1    (See Exhibit "T").

2        22.    Thereafter, on March 12, 2003, Reservoir received from Four Star a

3    document entitled "Financial Statements of Four Star Financial Services, LLC and

4    Subsidiaries for the year ended December 31, 2001" which was prepared by

5    Burgess & Company (the "2001 Burgess Financial Statements"). Burgess &

6    Company is an independent certified public account firm. A copy of the

7    2001 Burgess Financial Statements as Four Star produced are attached hereto as

8    Exhibit "U."

9        23.    The 2001 Burgess Financial Statements discloses that the wholly

10    owned subsidiary FSF owns the Arbitrage Contracts and not Four Star as

11    Saperstein had indicated. (Ex. "V" TR Saperstein pages 178-181). See also Ex.

12    "U" at page 15).

13        24.    In addition, the 2001 Burgess Financial Statements also disclose

14    another asset described as Animation Art Cels. The Animation Art Cels are

15    described as having an appraised value between $100,000,000.00 and

16    $272,000,000.00. (See Ex. "U" at page 12). Although the 2001 Burgess Financial

17    Statements do not reveal the ownership of the Animation Art Cels, Four Star has

18    asserted though its counsel at the March 14, 2003, debtor's examination that the

19    Art Cels are the sole property of Four Star's wholly owned subsidiary CBA. A

20    copy of the relevant pages from the March 14, 2003, debtor's examination are

21    attached hereto as Exhibit "W" (TR Saperstein, pages 238-241).

22        25.    In addition, the 2001 Burgess Financial Statements disclose at pages 6

23    and 15 that both FSF and CBA are a wholly owned subsidiaries of Four Star. (See,

24    Exhibit "U" hereto).

25        26.    Reservoir has obtained information from the California Secretary of

26    State's Office regarding the limited liability statements filed on behalf of Four Star

27    Financial, L.L.C., FSF, L.L.C. and Community Benefit Alliance, L.L.C. Certified

28

1    copies of these statement are attached to Reservoir's Request to Take Judicial

2    Notice as Exhibits "G," "H," and "I."

3        27.    These exhibits to the Request for Judicial Notice show the following:

4            a) Exhibit "G" shows that these limited liability companies share the

5               same members: Mark Cohn, Jack Garrett, Dana L Pierson, and Ronald

6               Anson.

7            b) Exhibit "H" and "I" show that FSF and CBA maintain the same

8               principal place of business.

9            c) Exhibit "I" shows that Four Star is the sole managing member of

10              CBA.

11           d) Finally, Exhibit "H" establishes that FSF, LLC was formed on

12              February 13, 2001, during the principal litigation of this action and

13              before the parties stipulated to the Judgment.

14       28.    Four Star has represented that FSF has always and exclusively owned

15   the Telephone Arbitrage Contracts.  However, the December 2000 Financial

16   Statement for Four Star Financial Services, LLC as prepared by Burgess &

17   Company shows that Four Star recognized $40,119,175.00 in telephone arbitrage

18   income.  A copy of the 2000 Burgess & Company Financial Statement is attached

19   hereto as  Exhibit "X".

20       29.    Four Star reported Telephone Arbitrage income on its end of year

21   2000 annual statement prior to the creation of FSF.  FSF did not exist until

22   February 12, 2001.  Four Star has produced no records that FSF provided any

23   consideration to Four Star for title to these Arbitrage Contracts.

24       30.    Four Star has never produced any of the Arbitrage Contracts for

25   review and inspection.

26       31.    Despite Four Star claims that its wholly owned subsidiary CBA owns

27   certain Animation Art Cels having an appraised value between $100,000,000.00

28

1    and $272,000,000.00 and despite a court order compelling production of the

2    documents of title, neither Four Star nor Community Benefit Alliance have

3    produced any records of title regarding the Animation Art Cels.

4        32.    Although Four Star alleges that FSF owns the Telephone Arbitrage

5    Contracts exclusively and CBA owns the Animation Art Cels exclusively, Four

6    Star has pledged CBA's "Animation Art Cels as collateral in connection with the

7    sale of the Company's positions in arbitrage contracts." (See Exhibit "U" page 12

8    – "the cels have been pledged as collateral in connection with the sale of the

9    Company's positions in the arbitrage contracts.")

10        33.    In addition, neither Four Star, FSF, nor CBA have produced any

11    records of its membership meetings in the form of minutes or company resolutions

12    or other business records. There are no records to support that these entities have

13    complied with any of the formalities required of limited liability companies.

14        34.    Four Star has produced only:

15    **Four Star**:  Its (1) Limited Liability Company Articles of Organization and

16    Limited Liability Company Statement of Information; and (2) Amendment to

17    the Amended and Restated Operating Agreement (Ex. "Y" and "Z");

18    **CBA**:  Its (1) Limited Liability Company Statement of Information; (2)

19    Certificate of Amendment; (3) Amended and Restated Operating Agreement;

20    and (Ex. "I," "AA," & "BB" respectfully);

21    **FSF**:  Its (1) Limited Liability Company Articles of Organization; and (2)

22    Amended Liability Company Agreement (Ex. "CC" and "DD" respectfully).

23        35.    Four Star's general ledger reflect loans to Jack Garrett, Ron Anson

24    and Mark Cohn. Garrett and Anson are members of Four Star, FSF and CBA. (See

25    Ex. "U" page 11 "Loaned to Class A Members $2,509,234.00). (See Ex. "EE" TR

26    Saperstein pages 200-203).

27        36.    On April 1, 2003, Jack Garrett executed a declaration stating that Four

28

1    Star has no note or any other loan document regarding a loan of money from Four

2    Star to these members.  Garrett stated that the only record of the loan is a "General

3    Ledger entry."  (See RJN Ex. "M").

4         37.    In another transaction, Ron Anson and Jack Garrett executed a Master

5    Revolving Note for a *personal* line of credit from Comerica Bank. ("Master

6    Revolving Loan Note Ex. "FF."

7         38.    Although Four Star is not a party to the Master Revolving Note, Four

8    Star makes all of payments for the Master Revolving Note through an automatic

9    withdrawal authorization on Four Star's general checking account. (See Ex. "GG"

10    TR Saperstein page 241: line 25 to page 242: lines 25 and Ex. "HH" Automatic

11    Loan Payment Authorization).

12         I declare at San Francisco, California and under penalty of perjury under the

13    laws of the United States of America that the foregoing is true and correct this 8th

14    day of August 2003.

15

16

17    Duane M. Geck

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DUANE M. GECK IN SUPPORT OF
MOTION AND MOTION FOR ORDER TO AMEND
JUDGMENT TO INCLUDE ALTER EGOS

i

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

RESERVOIR CAPITAL CORPORATION,          )
                                        )
                                        )
                                        )
                Plaintiff,              )
                                        )
        vs.                             ) No. FJ02-0002MJJ
                                        )       (JCS)
FOUR STAR FINANCIAL SERVICES,           )
                                        )
                Defendants.             )
_____)


DEPOSITION OF

RICK SAPERSTEIN

(Volume I, Pages 1-159)

_____

Friday, March 7, 2003

CERTIFIED COPY

REPORTED BY:  GAIL C. HECK, CSR 5289     JOB 01-330290



global court reporting • large case specialists
legal videography • litigation support • trial presentation

Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040   Fax 415-359-2050   www.legalink.com

Rick Saperstein                                      March 7, 2003

```
 1              A.   11755 Wilshire Boulevard, Suite 1350, Los
 2     Angeles, California.
 3              Q.   And phone number?
 4              A.   310-477-5252.
 5              Q.   And the address you gave, what business is
 6     at that address?
 7              A.   Anson & Garrett & Company.
 8              Q.   What is Anson & Garrett & Company?
 9              A.   It's a CPA firm.
10              Q.   Are you employed by Anson & Garrett &
11     Company?
12              A.   Yes.
13              Q.   What entity status is Anson & Garrett &
14     Company?
15              A.   A corporation.
16              Q.   Are you a shareholder in the corporation?
17              A.   Yes.
18              Q.   How many shareholders are there?
19              A.   Three.
20              Q.   Are the other two Mr. Anson and Mr. Garrett?
21              A.   Yes.
22              Q.   How long have you been associated with Anson
23     & Garrett & Company?
24              A.   Almost eleven years.
25              Q.   And what are your current duties and
```

5

Rick Saperstein                                    March 7, 2003

1   responsibilities at Anson & Garrett & Company?

2         A.  Well, I'm a CPA, so I perform accounting

3   services for quite a few clients.  I mean, I can go into

4   detail as to --

5         Q.  Do you have responsibilities handling

6   accounts with clients?

7         A.  Yes.

8         Q.  What other responsibilities do you have at

9   Anson & Garrett & Company besides dealing with clients?

10        A.  There is some administrative -- some firm

11  administrative duties.

12        Q.  Is there a shorthand way to refer to Anson &

13  Garrett & Company that you would prefer or should I say

14  Anson & Garrett & Company every time?

15        A.  We just call it Anson Garrett.

16        Q.  Anson Garrett?

17        A.  Yes.

18        Q.  Does Anson Garrett have within its corporate

19  structure officers?

20        A.  Yes.

21        Q.  And are you an officer?

22        A.  I don't think I am.  I'm not sure.  I don't

23  think so, though.

24        Q.  Do you have any responsibilities, for

25  instance, as a financial officer or controller of Anson

                                                        6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--o0o--

RESERVOIR CAPITAL CORPORATION,          )
                                        )
                                        )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               ) No. FJ02-0002MJJ
                                        )       (JCS)
FOUR STAR FINANCIAL SERVICES,           )
                                        )
            Defendants.                 )
_____)


DEPOSITION OF

RICK SAPERSTEIN

(Volume I, Pages 1-159)

_____

Friday, March 7, 2003

CERTIFIED COPY

REPORTED BY:  GAIL C. HECK, CSR 5289    JOB 01-330290



global court reporting • large case specialists
legal videography • litigation support • trial presentation

Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                                    March 7, 2003

1    give that some thought, because I'm not really sure I

2    can describe it that way.

3            MR. GECK:   Q.   Does Ms. Wong work for you

4    directly when you're working a client account?

5            A.   Well, Four Star -- Four Star is one of the

6    clients I work on, so when I'm working on Four Star,

7    there are times when we're working together.  And then

8    on those occasions, it's mostly -- I'm very -- I want to

9    give you a proper description of the relationship and

10   how an accounting firm works or how our accounting firm

11   works.  But most of the time I view her as a colleague.

12   So I'm not -- I'm still responding to the question, but

13   I'm pausing to properly answer it.

14           Q.   Would it be helpful if we went back at it

15   this way.  You said that Four Star is a client of Anson

16   Garrett; is that right?  You're hesitating.

17           A.   Four Star -- yes, Four Star is a client of

18   Anson Garrett.  I work on -- when I work on Four Star

19   accounts, I bill Four Star, I write on my time sheet --

20   I charge time to Four Star, yes.

21           Q.   Can you describe for me all the

22   relationships between Anson Garrett and Four Star.

23           MR. WOODLIEF:   If you know all the

24   relationships.

25           MR. GECK:   Q.   You can only tell me all the

                                                          10



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

RESERVOIR CAPITAL CORPORATION,  )
                                )
                                )
                                )
            Plaintiff,           )
                                )
        vs.                     ) No. FJ02-0002MJJ
                                )        (JCS)
FOUR STAR FINANCIAL SERVICES,   )
                                )
            Defendants.          )
_____ )


DEPOSITION OF

RICK SAPERSTEIN

(Volume I, Pages 1-159)

_____

Friday, March 7, 2003

CERTIFIED COPY

REPORTED BY:  GAIL C. HECK, CSR 5289    JOB 01-330290



global court reporting • large case specialists
legal videography • litigation support • trial presentation

Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                                    March 7, 2003

1          MR. WOODLIEF:  We can go back on.  Thank

2   you.

3          MR. GECK:  Q.  Mr. Saperstein, after

4   consulting with your counsel, is there any answer or

5   response that you'd like to change?

6          A.  No.

7          Q.  The sale of the asset, what asset is it

8   that's going to be sold?

9          A.  It's --

10         MR. WOODLIEF:  If you know.

11         THE WITNESS:  I can't go into very much

12  detail, because I don't want to misstate any of the

13  facts.  All I can -- I just want to say what it's

14  referred to as, they call arbitrage, telephone arbitrage

15  contracts, or telephone arbitrage income contracts.

16  Something like that.  Other than that, I'd be miss --

17  I'd be misstating or be afraid that I'd be misstating

18  some facts.  I really don't know much beyond that.

19         Q.  Have you seen the balance sheets, financial

20  statements for Four Star?

21         A.  Depends which ones you're referring to.  But

22  yes, some balance sheets, yes.

23         Q.  And the most recent one I think that we have

24  received is from the period ending September 30, 2002.

25  Have you ever seen that one?

                                                        43

Rick Saperstein                                    March 7, 2003

1    A.   I have seen it a while ago, but, yes.

2    Q.   Let me just show it to you here.

3         We should go ahead and mark it.

4         (Plaintiff's Exhibit No. 1

5         marked for identification.)

6         MR. GECK:  Q.  I'm showing you Exhibit 1,

7    which is a Four Star Financial Services LLC Financial

8    Statement, Nine Months Ended September 30, 2002.  Do you

9    see that?

10   A.   Yes, sir, I do.

11   Q.   Have you ever seen this before?

12   A.   I believe I have, yes.

13   Q.   I just want you to help me understand when

14   you refer to the arbitrage.  Would you refer to the

15   balance sheet which is on the fourth page of the

16   exhibit.  Do you see that?

17   A.   Yes, I do.

18   Q.   And there is a line item for arbitrage and

19   income receivable.  Do you see that?

20   A.   Yes, I do.

21   Q.   Do you know if these telephone arbitrage

22   contracts, would that be connected in any way with the

23   arbitrage income receivable shown on this balance sheet?

24   A.   Yes, I believe it would be.

25   Q.   Do you have an understanding as to whether

44

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040

**EXHIBIT R**

# FOUR STAR FINANCIAL SERVICES, LLC

---

## FINANCIAL STATEMENTS

## NINE MONTHS ENDED SEPTEMBER 30, 2002

# CONTENTS

|  | Page |
|---|---|
| Accountants' compilation report | 1 |
| Balance sheet | 2 |
| Statement of income | 3 |
| Statement of changes in members' equity | 4 |

ANSON, GARRETT & CO.

AN ACCOUNTANCY CORPORATION

CERTIFIED PUBLIC ACCOUNTANTS
11755 Wilshire Boulevard, Suite 1350
Los Angeles, California 90025

(310) 477-5252

TELECOPIER
(310) 478-5535

EMAIL
INFO@AGCPA.COM

To the Members
Four Star Financial Services, LLC
Los Angeles, California

We have compiled the accompanying balance sheet of Four Star Financial Services, LLC as of September 30, 2002, and the related statements of income and changes in members' equity for the nine months then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them. However, we did become aware of the departures from generally accepted accounting principles described in the following paragraphs.

The statements do not reflect the consolidation of two entities which are entirely owned by the Company and which are consolidated in the Company's annual financial statements. Generally accepted accounting principles require consolidation of all majority owned subsidiaries.

Management has elected to omit substantially all of the disclosures and the statement of cash flows required by generally accepted accounting principles. If the omitted disclosures and statement of cash flows were included in the financial statements, they might influence the user's conclusions about the Company's financial position, results of operations, and cash flows. Accordingly, these financial statements are not designed for those who are not informed about such matters.

We are not independent with respect to Four Star Financial Services, LLC.

Anson, Garrett + Co.

December 5, 2002

## FOUR STAR FINANCIAL SERVICES, LLC
### BALANCE SHEET
### SEPTEMBER 30, 2002

### ASSETS

| | | |
|---|---|---:|
| Factored accounts receivable | $ | 10,401,488 |
| Less allowance for doubtful accounts | | (235,000) |
| Notes receivable | | 82,179,977 |
| Less allowance for doubtful accounts | | (1,940,700) |
| Arbitrage income receivable | | 57,335,195 |
| Interest receivable | | 18,153,825 |
| Prepaid expenses and miscellaneous receivables | | 4,160,578 |
| Investment in unconsolidated subsidiaries | | 1,372,922 |
| Property and equipment, at cost, | | |
| net of accumulated depreciation | | 685,516 |
| | $ | 172,113,801 |

### LIABILITIES AND MEMBERS' EQUITY

**LIABILTIES**

| | | |
|---|---|---:|
| Cash overdraft | $ | 2,279,294 |
| Accounts payable | | 2,827,750 |
| Notes payable | | 81,923,742 |
| Notes payable - other | | 5,380,526 |
| Interest payable | | 1,568,929 |
| Miscellaneous liabilites | | 756,620 |
| | | 94,736,860 |

| | | |
|---|---|---:|
| **MEMBERS' EQUITY** | | 77,376,941 |
| | $ | 172,113,801 |

See accompanying accountants' compilation report

2

ANSON, GARRETT & CO

## FOUR STAR FINANCIAL SERVICES, LLC
### STATEMENT OF INCOME
### NINE MONTHS ENDED SEPTEMBER 30, 2002

**REVENUES**

| | | |
|---|---:|---:|
| Factoring fees | $ 1,378,646 | 5.65% |
| Interest income | 11,886,993 | 48.71 |
| Arbitrage income | 9,088,209 | 37.24 |
| Processing income | 1,581,555 | 6.48 |
| Equity in net income of unconsolidated subsidiaries | 36,591 | 0.15 |
| Miscellaneous income | 433,209 | 1.78 |
| | 24,405,203 | 100.00 |

| | | |
|---|---:|---:|
| **COST OF FUNDS** | 9,805,993 | 40.18 |
| | 14,599,210 | 59.82 |

**EXPENSES**

| | | |
|---|---:|---:|
| Bad debts | 1,220,586 | 5.00 |
| Collection expense | 50,500 | 0.21 |
| Commissions | 1,822,381 | 7.47 |
| Depreciation and amortization | 223,272 | 0.91 |
| Dues and subcriptions | 73,798 | 0.30 |
| Employee benefits | 47,410 | 0.19 |
| Filing fees | 1,345 | 0.01 |
| Insurance | 760,568 | 3.12 |
| Interest, notes payable - bank and other | 197,895 | 0.81 |
| Legal and professional | 2,490,198 | 10.20 |
| Miscellaneous | 218,353 | 0.89 |
| Office expense | 95,424 | 0.39 |
| Rent | 421,792 | 1.73 |
| Repairs and maintenance | 19,940 | 0.08 |
| Salaries | 1,841,061 | 7.54 |
| Litigation settlements | 318,585 | 1.31 |
| Taxes and licenses | 19,790 | 0.08 |
| Telephone | 77,914 | 0.32 |
| Travel | 93,722 | 0.38 |
| | 9,994,534 | 40.95 |

| | | |
|---|---:|---:|
| **INCOME BEFORE MANAGEMENT FEES** | 4,604,676 | 18.87 |
| **MANAGEMENT FEES** | 562,500 | 2.30 |
| **NET INCOME** | $ 4,042,176 | 16.56% |

## FOUR STAR FINANCIAL SERVICES, LLC
### STATEMENT OF CHANGES IN MEMBERS' EQUITY
### NINE MONTHS ENDED SEPTEMBER 30, 2002

| | | |
|---|---|---:|
| Balance, beginning of period | $ | 69,647,774 |
| Members' contributions | | 28,968,884 |
| Members' distributions | | (14,239,554) |
| Members' withdrawls | | (11,042,340) |
| Net income for the period | | 4,042,176 |
| Balance, end of period | $ | 77,376,941 |

1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                              --o0o--

5

RESERVOIR CAPITAL CORPORATION,          )

6                                               )

                                                )

7                  Plaintiff,                    )

                                                )

8          vs.                                   ) No. FJ02-0002MJJ

                                                )       (JCS)

9   FOUR STAR FINANCIAL SERVICES,               )

                                                )

10                 Defendants.                   )

    _____)

11

12

13

14

15                         DEPOSITION OF

16                       RICK SAPERSTEIN

17                  (Volume II, Pages 160-258)

18

                        Friday, March 14, 2003

19                         CERTIFIED COPY

20

    REPORTED BY:  GAIL C. HECK, CSR 5289        JOB 01-330712

21

22

23

24

25

                                                            160



global court reporting • large case specialists
legal videography • litigation support • trial presentation

Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                              March 14, 2003

1        Q.  Turn to the next page of the exhibit, which

2   is the balance sheet.  This says that it is a

3   Consolidated Balance Sheet for Four Star Financial

4   Services, LLC and Subsidiaries.  What subsidiaries are

5   included in the balance sheet?

6        A.  I don't recall, but it's disclosed elsewhere

7   in the financial statements.  I'd have to refer to it.

8        Q.  In the footnotes?

9        A.  Yes.

10       Q.  We will get to that then.

11           Do you know precisely which footnote it would

12   be in general?

13       A.  I could find it rather easily.  It should

14   be --

15       Q.  Why don't you take a look and see if you can

16   let me know.

17       A.  All right.  It's a footnote on page six.

18   It's footnote one, which is the Summary of Significant

19   Accounting Policies.  It's the second subheading

20   Principles of Consolidation.  "The accompanying

21   financial statements include the accounts of the company

22   and it's wholly-owned subsidiaries,FSF, LLC and

23   Community Benefit Alliance, LLC."

24       Q.  Those are the only two subsidiaries that are

25   included?

                                                        176

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040

Rick Saperstein                                    March 14, 2003

```
 1            A.  Yes.
 2                 MR. WOODLIEF:  Probably misstates the
 3       testimony.  I think the letter reads the only two that
 4       are referenced.  I'm not sure if that's the only two
 5       that are included or not.
 6                 MR. GECK:  I'm sorry?
 7                 MR. WOODLIEF:  They were the only two names
 8       that are referenced.
 9                 MR. GECK:  That's why I'm asking if there
10       are any others he's aware of.
11            Q.  If there are others, wouldn't they be
12       disclosed at this spot?
13            A.  I didn't mean to interrupt.  As I recall, at
14       this time those are the only two subsidiaries that are
15       consolidated.  I'm not aware of any others that are -- I
16        , I have no reason to believe any others are
17       consolidated.  I don't --
18            Q.  Let's look back at the balance sheet, and
19       looking at the line that says Arbitrage Income
20       Receivable, do you see that?
21            A.  Yes.
22            Q.  And it shows an amount of $38,358,644, do
23       you see that?
24            A.  Yes, I do.
25            Q.  Then I'd like you to look at Exhibit 1,
```
                                                        177

Rick Saperstein                    March 14, 2003

1    again.  I'll show you what was marked as Exhibit 1 last

2    week.  It's the Four Star Financial Services financial

3    statements for --

4         A.  How do I know that was Exhibit 1?  Just

5    teasing.

6         Q.  For the nine months ended September 30,

7    2002.  And there is a balance sheet here, and it has a

8    line for Arbitrage Income Receivable.  Do you see that?

9         A.  Yes.

10        Q.  What's your understanding of the ways in

11   which the numbers referenced on the Arbitrage Income

12   Receivable on Exhibit 1 would differ from the line item

13   for Arbitrage Income Receivable on Exhibit 3?

14        A.  Well, I'm a little unclear as to your

15   question.

16        Q.  Well, let me start again, because I want to

17   make sure I'm comparing apples to apples.

18             Exhibit 3 refers to subsidiaries.  Exhibit 1

19   does not.  Is there a difference between the numbers

20   because of subsidiaries?

21        A.  I don't believe so.

22             Christina, would you agree with me?

23        MS. WONG:  Okay.  The 2001 year end is

24   consolidated.  The one on September 2002 is not

25   consolidated.  Am I answering your question?

                                                        178

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

RESERVOIR CAPITAL CORPORATION,          )
                                        )
                                        )
                                        )
                Plaintiff,              )
                                        )
        vs.                             ) No. FJ02-0002MJJ
                                        )      (JCS)
FOUR STAR FINANCIAL SERVICES,           )
                                        )
                Defendants.             )
_____)


DEPOSITION OF

RICK SAPERSTEIN

(Volume I, Pages 1-159)

_____

Friday, March 7, 2003

CERTIFIED COPY

REPORTED BY:  GAIL C. HECK, CSR 5289    JOB 01-330290


global court reporting • large case specialists
legal videography • litigation support • trial presentation
Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                                    March 7, 2003

1          MR. WOODLIEF:  We can go back on.  Thank

2   you.

3          MR. GECK:  Q.  Mr. Saperstein, after

4   consulting with your counsel, is there any answer or

5   response that you'd like to change?

6          A.  No.

7          Q.  The sale of the asset, what asset is it

8   that's going to be sold?

9          A.  It's --

10         MR. WOODLIEF:  If you know.

11         THE WITNESS:  I can't go into very much

12  detail, because I don't want to misstate any of the

13  facts.  All I can -- I just want to say what it's

14  referred to as, they call arbitrage, telephone arbitrage

15  contracts, or telephone arbitrage income contracts.

16  Something like that.  Other than that, I'd be miss --

17  I'd be misstating or be afraid that I'd be misstating

18  some facts.  I really don't know much beyond that.

19         Q.  Have you seen the balance sheets, financial

20  statements for Four Star?

21         A.  Depends which ones you're referring to.  But

22  yes, some balance sheets, yes.

23         Q.  And the most recent one I think that we have

24  received is from the period ending September 30, 2002.

25  Have you ever seen that one?

                                                        43

Rick Saperstein                                    March 7, 2003

1       A.   I have seen it a while ago, but, yes.

2       Q.   Let me just show it to you here.

3            We should go ahead and mark it.

4            (Plaintiff's Exhibit No. 1

5            marked for identification.)

6            MR. GECK:   Q.   I'm showing you Exhibit 1,

7    which is a Four Star Financial Services LLC Financial

8    Statement, Nine Months Ended September 30, 2002.  Do you

9    see that?

10      A.   Yes, sir, I do.

11      Q.   Have you ever seen this before?

12      A.   I believe I have, yes.

13      Q.   I just want you to help me understand when

14   you refer to the arbitrage.  Would you refer to the

15   balance sheet which is on the fourth page of the

16   exhibit.  Do you see that?

17      A.   Yes, I do.

18      Q.   And there is a line item for arbitrage and

19   income receivable.  Do you see that?

20      A.   Yes, I do.

21      Q.   Do you know if these telephone arbitrage

22   contracts, would that be connected in any way with the

23   arbitrage income receivable shown on this balance sheet?

24      A.   Yes, I believe it would be.

25      Q.   Do you have an understanding as to whether

                                                         44

1    the contracts to be sold would constitute some portion

2    of this receivable shown in the balance sheet as

3    arbitrage income receivable?

4         A.   It's my understanding that it would

5    constitute some portion of that income receivable, yes,

6    arbitrage income receivable, yes, it is my

7    understanding.

8         Q.   Do you know what portion?

9         A.   No, I don't.

10        Q.   Any understanding whether it's half,

11   two-thirds?

12        A.   No understanding whatsoever.

13        Q.   Do you have any understanding as to what the

14   general sales proceed amount to be generated by this

15   sale in favor of Four Star is?

16        A.   No.

17        Q.   Do you know whether it's more than a

18   million?

19        A.   The gross proceeds to be received or the net

20   proceeds?

21        Q.   That's a fair question, because you talked

22   about the fact that there appears to be some debt

23   interest that had to be paid in connection with this;

24   isn't that right?

25        A.   Yes, I did.

                                                          45

Rick Saperstein                                              March 7, 2003

1          Q.   Whatever you know.  And I'll ask both.  But

2    whether it's the gross sales proceeds or the net

3    proceeds that Four Star may realize after it's

4    understanding some other debt interest has to be paid.

5    I'm just trying to understand what you know.

6               We'll start with the gross sales proceeds.

7    Your best understanding of what the range of that dollar

8    amount may be.

9          A.   You said the gross again, did you not?

10         Q.   Yes.

11         A.   It's my understanding that, looking at this

12   balance sheet, September 30, 2002 --

13         Q.   Yes.

14         A.   -- and this arbitrage income receivable?

15         Q.   Yes.  Just for the record it shows an amount

16   in excess of $57 million, right?

17         A.   Yes, it does.  My understanding is that it's

18   something in excess of a hundred million dollars is the

19   gross.  And I'll just tell you I don't know what the net

20   -- I just know what the net to Four Star Financial

21   Services LLC would be.  I don't.

22         Q.   Looking at the balance sheet, there are a

23   number of other assets identified on the balance sheet,

24   right?

25         A.   Yes.

                                                              46

Rick Saperstein                                    March 7, 2003

1          Q.  What other assets, as identified on this

2     balance sheet, are included in the sale of these

3     telephone arbitrage contracts as you described them?

4          A.  Could Christina come and help me look at

5     this?

6          Q.  Certainly.  Obviously, I asked that because

7     on this statement, the arbitrage income is 57 million,

8     and you've identified the gross sales amount may be in

9     excess of a hundred million.  So I want to understand

10    what other assets would be included.

11               MS. WONG:  Included in the sales?

12               MR. GECK:  Yes, in the sale, the potential

13    sale.

14               MS. WONG:  I don't know.

15               THE WITNESS:  I think none, right?

16               MS. WONG:  I don't think any of them.

17               THE WITNESS:  I don't think any.

18               MR. GECK:  Q.  What's your best

19    understanding of what the potential buyer is purchasing

20    from Four Star?

21          A.  I'm just -- my best understanding is just

22    that vague, or call it what you will, but this term that

23    I gave you before.

24          Q.  Telephone arbitrage contracts?

25          A.  Something like that, yes.  I mean, to me

                                                    47

# BURGESS & COMPANY

*Certified Public Accountants, Inc*

## FOUR STAR FINANCIAL SERVICES, LLC
## AND SUBSIDIARIES

## CONSOLIDATED FINANCIAL STATEMENTS

### FOR THE YEAR ENDED DECEMBER 31, 2001

Ex. ___3___ Date 3/14/03
Witness _SAPERSTEIN_
GAIL C. HECK

100 Spear Street
Suite 1105
San Francisco
California 94105
415 777-0601

# CONTENTS

|  | Page |
|---|---|
| Accountants' review report........................................ ...... | 1 |
| Consolidated balance sheet ........................................... | 2 |
| Consolidated statement of income...................................... | 3 |
| Consolidated statement of changes in members' equity................... | 4 |
| Consolidated statement of cash flows.................................... | 5 |
| Notes to consolidated financial statements............................... | 6 - 19 |

# BURGESS & COMPANY

*Certified Public Accountants, Inc*

100 Spear Street
Suite 1105
San Francisco
California 94105
415 777-0601
FAX 415 777-4435

Board of Directors
Four Star Financial Services, LLC and Subsidiaries
Los Angeles, California

We have reviewed the accompanying consolidated balance sheet of Four Star Financial Services, LLC and Subsidiaries as of December 31, 2001, and the related consolidated statements of income, changes in members' equity and cash flows for the year then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All information included in these financial statements is the representation of the management of Four Star Financial Services, LLC and Subsidiaries.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

*Burgess & Company*

Burgess & Company
Certified Public Accountants, Inc.

November 22, 2002

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEET
### DECEMBER 31, 2001

### ASSETS

| | | |
|---|---|---:|
| Cash | $ | 7,260,174 |
| Factored accounts receivable, less allowance for doubtful accounts of $235,000 | | 22,125,797 |
| Notes receivable, less allowance for doubtful accounts of $815,700 | | 63,807,515 |
| Arbitrage income receivable | | 38,358,644 |
| Interest receivable | | 3,689,551 |
| Other assets | | 18,872,193 |
| Investments in unconsolidated subsidiaries | | 7,737,729 |
| Property and equipment, at cost, net of accumulated depreciation of $1,063,269 | | 805,609 |
| | $ | 162,657,212 |

### LIABILITIES AND MEMBERS' EQUITY

**LIABILITIES**

| | | |
|---|---|---:|
| Accounts payable | $ | 2,057,715 |
| Due to factoring clients | | 11,368,135 |
| Notes payable | | 69,752,674 |
| Notes payable - related parties | | 3,007,183 |
| Notes payable - other | | 2,883,879 |
| Interest payable | | 1,460,736 |
| Miscellaneous liabilities | | 2,613,780 |
| | | 93,144,102 |

**COMMITMENTS**

| | | |
|---|---|---:|
| **MEMBERS' EQUITY** | | 69,513,110 |
| | $ | 162,657,212 |

See accompanying accountants' review report
and notes to consolidated financial statements.

2

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENT OF INCOME
### FOR THE YEAR ENDED DECEMBER 31, 2001

**REVENUES**

| | | |
|---|---|---:|
| Factoring fees | $ | 2,125,628 |
| Interest | | 13,921,455 |
| Arbitrage income | | 23,364,367 |
| Equity in net loss of unconsolidated subsidiaries | | (2,859,489) |
| Miscellaneous income | | 38,929 |
| | | 36,590,890 |

| | |
|---|---:|
| **COST OF FUNDS** | 11,644,126 |
| | 24,946,764 |

**OPERATING EXPENSES**

| | |
|---|---:|
| Advertising | 773 |
| Bad debts | 11,086,453 |
| Commissions | 2,016,362 |
| Amortization | 29,401 |
| Depreciation | 305,540 |
| Dues and subscriptions | 158,673 |
| Employee benefits | 65,882 |
| Filing fees | 5,101 |
| Insurance | 281,544 |
| Interest, notes payable - bank and other | 513,393 |
| Legal and professional | 2,560,804 |
| Litigation settlements | 1,330,000 |
| Miscellaneous | 262,968 |
| Office | 154,344 |
| Rent | 663,720 |
| Repairs and maintenance | 34,863 |
| Salaries | 2,319,482 |
| Taxes and licenses | 52,147 |
| Telephone | 105,742 |
| Travel | 62,768 |
| | 22,009,960 |

| | |
|---|---:|
| **INCOME BEFORE MANAGEMENT FEES** | 2,936,804 |
| **MANAGEMENT FEES** | (750,000) |
| **NET INCOME** | $   2,186,804 |

See accompanying accountants' review report
and notes to consolidated financial statements.

## FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENT OF CHANGES IN MEMBERS' EQUITY
## FOR THE YEAR ENDED DECEMBER 31, 2001

| | |
|---|---:|
| **MEMBERS' EQUITY**, beginning of year | $  62,700,711 |
| **MEMBERS' CONTRIBUTIONS** | 28,203,709 |
| **MEMBERS' WITHDRAWALS** | (8,649,688) |
| **MEMBERS' DISTRIBUTIONS** | (14,928,426) |
| **NET INCOME** | 2,186,804 |
| **MEMBERS' EQUITY**, end of year | $   69,513,110 |

See accompanying accountants' review report
and notes to consolidated financial statements.

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBISIDIARIES
## CONSOLIDATED STATEMENT OF CASH FLOWS
### FOR THE YEAR ENDED DECEMBER 31, 2001

**CASH FLOWS FROM OPERATING ACTIVITIES:**

| | | |
|---|---|---:|
| Net income | $ | 2,186,804 |
| Adjustments to reconcile net income | | |
| to net cash flows from operating activities: | | |
| Bad debts | | 11,086,453 |
| Capitalized interest income | | (8,860,824) |
| Equity in net loss of unconsolidated subsidiaries | | 2,994,504 |
| Depreciation and amortization | | 334,941 |
| Capitalized cost of funds | | 4,475,161 |
| Increase in: | | |
| Arbitrage income receivable | | (4,773,753) |
| Interest receivable | | (4,455,228) |
| Other assets | | (433,987) |
| Accounts payable | | 750,270 |
| Interest payable | | 454,873 |
| Miscellaneous liabilities | | 824,013 |
| Net cash flows provided by operating activities | | 4,583,227 |

**CASH FLOWS FROM INVESTING ACTIVITIES:**

| | |
|---|---:|
| Increase in net factored accounts receivable | (1,408,847) |
| Advances on notes receivable | (6,975,969) |
| Payments on notes receivable | 3,176,560 |
| Investments in unconsolidated subsidiaries | (1,539,064) |
| Distributions from unconsolidated subsidiaries | 97,500 |
| Acquisition of equipment | (207,944) |
| Net cash flows used by investing activities | (6,857,764) |

**CASH FLOWS FROM FINANCING ACTIVITIES:**

| | |
|---|---:|
| Advances on notes payable and notes payable – related parties | 9,113,192 |
| Principal payments on notes payable and notes payable – related parties | (4,890,991) |
| Principal payments on notes payable – other | (1,530,000) |
| Members' contributions | 19,880,708 |
| Members' withdrawals | (3,325,604) |
| Members' distributions | (9,863,181) |
| Net cash flows provided by financing activities | 9,384,124 |

| | | |
|---|---|---:|
| **NET INCREASE IN CASH** | | 7,109,587 |
| **CASH,** beginning of year | | 150,587 |
| **CASH,** end of year | $ | 7,260,174 |

See accompanying accountants' review report
and notes to consolidated financial statements.

5

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

Four Star Financial Services, LLC (the "Company") is a finance company licensed in the State of California. In accordance with its operating agreement, the Company must dissolve on or before December 31, 2026. As a limited liability company, each member's liability is limited to amounts reflected in their respective member accounts. The primary business of the Company is providing financing to companies in the telecommunications industry either by entering into arbitrage contracts, through the purchase of accounts receivable generated by "pay per call" telephone businesses, or through secured loans. The customers, and the callers who generated the receivables, are located throughout the United States.

## 1- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Cash

The Company maintains its cash balance at four institutions. The deposits at these institutions are insured by the Federal Deposit Insurance Corporation up to $100,000.

For purposes of the statement of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

### Principles of Consolidation

The accompanying financial statements include the accounts of the Company and its wholly-owned subsidiaries, FSF, LLC and Community Benefit Alliance, LLC ("CBA").

CBA became a wholly-owned subsidiary in late December 2001 when the Company acquired the remaining 50% ownership. Prior to that time, the Company accounted for its ownership of 50% of CBA under the equity method of accounting.

### Factored Accounts Receivable

Factored accounts receivable result from the purchase of accounts receivable, with recourse. The receivables are generated by companies in various segments of the telecommunications industry.

The Company receives repayment directly from the local exchange carriers according to the same terms that existed between the factoring client and the local exchange carrier. In addition, the factoring client assigns to the Company all of its rights with respect to the local exchange carrier.

Factoring fees are calculated and recognized on the daily outstanding balances of the funded portion of the factored accounts receivable. The Company has a minimum charge of one month's fee.

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

## 1- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

### Allowance For Doubtful Accounts

The allowance for doubtful accounts has been established through provisions for bad debts charged against income. Loans deemed to be uncollectible are charged against the allowance and subsequent recoveries, if any, are credited to the allowance. The Company accounts for certain loans under Statement No. 114 of the Financial Accounting Standards Board "Accounting by Creditors for Impairment of a Loan" and SFAS No. 118 "Accounting by Creditors for Impairment of a Loan-Income Recognition and Disclosures". Under these standards, the allowance for doubtful accounts related to loans that are identified for evaluation in accordance with SFAS No. 114 is based on discounted cash flows using the loan's effective interest rate at the date the loan is determined to be impaired or the fair value of the collateral for collateral-dependent loans. The allowance is maintained at a level considered adequate to provide for potential loan losses. In making this determination, management takes into consideration the results of internal review procedures, prior loan loss experience, an assessment of the effect of current and anticipated future economic conditions on the loan portfolio, the financial condition of the borrower and such other factors that, in management's judgement, deserve consideration. The determination of the adequacy of the allowance is inherently subjective, as it requires material estimates including the amounts and timing of future cash flows expected to be received on impaired loans that may be susceptible to significant change.

### Investments

Investments in entities in which the Company has a 20% to 50% interest are accounted for using the equity method, under which the Company's share of earnings of these investments is reflected in income as earned and dividends are credited against the investments when received. Six entities, of which the Company owns between 75% and 100%, are also accounted for using the equity method because the impact of consolidating these entities on the accompanying financial statements is immaterial.

### Property and Equipment

Depreciation of property and equipment is being provided on the straight-line and declining balance methods over the estimated useful lives of the assets. Estimated useful lives are five to ten years.

### Membership Units

The Company has issued Class A membership units to the three managing members and Class B through G membership units to all non managing members. Holders of Class B through G membership units are entitled to a cumulative annual priority return at rates ranging from 13% to 18%. These members are permitted to withdraw all or part of their respective capital balances upon giving prior notice ranging from 90 days to 12 months (depending on the amount to be withdrawn), provided that such withdrawal would not cause the Company to be insolvent or to be in default under any financial covenant contained in, or otherwise violate or accelerate, any financing arrangement to which the Company is a party.

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

### 1- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

Available Cash Flow from Operations (as defined in the Company's operating agreement) is allocated as follows:

| Available Cash Flow from Operations | Class A Members | Class B through G Members |
|---|---|---|
| Up to $10,000,000 | 99% | 1% |
| Over $10,000,000 | 90% | 10% |

#### Income Taxes

The Company is treated as a partnership for federal income tax purposes and does not incur federal income taxes. Members are taxed individually on their share of the Company's earnings. The Company's net income or loss is allocated among the members in accordance with the regulations of the Company.

The State of California has a limited liability company tax of $800 in addition to a limited liability company fee based on gross income. The maximum fee is $11,970 per year.

#### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### 2- FACTORED ACCOUNTS RECEIVABLE

As of December 31, 2001, factored accounts receivable consisted of the following:

| | |
|---|---|
| Face amount of accounts receivable purchased | $ 24,742,564 |
| Less amounts due for billing and collection services on behalf of factoring clients | (2,381,767) |
| Less allowance for doubtful accounts | (235,000) |
| | $ 22,125,797 |

The balance at December 31, 2001 represents amounts due from 9 clients, with net balances ranging from approximately $407,000 to approximately $2,700,000. The Company has a one-third ownership interest in one of the clients. This client has a net balance of approximately $2,636,000.

Six factoring clients, whose net accounts aggregate to approximately $6,822,000 have not repaid their accounts according to the original terms. Management feels the balances are fully collectible and that security is adequate. However, all of the accounts had allowances determined under SFAS No. 114 and 118. The allowance for losses related to these accounts was $235,000 at December 31, 2001. The status of each of these accounts is described below.

## FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

### 2- FACTORED ACCOUNTS RECEIVABLE (continued)

One account, with a net balance of approximately $684,000, has been written down and modified. Factoring fees have been reduced from 34% per annum to 14% per annum.

Four other accounts, with net balances aggregating approximately $5,709,000, had the funds retained by their billing company. Under a settlement agreement, an obligation was created evidencing this debt. Repayments are based upon the billing company's volume, and the minimum annual payments approximate 25%. The billing company is currently not in compliance with the terms of the obligation. The company continues to charge factoring fees at its standard rates. However, on one of the accounts the fees are no longer being accrued.

The company is in litigation to enforce collection of the $429,000 balance of the final account. The company feels security is adequate and the balance is fully collectible.

### 3- NOTES RECEIVABLE

As of December 31, 2001, notes receivable consisted of the following:

Secured notes receivable, bearing interest at rates ranging
from 14% to 44% per annum, are either due on demand or
maturing between July, 1995 and December 31, 2003. Security
generally consists of all assets of the borrower and personal
guarantees of the principals of the debtors. Included in the
balance is the non-interest bearing amount of $1,489,901 due
from the borrowers for cost reimbursements. Approximately
$23,892,000 are loans to companies in the telecommunications
industry. Loans in the amount of $28,994,176 are impaired
as of December 31, 2001. Interest receivable includes
$427,112 related to these impaired loans. The Company
feels these impaired amounts are fully collectible and that
there is adequate security.                                        $    31,060,655

Loaned to an entity that owns and operates campground timeshare
properties. The loans are secured by trust deeds on the properties, the
personal guaranty of the entity's principal and other assets of that
principal. The notes bear interest at the rate of 47% per annum and
were due in September 1996. The borrower was unable to pay the
principal and interest when due. During 1998 the Company assigned
its security interest in the two properties which secured the loans to
two entities it formed. One of the entities foreclosed on its property
and disposed of it in 1998. The other entity foreclosed on its property
in 1999. Since foreclosing on the subject property, the entity has made
significant improvements. A recent independent appraisal indicated the
Company's net equity to be $3.5 million. Foreclosure did not relieve
the borrower of the original debt and management believes that full
recovery will be realized. However, interest income is no longer
being accrued.                                                           3,000,000

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

3- NOTES RECEIVABLE (continued)

Loaned to entities in which the officers of the Company are
also principals. Combined, the entities own seven hotels located
throughout the United States. The notes are unsecured, bear interest
at the rate of 10% per annum, and are due on demand. Included in
the balance is the non-interest bearing amount of $36,296 due from
the borrowers for cost reimbursements. Interest income for the year
includes $1,110,674 related to the notes, and interest receivable
includes $99,118 at December 31, 2001.                                    4,685,541

Loaned to an airline, secured by surety bonds issued by an
insurance company and other assets of the airline. The notes
bear interest at rates between 18% and 42% per annum and
matured on June 30, 1997. The Company is currently proceeding
against an insurance related company in order to collect the
debt. Management is unable to provide a reasonable timeframe
for resolution of the case as it can not proceed with the case
until it has properly dismissed one of the original defendants. The
dismissal of this defendant has no bearing on the Company's
ultimate ability to collect. Management feels security for this loan
is adequate. However, interest income is no longer being accrued.        6,476,843

Loaned to Consumer Finance America an entity in which the
Company also has an investment, secured by all assets of the
borrower. The entity is in the business of purchasing commercial
and auto paper. Interest at the rate of 30% per annum plus
principal based on a 40 month amortization period is due monthly
and the note matures in January 2003. Included in the balance is
the non-interest bearing amount of $3,184 due from the borrower
for cost reimbursements. Interest income for the year includes
$121,104 related to the note and interest receivable includes this
same amount at December 31, 2001.                                          401,335

Loaned to Sentinel Acceptance Ltd. an entity in which the Company
also has an investment, secured by all assets of the borrower. The entity
is in the business of purchasing consumer and auto paper. Interest at
the rate of 30% per annum is due monthly and principal is due on
demand. Included in the balance is the non-interest bearing amount
of $273,451 due from the borrower for cost reimbursements. Interest
income for the year includes $644,917 related to the note, and
interest receivable includes $2,734,964 at December 31, 2001.
Management allowed the borrower to make excess payments on
debt senior to that owed to the Company in order to enhance
the Company's security position. These payments were allowed to be
made in lieu of payments required under the debt owed to the Company.    2,408,348

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

3- NOTES RECEIVABLE (continued)

Loaned to an entity which is a long distance reseller and in which the
managing members of the Company are principals. The note bears
interest at the rate of 12% per annum. In addition, the Company is
entitled to a 20% participation interest in the profits of the borrower.
Payments of interest only are due monthly through December 31, 2001
at which time principal begins to amortize over four years. Interest
income includes $369,353 related to this note and interest receivable
includes $11,014 at December 31, 2001. The borrower has been
unable to make the payments required under the loan agreement.
Accordingly, effective June 1, 2001, interest income is no longer
being accrued. Management feels security for this loan is adequate.                    8,494,501

Loaned to the Class A members. The note bears interest at the rate
of 15% per annum. Principal and interest are due June 1, 2003.
Interest income for the year includes $182,312 related to this note and
interest receivable includes this same amount at December 31, 2001.                    2,509,234

Loaned to Animation Communications, LLC, an entity in which
the Company also has an investment. The LLC is a long distance
re-seller. The note bears interest at the rate of 23% per annum.
Interest accrues until November 1999. Payments of interest only
are due monthly from November 1999 through October 2000.
Beginning November 2000, principal amortizes over a ten year
period, with the balance due in full on December 31, 2003.                              5,521,525

Unsecured notes which are due on demand                                                    65,233
                                                                                      64,623,215
Less allowance for doubtful accounts                                                      815,700
                                                                                    $ 63,807,515

Contractual maturities of notes receivable which were not impaired as of December 31, 2001 are as
follows:

| Year Ended December 31, | |
|---|---|
| 2002 | $ 988,473 |
| 2003 | 5,683,839 |
| 2004 | 2,611,494 |
| 2005 | 3,398,097 |
| 2006 | 2,412,450 |
| Thereafter | 2,528,206 |
| | $ 17,622,559 |

**FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2001

### 3- NOTES RECEIVABLE (continued)

Management anticipates that notes maturing during the year ended December 31, 2002 will be paid or extended in the ordinary course of business in accordance with standard Company underwriting guidelines.

It is the policy of the Company to recognize income on impaired loans so long as the total outstanding balance on the impaired loan does not exceed the net realizable value of the loan. The total investment in impaired loans, all of which had allowances determined under SFAS No. 114 and 118, was approximately $47,486,000 at December 31, 2001. The allowance for losses related to these loans was $815,700 at December 31, 2001. Interest income includes approximately $6,369,000 recognized on impaired loans subsequent to the loan becoming impaired, $77,000 of which was received in cash during the year.

The Company is in the business of lending and factoring to earn itself high yields. A number of these assets are put in default by the company in order to protect the collateral. This does not necessarily imply that the assets and corresponding collateral do not have the values necessary to allow full collection of the indebtedness at issue. Historically, most such impaired positions have been found to be collectable. Nevertheless, the Company has determined to take a more aggressive position toward writing off impaired positions. For this reason, the Company has written off all impaired positions which were deemed in any fashion questionable.

### 4- ALLOWANCE FOR BAD DEBTS

The following is an analysis of the allowance for bad debts:

| | |
|---|---:|
| Balance, January 1, 2001 | $ 1,050,700 |
| Charge-offs | (11,086,453) |
| Provision charged to operations | 11,086,453 |
| | |
| Balance, December 31, 2001 | $ 1,050,700 |

### 5- OTHER ASSETS

As of December 31, 2001, other assets consisted of the following:

| | |
|---|---:|
| Animation art cels acquired from a client in lieu of a foreclosure. The cels have been appraised by two reputable sources, which appraisals indicate total fair market value of between $100 to $272 million. Butterfield & Butterfield-range $100 million to $162 million and National Institute of Appraisers-value $272 million. The cels have been pledged as collateral in connection with the sale of the Company's positions in the arbitrage contracts (Note 7). The buyer agreed to a value of $150 million for the cels. | $ 16,200,296 |
| Prepaid expenses | 1,368,122 |
| Other receivables | 1,303,775 |
| | |
| | $ 18,872,193 |

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

## 6- INVESTMENTS IN UNCONSOLIDATED SUBSIDIARIES

As of December 31, 2001, investments in active entities consisted of the following:

|  | Percentage Owned |
|---|---|
| Animation Communications, LLC | 50.00% |
| Awesome Internet Services, LLC | 75.00% |
| CFC Investment, LLC | 99.50% |
| Consumer Finance America, LLC | 99.50% |
| Currituck Resort Shores, LLC (owns and operates a timeshare campground) | 99.00% |
| Direct One, LLC (A) | 35.00% |
| Gateway Credit Holdings, Inc. | 80.00% |
| Sentinel Acceptance Ltd., L.P. | 99.00% |

(A) As was reported in the 2000 financial statements, it is the intention of the majority of the members of Direct One to sell the company. However, certain factors which are described below have caused the members to delay their efforts to sell the company.

During the year 2001, virtually all of Direct One billings were done by way of credit cards. In large part because of the very fast growth that Direct One was experiencing, in the fourth quarter of 2001, it developed difficulties in processing transactions through the major credit card companies. As a result, at the end of 2001, Direct One suspended all billings to customers for a period of time.

In regrouping, Direct One went in two separate directions. First, toward the middle of 2002, it did resume processing transactions through the credit card companies. The major portion of its emphasis and business was in developing joint venture arrangements, principally with large, institutional quality companies. The context of the joint ventures included the joint venture partners being responsible for the retail level marketing, as well as all billing issues, whether by way of credit card or otherwise. Joint venture partners included Chase Manhattan Bank.

The result of the above is that the process to sell the company will likely be materially delayed. Market conditions in general also made the continuing marketing effort of the company more difficult. Management of Direct One was of the view that the above circumstances would likely lead to a decline in valuation for the short term and a probable increase in stability and valuation for the long term.

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

6- **INVESTMENTS IN UNCONSOLIDATED SUBSIDIARIES** (continued)

The following is a summary of the combined financial position and results of operations of the investee companies which was abstracted from unaudited financial statements:

|  | Total Subsidiary Amounts | Four Star's Pro-Rata Amounts |
|---|---|---|
| Inventory | $  103,684 | $   54,874 |
| Other current assets - predominantly accounts receivable and prepaid expenses | 16,190,877 | 11,657,341 |
| Property and equipment | 1,350,525 | 1,215,567 |
| Other assets - predominantly loans receivable | 2,084,354 | 885,384 |
|  | $ 19,729,440 | $ 13,813,166 |
|  |  |  |
| Current liabilities | $   2,095,343 | $   1,457,689 |
| Long-term liabilities | 21,483,004 | 14,759,211 |
| Deficit – other owners | (3,848,907) | (5,860,736) |
| Equity – Four Star Financial Services, LLC | - | 3,447,002 |
|  | $ 19,729,440 | $ 13,813,166 |
|  |  |  |
| Revenues | $ 57,596,642 | $ 23,510,498 |
|  |  |  |
| Net income | $ 11,036,302 | $   5,025,133 |
| Net loss from investment in Community Benefit Alliance, LLC prior to requirements for consolidation being met |  | (7,553,656) |
| Inactive investments written off |  | (330,966) |
| Equity in net loss of unconsolidated subsidiaries |  | $ (2,859,489) |

$11,140,741 of the above liabilities are payable to the Company.

Revenues on the accompanying statement of income includes $1,793,125 charged to the investee companies.

The following is a summary of investments in unconsolidated subsidiaries as presented on the accompanying balance sheet:

| | |
|---|---|
| Investments accounted for using the equity method of accounting | $   3,447,002 |
| Investments accounted for using the cost method of accounting | 4,290,727 |
|  | $   7,737,729 |

## FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2001

**7  ARBITRAGE CONTRACTS**

Through a wholly owned subsidiary, FSF, LLC ("FSF"), the Company has entered into several Arbitrage contracts. The Company funds the investment in the contracts by selling Participation Interests, whereby the Participants own an undivided interest in proceeds generated from the contractual relationships. The contracts entered into as of December 31, 2001 required investments by the Participants totaling approximately $42,188,000.

FSF has arranged to and in fact has sold its positions in the Arbitrage contracts to a large financial institution ('the Buyer"). Title, pursuant to an assignment agreement has been transferred to the Buyer.   FSF and the Company are subject to a very stringent confidentiality agreement, and are extremely limited as to disclosure at this time. The referenced Buyer is an AA rated company.  The purchase price is for an amount that is considerably in excess of the Company's basis in the contracts as of December 31, 2001. It is anticipated that this sale will be completed during the fourth quarter of 2002.

**8-  DUE TO FACTORING CLIENTS**

As of December 31, 2001, due to factoring clients consisted of the unfunded portion of factored accounts receivable, less accrued factoring fees and costs advanced.

**9-  NOTES PAYABLE**

As of December 31, 2001 notes payable consisted of the following:

Notes payable, unsecured, bearing interest at fixed rates
ranging from 10% to 20% per annum. Interest is payable monthly,
or at the option of the note holder, is compounded and added
to principal. The notes are due within 90 days after demand.
There are approximately 290 note holders who are owed amounts
ranging from less than $1,000 to approximately $2,430,000.
Accrued interest was $849,689 at December 31, 2001. This amount
was paid in January, 2002.                                                              $ 61,770,778

Notes payable, unsecured, bearing interest at the rate of 21.6%
per annum.  Monthly payments of interest only, aggregating $119,700
are payable through July 2002. Thereafter, fully amortizing monthly
payments of principal and interest aggregating $252,592 and payable
for 36 months. Accrued interest was $119,700 at December 31, 2001.
This amount was paid in January, 2002.                                                    6,650,000

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

## 9- NOTES PAYABLE (continued)

Notes payable, secured by certain notes receivable, bearing interest at 18% per annum. The balance includes $200,000 payable to related parties. Monthly payments of interest only, aggregating $16,500 are payable through December, 2001 or January, 2002. Thereafter, fully amortizing monthly payments of principal and interest, aggregating $54,854 are payable for 24 months. Accrued interest was $16,500 as of December 31, 2001. This amount was paid in January, 2002.                                    1,100,000

Notes payable, secured by certain factoring accounts receivable, bearing interest at 16% or 18% per annum. Monthly payments of $67,523 include interest plus principal amortized over 36 and 48 month periods ending in January and June, 2002. Accrued interest was $3,422 as of December 31, 2001. This amount was paid in January, 2002.                                    231,896

$ 69,752,674

## 10- NOTES PAYABLE - RELATED PARTIES

As of December 31, 2001 notes payable – related parties consisted of unsecured notes payable, bearing interest at fixed rates ranging from 14% to 18% per annum. The notes contain terms identical to the notes payable to unrelated parties (Note 9). Accrued interest was $44,327 at December 31, 2001. This amount was paid in January 2002. Cost of funds for the year includes $486,471 related to these notes.

## 11- NOTES PAYABLE - OTHER

As of December 31, 2001 notes payable consisted of the following:

Note payable, secured by assignment of a deed of trust the Company holds as collateral for a note receivable. Payments of interest only at the rate of 15% per annum in the amount of $13,125 were due monthly through April 1999. By mutual consent between the Company and the lender, upon maturity, the lender agreed to accept the underlying collateral in full satisfaction of the debt. Due to certain clouds on title, the lender was unable to obtain legal possession of the property. The lender has agreed to accept cash payments of $668,000 as payment in full. The remaining amount will be paid in 2002.                     $     88,000

Unsecured line of credit agreement with a bank, subject to a $2,500,000 maximum and expiring in June, 2002. Interest only is payable monthly at .75% per annum above the bank's prime rate. The interest rate was 5.25% per annum at December 31, 2001. Upon expiration in June, 2002, the agreement was renewed for one year.                          1,250,000

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

### 11- NOTES PAYABLE – OTHER (continued)

Unsecured note payable with a payment of $400,000 due in July, 2002.
Thereafter, payments are due in monthly installments of $200,000 from
August, 2002 through January, 2003. Interest is being imputed at the
rate of 4.518% per annum.

|  |
|---|
| 1,545,879 |
| $ 2,883,879 |

### 12  LONG-TERM DEBT

The following is a schedule of contractual principal payments on all Company debt which matures
beyond 2002:

| Year Ended December 31, |  |
|---|---|
| 2002 | $  2,740,268 |
| 2003 | 2,718,840 |
| 2004 | 2,421,249 |
| 2005 | 1,647,418 |
|  | $  9,527,775 |

### 13- COMMITMENTS

#### Equipment Leases

The Company leases certain equipment under six leases. The leases expire in June 2002, July 2002,
May 2003, July 2003 and January 2004. The required monthly payments amount to $7,123.

#### Office Leases

The Company leases office space in Brisbane, California and Los Angeles, California.

The lease for the Brisbane location and expires September 30, 2007. The required monthly payment
was $30,389 at December 31, 2001 with scheduled increases to $35,298 during the course of the lease.

The Los Angeles space is covered by two leases, both of which expire on June 30, 2004 with one
option to renew for seven years at fair market rent. Monthly rent for the Los Angeles space is $20,774.

Lease expense for 2001 under noncancelable operating leases amounted to $502,794.

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER 31, 2001

### 13- COMMITMENTS (continued)

The following is a schedule, by years, of future minimum lease payments required under the leases:

| Year Ended December 31, | |
|---|---|
| 2002 | $ 677,715 |
| 2003 | 660,145 |
| 2004 | 509,516 |
| 2005 | 405,154 |
| 2006 | 415,447 |
| 2007 | 317,680 |
| | $ 2,985,657 |

The Company is seeking, and filed for, declaratory judgement that there has been a Constructive Eviction because the Brisbane landlord has failed to provide basic services such as heating, ventilation and air conditioning.

### 14- RELATED PARTY TRANSACTIONS

Management fees are paid monthly to entities whose officers are also the managing members of the Company. In accordance with the operating agreement, management fees were $750,000 for the year ended December 31, 2001.

Accounting fees in the amount of $121,000 were paid to an entity whose officers are also officers of the Company.

Included in operating expenses are reimbursements of expenses incurred by members and affiliated companies.

### 15- SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION

| Cash paid during the year for: | |
|---|---|
| Income taxes | $ 10,977 |
| Cost of funds | 7,032,252 |
| Interest – note payable - bank and other | 195,332 |

# FOUR STAR FINANCIAL SERVICES, LLC AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2001

### 15- SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION (continued)

Non cash investing and financing activities:

During the year, the Company converted notes
receivable in the amount of $1,873,449 and net
factoring accounts receivable in the amount of
$1,660,000 into investments in unconsolidated subsidiaries.

During the year, various note holders exchanged their
notes for membership units in the amount of $2,816,847.

During the year, various members exchanged their membership
units for notes payable in the amount of $3,025,845 and
arbitrage participation interests in the amount of $2,298,238.

During the year, additional membership units were purchased
in lieu of receipt of cash for distributions in the amount of
$4,781,598.

During the year, the Company acquired the remaining 50% ownership interest in CBA in a transaction
that did not require a cash outlay. The assets acquired and liabilities assumed are summarized as
follows:

| | |
|---|---:|
| Animation art cels | $ 10,611,083 |
| Notes receivable | 3,425,579 |
| Prepaid expenses | 483,265 |
| Accounts payable assumed | (58,011) |
| Long-term debt assumed | (9,551,961) |
| Interest payable assumed | (4,909,955) |
| | $          -- |

The long-term debt and interest payable is owed to the Company and has been eliminated in
consolidation.

1
2                    UNITED STATES DISTRICT COURT
3                   NORTHERN DISTRICT OF CALIFORNIA
4                             --oOo--
5
    RESERVOIR CAPITAL CORPORATION,         )
6                                          )
                                           )
7              Plaintiff,                  )
                                           )
8         vs.                              ) No. FJ02-0002MJJ
                                           )      (JCS)
9    FOUR STAR FINANCIAL SERVICES,         )
                                          )
10             Defendants.                 )
    _____)
11
12
13
14
15                      DEPOSITION OF
16                    RICK SAPERSTEIN
17              (Volume II, Pages 160-258)

18
                    Friday, March 14, 2003
19                   CERTIFIED COPY
20
    REPORTED BY:  GAIL C. HECK, CSR 5289      JOB 01-330712
21
22
23
24
25
                                                      160


LEGALINK.

global court reporting • large case specialists
legal videography • litigation support • trial presentation
Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                          March 14, 2003

 1    again.  I'll show you what was marked as Exhibit 1 last

 2    week.  It's the Four Star Financial Services financial

 3    statements for --

 4              A.  How do I know that was Exhibit 1?  Just

 5    teasing.

 6              Q.  For the nine months ended September 30,

 7    2002.  And there is a balance sheet here, and it has a

 8    line for Arbitrage Income Receivable.  Do you see that?

 9              A.  Yes.

10              Q.  What's your understanding of the ways in

11    which the numbers referenced on the Arbitrage Income

12    Receivable on Exhibit 1 would differ from the line item

13    for Arbitrage Income Receivable on Exhibit 3?

14              A.  Well, I'm a little unclear as to your

15    question.

16              Q.  Well, let me start again, because I want to

17    make sure I'm comparing apples to apples.

18              Exhibit 3 refers to subsidiaries.  Exhibit 1

19    does not.  Is there a difference between the numbers

20    because of subsidiaries?

21              A.  I don't believe so.

22              Christina, would you agree with me?

23              MS. WONG:  Okay.  The 2001 year end is

24    consolidated.  The one on September 2002 is not

25    consolidated.  Am I answering your question?

                                                        178

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040

1          MR. GECK:  So Exhibit 1, which is not

2     consolidated, does not include the subsidiaries?

3          MS. WONG:  No.

4          THE WITNESS:  That is correct.  But --

5          MR. GECK:  Q.  But?

6     A.  Your question, though, I want to answer your

7     question.  Can you repeat your question.

8     Q.  I'm just trying to make sure we're comparing

9     the same entities.  The one refers to subsidiaries,

10    that's Exhibit 3.  And Exhibit 1 does not refer to

11    subsidiaries.  Do they include different items of

12    arbitrage income?

13    A.  And that's what I'm saying.  I don't believe

14    they do.

15          Do they include -- does it impact arbitrage

16    income?

17          MS. WONG:  No.

18          MR. GECK:  Q.  So for that line, it doesn't

19    make any difference?

20    A.  Correct.

21    Q.  It does make a difference on other lines

22    whether you include subsidiaries or not?

23    A.  Correct.

24    Q.  But you think for that line it makes a

25    difference?

179

Rick Saperstein                    March 14, 2003

1          A.   I don't think it does.

2               Do you agree with me?

3               MS. WONG:   I don't think it does.   It's

4     like --

5               MR. GECK:   Q.   If you had your work papers,

6     would you know for sure?

7          A.   I really think I would come to the same

8     conclusion.

9          Q.   The same conclusion being that?

10         A.   For this line item, there is no impact.

11         Q.   Now, let's compare the number for the line

12    item on Exhibit 3, the year end for 2001, it's

13    approximately $38 million.  And then for nine months

14    later, September 30, 2002 on Exhibit 1, it's in excess

15    of $57 million.  Do you see that?

16         A.   Yes.

17         Q.   Why does the item increase by almost $20

18    million over that nine-month period?

19         A.   It's about 19 million.

20              MR. WOODLIEF:   If you know.

21              THE WITNESS:   Well, that's kind of -- that's

22    sort of a general question.  I don't really know how to

23    answer you.  I mean, it's just -- I don't know how to

24    answer you other than nine months have elapsed.

25              Could you help me out there?

                                                        180

**EXHIBIT W**

1

2              UNITED STATES DISTRICT COURT

3            NORTHERN DISTRICT OF CALIFORNIA

4                      --oOo--

5

RESERVOIR CAPITAL CORPORATION,        )

6                                     )

                                      )

7             Plaintiff,              )

                                      )

8          vs.                        )  No. FJ02-0002MJJ

                                      )        (JCS)

9   FOUR STAR FINANCIAL SERVICES,     )

                                     )

10            Defendants.             )

    _____ )

11

12

13

14

15              DEPOSITION OF

16            RICK SAPERSTEIN

17         (Volume II, Pages 160-258)

18

               Friday, March 14, 2003

19              CERTIFIED COPY

20

    REPORTED BY:  GAIL C. HECK, CSR 5289        JOB 01-330712

21

22

23

24

25

                                                        160



global court reporting • large case specialists
legal videography • litigation support • trial presentation
Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102
Tel 415-359-2040  Fax 415-359-2050  www.legalink.com

Rick Saperstein                    March 14, 2003

1          A.  Principals could mean, without further

2     information, principals could mean -- I'm take --

3              MR. WOODLIEF:  Don't speculate.  He asked

4     you what does principals mean in that context.  If you

5     don't know, just say you don't know it.  If you do, go

6     ahead and answer.

7              THE WITNESS:  I don't know then right here.

8     Right now as I'm sitting here, I don't recall.

9              MR. GECK:  Q.  Could principal mean an

10    owner?

11         A.  It could.

12         Q.  Could principal mean an officer?

13         A.  It could.

14         Q.  Would your working papers reflect whether

15    principal means owner or officer?

16         A.  Perhaps.

17             MR. GECK:  Mark this as the next exhibit.

18             (Plaintiff's Exhibit No. 7

19             marked for identification.)

20             MR. GECK:  Q.  I'll show you what's been

21    marked as Exhibit 7.  It's a ledger item Due From

22    Community Benefit in the amount of $13,637,827.60.

23             Is Community Benefit an entity related to

24    Four Star?

25         A.  Yes.

238

Rick Saperstein                    March 14, 2003

1          Q.  How is Community Benefit related to Four

2     Star?

3          A.  Four Star owned 50 percent, and at some

4     point during the year of 2001, I don't recall exactly

5     when now, but at some point it acquired the remaining 50

6     percent ownership, thereby becoming 100 percent owner of

7     the Community Benefit.

8          Q.  Turning to the second page of Exhibit 7,

9     there is an entry for December 31, 2001.  It says, "Year

10    end adjustment to reflect assumption of Anicom liability

11    by CBA per Mark Cohn."  Do you see that?

12         A.  Yes.

13         Q.  What did that entry mean?

14         A.  That was a journal entry that I made and

15    Christine Wong is posting onto the books.  So it would

16    be my work papers -- I would need my work papers to know

17    precisely what it means.

18              But my best recollection, I'm fairly certain

19    of it, it's a transfer of a liability between two --

20    there is an entity called Animation Communications, LLC

21    or LP or something, I don't know, that had a liability

22    to Four Star, and that liability was assumed by

23    Community Benefit Alliance, and this entry is the

24    posting of that assumption.

25         Q.  Make sure I follow the transaction.

                                                        239

Combs & Greenley, Inc., A LegaLink Company (415) 359-2040

Rick Saperstein                    March 14, 2003

1          Why is a liability owing by Animated

2    Communications to Four Star showing as an adjustment on

3    the ledger due from Community Benefit?

4          A.   I guess it was -- I'm presuming here, but it

5    was agreed to by Four Star, I guess is the way you would

6    state it.  The assumption, the transfer from one debtor

7    to another was agreed to by Four Star.

8          Q.   What did Four Star receive in exchange for

9    transferring this obligation to Community Benefit?

10         A.   I don't recall.

11         Q.   Would that show in your work papers

12   supporting this adjustment?

13         A.   I'm not sure.

14         Q.   Would it show anywhere else?

15         A.   I don't know.

16         MR. GECK:  Ms. Wong, do you have any

17   information about this adjustment reflecting the

18   assumption of the Anicom liability by CBA?

19         MS. WONG:  I don't.  I'm not sure.  Can I

20   talk to Rick, because I have to confirm one thing with

21   him first?  Is okay?

22         MR. GECK:  Go ahead.

23         MS. WONG:  Is CBA owns Anicom, a certain

24   percentage Anicom?  That's why this thing happened?

25         THE WITNESS:  I don't know.  It's possible,

                                                      240

# BURGESS & COMPANY

*Certified Public Accountants, Inc*

## FOUR STAR FINANCIAL SERVICES, LLC

## FINANCIAL STATEMENTS

## FOR THE YEAR ENDED DECEMBER 31, 2000

100 Spear Street
Suite 1105
San Francisco
California 94105
415 777-0601
FAX 415 777-4435

# CONTENTS

|  | Page |
|---|---|
| Accountants' review report | 1 |
| Balance sheet | 2 |
| Statement of income | 3 |
| Statement of changes in members' equity | 4 |
| Statement of cash flows | 5 |
| Notes to financial statements | 6 - 17 |

# BURGESS & COMPANY

Certified Public Accountants, Inc.

100 Spear Street
Suite 1105
San Francisco
California 94105
415 777-0601
FAX 415 777-4435

## Accountants' Review Report

Board of Directors
Four Star Financial Services, LLC
Los Angeles, California

We have reviewed the accompanying balance sheet of Four Star Financial Services, LLC as of December 31, 2000, and the related statements of income, changes in members' equity and cash flows for the year then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. All information included in these financial statements is the representation of the management of Four Star Financial Services, LLC.

A review consists principally of inquiries of Company personnel and analytical procedures applied to financial data. It is substantially less in scope than an audit in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with generally accepted accounting principles.

*Burgess & Company*

Burgess & Company
Certified Public Accountants, Inc.

July 5, 2001

1

FOUR STAR FINANCIAL SERVICES, LLC
BALANCE SHEET
DECEMBER 31, 2000

## ASSETS

| | | |
|---|---|---:|
| Cash | $ | 150,587 |
| Factored accounts receivable | | 25,440,265 |
| Notes receivable, less allowance for doubtful accounts | | |
| of $1,050,700 | | 68,996,354 |
| Interest receivable | | 45,020,499 |
| Prepaid expenses and miscellaneous receivables | | 1,411,334 |
| Investments in unconsolidated subsidiaries | | 735,351 |
| Other investments | | - |
| Property and equipment, at cost, | | |
| net of accumulated depreciation of $757,729 | | 903,205 |
| | $ | 142,657,595 |

## LIABILITIES AND MEMBERS' EQUITY

**LIABILITIES**

| | | |
|---|---|---:|
| Accounts payable | $ | 1,191,423 |
| Due to factoring clients | | 8,615,403 |
| Notes payable | | 61,791,746 |
| Notes payable - related parties | | 2,590,803 |
| Notes payable - other | | 4,413,879 |
| Interest payable | | 1,005,863 |
| Miscellaneous liabilities | | 347,767 |
| | | 79,956,884 |

**COMMITMENTS AND CONTINGENCY**

| | | |
|---|---|---:|
| MEMBERS' EQUITY | | 62,700,711 |
| | $ | 142,657,595 |

See accompanying accountants' review report
and notes to financial statements

2

## STATEMENT OF INCOME
### FOR THE YEAR ENDED DECEMBER 31, 2000

**REVENUES**

| | | |
|---|---|---|
| Factoring fees | $ | 4,932,843 |
| Interest | | 16,091,131 |
| Telephone arbitrage | | 40,119,175 |
| Equity in net loss of unconsolidated subsidiaries | | (2,038,174) |
| Miscellaneous | | 534,407 |
| | | 59,639,382 |

| | |
|---|---|
| **COST OF FUNDS** | 10,265,836 |
| | 49,373,546 |

**OPERATING EXPENSES**

| | |
|---|---|
| Advertising | 4,963 |
| Bad debts | 29,636,001 |
| Commissions | 1,792,631 |
| Depreciation and amortization | 297,760 |
| Dues and subscriptions | 55,291 |
| Employee benefits | 79,548 |
| Filing fees | 1,015 |
| Insurance | 228,435 |
| Interest, notes payable - bank and other | 448,869 |
| Legal and professional | 1,380,379 |
| Miscellaneous | 204,029 |
| Office | 191,822 |
| Rent | 440,422 |
| Repairs and maintenance | 67,240 |
| Salaries | 1,873,359 |
| Taxes and licenses | 22,099 |
| Telephone | 125,467 |
| Travel | 49,989 |
| | 36,899,319 |

| | |
|---|---|
| **INCOME BEFORE MANAGEMENT FEES** | 12,474,227 |
| **MANAGEMENT FEES** | (750,000) |
| **NET INCOME** | $ 11,724,227 |

See accompanying accountants' review report
and notes to financial statements.

3

FOUR STAR FINANCIAL SERVICES, LLC
STATEMENT OF CHANGES IN MEMBERS' EQUITY
FOR THE YEAR ENDED DECEMBER 31, 2000

| | | |
|---|---|---:|
| MEMBERS' EQUITY, beginning of year | $ | 47,547,511 |
| MEMBERS' CONTRIBUTIONS | | 23,260,649 |
| MEMBERS' WITHDRAWALS | | (7,954,695) |
| MEMBERS' DISTRIBUTIONS | | (11,876,981) |
| NET INCOME | | 11,724,227 |
| MEMBERS' EQUITY, end of year | $ | 62,700,711 |

**FOUR STAR FINANCIAL SERVICES, LLC**
## STATEMENT OF CASH FLOW
### FOR THE YEAR ENDED DECEMBER 31, 2000

**CASH FLOWS FROM OPERATING ACTIVITIES:**

| | | |
|---|---|---:|
| Net income | $ | 11,724,227 |
| Adjustments to reconcile net income | | |
| to net cash flows from operating activities: | | |
| Bad debts | | 29,636,001 |
| Capitalized interest income | | (7,551,636) |
| Equity in net loss of unconsolidated subsidiaries | | 2,038,174 |
| Gain on sale of marketable equity securities | | (41,715) |
| Depreciation and amortization | | 297,760 |
| Discount on payoff of debt | | (396,326) |
| Capitalized cost of funds | | 3,651,132 |
| Commissions contributed to equity | | 176,758 |
| (Increase) decrease in: | | |
| Interest receivable | | (42,771,969) |
| Prepaid expenses and miscellaneous receivables | | (229,832) |
| Increase (decrease) in: | | |
| Accounts payable | | 313,234 |
| Interest payable | | 195,236 |
| Miscellaneous liabilities | | 332,085 |
| Net cash flows used by operating activities | | (2,626,871) |

**CASH FLOWS FROM INVESTING ACTIVITIES:**

| | |
|---|---:|
| Increase in net factored accounts receivable | (4,028,600) |
| Advances on notes receivable | (8,471,722) |
| Payments on notes receivable | 5,369,373 |
| Investments in unconsolidated subsidiaries | (1,717,579) |
| Distributions from unconsolidated subsidiaries | 304,331 |
| Proceeds from sales of marketable equity securities | 326,823 |
| Acquisition of equipment | (220,476) |
| Net cash flows used by investing activities | (8,437,850) |

**CASH FLOWS FROM FINANCING ACTIVITIES:**

| | |
|---|---:|
| Advances on notes payable and notes payable – related parties | 9,996,694 |
| Principal payments on notes payable and notes payable – related parties | (7,361,725) |
| Advances on notes payable – other | 2,200,000 |
| Principal payments on notes payable – other | (667,341) |
| Members' contributions | 16,333,761 |
| Members' withdrawals | (2,455,758) |
| Members' distributions | (7,950,981) |
| Net cash flows provided by financing activities | 10,094,650 |

| | |
|---|---:|
| **NET DECREASE IN CASH** | (970,071) |
| **CASH**, beginning of year | 1,120,658 |
| **CASH**, end of year | $ 150,587 |

See accompanying accountants' review report
and notes to financial statements.

5

FOUR STAR FINANCIAL SERVICES, LLC
NOTES TO FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2000

Four Star Financial Services, LLC is a finance company licensed in the State of California. In accordance with its operating agreement, the Company must dissolve on or before December 31, 2026. The primary business of the Company is providing financing to companies in the telecommunications industry either by entering into arbitrage contracts, through the purchase of accounts receivable generated by "pay per call" telephone businesses, or through secured loans. The customers, and the callers who generated the receivables, are located throughout the United States.

1- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Cash

The Company maintains its cash balance at four institutions. The deposits at these institutions are insured by the Federal Deposit Insurance Corporation up to $100,000.

For purposes of the statement of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

Factored Accounts Receivable

Factored accounts receivable result from the purchase of accounts receivable, with recourse. The receivables are generated by companies in various segments of the telecommunications industry such as long distance, "800 number", and "900 number" companies.

The Company receives repayment directly from the local exchange carriers according to the same terms that existed between the factoring client and the local exchange carrier. In addition, the factoring client assigns to the Company all of its rights with respect to the local exchange carrier.

Factoring fees are calculated and recognized on the daily outstanding balances of the funded portion of the factored accounts receivable. The Company has a minimum charge of one month's fee.

Investments

Investments in entities in which the Company has a 20% to 50% interest are accounted for using the equity method, under which the Company's share of earnings of these investments is reflected in income as earned and dividends are credited against the investments when received. Six entities, of which the Company owns between 99% and 100%, are also accounted for using the equity method because the impact of consolidating these entities on the accompanying financial statements is immaterial.

Property and Equipment

Depreciation of property and equipment is being provided on the straight-line and declining balance methods over the estimated useful lives of the assets. Estimated useful lives are five to ten years.

FOUR SQUARE FINANCIAL SERVICES, INC.
NOTES TO FINANCIAL STATEMENT
FOR THE YEAR ENDED DECEMBER 31, 2000

## 1- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

### Membership Units

The Company has issued Class A membership units to the three managing members and Class B through G membership units to all non managing members. Holders of Class B through G membership units are entitled to a cumulative annual priority return at rates ranging from 13% to 18%. These members are permitted to withdraw all or part of their respective capital balances upon giving prior notice ranging from 90 days to 12 months (depending on the amount to be withdrawn), provided that such withdrawal would not cause the Company to be insolvent or to be in default under any financial covenant contained in, or otherwise violate or accelerate, any financing arrangement to which the Company is a party.

Available Cash Flow from Operations (as defined in the Company's operating agreement) is allocated as follows:

| Available Cash Flow from Operations | Class A Members | Class B through G Members |
|---|---|---|
| Up to $10,000,000 | 99% | 1% |
| Over $10,000,000 | 90% | 10% |

### Income Taxes

The Company is treated as a partnership for federal income tax purposes and does not incur federal income taxes. Members are taxed individually on their share of the Company's earnings. The Company's net income or loss is allocated among the members in accordance with the regulations of the Company.

The State of California has a limited liability company tax of $800 in addition to a limited liability company fee based on gross income. The maximum fee for 2000 was $9,377.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

## 2- FACTORED ACCOUNTS RECEIVABLE

As of December 31, 2000, factored accounts receivable consisted of the following:

| | |
|---|---|
| Face amount of accounts receivable purchased | $ 27,878,848 |
| Less amounts due for billing and collection services on behalf of factoring clients | 2,438,583 |
| | $ 25,440,265 |

See accompanying accountants' review report

7

2-  **FACTORED ACCOUNTS RECEIVABLE** (continued)

The receivables are expected to be collected during the year ended December 31, 2001.

The balance at December 31, 2000 represents amounts due from 11 clients, with net balances ranging from approximately $18,000 to approximately $4,184,000.

Seven factoring clients, whose net accounts aggregate to approximately $10,070,000 have not repaid their accounts according to the original terms. Management feels the balances are fully collectible and that security is adequate. Resolution is expected in 2001. The status of each of these accounts is described below.

One account, with a net balance of approximately $1,546,000, has been modified. Factoring fees have been reduced from 34% per annum to 14% per annum. The balance is to be repaid from the cash flow of a related entity, to which the Company also made a loan. In addition, the Company has obtained a security interest in an entity related to the borrower. Repayment is currently being made in accordance with the modified terms as stated in the agreement with that related entity.

Another account, with a net balance of approximately $1,339,000, has been secured by additional collateral which generates cash flow that the Company feels is adequate to assure repayment of this account. Factoring fees continue to be charged on this account, but are no longer being accrued.

Four other accounts, with net balances aggregating approximately $6,759,000, had the funds retained by their billing company. Under a settlement agreement, an obligation was created evidencing this debt. Repayments are based upon the billing company's volume, and the minimum annual payments approximate 25%. The billing company is currently in compliance with the terms of the obligation. The company continues to charge factoring fees at its standard rates. However, on one of the accounts the fees are no longer being accrued.

The company is in litigation to enforce collection of the $429,000 balance of the final account. The company feels security is adequate and the balance is fully collectible.

3-  **NOTES RECEIVABLE**

As of December 31, 2000, notes receivable consisted of the following:

Secured notes receivable, bearing interest at rates ranging from 12% to 44% per annum, are either due on demand or maturing between July, 1995 and March, 2005. Security generally consists of all assets of the borrower and personal guarantees of the principals of the debtors. Included in the balance is the non-interest bearing amount of $1,343,896 due from the borrowers for cost reimbursements. Approximately $18,737,000 are loans to companies in the telecommunications industry. Loans in the amount of $7,037,679 are impaired as of December 31, 2000. Interest receivable includes $135,302 related to these impaired loans. The Company feels these impaired amounts are fully collectible and that there is adequate security.                                    $   25,995,511

Case 5:09-cv-03303-JF Document 12-10 Filed 08/28/09 Page 84 of 115

3- NOTES RECEIVABLE (continued)

Loaned to Animation Communications. LLC (a telecommunications company). an entity in which the Company also has an investment. The note bears interest at the rate of 18% per annum and is secured by animation art cells. Interest accrues until November 1999. Payments of interest only are due monthly from November 1999 through October 2000. The Company is entitled to 100% of the borrower's cash flow up to an amount equal to these payments. Beginning November 2001, principal amortizes over a ten year period, with the balance due in full on December 31, 2003. Interest income for the year includes $1,069,887 related to this note. .......... 4,578,772

Loaned to an entity that owns and operates campground timeshare properties. The loans are secured by trust deeds on the properties. the personal guaranty of the entity's principal and other assets of that principal. The notes bear interest at the rate of 47% per annum and were due in September 1996. The borrower was unable to pay the principal and interest when due. During 1998 the Company assigned its security interest in the two properties which secured the loans to two entities it formed. One of the entities foreclosed on its property and disposed of it in 1998. The other entity foreclosed on its property in 1999. Since foreclosing on the subject property, the entity has made significant improvements and intends to do the same in the year 2000. A recent independent appraisal indicated the Company's net equity to be $3.5 million In addition, foreclosure did not relieve the borrower of the original debt and management believes that full recovery will be realized. However, effective February 2000 interest is no longer being accrued. Included in the balance is the non-interest bearing amount of $11,437 due from the borrower for cost reimbursements. .......... 4,987,455

Loaned to entities in which the officers of the Company are also principals. Combined, the entities own seven hotels located throughout the United States. The notes are unsecured, bear interest at the rate of 30% per annum, and are due on demand. Included in the balance is the non-interest bearing amount of $38,593 due from the borrowers for cost reimbursements. Interest income for the year includes $816,492 related to the notes, and interest receivable includes $63,704 at December 31, 2000. .......... 3,517,998

Loaned to Internet Entertainment Group ("IEG"), an entity in which the Company also has an investment, secured by all assets of the borrower. IEG provides entertainment via the internet. Interest at the rate of 30% per annum compounds monthly. Principal and accrued interest are due on demand. Included in the balance is the non-interest bearing amount of $64,130 due from the borrower for cost reimbursements. Interest income includes $218,229 related to this note. .......... 923,592

NOTES TO FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2000

3- NOTES RECEIVABLE (continued)

Loaned to an airline, secured by surety bonds issued by an insurance company and other assets of the airline. The notes bear interest at rates between 18% and 42% per annum and matured on June 30, 1997. The Company is currently proceeding against two insurance related companies in order to collect the debt. Resolution was expected in 1999, but the court has now mandated briefing as to the issue of whether or not damages are speculative. The parties are still awaiting a briefing schedule on this matter. Management feels security is adequate. However, effective February 2000, interest is no longer being accrued. ... 6,476,843

Loaned to Consumer Finance America an entity in which the Company also has an investment, secured by all assets of the borrower. The entity is in the business of purchasing commercial and auto paper. Interest at the rate of 30% per annum plus principal based on a 40 month amortization period is due monthly and the note matures in January 2003. Included in the balance is the non-interest bearing amount of $2,924 due from the borrower for cost reimbursements. Interest income for the year includes $113,610 related to the note. ... 401,076

Loaned to a loan brokerage company, secured by all assets of the borrower, as well as certain assets of entities which are related to the borrower and to which the Company has also made loans. Interest at the rate of 30% per annum and principal were due at maturity. The loans matured between March and June, 1996. The borrower was unable to pay the principal and interest when due, but the Company feels the balance is fully collectible and that there is adequate security. However, interest is no longer being accrued. ... 335,948

Loaned to an entity which is a long distance reseller and in which the managing members of the Company are principals. The note bears interest at the rate of 12% per annum. In addition, the Company is entitled to a 20% participation interest in the profits of the borrower. Payments of interest only are due monthly through December 31, 2001 at which time principal begins to amortize over four years. Interest income includes $747,337 related to this note. ... 6,511,452

3- NOTES RECEIVABLE (continued)

Loaned to Sentinel Acceptance Ltd. an entity in which the Company also has an investment, secured by all assets of the borrower. The entity is in the business of purchasing consumer and auto paper. Interest at the rate of 30% per annum is due monthly and principal is due on demand. Included in the balance is the non-interest bearing amount of $248,764 due from the borrower for cost reimbursements. Interest income for the year includes $634,230 related to the note, and interest receivable includes $2,090,046 at December 31, 2000. Management allowed the borrower to make excess payments on debt senior to that owed to the Company in order to enhance the Company's security position. These payments were allowed to be made in lieu of payments required under the debt owed to the Company.    2,383,662

Loaned to an entity in which the officers of the Company are also principals. The note bears interest at the rate of 33% per annum and is secured by a property tax refund that has been approved and is pending payment in 2001. Interest receivable includes $93,800 related to this note.    285,181

Loaned to Community Benefit Alliance, LLC, an entity in which the Company also has an investment. The LLC owns and markets animation art cels. Most of these animation cels were acquired from a client who was in default, in lieu of a foreclosure. Certain of the cels were acquired thereafter. The cels have been appraised by two reputable sources, which appraisals indicate total fair market value of between $100 to $270 million. Butterfield & Butterfield – range $100.21 million to $162.3 million and National Institute of Appraisers – value $272,182,545. The note bears interest at the rate of 23% per annum and is secured by animation art cels. Interest accrues until November 1999. Payments of interest only are due monthly from November 1999 through October 2000. Beginning November 2000, principal amortizes over a ten year period, with the balance due in full on December 31, 2003. Interest income for the year includes $3,174,357 related to this note, and interest receivable includes $6,639,348 at December 31, 2000.    13,539,900

Unsecured notes which are due on demand    109,664
    70,047,054
Less allowance for doubtful accounts    1,050,700
    $ 68,996,354

3- NOTES RECEIVABLE (continued)

Contractual maturities of notes receivable which were not impaired as of December 31, 2000 are as follows:

| Year Ended December 31, | |
|---|---|
| 2001 | $ 7,865,836 |
| 2002 | 22,688,572 |
| 2003 | 10,631,687 |
| 2004 | 6,071,697 |
| 2005 | 1,973,737 |
| Thereafter | 1,977,600 |
| | $ 51,209,129 |

Management anticipates that notes maturing during the year ended December 31, 2001 will be paid or extended in the ordinary course of business in accordance with standard Company underwriting guidelines.

It is the policy of the Company to recognize income on impaired loans so long as the total outstanding balance on the impaired loan does not exceed the net realizable value of the loan. The total investment in impaired loans was approximately $18,973,000 at December 31, 2000. Interest income includes approximately $1,364,000 recognized on impaired loans subsequent to the loan becoming impaired, none of which was received in cash during the year.

The Company is in the business of lending and factoring to earn itself high yields. A number of these assets are put in default by the company in order to protect the collateral. This does not necessarily imply that the assets and corresponding collateral do not have the values necessary to allow full collection of the indebtedness at issue. Historically, most such impaired positions have been found to be collectable. Nevertheless, the Company has determined to take a more aggressive position toward writing off impaired positions. For this reason, the Company has written off all impaired positions which were deemed in any fashion questionable.

4- INVESTMENTS IN UNCONSOLIDATED SUBSIDIARIES

As of December 31, 2000, investments in active entities consisted of the following:

| | Percentage Owned |
|---|---|
| Animation Communications, LLC | 50.00% |
| Community Benefit Alliance, LLC | 50.00% |
| CFC Investment, LLC | 100.00% |
| Consumer Finance America, LLC | 99.50% |
| Currituck Resort Shores, LLC (owns and operates a timeshare campground) | 99.00% |
| Direct Connect Communications, LLC | 33.33% |
| Gateway Credit Corp. | 100.00% |
| Gateway Credit, Ltd. | 99.00% |
| Interfund Financial Corp. (a master lessee) | 50.00% |
| Internet Entertainment Group, LLC (an internet entertainment company) | 50.00% |
| Internet Gaming Group, LLC | 50.00% |
| Sentinel Acceptance Ltd., L.P. | 99.00% |
| Telworld, LLC | 50.00% |

## NOTES TO FINANCIAL STATEMENTS
## FOR THE YEAR ENDED DECEMBER 31, 2000

### 4- INVESTMENTS UNCONSOLIDATED SUBSIDIARIES (continued)

The Company does not participate in the management of any of these investees.

The following is a summary of the combined financial position and results of operations of the investee companies which was abstracted from unaudited financial statements:

| | |
|---|---:|
| Inventory | $ 11,355,846 |
| Other current assets - predominantly accounts receivable and prepaid expenses | 41,813,453 |
| Property and equipment | 1,357,540 |
| Other assets - predominantly loans receivable | 3,671,910 |
| | $ 58,198,749 |
| | |
| Current liabilities | $ 55,248,507 |
| Long-term liabilities | 10,611,551 |
| Equity | (7,661,309) |
| | $ 58,198,749 |

$36,260,528 of the above liabilities are payable to the Company.

| | |
|---|---:|
| Revenues | $ 11,895,523 |
| Net loss | $ (2,979,155) |

### 5- OTHER INVESTMENTS

Through an affiliate company, the Company has entered into several Telephone Arbitrage ("Arbitrage") contracts. The Company funds the investment in the contracts by selling Participation Interests, whereby the Participants own an undivided interest in proceeds generated from the contractual relationships. The contracts entered into as of December 31, 2000 required investments by the Participants totaling approximately $15,660,000. Telephone arbitrage income for the year was $40,119,175 from these contracts.

At the conclusion of each set of contracts, the Company intends to seek out replacement opportunities significantly similar to the prior transactions.

As of the date of issuance of these financial statements, the investment in Arbitrage Contracts is in excess of $26,000,000.

### 6- DUE TO FACTORING CLIENTS

As of December 31, 2000, due to factoring clients consisted of the unfunded portion of factored accounts receivable, less accrued factoring fees and costs advanced.

NOTES TO FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2000

## 7- NOTES PAYABLE

As of December 31, 2000 notes payable consisted of the following.

Notes payable, unsecured, bearing interest at fixed rates
 ranging from 10% to 20% per annum. Interest is payable monthly,
 or at the option of the note holder, is compounded and added
 to principal. The notes are due within 90 days after demand.
 There are approximately 280 note holders who are owed amounts
 ranging from less than $1,000 to approximately $2,375,000.
 Accrued interest was $689,742 at December 31, 2000. This amount
 was paid in January, 2001.   $ 52,508,324

Notes payable, unsecured, bearing interest at the rate of 21.6%
 per annum. Interest in the amount of $119,700 is payable monthly
 through June 2002 at which time the notes mature. Accrued interest
 was $119,700 at December 31, 2000. This amount was paid in
 January, 2001.   6,650,000

Notes payable, secured by certain notes receivable, bearing
 interest at 18% per annum. The balance includes $200,000
 payable to related parties. Monthly payments of interest
 only, aggregating $16,500 are payable through December,
 2001 or January, 2002. Thereafter, fully amortizing
 monthly payments of principal and interest, aggregating
 $54,854 are payable for 24 months. Accrued interest was
 $16,500 as of December 31, 2000. This amount was paid
 in January, 2001.   1,100,000

Notes payable, secured by certain factoring accounts receivable,
 bearing interest at rates ranging from 16% to 20% per annum.
 Monthly payments of $190,987 include interest plus principal
 amortized over 36 and 48 month periods ending in February 2001,
 December 31, 2001; and June, 2002. Accrued interest was $22,894
 as of December 31, 2000. This amount was paid in January, 2001.   1,533,422
   $ 61,791,746

## 8- NOTES PAYABLE - RELATED PARTIES

As of December 31, 2000 notes payable – related parties consisted of unsecured notes payable,
bearing interest at fixed rates ranging from 14% to 18% per annum. The notes contain terms identical
to the notes payable to unrelated parties (Note 7).   Accrued interest was $47,990 at
December 31, 2000. This amount was paid in January 2001. Cost of funds for the year includes
$343,851 related to these notes.

NOTES TO FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 2000

9- NOTES PAYABLE - OTHER

As of December 31, 2000 notes payable consisted of the following:

| | |
|---|---|
| Note payable, secured by assignment of a deed of trust the Company holds as collateral for a note receivable. Payments of interest only at the rate of 15% per annum in the amount of $13,125 were due monthly through April 1999. By mutual consent between the Company and the lender, upon maturity, the lender agreed to accept the underlying collateral in full satisfaction of the debt. Due to certain clouds on title, the lender was unable to obtain legal possession of the property. The lender has agreed to accept cash payments of $668,000 as payment in full. This amount will be paid in 2001 | $ 668,000 |
| Unsecured note payable to a bank, bearing interest at 1% per annum above the bank's prime rate. Interest and principal is due in five monthly payments through May 2001. All such payments were made timely during January through May 2001. The interest rate was 10% per annum at December 31, 2000. | 500,000 |
| Unsecured line of credit agreement with a bank, subject to a $2,500,000 maximum and expiring April 25, 2001. Interest only is payable monthly at 1% per annum above the banks prime rate. The interest rate was 10% per annum at December 31, 2000. Upon expiration in April, 2001, the agreement was renewed for one year | 1,700,000 |
| Unsecured note payable due on demand. The interest rate was being negotiated as of the date of the financial statements. | 1,545,879 |
| | $ 4,413,879 |

10- LONG-TERM DEBT

The following is a schedule of contractual principal payments on all Company debt which matures beyond 2001:

| Year Ended December 31, | |
|---|---|
| 2001 | $ 1,301,526 |
| 2002 | 7,310,055 |
| 2003 | 671,851 |
| | $ 9,283,432 |

NOTES TO FINANCIAL STATEMENT
FOR THE YEAR ENDED DECEMBER 31, 2000

## 11- COMMITMENTS

Equipment Leases

The Company leases certain equipment under six leases. The leases expire in June 2002, July 2002, May 2003, July 2003 and January 2004. The required monthly payments amount to $7,123

Office Leases

The Company leases office space in Brisbane, California and Los Angeles, California.

The lease for the Brisbane location commenced October 1, 2000 and expires September 30, 2007. The required monthly payment was $30,389 at December 31, 2000 with scheduled increases to $35,298 during the course of the lease. Prior to entering into this lease the Company leased space in South San Francisco, California for approximately $12,000 per month.

The Los Angeles space is covered by two leases, both of which expire on June 30, 2004 with one option to renew for seven years at fair market rent. Monthly rent for the Los Angeles space is $20,774.

Lease expense for 2000 under noncancelable operating leases amounted to $511,252.

The following is a schedule, by years, of future minimum lease payments required under the leases:

| Year Ended December 31, | | |
|---|---|---|
| 2001 | $ | 699,436 |
| 2002 | | 677,715 |
| 2003 | | 660,145 |
| 2004 | | 509,516 |
| 2005 | | 405,154 |
| Thereafter | | 733,127 |
| | $ | 3,685,093 |

## 12- CONTINGENCY

The Company had balances of $105,951 in excess of the amounts insured by the Federal Deposit Insurance Corporation at December 31, 2000.

## 13- SUBSEQUENT EVENT

In March 2001, the Company exercised an option to purchase up to 43.75% (35% on a fully diluted basis) of the membership interests of a telecommunications carrier. The company, Direct One, Inc. granted this option to Four Star Financial Services as part of the consideration associated with a loan made by Four Star.



## State of California

### SECRETARY OF STATE

I, *Kevin Shelley*, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___1___ page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.

*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this day of

APR 1 4 2003



Secretary of State

Sec/State Form CE-108 (rev 1/03)

OSP 03 74571



# STATE OF CALIFORNIA
## ACTING SECRETARY OF STATE
## TONY MILLER

### LIMITED LIABILITY COMPANY
### ARTICLES OF ORGANIZATION

**IMPORTANT** - Read instructions before completing the form.
**This document is presented for filing pursuant to Section 17050 of the California Corporations Code.**

---

1. Limited liability company name:    FOUR STAR FINANCIAL SERVICES, LLC

(End the name with "LLC" or "Limited Liability Company". No periods between the letters in "LLC". "Limited" and "Company" may be abbreviated to "Ltd." and "Co.")

---

2. Latest date on which the limited liability company is to dissolve:

     December 31, 2026

---

3. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act.

---

4. Enter the name of initial agent for service of process and check the appropriate provision below:

   Mark Cohn

_____ , which is

     [ X ]   an individual residing in California. Proceed to Item 5.

     [   ]   a corporation which has filed a certificate pursuant to Section 1505 of the California Corporations Code. Skip Item 5 and proceed to Item 6.

---

5. If the initial agent for service of process is an _individual_, enter a business or residential street address in California:

   Street address:    601 Gateway Boulevard, Suite 260

   City: South San Francisco      State: **CALIFORNIA**      Zip Code: 94080

---

6. The limited liability company will be managed by : (check one)

   [   ] one manager      [x] more than one manager      [   ] limited liability company members

---

7. If other matters are to be included in the articles of organization attach one or more separate pages.

   Number of pages attached, if any:

---

8. It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

_Signature of organizer_

Leslie S. Klinger

Type or print name of organizer

Date:      April 11,      , 19   96

**101996103006**

FILED: REGISTRN/ARTICLES OF ORG.
AT SACRAMENTO, CA ON APR.12,1996
SECRETARY OF STATE OF CALIFORNIA

LLC-1
Filing Fee $80      Approved by the Secretary of State
     04/11/94

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## FOUR STAR FINANCIAL SERVICES, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into as of January 1, 1997 by and among RONALD I. ANSON, an individual ("Anson"); MARK F. COHN, an individual ("Cohn"); JACK GARRETT, an individual ("Garrett"); and those other persons who execute a Signature Page to this Agreement, with reference to the following facts:

A. Anson, Cohn and Garrett have caused to be formed a limited liability company named "Four Star Financial Services, LLC" (the "Company") to acquire, own, operate, develop, and otherwise promote the business of investing in and/or financing accounts receivable, debt obligations, contracts, or other choses in action representing a stream of payments due from subscribers, members, or similar payors (including, without limitation, by owning interests in other entities owning such accounts receivable, debt obligations, contracts, or other choses in action representing a stream of payments due from subscribers, members, or similar payors) (the "Business"), and to engage in such other lawful activities for which a limited liability company may be organized under applicable law.

B. The parties hereto wish to enter into this Agreement in order to provide for the purposes for which the limited liability company is formed, the division of profits and losses from the operations thereof, restrictions on dispositions of interests in the limited liability company, the management of the limited liability company, and other matters related thereto. This Agreement amends and restates that certain Operating Agreement of the Company dated as of June 10, 1996.

ACCORDINGLY, the parties hereto agree as follows:

## 1. FORMATION AND PURPOSE; GENERAL DEFINITIONS

**1.1    Organization; Name.** Anson, Cohn and Garrett have caused Articles of Organization ("Articles") for the Company to be filed with the California Secretary of State. Sections 17000 through 17705, inclusive, of the California Corporations Code, commonly known as the Beverly–Killea Limited Liability Company Act, as amended (the "Act"), shall govern the Company except as expressly provided to the contrary in this Agreement. The name of the Company shall continue to be "Four Star Financial Services, LLC."

**1.2    Principal Office; Agent.** The Company shall continuously maintain a registered agent and at least one office in the State of California as required by the Act and determined by the Managers (defined in Section 4.1 hereof). The principal offices of the Company shall be 11755 Wilshire Boulevard, Suite 2150, Los Angeles, California 90025 and 601 Gateway Boulevard, Suite 260, South San Francisco, California 94080, or such other place(s) as the Managers may determine after notice to the Members (defined in Section 1.6.20 hereof) and Assignees (defined in Section 1.6.2 hereof). Cohn shall be the initial registered agent for service of process.

**1.3    Purpose.** The Company is formed to (a) acquire, own, operate, develop, and otherwise deal with the Business, and (b) engage in any other lawful activity for which a limited liability company may be organized under the Act.

**1.4    Term.** The Company shall continue in existence until December 31, 2026, unless sooner dissolved pursuant to this Agreement or under the Act.

**1.5    Other Business.** Nothing herein contained shall preclude any Member (including a Manager) from owning, purchasing, selling, or otherwise dealing in any manner with any property or

engaging in any business whatsoever without notice to any other Members, without participation of any other Member, and without liability to any other Member. It is understood that any Member can now or hereafter engage in any business or possess any property of any type, whether or not such business or such property competes with the business or property of the Company. Each Member hereby waives any right which it may have against others who may capitalize on or take advantage of non-proprietary information learned as a result of an association in this Company.

      **1.6**    **Definitions.** In addition to such terms as are defined elsewhere in this Agreement, the following terms shall have the following meanings:

      **1.6.1**    **"Affiliate"** means, with respect to any person (the "first person"), (a) any second person directly or indirectly controlling, controlled by or under common control with the first person or owning or controlling ten percent (10%) or more of the outstanding securities of the first person; (b) any officer, director, manager, or general partner or family member of the first person; or (c) if the first person is an officer, director, manager or general partner, any corporation, partnership, or limited liability company for which such first person acts in that capacity. For purposes of this Section 1.6.1, (I) the term "control" under clause (a) (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, and (II) a manager of a limited liability company under clauses (b) and (c) includes a member of a limited liability company that is managed by its members rather than by managers.

      **1.6.2**    **"Assignee"** means a permitted transferee of a Membership Interest under Section 5 hereof who has not been admitted as a Member of the Company.

      **1.6.3**    **"Bad Debt Reserve"** is as defined in Section 4.2.2 hereof.

      **1.6.4**    **"Bankruptcy"** or **"Bankrupt"** means, with respect to a person, (a) the making by such person of an assignment for the benefit of creditors; (b) the filing by such person of a voluntary petition in bankruptcy; (c) the adjudication of such person as being bankrupt or insolvent; (d) the filing by such person of a petition or answer seeking for such person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (e) the filing by such person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such person in any proceeding of a nature described in clauses (a), (b), (c) or (d) of this Section 1.6.4; (f) the seeking, consenting to, or acquiescing in, the appointment of a trustee, receiver or liquidator for such person or of all or any substantial part of such person's property; or (g) the continuation of any proceedings against such person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, one hundred and twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator of such person or all or any substantial part of such person's property without such member's consent or acquiescence, which appointment is not vacated or stayed within ninety (90) days or, if the appointment is stayed, ninety (90) days after the expiration of the stay during which the appointment is not vacated.

      **1.6.5**    **"Capital Contribution"** of a Member means such Member's Initial Capital Contribution pursuant to Section 2.1 hereof and any additional contributions by such Member to the capital of the Company pursuant to Sections 2.2 or 2.5.3(a) hereof.

      **1.6.6**    **"Class"** (collectively, **"Classes"**) means one of the classes of membership into which the Members shall be divided according to the type of Unit such Member has acquired as set forth on the Signature Page to this Agreement executed by such Member or as set forth in Section 2.1.1 hereof. The

Company shall initially have seven (7) different Classes: "A," "B," "C," "D," "E," "F" and "G." The following rules govern the Classes for all purposes of this Agreement at all times: (a) each Member of a Class has the same rights and obligations hereunder as any other Member of the same Class; (b) Members of one Class have different rights and obligations from those of another Class only to the extent expressly provided in this Agreement; and (c) a person may own Units of two or more different Classes at the same time, and in that case shall be deemed to be a Member of one Class to the extent of the number of Units of such Class owned by such person and a Member of another Class to the extent of the number of Units of such other Class owned by such person.

        1.6.7    **"Class A Member"** means any person who owns a Class A Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof. Anson, Cohn and Garrett are the initial Class A Members.

        1.6.8    **"Class B Member"** means any person who owns a Class B Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.9    **"Class C Member"** means any person who owns a Class C Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.10    **"Class D Member"** means any person who owns a Class D Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.11    **"Class E Member"** means any person who owns a Class E Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.12    **"Class F Member"** means any person who owns a Class F Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.13    **"Class G Member"** means any person who owns a Class G Unit by being an initial owner or a permitted transferee thereof who has been admitted as a Member under Section 5 hereof.

        1.6.14    **"Code"** means the Internal Revenue Code of 1986, as amended.

        1.6.15    **The "family"** of an individual includes and is limited to such person's spouse and natural and adopted issue.

        1.6.16    **"Fiscal Year"** is as defined in Section 7.4 hereof.

        1.6.17    **"Incompetence"** or **"Incompetent"** means, with respect to an individual, the adjudication of such individual by a court of competent jurisdiction as insane or incompetent to manage such individual's person or property.

        1.6.18    **"Index"** means the "Consumer Price Index, All Items, U.S. City Average for All Urban Consumers, 1982-1984 equals 100," published by the Bureau of Labor Statistics of the United States Department of Labor. If the Index is changed so that the applicable base year differs from that in effect when an applicable term commences for any purpose of this Agreement, the Index shall be converted in accordance with the conversion factor published by the Bureau of Labor Statistics of the United States Department of Labor. If the Index is discontinued or revised during the term of this Agreement, such other government index or computation with which it is replaced shall be used in order to obtain substantially the same result that would have been obtained if the Index had not been discontinued or revised. If there is no

such replacement index, then the Managers shall determine a replacement index pursuant to Section 8.3.3 hereof.

      1.6.19 **"Majority in Interest"** at any time means those Members owning Units representing more than one half (½) of the Percentage Interests, except that, where this Agreement expressly refers to a Majority in Interest of fewer than all of the Members, then Majority in Interest means those Members in such sub-group owning Units representing more than one half (½) of the Percentage Interests encompassed in that sub-group.

      1.6.20 **"Member"** (collectively, **"Members"**) means any of the Class A, B, C, D, E, F or G Members. For purposes of Section 3 only, a "Member" shall also be deemed to include an Assignee.

      1.6.21 **"Membership Interest"** means a Member's rights in the Company, collectively, including the Member's right to share in the income, gains, losses, deductions, credit, or similar items of, and to receive distributions from, the Company; any right to vote or participate in management; and any right to information concerning the business and affairs of the Company. A Membership Interest may consist of Units of different Classes.

      1.6.22 **"Percentage Interest"** of a Member means the ratio, expressed as a percentage, of such Member's positive Capital Account balance at such time to the aggregate positive Capital Account balances of all Members. For purposes of determining the Percentage Interests of the Members, (a) such Percentage Interests shall be determined without regard to the types of Units owned by the Members or the Classes to which the Members are assigned; (b) except as provided in clauses (c) and (d) of this Section 1.6.22, the Members' Percentage Interests as of any date shall be determined according to the Capital Account balances of the Members as of the beginning of the Fiscal Year in which such date occurs; (c) the Percentage Interest of a Member as of any date shall be adjusted to take into account any amount contributed to the capital of the Company pursuant to Section 2.2 or 2.5.3(a) hereof on or before such date; and (d) the Percentage Interest of a Class B, C, D, E, F or G Member as of any date shall be adjusted to take into account any amount paid by the Company to such Member under Section 2.5.2 hereof on or before such date.

      1.6.23 A **"person"** means an individual or a corporation, partnership, limited liability company, trust or other legal entity.

      1.6.24 **"Regulations"** mean the Treasury regulations promulgated under the Code.

      1.6.25 **"Reserve"** means any amount set forth on the books of the Company as a reserve for all company expenses, debt payments, capital improvements, replacements and contingencies as reasonably determined by the Managers, and includes without limitation the Bad Debt Reserve.

      1.6.26 **"Subscription Agreement"** means that certain Subscription Agreement by and between the Company and any person who purchases Units from the Company, and any amendments thereto or restatements thereof.

      1.6.27 **"Terminating Capital Event"** means any sale, exchange, or other disposition of all or substantially all of the property or trade or business of the Company.

      1.6.28 **"Termination Event"** with respect to a Member means (a) the Bankruptcy of such Member; (b) a distribution to such Member pursuant to Section 2.5.2 hereof which distribution causes such Member to cease owning any Units; (c) in the case of a Member who is an individual, the death or

Incompetence of such Member; **(d)** in the case of a Member other than an individual, the dissolution of such Member; or **(e)** in the case of a Member who is a Manager, the resignation or removal of such Manager.

**1.6.29   A "transfer"** of a Membership Interest means a sale, assignment, conveyance, exchange, gift, encumbrance, pledge, hypothecation, use as collateral, or other disposition or transfer of legal or beneficial ownership of such Membership Interest, whether voluntary or involuntary; *provided,* that a transfer shall not include a transfer of a Membership Interest by a wholly revocable trust to its grantors pursuant to a revocation of such trust in whole or in part.

**1.6.30   "Unit"** means the smallest divisible portion of a Membership Interest that may be acquired initially by a Member or transferred pursuant to Section 5 hereof.  Subject to the Subscription Agreement as the same may be varied by the Managers pursuant to Section 4.2.1(l) hereof, the Initial Capital Contribution required to acquire a Unit shall vary with each existing Class as follows:

Class A Unit . . . . . . . . . . . . . One Thousand Two Hundred Fifty and 00/100 Dollars ($1,250.00)
Class B Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)
Class C Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)
Class D Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)
Class E Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)
Class F Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)
Class G Unit . . . . . . . . . . . . . . . . . . . . Twenty-Five Thousand and 00/100 Dollars ($25,000.00)

## 2.    CAPITALIZATION

**2.1     Initial Capital Contributions.**  In order to become an initial Member of the Company, each party hereto has made the following contributions to the capital of the Company in exchange for one or more Units, effective as of the date of this Agreement (such Member's "Initial Capital Contribution"):

### 2.1.1   Contributions by Class A Members

**(a)     By Anson.**  Anson has made an Initial Capital Contribution of Forty-One Thousand Two Hundred Fifty and 00/100 Dollars ($41,250.00) in exchange for thirty-three (33) Class A Units.

**(b)     By Cohn.**  Cohn has made an Initial Capital Contribution of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) in exchange for sixty (60) Class A Units.

**(c)     By Garrett.**  Garrett has made an Initial Capital Contribution of Thirty-three Thousand Seven Hundred Fifty and 00/100 Dollars ($33,750.00) in exchange for twenty-seven (27) Class A Units.

### 2.1.2   Contributions by Other Members.  Each Class B, C, D, E, F or G Member has made the Initial Capital Contribution in exchange for the number of Units set forth on the Signature Page executed by such Member.

**2.2     Additional Contributions.**  Except as otherwise expressly provided in this Section 2.2 and Section 2.5.3(a) hereof, no Member may or shall be obligated to contribute amounts to the capital of the Company in addition to such Member's Initial Capital Contribution.

**2.2.1    By Certain Members Upon Election.** Subject to the terms and conditions of this Section 2.2.1, any Class B, C, D, E, F or G Member may, but shall not be obligated to, elect to cause distributions that would otherwise be made to such Member during a Fiscal Year under Section 3.2 hereof to instead be retained by the Company as additional contributions to the capital of the Company.

**(a)    Manner of Election.** A Class B, C, D, E, F or G Member may make an election under this Section 2.2.1 at any time by notice to the Company, and such election shall be effective as to any distributions made ten (10) or more days after such notice is given.

**(b)    Revocation.** A Class B, C, D, E, F or G Member may revoke an election under Section 2.2.1(a) hereof at any time by notice to the Company, and such revocation shall be effective as to any distributions made ten (10) or more days after such notice is given. A revocation shall be without prejudice to such Member's making a subsequent election under Section 2.2.1(a) hereof.

**(c)    Partial Elections or Revocations.** A Member may make an election under Section 2.2.1(a) hereof, and may revoke such election under Section 2.2.1(b) hereof, with respect to any or any portion of the distributions made with respect to any Class B, C, D, E, F or G Unit owned by such Member, as the case may be; *provided,* that the notice by such Member under Section 2.2.1(a) or (b) hereof shall specify the Units to be affected and, if applicable, the portion of distributions with respect to a Unit to be affected.

**(d)    Manner of Contribution.** For so long as an election under Section 2.2.1(a) hereof is in effect as to a Member, amounts that would otherwise be distributed to such Member pursuant to Section 3.2 hereof with respect to the Class(es) of Unit(s) for which such election is effective shall be deemed contributed by such Member to the capital of the Company with respect to such Class(es) of Unit(s) as of the date that distributions are made to all Members as provided in Section 3.8.3 hereof.

**(e)    Continuing Representation.** The making of an election under this Section 2.2.1 shall be deemed to constitute a representation and warranty by the electing Member that each and every representation, warranty and statement made by such Member (and such Member's purchaser representative) in such Member's Subscription Agreement is true and correct as of the date notice of such election is given. For purposes of this Section 2.2.1(e), all references in such Subscription Agreement to "Units" shall refer to the Units being acquired pursuant to this Section 2.2.1.

**(f)    Securities Law Restrictions.** Notwithstanding anything to the contrary in this Section 2.2.1, the Company shall not be obligated to give effect to an election made under this Section 2.2.1 to the extent that the Managers determine, in their sole and absolute discretion, that giving effect thereto would result in a violation of applicable securities laws.

**2.2.2    By Any Member Upon Purchase of Additional Units.** The Managers in their sole and absolute discretion may cause the Company to issue

**(a)**    additional Class A, B, C, D, E, F or G Units, or

**(b)**    Units representing new Classes which Classes may have rights and preferences (including, without limitation, rights and preferences with respect to distributions and allocations, voting, and distribution of proceeds upon liquidation of the Company) subordinate to, *pari passu* with, and/or superior to those of the Class A, B, C, D, E, F or G Units or Units of any other Class that may be outstanding at the time such Units from such new Classes are issued

6

in which event a current Member may, but shall not be obligated to, make further contributions to the capital of the Company by acquiring the Units so offered, subject to the Subscription Agreement as the same may be varied by the Managers pursuant to Section 4.2.1(l) hereof.

   **2.3    Capital Accounts.**  For financial accounting purposes, a "Capital Account" shall be established and maintained for each Member in accordance with the following provisions:

      **2.3.1**    Each Member's Capital Account shall be credited with such Member's Capital Contributions, any income or gain allocated to such Member pursuant to Section 3 hereof, and the amount of any company liabilities assumed by such Member or which are secured by any property distributed to such Member.

      **2.3.2**    Each Member's Capital Account shall be reduced by the amount of cash distributed to such Member, any losses or deductions allocated to such Member pursuant to Section 3 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

      **2.3.3**    For federal income tax purposes, such Capital Accounts shall be maintained for each Member in accordance with section 1.704-1(b)(2)(iv) of the Regulations.

      **2.3.4**    A single Capital Account shall be maintained for a Member for federal income tax purposes notwithstanding that such Member may own more than one Unit or Units of different Classes; *provided, however*, that (a) if a Member transfers fewer than all the Units owned by such Member in compliance with Section 5 hereof, the transferee will succeed to that portion of the transferor's Capital Account attributable to the Unit(s) transferred; and (b) with respect to any Member owning Units of different Classes, the Company shall maintain sufficient records with respect to each Class of Units owned by such Member to enable the Company to determine (i) the Class Percentages (defined in Section 3.1.5 hereof); (ii) the manner in which the Units of one Class owned by such Member shall share in allocations and distributions under Section 3 hereof with Units of the same Class owned by other Members; (iii) the effect of Capital Contributions by such Member under Sections 2.2 and 2.5.3(a) hereof; (iv) the effect of withdrawals by such Member under Section 2.5.2 hereof; (v) the effect of conversions by such Member under Sections 2.5.3 or 2.5.4 hereof; and (vi) for such other purposes as are necessary in the opinion of the Managers to effect the intent of this Agreement.

   **2.4    Advances and Loans.**  A Member may, but shall not be obligated to, loan money to the Company or advance funds on its behalf with the consent of the Managers under such terms as the lending Member and the Managers, in the exercise of sound business judgment, shall agree, subject to the terms of this Section 2.4.

      **2.4.1    No Capital Contribution.**  A loan under this Section 2.4 shall be a debt owed by the Company to the lending Member in such Member's capacity as a creditor and not a Member, shall not increase such Member's Capital Account, and shall not entitle such Member to a greater share of distributions or allocations pursuant to Section 3 hereof.

      **2.4.2    Separate Account.**  Each loan under this Section 2.4 shall be segregated in a loan payable account. Principal and interest on such loan shall be paid from the gross income of the Company, net of all other expenses of the Company, before any distributions are made to the Members.

      **2.4.3    Security.**  A Member may make loans to the Company on a secured or unsecured basis as the Managers and such Member may determine.

2.5    Withdrawal

2.5.1    **In General.**  Except as provided in this Section 2.5 and notwithstanding any provision of the Act to the contrary, a Member shall not have the right to have such Member's Membership Interest redeemed or to withdraw all or any portion of such Member's Capital Account or Capital Contributions until the full and complete winding up and liquidation of the business and affairs of the Company.

2.5.2    **Withdrawal by Certain Members.**  Subject to paragraphs (a) through (d), inclusive, of this Section 2.5.2 and Sections 2.5.3 and 2.5.4 hereof, a Member may withdraw cash up to the amount of such Member's positive Capital Account balance attributable to one or more of such Member's Class B, C, D, E, F or G Units, as the case may be, by giving notice to the Company describing the amounts to be withdrawn and, if such Member owns more than one Unit, the Units from which such amounts shall be withdrawn. Upon giving such notice, such Member shall be deemed (I) a mere Assignee with respect to a Unit from which cash equal to the entire Capital Account balance is to be withdrawn, and (II) with respect to a Unit from which cash in an amount less than the entire Capital Account balance is to be withdrawn, an Assignee with respect to the portion of the Capital Account balance to be withdrawn and a Member with respect to the portion of the Capital Account balance to remain.

(a)    **Withdrawal by Class B Member.**  With respect to a Class B Member who has duly given notice pursuant to this Section 2.5.2, the Company shall pay such Member, in cash, the amount demanded in such notice (i) within ninety (90) days if the amount demanded is Two Hundred Thousand and 00/100 Dollars ($200,000.00) or less; (ii) within six (6) months if the amount demanded is more than Two Hundred Thousand and 00/100 Dollars ($200,000.00) but One Million and 00/100 Dollars ($1,000,000.00) or less; and (iii) within nine (9) months if the amount demanded is more than One Million and 00/100 Dollars ($1,000,000.00).

(b)    **Withdrawal by Class C, D, E, F or G Member.**  With respect to a Class C, D, E, F or G Member who has duly given notice pursuant to this Section 2.5.2, the Company shall pay such Member, in cash, the amount demanded in such notice (i) within ninety (90) days if the amount demanded is One Hundred Thousand and 00/100 Dollars ($100,000.00) or less; and (ii) within six (6) months if the amount demanded is more than One Hundred Thousand and 00/100 Dollars ($100,000.00).

(c)    **Overall Monetary Limit.**  Notwithstanding the time limitations set forth in paragraphs (a) or (b) of this Section 2.5.2, if the aggregate amount demanded by a Member to be withdrawn pursuant to notices duly given by such Member under this Section 2.5.2 during any consecutive ninety (90) day period is Two Million Dollars ($2,000,000.00) or more, then the applicable time limitations described in paragraphs (a) or (b) of this Section 2.5.2 shall be extended an additional ninety (90) days.

(d)    **Discretion of Managers.**  Notwithstanding any provision of this Section 2.5.2 to the contrary, the Managers may, in their sole and absolute discretion, deny any request by a Member to have such Member's Membership Interest redeemed or to withdraw all or any portion of such Member's Capital Account or Capital Contributions, even if notice is duly given under this Section 2.5.2, if such redemption or withdrawal would, in the opinion of the Managers,

(i)    cause the Company to be in default under any net worth, debt-to-equity ratio, asset base, or similar financial test or covenant contained in, or otherwise violate or accelerate, any financing arrangement, promissory note, loan or credit agreement, security agreement, indenture, or other instrument to which the Company is a party, or

8

(ii)    render the Company insolvent or otherwise unable to conduct its business.

If a Member has duly given notice pursuant to this Section 2.5.2 and the Managers anticipate that the Company will be unable to make any of the distributions demanded in such notice as a result of this paragraph (d), such notice shall be null and void and the Managers shall as soon as possible notify such Member that the Company is unable to make any distributions demanded in such notice (which notification shall refer to this Section 2.5.2(d)). Such notification by the Managers shall be without prejudice to such Member giving a subsequent notice under this Section 2.5.2.

(e)    **Manner of Payment.** Any amount withdrawn by a Class B, C, D, E, F or G Member pursuant to this Section 2.5.2 shall, at the option of the Managers, be paid by cashier's or certified check within the period set forth in Section 2.5.2(a), (b) or (c) as applicable.

2.5.3    **Conversion of Units.** Subject to the Subscription Agreement as the same may be varied by the Managers pursuant to Section 4.2.1(l) hereof (including, without limitation, any restrictions on the Class of Units that a Member may purchase and the minimum purchase requirements applicable to the Class of Units that such Member may purchase) and subject further to the terms and conditions of this Section 2.5.3, a Class B, C, D, E, F or G Member may elect to acquire new Class B, C, D, E, F or G Units (regardless of whether such Member already owns Units of such Class) by withdrawing an amount of cash equivalent to the purchase price of such new Units (but in no event more than the amount of such Member's positive Capital Account balance attributable to one or more of such Member's Class B, C, D, E, F or G Units) and causing such cash, together with any additional cash necessary, to be applied to the purchase of such new Units in the manner set forth in this Section 2.5.3.

(a)    **Manner of Election.** A Class B, C, D, E, F or G Member shall make the election provided in this Section 2.5.3 by notice to the Company specifying (i) the amounts to be withdrawn (and, if such Member owns more than one (1) Unit, the Units from which such amounts shall be withdrawn) and (ii) the number and Class of the new Unit(s) to be acquired. If the purchase price under the Subscription Agreement of the Unit(s) in clause (ii) of this Section 2.5.3(a) exceeds the amounts set forth in clause (i) of this Section 2.5.3(a), the election described in this Section 2.5.3(a) shall not be deemed given unless and until the electing Member has tendered a certified or cashier's check equal to such excess (the "Additional Consideration").

(b)    **Effect of Election.** If a Member gives the notice described in Section 2.5.3(a) hereof, such Member (i) shall be deemed to have withdrawn the amount described in such notice on the tenth (10th) day after the giving of such notice and immediately applied such amounts, together with the Additional Consideration (if any), to the purchase of the new Units specified in such notice; (ii) shall, until such deemed withdrawal and purchase, continue to be deemed a Member with respect to a Unit from which cash equal to the entire Capital Account balance is to be withdrawn; and (iii) with respect to a Unit from which cash in an amount less than the entire Capital Account balance is to be withdrawn, shall, until such deemed withdrawal and purchase, continue to be deemed a Member with respect to the portion of the Capital Account balance to be withdrawn.

(c)    **Effect on Withdrawal Rights.** If (i) a Member (y) owning one or more Class B Units shall withdraw any amount with respect to such Unit(s) and apply such amount to the purchase of one or more Class C, D, E, F or G Units pursuant to this Section 2.5.3, or (z) owning one or more Class C, D, E, F or G Units shall withdraw any amount with respect to such Unit(s) and apply such amount to the purchase of one or more Class B Units pursuant to this Section 2.5.3; (ii) such Member then elects pursuant to Section 2.5.2 hereof to withdraw any amount from any of the new Units thereby acquired; and (iii)

9

application of the time limits in Sections 2.5.2(a), (b) or (c) hereof would otherwise cause such Member to receive such amount sooner than if such Member had made the election pursuant to Section 2.5.2 hereof with respect to the original Class B, C, D, E, F or G Units, as the case may be, then such Member shall not receive such amounts any sooner than if such Member had made the election pursuant to Section 2.5.2 hereof with respect to the original Class B, C, D, E, F or G Units, as the case may be.

        (d)    **Continuing Representation.** The making of an election under this Section 2.5.3 shall be deemed to constitute a representation and warranty by the electing Member that each and every representation, warranty and statement made by such Member (and such Member's purchaser representative) in such Member's Subscription Agreement is true and correct as of the date notice of such election is given. For purposes of this Section 2.5.3(d), all references in such Subscription Agreement to "Units" shall refer to the Units being acquired pursuant to this Section 2.5.3.

        (e)    **Securities Law Restrictions.** Notwithstanding anything to the contrary in this Section 2.5.3, the Company shall not be obligated to give effect to an election made under this Section 2.5.3 to the extent that the Managers determine, in their sole and absolute discretion, that giving effect thereto would result in a violation of applicable securities laws.

        2.5.4    **Class of Remaining Units.** If (I) a Member withdraws or is deemed to withdraw any amount from one or more Class B, C, D, E, F or G Units under Sections 2.5.2 or 2.5.3(b) hereof and continues to own such Unit(s) ("remaining Unit(s)") after such withdrawal, and (II) the remaining aggregate positive Capital Account balances attributable to any remaining Class B, C, D, E, F or G Unit(s) would, had they been applied toward the purchase of a Unit or Units of that Class, been insufficient to purchase such Unit(s) under the Subscription Agreement as the same may be varied by the Managers under Section 4.2.1(l) hereof, then

        (a)    the amounts attributable to the aggregate positive Capital Account balances attributable to such remaining Unit(s) shall be deemed to have been withdrawn by and distributed to such Member, and immediately applied to the purchase of the maximum number of Units of that Class with the highest Priority Return under Section 3.1.13 hereof that could have been purchased under the Subscription Agreement, as of the date that the distribution is made or deemed to have been made to such Member under Sections 2.5.2 or 2.5.3(b), as the case may be;

        (b)    if a fractional Unit would be created by virtue of the deemed withdrawal and purchase by such Member under Section 2.5.4(a) hereof, then such Member shall be deemed to have acquired (i) the maximum whole number of Units that could be acquired pursuant to Section 2.5.4(a) hereof; and (ii) one (1) Unit with the amount of such deemed withdrawal remaining after application of clause (i) of this Section 2.5.4(b);

        (c)    such Member shall, until such deemed withdrawal and purchase, continue to be deemed a Member with respect to such remaining Unit(s);

        (d)    the acquisition of the new Units under Section 2.5.4(a) hereof shall be without prejudice to an election by such Member under Section 2.5.3 with respect to such new Units and any other Units owned by such Member; and

        (e)    Section 2.5.3(c), (d) and (e) hereof shall apply to such new Units as if such Member had acquired such new Units pursuant to an election under Section 2.5.3 hereof.

## 3. ALLOCATIONS AND DISTRIBUTIONS

3.1    **Definitions.** The following definitions shall apply for purposes of this Agreement:

3.1.1    **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, of such Member's Capital Account as of the end of the relevant fiscal year. after giving effect to the following adjustments: (a) credits for such Member's share of Company Minimum Gain pursuant to section 1.704-2(g)(1) of the Regulations and such Member's share of Member Nonrecourse Debt Minimum Gain pursuant to section 1.704-2(i)(5) of the Regulations; and (b) debits for items described in section 1.704-1(b)(2)(ii)*(d)(4), (5)* and *(6)* of the Regulations.

3.1.2    **"Annual Limit"** means Ten Million and 00/100 Dollars ($10,000,000.00) with respect to any Fiscal Year; *provided*, that with respect to any Fiscal Year that is shorter than twelve (12) full months, the Annual Limit shall be prorated according to the ratio of (a) the number of days in such shortened Fiscal Year to (b) the number of days in a full Fiscal Year.

3.1.3    **"Available Cash from Operations"** means, with respect to any fiscal period, total cash revenues generated by the Business and from other sources (other than Available Cash from Sale) and from the elimination or reduction of Reserves previously established, less cash expenditures (including, but not limited to, fees to the Managers or Affiliates of the Managers for services rendered to the Company), current debt service (including, but not limited to, payments on debts to a Member), operating expenses, and the establishment or increase of Reserves; *provided*, that prepayments of the Company's debts shall not be taken into account in determining Available Cash from Operations.

3.1.4    **"Available Cash from Sale"** means the cash proceeds from a Terminating Capital Event, less (a) all costs and other expenses related to the creation of such proceeds (including, but not limited to, broker's commissions and attorney's fees and other costs related to negotiating and effecting the sale or other disposition of the Company's assets); (b) amounts to establish or increase Reserves; (c) the satisfaction of any debt being discharged (including prepayment penalties); and (d) any other expenditure for which such proceeds are used.

3.1.5    **"Class Percentage"** (collectively, **"Class Percentages"**) means one of the following:

(a)    **"Class A Percentage,"** which means, as of any date with respect to the Class A Members as a class, ninety-nine and 00/100 percent (99.00%);

(b)    **"Class B Percentage,"** which means, as of any date with respect to the Class B Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class B Units to (ii) the aggregate positive Capital Account balances of all Members;

(c)    **"Class C Percentage,"** which means, as of any date with respect to the Class C Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class C Units to (ii) the aggregate positive Capital Account balances of all Members;

(d)    **"Class D Percentage,"** which means, as of any date with respect to the Class D Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class D Units to (ii) the aggregate positive Capital Account balances of all Members;

(e)    **"Class E Percentage,"** which means, as of any date with respect to the Class E Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class E Units to (ii) the aggregate positive Capital Account balances of all Members;

(f)    **"Class F Percentage,"** which means, as of any date with respect to the Class F Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class F Units to (ii) the aggregate positive Capital Account balances of all Members; and

(g)    **"Class G Percentage,"** which means, as of any date with respect to the Class G Members as a class, the ratio of (i) the aggregate positive Capital Account balances attributable to all Class G Units to (ii) the aggregate positive Capital Account balances of all Members.

The Class B, C, D, E, F and G Percentages as of any date shall be determined according to the Capital Account balances of the Members as of the beginning of the Fiscal Year in which such date occurs; *provided*, that (I) such Class Percentages shall take into account any amounts paid by the Company to any Class B, C, D, E, F or G Member under Section 2.5.2 hereof on or before such date; (II) such Class Percentages shall take into account any amount contributed to the capital of the Company pursuant to Sections 2.2 or 2.5.3(a) hereof on or before such date; and (III) such Class Percentages shall take into account any conversions pursuant to Sections 2.5.3 and 2.5.4 hereof effective on or before such date.

3.1.6    **"Company Minimum Gain"** means, with respect to any fiscal year, the "partnership minimum gain" computed in accordance with the principles of section 1.704-2(d)(1) of the Regulations.

3.1.7    **"Excess Nonrecourse Liability"** means a nonrecourse liability not allocated under section 1.752-3(a)(1) or (2) of the Regulations.

3.1.8    **"Member Nonrecourse Debt Minimum Gain"** means an amount of gain characterized as "partner nonrecourse debt minimum gain" under section 1.704-2(i)(2) and (3) of the Regulations.

3.1.9    **"Member Nonrecourse Deductions"** means the Company deductions that are characterized as "partner nonrecourse deductions" pursuant to section 1.704-2(i)(1) and (2) of the Regulations.

3.1.10    **"Net Income"** and **"Net Loss"** mean the net income or net loss of the Company for federal income tax purposes for each Fiscal Year of the Company as determined by the accountants for the Company, but not including any item allocated under Section 3.7 hereof.

3.1.11    **"Nonrecourse Deductions"** mean the Company deductions that are characterized as "nonrecourse deductions" pursuant to section 1.704-2(c) of the Regulations.

3.1.12    **"Nonrecourse Liability"** means a Company liability to the extent that no Member or related person bears the economic risk of loss for that liability under section 1.752-2 of the Regulations.

3.1.13    **"Priority Return"** means, with respect to a Class B, C, D, E, F or G Member only, a simple annual return equal to a percentage of such Member's positive Capital Account attributable to a Class B, C, D, E, F or G Unit as the case may be, which shall vary with each such Unit as follows:

Class B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Eighteen and 00/100 percent (18.00%)

12

Class C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Seventeen and 00/100 percent (17.00%)
Class D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Sixteen and 00/100 percent (16.00%)
Class E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fifteen and 00/100 percent (15.00%)
Class F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Fourteen and 00/100 percent (14.00%)
Class G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Thirteen and 00/100 percent (13.00%)

For purposes of determining the Priority Return of any Class B, C, D, E, F or G Member as of any date,

(a)    with respect to any Fiscal Year that is shorter than twelve (12) full months, the percentages set forth above shall be prorated according to the ratio of (i) the number of days in such shortened Fiscal Year to (ii) the number of days in a full Fiscal Year;

(b)    the Capital Account balance attributable to a Class B, C, D, E, F or G Unit shall be determined as of the beginning of the Fiscal Year in which such date occurs; *provided*, that the Company shall take into account (i) any amounts paid by the Company to any Class B, C, D, E, F or G Member under Section 2.5.2 hereof on or before such date; (ii) any amounts contributed to the capital of the Company by any Class B, C, D, E, F or G Member under Sections 2.2 or 2.5.3(a) hereof on or before such date; and (iii) any conversions by a Class B, C, D, E, F or G Member under Sections 2.5.3 or 2.5.4 hereof effective on or before such date;

(c)    if a Class B, C, D, E, F or G Member does not receive distributions with respect to a Fiscal Year up to the applicable Priority Return for such year, the shortfall shall cumulate and increase such Member's Priority Return for the following Fiscal Year; and

(d)    in the case of a conversion of a Class B, C, D, E, F or G Unit described in Sections 2.5.3 or 2.5.4 hereof, any amount cumulated under clause (c) of this Section 3.1.13 hereof shall carry over and increase the Priority Return applicable to the new Unit(s) thereby acquired, to be allocated to such Unit(s) according to any reasonable method selected by the Managers.

3.2    **Distributions of Available Cash from Operations**. Except upon the liquidation of the Company, in which event Available Cash from Operations and Available Cash from Sale shall be distributed according to Section 6.2.4 hereof, Available Cash from Operations shall be distributed at such times as the Managers shall determine (but in no event less frequently than thirty (30) days after the end of each Fiscal Year) as follows:

3.2.1    *First*, to each of the Class B, C, D, E, F and G Members until each such Member has received an amount equal to such Member's Priority Return with respect to such Fiscal Year, in proportion to the amounts required to be distributed pursuant to this Section 3.2.1;

3.2.2    *Second*, to the following Classes in the following proportions until distributions in an amount equal to the Annual Limit have been distributed with respect to such Fiscal Year pursuant to this Section 3.2.2: (a) to the Class A Members as a Class according to the Class A Percentage; and (b) one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

3.2.3    *Third*, to the following Classes in the following proportions: (a) ninety and 00/100 percent (90.00%) to the Class A Members; and (b) ten and 00/100 percent (10.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes.

3.3    **Allocation of Net Loss Other than from Terminating Capital Event.** Subject to Sections 3.5 and 3.7 hereof, Net Loss with respect to each Fiscal Year shall be allocated as follows:

**3.3.1** *First*, to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated with respect to such Fiscal Year under this Section 3.3.1 equal to (I) the original amount of the Bad Debt Reserve plus any additions thereto less (II) any reductions of the Bad Debt Reserve and any Net Loss previously allocated pursuant to this Section 3.3.1: (a) to the Class A Members as a Class according to the Class A Percentage; and (b) one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes;

**3.3.2** *Second*, to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated under this Section 3.3.2 equal to the aggregate amount of Net Loss allocated pursuant to Section 3.3.1 hereof: (a) one and 00/100 percent (1.00%) to the Class A Members; and (b) ninety-nine and 00/100 percent (99.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

**3.3.3** *Third*, to the following Classes in the following proportions: (a) fifty and 00/100 percent (50.00%) to the Class A Members; and (b) fifty and 00/100 percent (50.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes.

3.4    **Allocation of Net Income Other than from Terminating Capital Event.** Subject to Sections 3.6 and 3.7 hereof, Net Income with respect to each Fiscal Year shall be allocated as follows:

**3.4.1** *First*, to those Members who have been previously allocated an aggregate amount of Net Loss pursuant to Section 3.3 hereof in excess of the aggregate amount of Net Income previously allocated to such Members pursuant to this Section 3.4.1, in the amounts of and in proportion to such excesses;

**3.4.2** *Second*, to those Members who have previously received an aggregate amount of distributions pursuant to Section 3.2 hereof in excess of the aggregate amount of Net Income previously allocated pursuant to this Section 3.4.2, in the amounts of and in proportion to such excesses;

**3.4.3** *Third*, to the following Classes in the following proportions until an aggregate amount of Net Income equal to the Annual Limit with respect to such Fiscal Year has been allocated according to this Section 3.4.3: (a) to the Class A Members as a Class according to the Class A Percentage; and (b) one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

**3.4.4** *Fourth*, to the following Classes in the following proportions: (a) ninety and 00/100 percent (90.00%) to the Class A Members; and (b) ten and 00/100 percent (10.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes.

3.5    **Allocation of Net Loss from Terminating Capital Event.** Subject to Section 3.7 hereof, Net Loss from a Terminating Capital Event shall be allocated as follows:

3.5.1    *First,* unless and until one (1) or more Members shall have a Capital Account balance of zero (0) or below with respect to all the Units of a Class owned by such Member, to the Members as follows:

(a)    *First,* to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated with respect to the Fiscal Year in which the Terminating Capital Event occurs under this Section 3.5.1(a) equal to (I) the original amount of the Bad Debt Reserve plus any additions thereto less (II) any reductions of the Bad Debt Reserve and any Net Loss previously allocated pursuant to Section 3.3.1 hereof: (i) to the Class A Members as a Class according to the Class A Percentage; and (ii) one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes;

(b)    *Second,* to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated under Section 3.3.2 hereof and this Section 3.5.1(b) equal to the aggregate amount of Net Loss allocated pursuant to Sections 3.3.1 and 3.5.1(a) hereof: (i) one and 00/100 percent (1.00%) to the Class A Members; and (ii) ninety-nine and 00/100 percent (99.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

(c)    *Third,* to the following Classes in the following proportions: (i) fifty and 00/100 percent (50.00%) to the Class A Members; and (ii) fifty and 00/100 percent (50.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes;

3.5.2    *Second,* if one (1) or more Members shall have a Capital Account balance of zero (0) or below with respect to all the Units of a Class owned by such Member before or as a result of the allocation pursuant to Section 3.5.1 hereof, to those Members with positive Capital Account balances with respect to all Units owned to the extent of and in proportion to such balances, until no Member shall have a positive Capital Account balance with respect to any Units owned by such Member; and

3.5.3    *Third,* to the Members as follows:

(a)    *First,* to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated with respect to the Fiscal Year in which the Terminating Capital Event occurs under this Section 3.5.3(a) equal to (I) the original amount of the Bad Debt Reserve plus any additions thereto less (II) any reductions of the Bad Debt Reserve and any Net Loss previously allocated pursuant to Sections 3.3.1 and 3.5.1(a) hereof: (i) to the Class A Members as a Class according to the Class A Percentage; and (ii) one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes;

(b)    *Second,* to the following Classes in the following proportions until an aggregate amount of Net Loss has been allocated under Sections 3.3.2 and 3.5.1(b) hereof and this Section 3.5.3(b) equal to the aggregate amount of Net Loss allocated pursuant to Sections 3.3.1, 3.5.1(a), and 3.5.3(a) hereof: (i) one and 00/100 percent (1.00%) to the Class A Members; and (ii) ninety-nine and 00/100 percent (99.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

(c)    *Third,* to the following Classes in the following proportions: (i) fifty and 00/100 percent (50.00%) to the Class A Members; and (ii) fifty and 00/100 percent (50.00%) to the Class

B, C, D, E, F and G Members. to be shared among them in proportion to the respective Class Percentages of such Classes.

3.6    **Allocation of Net Income from Terminating Capital Event.** Subject to Section 3.7 hereof, Net Income from a Terminating Capital Event shall be allocated as follows:

3.6.1    *First,* to any Member with a negative Capital Account balance. to the extent of and in proportion to such negative balances until no Member shall have a negative Capital Account balance;

3.6.2    *Second,* with respect to any Class B, C, D, E, F or G Member with respect to which the Priority Return of such Member with respect to the Fiscal Year in which the Terminating Capital Event occurs, exceeds distributions to such Member pursuant to Section 3.2.1 hereof with respect to such Fiscal Year, to such Members, to be shared among them in the amounts of and in proportion to such excesses;

3.6.3    *Third,* to the extent of the excess of the Annual Limit over the aggregate distributions to all Members pursuant to Section 3.2.2 with respect to the Fiscal Year in which the Terminating Capital Event occurs, **(a)** to the Class A Members as a Class according to the Class A Percentage; and **(b)** one and 00/100 percent (1.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes; and

3.6.4    *Fourth,* to the following Classes in the following proportions: **(a)** ninety and 00/100 percent (90.00%) to the Class A Members; and **(b)** ten and 00/100 percent (10.00%) to the Class B, C, D, E, F and G Members, to be shared among them in proportion to the respective Class Percentages of such Classes.

3.7    **Special Allocation Provisions**

3.7.1    **Member Nonrecourse Deductions.** Member Nonrecourse Deductions for each fiscal year shall be allocated among the Members as required by section 1.704-2 of the Regulations.

3.7.2    **Minimum Gain Chargeback.** Prior to any allocation under this Section 3 and subject to the exceptions set forth in section 1.704-2(f) of the Regulations, if there is a net decrease in the Company Minimum Gain during a Fiscal Year, each Member shall be allocated items of gross income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease (which share of such decrease shall be determined in accordance with section 1.704-2(g) of the Regulations). It is intended that this Section 3.7.2 shall constitute a "minimum gain chargeback" as provided by section 1.704-2(f) of the Regulations, which Regulations shall control in the event of a conflict.

3.7.3    **Member Nonrecourse Debt Minimum Gain Chargeback.** Prior to any allocation under this Section 3 (other than Section 3.7.2 hereof) and subject to the exceptions set forth in section 1.704-2(i)(4) of the Regulations, if there is a net decrease in the Member Nonrecourse Debt Minimum Gain during a Fiscal Year, each Member with a share of such Member Nonrecourse Debt Minimum Gain (determined in accordance with section 1.704-2(i)(5) of the Regulations) shall be allocated items of gross income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease (which share of such decrease shall be determined in accordance with section 1.704-2(i)(4) of the Regulations). It is intended that this Section 3.7.3 shall constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by section 1.704-2(i)(4) of the Regulations, which Regulations shall control in the event of a conflict.

16

3.7.4    **Qualified Income Offset.** Prior to any allocation under this Section 3 (other than Sections 3.7.2 or 3.7.3 hereof), if any Member unexpectedly receives any adjustments, allocations or distributions described in section 1.704-1(b)(2)(ii)*(d)(4)*, *(5)* or *(6)* of the Regulations that cause or increase an Adjusted Capital Account Deficit for such Member, items of the Company's gross income and gain shall be allocated, in accordance with, and to the extent required by, section 1.704-1(b)(2)(ii)*(d)* of the Regulations to each such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible, in proportion to the respective Adjusted Capital Account Deficits of such Members; *provided, however,* that an allocation pursuant to this Section 3.7.4 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.7.4 were not in this Agreement. It is intended that this Section 3.7.4 shall constitute a "qualified income offset" as provided by section 1.704-1(b)(2)(ii)*(d)* of the Regulations, which Regulations shall control in the event of a conflict.

3.7.5    **Adjusted Capital Account Deficit.** Prior to any allocation under this Section 3 (other than Sections 3.7.2, 3.7.3 or 3.7.4 hereof), if any Member has a deficit in such Member's Capital Account at the end of any Fiscal Year in excess of such Member's share of Company Minimum Gain pursuant to section 1.704-2(g)(1) of the Regulations and such Member's share of Member Nonrecourse Debt Minimum Gain pursuant to section 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of gross income and gain in the amount of such excess as quickly as possible in proportion to the respective deficits as determined under this Section 3.7.5; *provided, however,* that an allocation pursuant to this Section 3.7.5 shall be made only if and to the extent that such Member would have a deficit balance in such Member's Capital Account as determined under this Section 3.7.5 after all other allocations provided in this Section 3 have been made as if Section 3.7.4 hereof and this Section 3.7.5 were not in this Agreement.

3.7.6    **Compensating Allocations.** Any allocations of items of income or gain pursuant to Sections 3.7.2, 3.7.3, 3.7.4 or 3.7.5 hereof shall be taken into account in computing subsequent allocations under this Section 3, so that the net amount so allocated shall, to the extent possible, and as promptly as possible, be made equal to the net amount that would have been allocated to each Member if no allocation of income or gain were made pursuant to Sections 3.7.2, 3.7.3, 3.7.4 or 3.7.5 hereof. To the extent that Sections 3.7.2, 3.7.3, 3.7.4 or 3.7.5 hereof apply at the same time and provide for inconsistent treatment, the inconsistency shall be resolved in a fashion designed best to meet the purposes of section 1.704-1(b) of the Regulations.

3.7.7    **Allocation of Excess Nonrecourse Liabilities.** For purposes of determining each Member's share of any excess Nonrecourse Liabilities of the Company, each Member's interest in Company profits, within the meaning of section 1.752-3(a)(3) of the Regulations, shall be determined among the Classes in accordance with their respective Class Percentages, and among the Members of a Class according to Section 3.8.1 hereof.

3.7.8    **Section 704(c).** For federal, state and local income tax purposes only, and not for any other purpose (including the computation of any Member's Capital Account or distributions), income, gain, loss and deduction with respect to any property contributed by a Member to the capital of the Company or any portion thereof shall be allocated among the Members, pursuant to section 704(c) of the Code, so as to take into account the variation between the adjusted basis of such property or portion thereof to the Company for tax purposes and the fair market value of such property or portion thereof at the time of the contribution thereof. Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intent of this Agreement, and in a manner consistent with section 1.704-3 of the Regulations.

17

3.7.9    **Guaranteed Payments.** If any amount claimed by the Company to constitute a guaranteed payment under section 707(c) of the Code or a deductible payment to a Member not acting in its capacity as a Member under section 707(a) of the Code is instead treated for federal income tax purposes as a distribution to such Member, then such Member shall first be allocated an amount of gross income of the Company equal to such payment; such Member's Capital Account shall be reduced to reflect such distribution; and allocations under Sections 3.3 through 3.6 hereof shall be made after making the allocations required under this Section 3.7.9.

### 3.8    Other Rules

3.8.1    **Allocations or Distributions to Classes.** Subject to Section 3.8.2 hereof, wherever this Agreement provides that an amount shall be distributed or allocated to a Class,

(a)    except as provided in Section 3.8.1(b) hereof, such amounts shall be distributed to or allocated among the Members of such Class in the ratio which the positive Capital Account balance of each such Member attributable to such Member's Units in that Class as of the beginning of the Fiscal Year with respect to which such allocation or distribution is made bears to the total of such positive Capital Account balances attributable to all of the Units of that Class; and

(b)    the Company shall take into account, under any reasonable method selected by the Managers that is consistent with section 706(d) of the Code, (i) any amounts actually distributed by the Company to any Class B, C, D, E, F or G Member under Section 2.5.2 hereof on or before the date with respect to which such allocation or distribution is made, (ii) any amounts actually contributed to the capital of the Company by any Member under Sections 2.2 or 2.5.3(a) hereof on or before the date with respect to which such allocation or distribution is made, and (iii) any conversions under Sections 2.5.3 or 2.5.4 effective on or before the date with respect to which such allocation or distribution is made.

3.8.2    **Allocations With Respect to Terminating Capital Event.** In making the allocations provided in Sections 3.5 or 3.6 hereof, the Capital Accounts shall be determined (a) prior to any such allocation and as of the close of business on the last day of the Fiscal Year in which the Terminating Capital Event occurs; (b) after taking into account all distributions of Available Cash from Operations actually made or due to Members under Section 3.2 hereof; and (c) after making all allocations under Sections 3.3 or 3.4 through such date.

3.8.3    **Manner of Distribution: In General.** Payment of distributions pursuant to this Section 3 (a) shall be made in any manner determined by the Managers in their sole and absolute discretion (which manner may vary from time to time but not with respect to the Members at any one time); (b) shall be deemed made to a Member notwithstanding that such amounts may be retained by the Company pursuant to an election by such Member under Section 2.2.2 hereof; and (c) shall be deemed made to a Member notwithstanding that all or a portion of such amounts are withheld by the Company pursuant to any requirement of the Code or of foreign, state or local tax law, provided that such amounts are duly remitted to the appropriate taxing authority.

3.8.4    **Manner of Distribution From Terminating Capital Event.** Notwithstanding any other provision of this Agreement, distributions of Available Cash from Sale under Section 6.2.4 hereof shall be made in the following order: (a) *first*, to each Member in an amount equal to the positive balance of such Member's Capital Account after making all adjustments under Section 3.8.2 hereof, but before application of Section 3.6 hereof; and (b) *second*, to the Members in the same manner as that set forth in Section 3.2 hereof for Available Cash From Operations. Distributions of Available Cash From Sale may be accomplished, to the extent possible, by such allocations of gross income, income, gain, loss or deduction

as will ensure that distributions of Available Cash From Sale will in all events be identical to those provided in the first sentence of this Section 3.8.4.

   3.8.5    **Covenant of Members.** Each Member agrees to file federal, state, and local income tax returns on a basis consistent with the terms and provisions of this Agreement, and each Member agrees not to take a position inconsistent therewith before any federal, state or local taxing authority without first obtaining the prior consent of all the other Members.

## 4.    GOVERNANCE

   4.1    **Managers.** The Company shall at all times be managed by at least two (2) managers under the Act as set forth in its Articles (the "Managers").

   4.1.1    **Manager Also a Member.** No person may serve as a Manager of this Company who is not also a Member, and a Manager shall have all the rights and obligations of a Member; *provided*, that in the event of the Bankruptcy of a Manager, such Manager may continue as a Manager pending such Bankruptcy but subject to Section 5.5.2 hereof.

   4.1.2    **Designation of Initial Managers.** Anson, Garrett and Cohn shall serve as the initial Managers.

   4.1.3    **Term.** Each Manager shall serve for a term of seven (7) years unless such Manager shall sooner resign or be removed pursuant to Section 4.8 hereof. A Manager may serve for two or more consecutive terms.

   4.1.4    **Replacement of Manager**

      (a)    A Manager who has served to the end of a term described in Section 4.1.3 hereof shall continue to serve for a subsequent term unless the other Managers shall designate a replacement Manager before the end of the former term.

      (b)    If a Termination Event occurs with respect to a Manager and the other Members vote to continue the business of the Company within the time limit specified in Section 6.1.3 hereof (i) and there are no remaining Manager, the Members by a Majority in Interest shall appoint two (2) or more new Managers within such time limit; (ii) and there is one (1) remaining Manager, such remaining Manager shall appoint one or more additional Managers within such time limit; or (iii) if there are two (2) or more remaining Managers, such remaining Managers may appoint one or more additional Managers at any time; *provided*, that if such Termination Event is the Bankruptcy of such Manager, such Manager shall continue to serve as a Manager notwithstanding such Bankruptcy for purposes of this Section 4.1.4(b).

   4.1.5    **Notice.** The Company shall send notice to all Members giving the name and address of any new Manager.

   4.2    **Authority.** The Managers (and no one else) shall have full, exclusive and complete authority and discretion in the management, direction and control of the Business and the Company, and shall have all such rights, power and authority generally conferred by law or as necessary to, advisable for or consistent with accomplishing the purposes of the Company.

   4.2.1    **Certain Powers.** Without limiting the generality of the foregoing, and in addition to such other powers and responsibilities as are conferred elsewhere in this Agreement or the Act, the

Managers shall have the right to (a) make all decisions concerning the development, ownership, and operation of the Business and other ventures conducted by the Company; (b) spend the capital and income of the Company in the exercise of any rights or powers possessed by the Managers hereunder; (c) establish, increase, reduce, or eliminate Reserves, subject to Section 4.2.2 hereof; (d) sell, exchange, purchase, hold, operate, and manage any Company property; (e) purchase, at the expense of the Company, contracts of liability and other insurance that the Managers deem advisable, appropriate or convenient for the protection of the properties or affairs of the Company; protection of the Managers or any officer, employee, agent or contractor of the Company; or for any other purpose convenient or beneficial to the Company; (f) invest Company funds in commercial paper, government securities, certificates of deposit, money market accounts, and similar investments; (g) retain and assign duties and delegate responsibilities to one or more officers or employees of the Company; compensate such persons under such terms as the Managers shall determine; and cause Units to be issued or transferred to such officers or employees under a bonus, option, or similar incentive plan; (h) borrow money on behalf of the Company and encumber the Company assets or place title to such assets in the name of a nominee for the purpose of obtaining financing; (i) prepay in whole or in part, refinance, increase, modify or extend any obligation; (j) pay all organization expenses incurred in the creation of the Company, and all operating expenses incurred in the operation of the Company and the Business; (k) employ, engage, retain or deal with such persons as brokers, accountants, attorneys and such other persons as the Managers deem advisable for the proper operation of the Company; compensate such persons under such terms as the Managers shall determine; and cause Units to be issued or transferred to such persons under a bonus, option, or similar incentive plan; (l) waive or modify the provisions of the Subscription Agreement governing the purchase price of a Unit of a certain Class (including, but not limited to, for purposes of Sections 1.6.30, 2.2.2, 2.5.3, and 2.5.4 hereof) for administrative convenience, to enhance the Company's ability to raise or retain capital, or otherwise to further the interests and purposes of the Company; (m) modify the terms of this Agreement without the consent of the Members as set forth in Sections 2.2.2 and 8.3.3 hereof; (n) decline to give effect to an election by a Member under Sections 2.2.1(f), 2.5.2(d) or 2.5.3(e) hereof; and (o) enter into and perform any other agreements, contracts, documents and instruments with such parties and to give such receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto as the Managers may deem advisable, appropriate or convenient.

    **4.2.2**  **Bad Debt Reserve.** The Company shall at all times maintain a Reserve (the "Bad Debt Reserve"), in such amounts as are reasonably determined by the Managers from time to time, for amounts that are or may become uncollectible for any reason with respect to any accounts receivable, debt obligations, contracts, or other choses in action owned by the Company (collectively, "Bad Debts"), subject to the following terms and conditions:

    **(a)**  **Accumulation.** The Managers may only make additions to, and may not reduce the Bad Debt Reserve during the first Fiscal Year and the next three (3) full Fiscal Years; *provided*, that this Section 4.2.2(a) shall not affect the Managers' ability, in their sole and absolute discretion, to make reductions to the Bad Debt Reserve with respect to actual Bad Debts of the Company ("Reductions for Bad Debts").

    **(b)**  **Reductions.** During any Fiscal Year beginning after the period described in Section 4.2.2(a) hereof, the Managers in their sole and absolute discretion may make reductions to the Bad Debt Reserve in addition to and apart from Reductions for Bad Debts with respect to such Fiscal Year; *provided*, that the aggregate reductions during such Fiscal Year in addition to and apart from Reductions for Bad Debts with respect to such Fiscal Year may not exceed the aggregate additions with respect to the third (3rd) Fiscal Year prior to such Fiscal Year less Reductions for Bad Debts with respect to such prior Fiscal Year. For purposes of this Section 4.2.2(b), Reductions for Bad Debts shall be applied against additions to the Bad Debt Reserve in the order in which such additions were made.