(c)    **Disclosure.** The amount of the Bad Debt Reserve at the end of a Fiscal Year, any additions thereto during such Fiscal Year, and any reductions thereto with respect to such Fiscal Year (including, without limitations. Reductions for Bad Debts) shall be set forth in the report described in Section 7.2 hereof.

4.3    **Voting by Managers.** Notwithstanding any provision of this Agreement or the Act to the contrary, no Manager shall take any action or omit to take any action on behalf of the Company (including, without limitation, the execution of any contract, agreement, promissory note or other instrument or document for or on behalf of the Company or the representation to any party that such Manager is authorized to act for or on behalf of or to bind the Company in any manner whatsoever) unless such Manager has been authorized to do so by the Managers in the manner described in this Section 4.3.

4.3.1    **Vote Required.** Wherever this Agreement requires a vote, approval or consent by the Managers and unless expressly provided otherwise in this Agreement, such vote, approval or consent shall be by a Majority in Interest of the Managers pursuant to such meeting and voting procedures as the Managers may determine among themselves from time to time.

4.3.2    **Indemnity.** To the maximum extent permitted by law, any Manager shall indemnify, defend, and hold harmless the other Managers, the other Members, the Company, and their respective officers, directors, shareholders, employees, agents, attorneys, subsidiaries and assigns from and against any liability, loss, claim, expense or damage incurred by them by reason of any act or omission by such Manager in violation of this Section 4.3, including costs and attorney's fees and any amounts expended in the settlement of any claims of liability, loss or damage.

4.4    **Duties.** Each Manager shall at all times be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company, including the safekeeping and use of all of the Company property for the exclusive benefit of the Company, and shall be under a duty to (a) discharge such Manager's duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager reasonably believes to be in the best interests of the Company; (b) take all actions that may be necessary or appropriate for the continuation of the Company as a limited liability company under California law, the protection of the Members from personal liability for the debts and liabilities of the Company, and the accomplishment of the Company's purposes; and (c) devote such time to the Company as shall be necessary to manage the Company's business. In discharging the duties under this Agreement, a Manager may rely on information received from other persons if such reliance is consistent with the Manager's duties under this Section 4.4.

4.5    **Liability of Managers**

4.5.1    **Release.** Each Manager and such Manager's Affiliates shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member or any of their successors or assigns for any act or omission by such Manager performed or omitted in good faith pursuant to the authority granted to it by this Agreement; *provided*, that such Manager is not guilty of fraud, bad faith, or gross negligence. No amendment or repeal of this Section 4.5.1 affects any liability or alleged liability of any Manager for any acts, omissions, or conduct that occurred prior to the amendment or repeal.

4.5.2    **Indemnification.** To the maximum extent permitted by law, the Company shall indemnify, defend, and hold harmless each Manager and such Manager's officers, directors, shareholders, employees, agents, attorneys, subsidiaries and assigns from any liability, loss, claim, expense or damage incurred by them by reason of any act performed or omitted to be performed by them in connection with the Company, including costs and attorney's fees and any amounts expended in the settlement of any claims of

liability. loss or damage; *provided.* that nothing in this Section 4.5.2 shall relieve the party seeking indemnity from liability for fraud, bad faith. or gross negligence.

4.6      **Compensation and Reimbursement.** In addition to such Manager's interest in the capital and profits of the Company, each Manager shall receive the following in consideration of the services rendered to the Company.

4.6.1      **Management Fee.** Each Manager shall receive a management fee (the "Management Fee"), payable in equal monthly installments on the first (1st) day of each calendar month, under the following terms and conditions:

(a)      **Split; Death or Incompetence of Manager.** The aggregate Management Fees payable under this Section 4.6.1 shall be split among the Managers and their successors in such manner as they shall determine from time to time; *provided,* that in the event of the death or Incompetence of a Manager, the Management Fee that would have been paid to such Manager shall be paid to the other Managers, to be allocated between them in such manner as they may determine. Nothing in this Section 4.6.1(a) shall be deemed to modify Section 5.5.1 hereof.

(b)      **Initial Management Fee.** The aggregate Management Fees with respect to each Fiscal Year of the Company up to and including the first full Fiscal Year shall be Seven Hundred and Fifty Thousand and 00/100 Dollars ($750,000.00); *provided,* that the aggregate Management Fees for less than a full Fiscal Year of the Company shall be prorated according to the actual number of days in such short Fiscal Year.

(c)      **Subsequent Management Fee.** Beginning with the second (2nd) full Fiscal Year of the Company, and with respect to each Fiscal Year thereafter, the aggregate Management Fees with respect to such Fiscal Year shall be determined as follows:

(i)      An amount up to the "net profit" of the Company for the prior Fiscal Year for book purposes (not taking into account the payment of the Management Fees) as determined under generally accepted accounting principles and as set forth in the report to the Members for such prior Fiscal Year under Section 7.2 hereof shall be applied against **(A)** the aggregate Management Fees paid under Section 4.6.1(b) hereof up to and including the first full Fiscal Year of the Company, taking into account prior reductions under this clause (A); then against **(B)** the aggregate Management Fees payable with respect to the current Fiscal Year of the Company as determined under Section 4.6.1(d) hereof; and then against **(C)** the amount carried over to the current Fiscal Year under Section 4.6.1(c)(ii) hereof, taking into account prior reductions under this clause (C); and the Management Fee payable for such current Fiscal Year shall equal the amount of net profit applied against the amounts described in clauses (B) and (C) of this Section 4.6.1(c)(i).

(ii)      If the amount of net profit for the prior Fiscal Year is insufficient to discharge the amounts described in clauses (B) and (C) of Section 4.6.1(c)(i) hereof, then an amount equal to such deficiency shall carry over to each subsequent Fiscal Year and become part of the aggregate Management Fees for such Fiscal Year until discharged pursuant to clause (C) of Section 4.6.1(c)(i) hereof.

(iii)      If the Company has a net loss for the prior Fiscal Year for book purposes (not taking into account the payment of the Management Fees) as determined under generally accepted accounting principles and as set forth in the report to the Members for such prior Fiscal Year under Section 7.2 hereof, then, for purposes of this Section 4.6.1(c), the net profit of the Company for such prior Fiscal Year shall be treated as zero (0).

(d)    **Adjustment.**  With respect to the second (2nd) full Fiscal Year of the Company, the amount described in clause (B) of Section 4.6.1(c)(i) hereof shall equal Seven Hundred Fifty and 00/100 Thousand Dollars ($750,000.00) times a fraction, the numerator of which is the Index published as of the beginning of such Fiscal Year, and the denominator of which is the Index published as of the beginning of the immediately prior Fiscal Year. With respect to the third (3rd) and subsequent Fiscal Years of the Company, the amount described in clause (B) of Section 4.6.1(c)(i) hereof shall equal the amount described in clause (B) of Section 4.6.1(c)(i) hereof with respect to the immediately preceding Fiscal Year times a fraction, the numerator of which is the Index published as of the beginning of such Fiscal Year, and the denominator of which is the Index published as of the beginning of the immediately prior Fiscal Year; *provided*, that the amount described in clause (B) of Section 4.6.1(c)(i) hereof for less than a full Fiscal Year of the Company shall be prorated according to the actual number of days in such short Fiscal Year.

(e)    **Reconciliation.**  Upon a liquidation of the Company under Section 6.2 hereof, (i) any outstanding Management Fees shall be considered a liability of the Company for purposes of Section 6.2.2 hereof; and (ii) any amount outstanding under clause (A) of Section 4.6.1(c)(i) hereof shall be considered a debt of the then-current Managers to the Company, and the Company may apply any and all distributions due to the Managers against such liability.

**4.6.2    Fees and Reimbursement for Organization.**  The Company shall pay to the Managers and their Affiliates reasonable compensation for services rendered in connection with the organization of the Company, as determined by the Managers, and shall reimburse the Managers for expenses incurred in connection with such organization, including, without limitation, legal fees incident to the formation of the Company (including the negotiation and preparation of this Agreement); accounting fees incident to the organization of the Company; and other organizational costs.

**4.6.3    Out-of-Pocket Expenses.**  A Manager or such Manager's Affiliates, agents, employees and consultants, and such Manager's counsel and accountants, shall be entitled to reimbursement for all reasonable out-of-pocket expenses incurred by them for the benefit of the Company as determined by the Managers and upon presentation of satisfactory evidence thereof.

(a)    **Certain Services by Manager or Affiliate.**  To the extent that services described in Section 4.2.1(k) hereof are performed by personnel of a Manager or Affiliates thereof, such Manager or Affiliate shall receive compensation in addition to the Management Fee not in excess of such compensation charged by independent contractors in the community for the same type of services and expertise.

(b)    **Certain Non-Reimbursed Expenses.**  Except as expressly provided otherwise in this Section 4.6, in no event may a Manager or Affiliate thereof be reimbursed for (i) compensation to officers and directors of such Manager and such Manager's Affiliate, or (ii) overhead expenses of such Manager or Affiliate (including, without limitation, rents, salaries and general office expenses).

**4.7    Powers of Members.**  No Member solely by virtue of being a Member is an agent of the Company or has the authority to make any contracts, enter into any transactions, or make any commitments on behalf of the Company, except as expressly provided in this Section 4.7.

**4.7.1    Voting Rights.**  In addition to such voting and approval rights as are expressly set forth elsewhere in this Agreement, the Members shall have the following powers:

23

(a)    to approve by a Majority in Interest (i) the sale of all or substantially all of the assets of the Company; (ii) the contribution of all or substantially all of the assets of the Company to a corporation, partnership or limited liability company; or (iii) the conversion of the Company to a corporation or partnership;

(b)    to approve by a Majority in Interest a merger of the Company; or

(c)    to approve by a Majority in Interest any act by the Managers that would (i) make it impossible to carry on the ordinary business of the Company; (ii) change the nature of the Company's business as set forth in Section 1.3 hereof; (iii) confess a judgment against the Company; or (iv) allow any Member to possess Company property, or assign the Company's right in such property, for other than a Company purpose.

4.7.2    **Voting Procedure.** This Section 4.7.2 (and, where not inconsistent therewith, the Act) shall govern any matter with respect to which the Members have voting or approval rights under this Agreement except to the extent another provision of this Agreement expressly provides otherwise.

(a)    **Calling of Vote.**  The Managers, or those Members owning Units representing more than ten and 00/100 percent (10.00%) of the Percentage Interests of all Members, may submit a matter to the vote or approval of the Members by sending out written notice to each Member and the Company stating the general nature of business to be transacted and the vote required under this Agreement to approve any matter put to the vote of the Members.

(b)    **Meeting of Members.** Such notice may call for the vote to be taken at a meeting of the Members at the principal office of the Company, on a date that shall be no sooner than sixty (60) days after the date such notice is given and at any time during regular business hours.  No business may be transacted at such meeting that is not described in such notice.

(c)    **Telephonic Conference; Proxy.** A Member may participate in a meeting by telephonic conference or proxy, provided that the Member shall have furnished notice to the Company of such Member's intent to participate by telephonic conference or by proxy, and have identified such proxy in such notice, a reasonable time before the meeting is held.

(d)    **Quorum.** The presence of two (2) Managers and a Majority in Interest of the other Members, whether in person or by telephonic conference or proxy, shall constitute a quorum for the purpose of transacting business at such meeting.

(e)    **Written Consent.** In lieu of a meeting, such notice may call for approval of the actions set forth in such notice by the written consent of the Members which consents shall be given by a date set forth in the notice, which date may not be sooner than thirty (30) days after the date the notice is given. Failure by a Member timely to submit a written consent by the date set forth in the notice shall be deemed to be approval of the proposed action.

**4.8    Resignation and Removal of Manager**

4.8.1    **Resignation.** A Manager may not voluntarily resign as Manager except (a) upon ninety (90) days' written notice to the Members, and (b) upon the consent of the other Managers and a Majority in Interest of the Members other than Managers. If such Manager effects such resignation by withdrawing such Manager's entire Capital Contributions from the Company or by transferring all of such

24

Manager's Membership Interest, this Section 4.8.1 shall govern such withdrawal or transfer in addition to Sections 2.5.2 and 5 hereof.

**4.8.2    Removal.** A Manager may be removed for cause upon the vote of the other Managers and a Majority in Interest of the Members other than Managers. For purposes of this Section 4.8.2, "cause" includes, and is limited to, (a) gross negligence, misconduct or fraud in the management of the Company or its business; (b) a material breach by such Manager of any provision of this Agreement, together with failure to correct such breach within ten (10) days before the removal vote is taken; or (c) such Manager's conviction or a plea of guilty or *nolo contendere* with respect to any felony arising from or related to the conduct of the Business or the Company's affairs.

**4.8.3    Effect of Resignation or Removal.** Unless a Manager effects a resignation by withdrawing such Manager's entire Capital Contributions from the Company or by transferring all of such Manager's Membership Interest, a Manager who resigns or is removed pursuant to this Section 4.8 shall remain a Member and shall continue to have all the rights and obligations of a Member.

## 5.    EVIDENCE AND TRANSFER OF INTERESTS

**5.1    Certificates of Interest.** An original Signature Page, executed by a Member and by each of the Managers, shall serve as evidence of ownership of the Units described in such Signature Page, and the Company shall not issue any additional certificates, documents or other proof of ownership of Units except as the Managers may otherwise determine; *provided, however,* that in the case of a lost, destroyed or mutilated original Signature Page, the Company shall issue a replacement under such terms and indemnities as the Managers may determine.

**5.2    Transfer of Membership Interests: In General.** Notwithstanding any provision of the Act to the contrary, no Member may transfer all or any portion of such Member's Membership Interest except in compliance with this Section 5. In addition to such other restrictions as are set forth in this Section 5, the following provisions shall govern any transfer of a Membership Interest:

**5.2.1    No Further Fractionalization.** No portion of a Membership Interest may be transferred smaller than that attributable to one (1) Unit (or, if a fractional Unit was originally issued to such Member, a portion smaller than that attributable to such fractional Unit as originally issued).

**5.2.2    Applicability of Agreement.** Upon the consummation of any transfer of a Unit, the Unit so transferred shall continue to be subject to this Agreement and any further transfers of such Unit shall be required to comply with this Agreement; and any Assignee shall be under the same restrictions as a Member for purposes of this Section 5.

**5.2.3    Effect of Violation.** Any transfer in violation of this Section 5 shall be null and void *ab initio* and of no effect whatsoever.

**(a)    Recognition of Non-Permitted Transfers.** If the Company is required to recognize a transfer of a Unit that is not permitted by or does not comply with this Section 5, the Membership Interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Unit, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Unit may have to the Company, and such transferee shall have no other rights under this Agreement or the Act.

25

**(b)    Indemnity.** In the case of a transfer or attempted transfer of a Unit that does not comply with this Section 5, the parties engaging or attempting to engage in such transfer shall be liable to indemnify and hold harmless the Company and the other Members and their successors and assigns from all cost, liability, and damage that any of such indemnified parties may incur (including, without limitation, incremental tax liability and attorneys' fees and expenses) as a result of such transfer or attempted transfer and efforts to enforce the indemnity in this Section 5.2.3(b).

**5.3    Permitted Transfers.** A Member may transfer a Unit, provided that the conditions of Section 5.6 are met, to the following persons:

**5.3.1**    the Company;

**5.3.2**    another Member;

**5.3.3**    if such Member is an individual,

**(a)**    a member or members of such Member's family;

**(b)**    a trust (i) that is wholly revocable by such Member, or (ii) of which such Member and/or one or more members of such Member's family are the sole and exclusive beneficiaries so long as such individuals are living, provided that the trustees of such trust shall consist exclusively of one or more such individuals; or

**(c)**    a corporation, partnership or limited liability company whose equity owners consist of such individual alone or together with one or more persons described in clauses (a) or (b) of this Section 5.3.3; or

**5.3.4**    in the case of a transfer of a Class A Unit by a Manager, to an employee or independent contractor of the Company pursuant to Sections 4.2.1(g) or (k) hereof.

**5.4    Option to Purchase.** Except as provided in Sections 5.3 or 5.5 hereof, if a Member (the "transferring Member") desires to transfer a Unit or Units, the Company shall have the right, but not the obligation, to purchase such Unit(s) under the terms and conditions of this Section 5.4.

**5.4.1    Notice.** The Member proposing to transfer such Unit(s) shall give notice to the Company of such Member's intention to transfer such Unit(s), which notice shall disclose (a) the Unit(s) to be transferred; (b) all material terms and conditions of such transfer (including, if applicable, the sale price); and (c) the identity of the proposed transferee.

**5.4.2    Repurchase Right.** The Managers shall have the right to cause the Company to purchase the Unit, or any or all of the Units, proposed to be transferred pursuant to such notice at the price and upon the terms set forth in Section 5.7 hereof by notice given to the transferring Member within sixty (60) days after notice is given by such Member pursuant to Section 5.4.1 hereof.

**5.4.3    Failure to Exercise.** If the Company does not duly exercise its right to purchase the Unit(s), the transferring member may thereupon transfer the Unit(s) described in the notice given under Section 5.4.1 under the terms and conditions disclosed in such notice; *provided*, that if the transferring Member proposes to transfer such Unit(s) under terms and conditions that differ materially from those disclosed in the notice described in Section 5.4.1 hereof or does not consummate such transfer within thirty

(30) days after the expiration of the sixty (60) days period described in Section 5.4.2 hereof, the Unit(s) proposed to be transferred shall again become subject to this Section 5.4.

### 5.5    Involuntary Transfers

**5.5.1    By Death, Incompetence, or Dissolution.** If a transfer of a Unit or Units results from (a) the death or Incompetence of a Member who is an individual, or (b) the dissolution, revocation, merger or other termination of a Member that is a corporation, trust, partnership or other legal entity, such Member's executor, administrator, guardian, conservator, successor, assign, trustee or other legal representative (such Member's "Successor in Interest") shall be deemed a permitted transferee of such Unit(s) provided that the conditions of Section 5.6 are met. In no event shall the Successor in Interest have the right to demand payment for such Unit(s) except as provided in Section 2.5 hereof and notwithstanding any provision of the Act to the contrary.

**5.5.2    By Other Means.** Except as provided in Section 5.5.1 hereof, if a Member's Unit or Units is or are transferred by any involuntary means (including, without limitation, attachment, garnishment, execution, levy, seizure, transfer in connection with a divorce or marital property settlement, or Bankruptcy), such Member's executor, administrator, guardian, conservator, successor, assign, trustee or other legal representative (such Member's "Involuntary Transferee") shall be deemed a permitted transferee of such Member's Unit(s) provided that the conditions of Section 5.6 are met, but shall be subject to the additional provisions of this Section 5.5.2. A transfer of a Unit or Unit(s) shall also be deemed to have occurred for purposes of this Section 5.5.2 if a permitted transferee described in Section 5.3.3 hereof shall cease to be so described, in which case such transferee shall be deemed an Involuntary Transferee for purposes of this Section 5.5.2.

(a)    **Repurchase Right.** Within sixty (60) days after the transfer described in this Section 5.5.2 (or, if later, after the date that the Company first becomes aware of such transfer pursuant to a notice given by the Member with respect to which such transfer occurred or by the Involuntary Transferee, which notice shall contain information similar to that described in Section 5.4.1 hereof), the Managers by notice to the Involuntary Transferee may elect to cause the Company to repurchase the Unit(s) of the Member at the price and upon the terms set forth in Section 5.7 hereof. Any prior failure by the Company to exercise its rights under Section 5.4.2 hereof with respect to such Unit(s) shall not constitute a waiver by the Company of this Section 5.5.2(a).

(b)    **No Right to Withdrawal.** In no event shall the Involuntary Transferee have the right to demand payment for such Interest, notwithstanding any provision of the Act or this Agreement (including, without limitation, Section 2.5 hereof) to the contrary.

**5.6    Conditions of Transfer.** No transfer of a Membership Interest shall be permitted under this Section 5 unless each of the following conditions has been satisfied; *provided*, that the Managers may waive such condition in their sole and absolute discretion; and *provided further*, that the conditions described in Sections 5.6.2 and 5.6.3 hereof shall not apply to a transfer described in Section 5.5 hereof:

**5.6.1**    the transferor or transferee shall give written notice of such transfer to the Company and provide the Company with the name, address, and taxpayer identification number of the transferee and such other information as the Managers shall request to prepare tax returns and other filings reflecting such transfer as are required by the Act or otherwise;

27

**5.6.2**    the transferor or transferee shall furnish the Company with an opinion of counsel in form and substance satisfactory to the Managers and counsel for the Company to the effect that such transfer will not result in a termination of the Company under section 708(b)(1)(B) of the Code;

**5.6.3**    the transferor or transferee shall deliver to the Company an opinion of counsel in form and substance satisfactory to the Managers and counsel for the Company to the effect that the transfer of such Membership Interest may be made without violating federal or state securities laws;

**5.6.4**    the transferor and/or transferee shall be jointly and severally responsible for, and shall reimburse the Company for, all costs and expenses related to such transfer; and

**5.6.5**    the transferee shall execute any documents as the Managers may request to prepare tax returns and other filings reflecting such transfer as are required by the Act or otherwise.

**5.7    Manner of Purchase.**  Where the Company purchases a Unit or Unit(s) of a Member pursuant to Sections 5.4.2 or 5.5.2(a) hereof, the Company shall effect such purchase under such terms and conditions as the Managers shall determine, subject to the following provisions:

**5.7.1    Purchase Price.**  The purchase price shall equal the Capital Account balance attributable to such Unit(s) as of the beginning of the Fiscal Year in which the Company gives notice of its election to purchase such Unit(s), taking into account allocations and distributions under Section 3 hereof up to the closing date described in Section 5.7.2 hereof; *provided*, that if the Capital Account so determined shall be zero (0) or less, the purchase price shall be One and 00/100 Dollars ($1.00).

**5.7.2    Closing Date.**  The closing date of such purchase shall be no later than sixty (60) days after the Company gives notice of its election to purchase such Unit(s).

**5.7.3    Manner of Payment.**  The purchase price shall, at the option of the Managers, be paid by cashier's or certified check on the closing date.

**5.8    Admission as Member**

**5.8.1    Rights of Assignee.**  A permitted transferee of a Membership Interest under Sections 5.3, 5.4 or 5.5 hereof, unless and until such person shall have been admitted as a Member of the Company pursuant to Section 5.8.2 hereof, shall have no right to require any information or account of the Company transactions except as provided in Sections 7.1.2(a) and 7.3.1 hereof; to inspect the Company books; or to vote on any of the matters as to which a Member would be entitled to vote pursuant to this Agreement, and shall be entitled only to receive the distributions and allocations to which the transferor would otherwise be entitled.

**5.8.2    Admission as Member.**  A permitted transferee shall be admitted as a Member of the Company upon satisfaction of the following conditions:

**(a)    Notice.**  Such transferee has given notice to the Company that it wishes to be admitted as a Member of the Company.

**(b)    Consent.**  A Majority in Interest of the Members (excluding the transferor with respect to such transferee) consents to the admission of such transferee as a Member of the Company.

(i)    **Discretion.**  A Member may give or withhold such consent in such Member's sole and absolute discretion.

(ii)    **Manner of Consent.** The Managers shall, along with each report described in Section 7.2 hereof, submit to the Members a list of transferees with respect to which it has received a notice described in Section 5.8.2(a) has been received by the Company during such quarter. The manner of voting shall be governed by Section 4.7.2(e) hereof.

(c)    **Execution of Agreement.** Such transferee executes a copy of this Agreement along with an express statement that it agrees to be bound by the terms and conditions of this Agreement, and executes any other documents as the Managers may request to prepare tax returns and other filings reflecting such transfer as are required by the Act or otherwise.

Such transferee shall then be deemed a Member from and after the date it complies with paragraph (c) of this Section 5.8.2. Nothing in this Section 5.8.2 shall be deemed to modify the right of the Managers to cause additional Units to be issued without the consent of the Members pursuant to Section 2.2.2 hereof.

## 6.    DISSOLUTION

6.1    **Events of Dissolution.**  The Company shall be dissolved upon the occurrence of any of the following events:

6.1.1    the vote by a Majority in Interest of the Managers and of a Majority in Interest of the Members other than Managers to dissolve the Company;

6.1.2    a Terminating Capital Event;

6.1.3    a Termination Event with respect to any Member, unless a Majority in Interest of the remaining Members elect to continue the business of the Company within ninety (90) days of the occurrence of such event and, if necessary, admit or designate one or more new Managers; or

6.1.4    the end of the term of the Company as set forth in Section 1.4 hereof.

A Member's execution of a Signature Page shall constitute such Member's consent to continue the business of the Company under Section 6.1.3 hereof after a Termination Event with respect to another Member unless and until such Member shall revoke such consent pursuant to a notice to the Company which notice shall specifically reference this Section 6.1.

6.2    **Liquidation.**  Upon the occurrence of an event of dissolution as described in Section 6.1 hereof, the Managers (or, if there is no Manager, such other party as shall be designated by a Majority in Interest of the Members) shall take full account of the Company's assets and liabilities, shall collect the receivables of the Company, and shall liquidate the Company's assets as promptly as is consistent with obtaining the fair market value thereof. Upon dissolution, the Company shall engage in no further business other than that necessary to collect its receivables and to liquidate its assets. The proceeds from the liquidation of Company assets and collection of Company receivables, together with assets distributed in kind, shall, to the extent sufficient therefore, be applied and distributed in the following order:

6.2.1    first, to the expenses of liquidation, including brokerage commissions from the sale of Company assets, escrow costs, accounting and legal fees, and other expenses;

6.2.2    second, to the liabilities and obligations of the Company to its creditors (including any Member that may have made a loan or advance to the Company);

6.2.3    third, to the creation or increase of any Reserves; and

6.2.4    fourth, to the Members in proportion to the positive balances of their Capital Accounts after taking into effect all allocations under Section 3 hereof.

Amounts distributed under Section 6.2.4 hereof shall be made within the Fiscal Year of the Company in which the liquidation of the Company (within the meaning of section 1.704-1(b)(2)(ii)(g) of the Regulations) is deemed to occur or, if later, ninety (90) days after such date of liquidation.

**6.3    Termination Upon Liquidation.** Upon completion of the dissolution, winding up, liquidation and distribution of the Company assets and liquidation proceeds, the Company shall terminate and the Managers shall file or cause to be filed with all appropriate governmental authorities a Certificate of Cancellation as required by the Act.

## 7.    FINANCIAL MATTERS

**7.1    Books and Records.** The books and records of, and other information pertaining to, the Company shall be available for inspection, audit, and copying by any Member or such Member's representative during normal business hours at the principal office(s) of the Company set forth in Section 1.2 hereof.

**7.1.1    Minimum Books and Records Required.** The books, records and other information described in this Section 7.1 shall include at least the following: (a) a current list of the full name and last known business or residence address of each Member, together with the contribution and share in profits and losses of each Member; (b) a copy of the Articles and all amendments thereto, and executed copies of any powers of attorney pursuant to which any such instrument has been executed; (c) copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six (6) most recent Fiscal Years; (d) copies of this Agreement and all amendments thereto; (e) financial statements of the Company for the six (6) most recent Fiscal Years; and (f) the Company's books and records for the current and past three (3) Fiscal Years.

**7.1.2    Delivery to Members and Inspection**

(a)    **Delivery Upon Request.** Upon the request of a Member or an Assignee, the Company shall promptly deliver to the requesting person, at the expense of the Company, a copy of the information required to be maintained by Sections 7.1.1(a), (b) or (d) hereof.

(b)    **Inspection.** Each Member or such Member's representative has the right, upon reasonable request, to inspect and copy at such Member's expense during normal business hours any of the Partnership records required to be maintained under Section 7.1.1 hereof.

**7.2    Reports to Members.** Within one hundred twenty (120) days after the close of each Fiscal Year, the Company shall deliver to each Member a financial report containing a balance sheet as of the end of the Fiscal Year, and an income statement and statement of changes in financial position for the Fiscal Year. The financial statements shall be accompanied by a report, if any, from the independent accountant engaged by the Company (or, if there is no report, the financial statement shall be accompanied by the

certificate of the Managers stating that the financial statements were prepared without audit from the books and records of the Company).

7.3    **Tax Information and Elections**

      7.3.1    **Returns and Information Statements.** The Managers shall cause income tax returns for the Company to be prepared and filed with all appropriate governmental authorities, and corresponding schedules to be distributed to the Members and Assignees, no later than seventy-five (75) days after the end of each Fiscal Year.

      7.3.2    **Elections.** The Managers shall from time to time make such tax elections with respect to the Company as the Managers deem necessary or desirable (including, without limitation, an election to be treated as a partnership and not as an association taxable as a corporation for income tax purposes and an election pursuant to section 754 of the Code to adjust the basis of the Company's assets pursuant to sections 734(b) and 743(b) of the Code to reflect the Capital Contribution of any Member that may be admitted to the Company or distributions to any withdrawing Members).

      7.3.3    **Tax Matters Partner.** The Managers shall designate from time to time which among them shall serve as the tax matters partner of the Company within the meaning of section 6321(a)(7) of the Code. Anson is hereby designated the initial tax matters partner.

7.4    **Fiscal Year.** The fiscal year of the Company shall be the calendar year (the "Fiscal Year").

7.5    **Accounting Method.** The Company shall use the accrual method of accounting.

8.    **GENERAL PROVISIONS**

8.1    **Special Power of Attorney**

      8.1.1    **Attorney–in–Fact.** Each Member grants to each Manager a special power of attorney irrevocably making, constituting and appointing such Manager as the Member's attorney–in–fact, with full power of substitution and resubstitution and with full legal power and authority to act in the name, place and stead of such Member to make, execute, deliver, acknowledge, publish, file and record, and swear to the execution, delivery, acknowledgment and filing and recording of, such documents as are necessary or appropriate to the conduct of the Company and its business, including, without limitation, the following:

      **(a)**    the Articles, this Agreement and any amendment to the Articles or this Agreement, which, under the laws of the State of California or the laws of any other state, are required to be filed, or which the Managers elect to file;

      **(b)**    any certificates, counterparts, instruments and documents and any amendments thereto (including, without limitation, fictitious business name statements) as may be required by or appropriate under the laws of the State of California or of any jurisdiction in which the Company does business or intends to do business;

      **(c)**    any other instrument or document required to be filed by the Company under the laws of any state or by any governmental agency, or which the Managers elect to file; and

      **(d)**    any instrument or document that may be required to effect the continuation of this Company, the admission of an additional or substituted Member or the dissolution and termination

of the Company (provided that the continuation, admission or dissolution and termination are in accordance with the terms of this Agreement), or to reflect any reduction in amount of the Members' Capital Contributions or Capital Accounts.

        8.1.2   **Special Provisions.** The special power of attorney being granted by each Member (a) is a special power of attorney coupled with an interest, (b) is irrevocable, (c) shall survive the transfer of Units by the granting Member, and (d) is limited to the matters set forth in Section 8.1 hereof.

        8.1.3   **Signatures.** A Manager may exercise the special power of attorney on behalf of each Member by a facsimile signature of such Manager or one of such Manager's officers or agents, or by the signature of such Manager or one of such Manager's officers or agents acting as an attorney–in–fact for all of the Members.

        8.1.4   **Waiver.** Each Member hereby agrees to be bound by any and all of the representations of such Member's attorney-in-fact under this Section 8.1 and waives any and all defenses that may be available to such Member to contest, negate or disaffirm the actions of such attorney-in-fact under this Section 8.1, and hereby ratifies and affirms any and all acts that such attorney-in-fact may take as attorney-in-fact hereunder in all respects as though performed by such Member.

        8.2     **Complete Agreement.** This Agreement and any documents referred to herein or executed contemporaneously herewith constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof.

        8.3     **Amendments.** Except as expressly provided otherwise in this Section 8.3, this Agreement may be amended only with the written consent of a Majority in Interest of the Members. Amendments of this Agreement may be proposed by the Managers or by Members owning Units representing more then ten percent (10%) of the Percentage Interests of all Members.

        8.3.1   **Super-Majority Provisions.** Any provision of this Agreement that requires the consent of more Members than a Majority in Interest of the Members may be amended only by whatever vote of the Members is necessary under the provision proposed to be amended.

        8.3.2   **Amendments Affecting Certain Members.** Except as provided in Section 2.2.2 hereof, any amendment affecting a Member's voting rights under this Agreement, transfer rights under Section 5 hereof, or allocations and distributions under Section 3 hereof must also be signed by the Member so affected.

        8.3.3   **Amendments Without Consent of Other Members.** Amendments may be made to this Agreement from time to time by the Managers without the consent of any other Member (a) to conform the allocation and distribution sections of this Agreement to changes in the Code and Regulations; (b) to add to the representations, duties or obligations of the Managers, or to surrender any right or power granted to the Managers herein, for the benefit of the other Members; (c) to correct any error or resolve any ambiguity in or inconsistency among any of the provisions hereof, or to make any other provision with respect to matters or questions arising under this Agreement that is not inconsistent with the provisions of this Agreement; (d) to delete or add any provision of this Agreement required to be so deleted or added by any state securities commission or similar governmental authority for the benefit or protection of the other Members; (e) to add to or change the name of the Company, if such addition or change is necessary to protect the limited liability of the Members or to comply with applicable federal or state law or the rules or regulations of any governmental agency; (f) to determine a suitable replacement for the Index pursuant to

Section 1.6.18 hereof; or (g) to permit the Company to issue additional Units from existing or new Classes as provided in Section 2.2.2 hereof; *provided, however,* that no amendment shall be adopted pursuant to this Section 8.3.3 unless the Company gives notice of such amendments to the Members and, in the good faith determination of the Managers, the adoption of such amendments (i) is for the benefit of or not adverse to the interest of the other Members, will enhance the Company's ability to raise or retain capital, or will otherwise further the interests and purposes of the Company; (ii) except as provided in clauses (a) and (g) above, does not affect any distributions or allocations among the Members, and (iii) does not affect the limited liability of the Members or the status of this Company as a partnership for income tax purposes.

    **8.4**    **Notice.**  Whenever this Agreement requires that notice be given to the Company, the Manager or a Members, such notice shall be given to such person at the address set forth below (or such other address as shall be communicated by such person to the Company pursuant to this Section 8.4), as follows: by personal delivery, in which case the person shall be deemed to have received such notice on the date of delivery; by certified mail, return receipt requested, in which case the person shall be deemed to have received such notice three (3) days after deposit of such notice in the mail; by overnight delivery service, in which case the person shall be deemed to have received such notice the day after deposit of such notice with such service; or by facsimile with a copy of such notice sent by certified mail, return receipt requested, in which case the person shall be deemed to have received such notice on the day of the facsimile transmission as set forth in a facsimile log. The initial addresses for notice for the Company and the Class A Members are as follows:

If to the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Four Star Financial Services, LLC
11755 Wilshire Boulevard
Suite 2150
Los Angeles, California 90025
(310) 478-5535 (facsimile)


and

Four Star Financial Services, LLC
601 Gateway Boulevard
Suite 260
South San Francisco, California 94080
(415) 871-9503 (facsimile)

If to Anson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . c/o Anson, Garrett & Co.
11755 Wilshire Boulevard
Suite 2150
Los Angeles, California 90025
(310) 478-5535 (facsimile)

If to Cohn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 601 Gateway Boulevard
Suite 260
South San Francisco, California 94080
(415) 871-9503 (facsimile)

If to Garrett ............................................................. c/o Anson, Garrett & Co.
11755 Wilshire Boulevard
Suite 2150
Los Angeles, California 90025
(310) 478-5535 (facsimile)

The initial address for notice purposes of any other Member shall be as set forth on Annex B of the Subscription Agreement executed by such Member.

    8.5    **Arbitration.**  Any and all controversies, claims or disputes in any way concerning the negotiation for, execution, interpretation, performance or breach of this Agreement shall be determined, at the request of any party to this Agreement, by final and binding arbitration conducted in Los Angeles, California under and in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and a final judgment embodying any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof.

        8.5.1    **Selection of Arbitrators.**  The parties shall select three (3) arbitrators pursuant to the above-referenced AAA rules to hear and decide the dispute, unless the dispute involves less than One Hundred Thousand and 00/100 Dollars ($100,000), in which case the parties shall select one (1) arbitrator. At least one of the arbitrators selected for a three-person panel and any single arbitrator must be an attorney with at least five (5) years of experience in general business law.

        8.5.2    **Discovery.**  The provisions of section 1283.05 of the California Code of Civil Procedure or its successor section(s) are expressly incorporated in and made a part of this Agreement. However, the limitation on depositions set forth in section 1283.05(e) of the California Code of Civil Procedure is not.

        8.5.3    **Powers of Arbitrators.**  In addition to all powers given to arbitrators under the above-referenced AAA rules and/or statutes and case law, the arbitrators selected hereunder shall have the power to give such directions and to make such orders in the matters so referred to them as they deem just and reasonable and shall specifically have the power, notwithstanding any judicial opinions to the contrary, to award any remedy or relief which they deem just, equitable and within the scope, meaning and intent of this Agreement. The arbitrators shall not, however, have the power to negate, add to or modify the terms of this Agreement.

        8.5.4    **Attorneys' Fees and Costs.**  The arbitrators shall determine in their award which party is the "prevailing party" in the arbitration and shall award that party its reasonable attorneys' fees and costs (including its share of the arbitrators' fees, and AAA charges and its reasonable expert witness fees).

        8.5.5    **Time Limits; Reasoned Opinion.**  Unless the time is extended by stipulation of the parties or by order of the arbitrators made for good cause shown, the arbitrators shall render their award not later than one hundred and eighty (180) days from the date of their appointment. The award shall be in writing and shall set forth the reason for the arbitrators' decision on each issue in sufficient detail so as to enable the parties to understand the factual and legal base for the decision.

    8.6    **Additional Documents.**  Each party hereto agrees to execute any and all further documents and writings and to perform such other actions which may be or become necessary or expedient to effectuate and carry out this Agreement.

34

**8.7    Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns. Nothing in this Section 8.7 shall be deemed to modify in any way the prohibition on transfer contained in Section 5 hereof.

**8.8    Governing Law.** This Agreement shall be governed by the laws of the State of California, regardless of the choice of law provisions of California or any other jurisdiction and regardless of where the parties hereto may now or hereafter reside, be organized or do business.

**8.9    Exhibits.** All exhibits attached hereto are hereby incorporated in and made a part of this Agreement as if fully set forth herein.

**8.10    Headings; Gender.** The headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, or interpret the scope of this Agreement or of any particular section hereof. As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so indicates.

**8.11    Severability.** The validity, legality or enforceability of the remainder of this Agreement shall not be affected even if one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable in any respect.

**8.12    Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

/S/ RONALD I. ANSON
Ronald I. Anson

/S/ MARK F. COHN
Mark F. Cohn

/S/ JACK E. GARRETT
Jack E. Garrett

35

## SIGNATURE PAGE
## FOUR STAR FINANCIAL SERVICES, LLC,
### A California limited liability company

This page constitutes a Signature Page to the Operating Agreement of Four Star Financial Services. LLC, a California limited liability company, as the same may be amended from time to time (the "Agreement").

The undersigned, a Member of Four Star Financial Services, LLC (the "Company") and a party to the Agreement, hereby consents to the adoption of the Agreement and agrees to be bound by all of the terms and conditions thereof, and consents to the continuation of the business of the Company upon a Termination Event (as defined in the Agreement) with respect to another Member pursuant to Section 6.1.3 of the Agreement, unless and until the undersigned shall revoke such consent in the manner set forth in Section 6.1 of the Agreement.

EXECUTED as of _____, 199__

*If subscriber is an individual:*                    *If subscriber is an entity:*

_____               _____
Signature                                                    Name of entity (please print)

_____               By_____
Name (please print)                                      Signature

                                                              _____
                                                              Name (please print)

                                                              _____
                                                              Title (please print)

*If subscribers are joint tenants, tenants-in-common or husband and wife as community property, both persons must sign:*

_____               _____
Signature                                                    Signature

_____               _____
Name (please print)                                      Name (please print)

Ownership, issuance, transfer, encumbrance, attachment, hypothecation and any other disposition (including by operation of law or other legal process) of the Membership Interest represented by this Signature Page are restricted by and subject to the provisions of the Agreement, which is available for inspection at the principal office of the Company. Any transfer or disposition in violation of the Agreement is null and void. The Agreement is automatically binding upon any person who acquires this Membership Interest in the Company.

THE SECURITIES REPRESENTED BY THE AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAW. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED OR REGISTERED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THE AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.



## State of California

**SECRETARY OF STATE**

I, *Kevin Shelley*, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___2___ page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.

*IN WITNESS WHEREOF*, I execute this certificate and affix the Great Seal of the State of California this day of

APR 1 4 2003



Secretary of State

Sec/State Form CE-108 (rev 1/03)

QSP 03 74671



# State of California
## Bill Jones
## Secretary of State

**LLC-1**

### LIMITED LIABILITY COMPANY
### ARTICLES OF ORGANIZATION

**IMPORTANT- Read the instructions before completing the form.**
This document is presented for filing pursuant to Section 17050 of the California Corporations Code.

---

1. Limited liability company name:
   (End the name with "LLC" or "Limited Liability Company". No periods between the letters in "LLC". "Limited" and "Company" may be abbreviated to "Ltd." and "Co.")

   **Animation Holdings, LLC**

2. Latest date (month/day/year) on which the limited liability company is to dissolve:
   **DECEMBER 31, 2096**

3. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act.

4. Enter the name of initial agent for service of process and check the appropriate provision below:

   **C T CORPORATION SYSTEM**                                    , which is

   [ ]  an individual residing in California. Proceed to Item 5.

   [X]  a corporation which has filed a certificate pursuant to Section 1505 of the California Corporations Code. Skip Item 5 and proceed to Item 6.

5. If the initial agent for service of process is an individual, enter a business or residential street address in California:

   Street address:

   City:                                State: **CALIFORNIA**                Zip Code:

6. The limited liability company will be managed by: (check one)

   [ ] one manager          [ ] more than one manager          [X] limited liability company members

7. If other matters are to be included in the Articles of Organization attach one or more separate pages.
   Number of pages attached, if any:

---

8. It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

   _Dana Z. Pierson_
   Signature of organizer

   Dana L. Pierson, Secretary
   900 Capital Services, Inc. (Member)

   Type or print name of organizer

   Date: __10/10__, 19 __97__

**For Secretary of State Use**

101997294042

**FILED**
In the office of the Secretary of State
of the State of California

**OCT 2 1 1997**

_Bill Jones_

**BILL JONES, Secretary of State**

---

LLC-1
Filing Fee $70          Approved by the Secretary of State
                        2/96

(CALIF. - LLC 3460 - 2/7/96)



# State of California
# Bill Jones
## Secretary of State

### LIMITED LIABILITY COMPANY
### CERTIFICATE OF AMENDMENT

**A $30.00 filing fee must accompany this form**
**IMPORTANT - Read instructions before completing this form**

**FILED**
In the office of the Secretary of State
of the State of California

**MAY 0 6 1998**

*Bill Jones*
BILL JONES, Secretary of State

This Space For Filing Use Only

---

1. Limited Liability Company Name:

   Animation Holdings, LLC

2. Secretary of State File number: 101997291042

3. Enter only the information in the Articles of Organization (LLC-1) amended by filing this Certificate of Amendment (LLC-2). Provide the text of the amendment adopted using the space provided and/or attaching one or more separate pages.

   A. Amendment to text of the Articles of Organization:


   B. Limited Liability Company Name: Community Benefit Alliance, LLC

   C. Latest date on which the limited liability company is to dissolve: (Month/Day/Year) _____

   D. The Limited Liability Company will be managed by (Check One):

      [ ] One Manager      [ ] More Than One Manager      [ ] Limited Liability Company Members

   E. Any change in the events that will cause dissolution of the Limited Liability Company.

4. Number of pages attached, if any:

5. It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

   _____          Mark F. Cohn, Member
   Signature of authorized person            Type or print name and title of authorized person

   Date: May 4, 1998

6. RETURN TO:

   NAME         Community Benefit Alliance, LLC
   FIRM         601 Gateway Blvd., Ste. 260
   ADDRESS      So. San Francisco, CA 94080
   CITY/STATE   Attn. Dana Pierson
   ZIP CODE



COMMUNITY BENEFIT ALLIANCE, LLC

# AMENDED AND RESTATED
# ANIMATION HOLDINGS, LLC
# OPERATING AGREEMENT

THIS AGREEMENT, dated the 1ST day of January, 1998, is entered into by and among 900 Capital Services, Inc. (hereinafter "900 Capital"), Mark F. Cohn (hereinafter "Cohn"), Ward Leber (hereinafter "Leber" or "Member"), Four Star Financial Services, LLC (hereinafter "Four Star" or "Member")   The Members when referred to collectively shall be referred as the "Members."

IN CONSIDERATION of the mutual covenants and agreements hereinafter set forth, the parties hereby amend that certain Operating Agreement heretofore made by the parties as of the 10th day of October, 1997 as follows.

## WITNESSETH:

1        1 1  Formation    Four Star Financial Services, LLC has been duly formed as a Limited Liability Company ("The Company") pursuant to the laws of the State of California and pursuant to the California Limited Liability Company Act.  The business of the Company shall continue to be conducted under the name "Animation Holdings, LLC"  The Company shall conduct its business as a member managed limited liability company.

1.2   Statement of Intent.   It is the intent of the Members that this Company be created pursuant to the provisions of I.R.C  Revenue Procedure 95-10, in order that the Company may be considered a partnership for federal income tax purposes. If any provision of this Agreement results in a contrary result, such provision shall be considered null and void, with the remaining provisions remaining in full force and effect.

2.    Place of Business.   The principal place of business of the Company shall be at 601 Gateway Boulevard, Suite 260, South San Francisco, California  94080, or such other place as may be from time to time designated in writing. The Company may also maintain such other offices as it may deem advisable.

3.    Registered Office and Registered Agent.    CT Corporation Systems, San Francisco, CA.

4.    Term of Existence    The term of the Company shall be until December 31, 2096, unless sooner terminated.

5   Purpose and Business of the Company    The purposes of the company are to engage in the business of owning and marketing animation related products

6    Members

6.1    Interests.   An interest of a Member in the Company is personal property; no Member has any specific interest in the property of the Company.  The initial members of

the Company, 900 Capital and Cohn, are hereby removed as Members. The following are the new Members: Four Star Financial Services, LLC (hereinafter "Four Star") and Ward Leber (hereinafter "Leber") with interests as follows:

> 6.1.1. Four Star has a fifty percent (50%) interest in the Company
> 6.1.2. Leber has a fifty percent (50%) interest in the Company.

Four Star contributes all of its cel art and related rights as more particularly described in Exhibit "A" hereto, and receives therefore.

> a) promissory note in the amount of nineteen million dollars ($19,000,000); and
> b) a fifty percent (50%) interest in the company.

The terms of this promissory note are as set forth in Exhibit "B" hereto

Ward Leber contributes all of his interest in Home Safety School, both tangible and intangible and receives therefore.

> a) promissory note in the amount of four million five hundred thousand dollars ($4,500,000); and
> b) a fifty percent (50%) interest in the company

The terms of this promissory note are as set forth in Exhibit "C" hereto

        6 2    **Profits and Losses**.  Items of income, gain, loss, deduction, and credit shall be allocated in accordance with the percentage interests held by each member provided however that, prior to payments of any profits to any partner, the New Loans as referenced herein shall be repaid in full with all accrued and unpaid interests. Thereafter, the promissory notes referenced in section 6.1 hereof shall be retired pro-rata as to their amounts.

        6 3    **Distributions**.    Subject to the other provisions of this Agreement, distributions shall be made to Members based upon a Member's interest in the Company. Distributions shall not be allowed if such distributions result in liabilities of the Company, with the exception of those liabilities to members (including return of capital contributions), and recourse liabilities, in excess of the fair market value of the Company's assets. If any Member shall knowingly receive a distribution under such circumstances, the Company has the right to receive the return of such distribution for a period of three years from the date said distribution is made.

        6.4    **Profit**.  For purposes of this paragraph 6.4, "profit" is defined as gross income less expenses deductible for federal income tax purposes.

        6.5    **Access to Information**.  Any Member shall have free access to the books and records of the Company such that such Member may review such books and records at any time without notice to any other Member or to the Manager of the Company.

    7.    **Management**.

        7.1    **Structure of Management**.  There will be two (2) Directors. One director shall be selected by Four Star and one Director shall be selected by Leber. The management of the company shall be effected by officers who shall be elected by a majority (as defined in Paragraph 14.8) of the Members subject to the provisions and limitations referenced in this

letter.  Officers shall serve until they resign or by termination by a majority of the Members.
Officers may also be Members.

7.1.1 **Offices**.    Offices created shall be President. Executive Vice
President, Chief Operating Officer, Chief Executive Officer, and Secretary or as otherwise
determined by the Directors.  Initially, the officers shall be as follows:

| | |
|---|---|
| President | Mark Cohn |
| Executive Vice President | Ward Leber |
| Treasurer | Jack Garrett |
| Secretary | Dana Pierson |

7 1.2   **President**.   The President shall be the principal executive officer
and shall in general supervise and control all of the business and affairs of the Company   He or
she shall preside at all meetings of the Members.  The President shall have authority. subject to
such rules as may be  prescribed by the Members. to appoint such agents and employees of
the Company as he or she shall deem necessary, to prescribe their powers, duties and
compensation. and to delegate authority to them.  Such agents and employees shall hold office
at the discretion of the President.   The President shall have authority to sign, execute, and
acknowledge on behalf of the Company  all deeds. mortgages. bonds. stock certificates.
contracts, leases, reports. and all other documents or instruments necessary or proper to be
executed in the course of the Company's regular business. or which shall be authorized by
resoltuion of the Members; and. except as otherwise provided by law of the Members, the
President may authorize any Vice President or other officer or agent of the Company to sign,
execute, and acknowledge such documents or instruments in his or her place and stead.  In
general, he shall perform all duties incident to the office of President and such other duties as
may be prescribed by the Members from time to time.  The President hereby delegates all
duties in his absence to the Executive Vice President.

7 1.3   **Executive Vice President**.   The Executive Vice President shall
perform all of the President's  duties in the absence of the President.   The President may
designate either orally or in writing that the Executive Vice President is acting on the President's
behalf.  In addition. the Executive Vice President shall peform all duties incident to the office of
Executive Vice President and such other duties as may be prescribed by the Members from
time to time, including the daily management of all internal business operations of the Company
and to take other such action and perform such other acts as may be necessary and desirable
for  the  conduct of  Company  busines  or  effect  any  powers  accorded  to  a  Limited  Liability
Company pursuant to California law.  All employees of the Company shall report directly or
indirectly. to the Executive Vice President.

7.1.4   **Secretary**.    The Secretary shall: (a) keep the minutes of any
meetings of the Members or the Officers in one or more books provided for that purpose; (b)
see that all notices are duly given in accordance with the provisions of this Agreement as
required by law; (c) be custodian of the records; (d) keep or arrange for the keeping of a
register of the post office address of each member which shall be furnished to the Secretary by
such member; (e) have general charge of the interest transfer books of the Company; and (f) in
general, perform all duties incident to the office of Secretary and have such other duties and
exercise such authority as from time to time may be delegated or assigned to him or her by the
President or by the Members.

Amended & Restated
Animation Holdings. LLC Agreement                                                3

7.2   **Member Consent**.   Notwithstanding the foregoing delegations of powers to officers, the following actions shall require majority consent in writing of all Members of the Company:

a)   Authorization of initial funding of any investments;

b)   Approval of disbursement of funds exceeding one thousand dollars ($1,000), except compensation of officers or other employees as agreed to in any separate employment agreement;

c)   Authorization of any Officer to perform outside consulting work.

7.3   Compensation.

7.3.1   Officers.   No officer or director shall receive a salary without prior approval of the Members.

8   **Limited Liability**   No Member or Manager or Officer of the company shall be personally liable for the Company's obligations solely by reason of being a Member, Manager, or Officer.

8.1   No Member shall take part in the control of Company business or transact any business on behalf of the Company, in such Members capacity as a Member, except as set forth herein.

8.2   If a Member receives the return of any part of the Member's contribution without violation of the Agreement, a Member is liable to the Company for the period of one (1) year thereafter for the amount of the returned contribution, but only to the extent necessary to discharge the Company's liabilities to creditors who extended credit to the Company during the period the contribution was held by the Company.

8.3   Each Member shall not be liable for the general obligations of the Company.  However, if a Member acts in such a way that persons who transact business with the Company reasonably believe, based upon the Member's conduct, that the Member is acting as the Manager or an Officer, then such Member shall be held liable in obligations only to those persons who reasonably believe the Member to be the Manager or an Officer of the Company.

8.4   **Limited Distributions**.   No salaries shall be paid to any Member in such Member's capacity as a Member, nor shall any Member have a drawing account.  No Member shall be entitled to the return of such Member's Capital Contribution, except to the extent that distributions made pursuant to this Agreement may be considered as such by law and except upon termination of the Company as provided in this Agreement.  No Member shall be entitled to receive interest on his Capital Contribution except that 900 Capital shall be entitled to the interest in its Loan to the Company.

9.   Assignment by Members.

9.1   Generally.   Provided that such action is in compliance with applicable state or federal securities laws and any other applicable laws and other agreements to which the Company is a party or by which the Company or any Company property may be bound or

subject, but only upon approval by the Manager and all remaining Members, a Member may assign, hypothecate, or transfer all or part of the Interest thereof, to become effective as of such assignment, hypothecation, or transfer is executed. Such assignment, hypothecation, or transfer shall not release the Member transferring an Interest from the obligations under this Agreement, nor shall it constitute the transferee a substitute Member; such transaction shall be an economic assignment as defined herein. The assignee may become a Member when the assignee delivers to the Manager: (i) a counterpart of this Agreement executed by the assignee whereby the assignee evidences the intention to become a Member, and to be bound by the provisions of this Agreement; and (ii) an opinion of legal counsel acceptable to the Manager that the proposed transfer does not violate applicable state or federal securities laws and any other applicable laws and (iii) upon written approval of the Manager and all remaining Members. In any event, any release of any Member transferring an Interest under this Agreement shall be subject to the provisions of California Limited Liability Company Act.

      9.2    Limitations.   Except as provided in this Agreement, no assignment, hypothecation, or transfer of all or any part of any Interest (including, without limitation, any rights to income or other attributes of any Interest) shall be made by any of the Members and the Company will not recognize any such attempt. No additional interests in Company capital and profits will be issued by the Company, if, in the opinion of counsel to the Company, when added to the total of all interests in Company capital and profits sold, exchanged, or issued within a period of twelve consecutive months prior thereto, such sale, exchange, or issuance could result in the Company's not being taxed as a Partnership, or the Company's being terminated for tax purposes under the Internal Revenue Code.

      9.3    Economic Assignment.   An assignee who does not become a substitute Member as provided herein has no right to require any information or accounting for Company transactions, to inspect the Company books, to seek judicial dissolution, to receive allocations and distributions the assignor may otherwise have received, or to exercise any voting or consensual rights, all of which shall be recognized by the Company as rights solely of the assignor.

      9.4    Payment After Assignment.   The Company shall, after the effective date of any assignment, hypothecation, or transfer in accordance with Section 9.1, make all further allocations and distributions in respect of the Interest so assigned, to the assignee from the date such Interest is transferred on the books of the Company after compliance with the foregoing provisions.

      9.5    Accountability to Assignees.   No assignment, hypothecation, or transfer to more than one party, including assignment, hypothecation, or transfer of less than all of a Member's rights hereunder, shall require the Company to account to more than one party. The assignees or transferees shall designate in writing one party to act as their representative in all Company matters.

      9.6    Allocation.   In the event of an assignment of a Membership Interest in accordance with Section 9.1, allocation of items of Company income, gain, loss, deduction, and credit between the assignor and the assignee shall be based on the number of days in the particular year during which each such Membership Interest is held according to Company records, or on any other basis deemed reasonable by the Manager consistent with Delaware Law and Federal Income Taxation of Partnerships. Each Member shall be entitled to such

allocation of income, gain, loss, deduction, and credit in computing taxable income or tax liability to the exclusion of any other party.

10.  Dissolution and Winding Up.

10.1  General.

10.1.1 Mandatory Dissolution.    The Company shall be dissolved upon any of the following occurrences:

(a)  The filing of any bankruptcy proceeding by any Member;

(b)  The expiration date of this Agreement which is December 31, 2096;

(c)  By the written consent of all Members;

(d)  Entry of a decree of judicial dissolution upon application by or for any Member or Manager.

10.2  Withdrawal of Members.    A Member may withdraw or shall be deemed withdrawn from the Company upon the following circumstances: Retirement, death, adjudication of incapacity, bankruptcy (as determined by the commencement of the filing of bankruptcy proceedings), dissolution, or liquidation. Any voluntary withdrawal by a Member shall be effective upon such Member providing to the Manager in writing notice of such member's withdrawal 90 days before the date of such Member's planned withdrawal date. The withdrawal of any Member, whether voluntary or involuntary, or the transfer of a Member's interest in the Company, shall not dissolve the Company, so long as such withdrawal or transfer does not violate the provisions set forth in Article 9 of this Agreement.

10.3  Effectiveness of Termination.    Termination shall be effective on the date on which the event occurs giving rise to the termination, but the Company shall not wind up until the assets have been distributed pursuant to this Agreement.

10.4  Distribution Upon Terms.    Upon winding up, assets shall be distributed in the following order:

a)  To creditors of the Company, including Members or Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or reasonable provision for payment thereof) other than liabilities for distributions to Members or former Members, including but not limited interim distributions and distributions upon resignations;

b)  To Members and former Members in satisfaction of liabilities of interim distributions and distributions upon resignation, including the preferred return set forth in Article 6;

c)  Return of Members contributions and subsequently respecting their interest, in proportions in which Members share in distributions.

10.5    **Allocations upon Termination.**    Upon the termination of the Company:

(a)    Company properties, or any portion of them, may be sold at the election of the Manager if a price deemed reasonable by the Manager may be obtained.

(b)    The fair market value of any Company properties that are not sold shall be determined, and the gain or loss that would have resulted had each such Company property been sold for its fair market value shall be computed.

(c)    Gain or loss realized on actual sales of Company property and the gain or loss that would have been realized on sales of unsold Company property computer as provided in (b) above, shall be allocated for federal income tax purposes among the Members as provided in Section 6.3 hereof.

(d)    The Company properties, or the proceeds from them in the event of a sale of all or a portion of them, shall be distributed as provided above in Section 10.4.

Company Properties distributed upon termination of the Company shall remain subject to such agreements, if any then in effect with respect to such Company properties.

10.6    Upon dissolution and completion of winding up a certificate of cancellation shall be filed with the Secretary of State containing:

a)    The name of the Company;

b)    The date the certificate was filed;

c)    The reason for canceling;

d)    The future effect of time of cancellation;

e)    Any other information deemed advisable at time of cancellation.

10.7 <u>Winding Up</u>.    The winding up of Company affairs and fiquidation and distribution of its assets shall be conducted exclusively by the Manager or, if the Manager is unable or unwilling to act, by a trustee named by unanimous consent of all remaining members (the "Trustee"). The Manager or the Trustee is hereby authorized to do any and all acts and things authorized by law to effect such dissolution, liquidation, and distribution of the assets of the Company.

11. <u>New Loans</u>

11.1 From time to time, Four Star, or affiliates thereof(Lender), may, at its sole discretion, loan to the Company amounts as deemed necessary by the directors. These loans are to be evidenced by a promissory note. The maturity of said advances shall be January 1, 2000. The interest rate shall be 18% per annum, compounded monthly. As stated herein, all first available cash flow shall be allocated to the repayment of this New Loan with first payments applying toward interest and fees. The loan shall be secured by the animation are referenced

Amended & Restated
Animation Holdings, LLC Agreement                                                    7

herein. The Company agrees to execute all documents required by Lender to evidence the indebtedness and/or to perfect security.

121.    Income Tax Elections.

12.1    Income Tax Election.    The Manager shall make such federal income tax elections as it deems in the interest of the Company.    Pursuant to Rev. Proc. 95-10, the Company shall be subject to income tax as a partnership.

12.2    Election upon Transfer, Death, or Distribution.    In the event of the transfer of a Company Interest, or upon the death of an individual Member, or in the event of the distribution of Company properties to any party, the Company may, upon the request of any Member and in the complete discretion of the Manager, file an election in accordance with applicable United States Treasury Regulations to cause the basis of the Company properties to be adjusted for federal income tax purposes as provided in §734 and §743 of the Internal Revenue Code.

13.    Amendment of Agreement

13 1    Amendments Requiring Consent.    This Agreement may be amended by majority vote of the Members in any way deemed necessary or desirable by such Members to satisfy any requirements, conditions, guidelines, or election pursuant to or in connection with any opinion, directive, order, ruling, or regulation of the Securities and Exchange Commission, the Internal Revenue Service, or any other federal, state, or local agency, or in connection with any federal, state, or local statute or ordinance, compliance with which the Manager deems to be in the best interests of the Company.    This Agreement, however, shall not be amended without the unanimous consent of the Members if the effect of such amendment would be to (i) change the purpose provisions set forth in Article 5; (ii) increase the liability of the Members; (iii)change the contributions required of Members; (iv) change the rights and interests in profits and losses of the Company; (v) change the rights of Members upon liquidation; (vi) amend allocations under Article 9; or (vii) amend this Article.

13.2    Prohibited Amendments.    No amendment to this Agreement shall be effective if, in the opinion of counsel to the Company, such amendment could result in the Company's not being taxed as a partnership, or the Company's being terminated for tax purposes.

14.    Further Assurances.    Each Member hereby agrees to execute and deliver to the Manager within 10 days after receipt of the Manager's written request such other and further statements of interest and holdings, designations, powers of attorney, and other instruments as the Manager deems necessary or desirable to comply with the requirements of law or administrative rule for the formation and operation of this Company.

14.1    Irrevocability of Power.    The foregoing grant of authority are hereby declared to be irrevocable, and a power coupled with an interest, and shall survive the death of the Member.

14.2    Conflicts Between Exercise of Power and this Agreement.    In the event of any conflict between the provisions of this Agreement and any document executed or filed by

Amended & Restated
Animation Holdings, LLC Agreement                                                    8

the Manager pursuant to exercise of the Power of Attorney granted herein, this Agreement shall govern.

15.    Miscellaneous.

15.1    Counterparts.    This Agreement may be executed in as many counterparts as shall be deemed necessary by the Manager, and when so executed, each such counterpart shall be as fully valid and binding on all parties as every other such counterpart.

15.2    Headings.    The headings in this Agreement are inserted for convenience and identification only and are in no way intended to limit the scope, extent, or intent of this Agreement or any provision of it.

15.3    Severability.    If any provision of this Agreement or the application of such provision to any person or circumstance is illegal or invalid for any reason whatsoever, such illegality of invalidity shall not affect the validity of the remaining terms and provisions of it.

15.4    Governing Law and Venue.    This Agreement and the application or interpretation of it shall be governed exclusively by its terms and by the laws of California without regard to its conflicts of laws provisions.    Each of the parties agrees to submit to the jurisdiction of the state and federal courts in California, in any action, claim, or other proceeding arising out of any dispute in connection with this Agreement.

15.5    Cumulative Remedies.    The rights and remedies provided by this Agreement are cumulative, and the exercise of one right or remedy by any party shall not preclude or waive its rights to use any or all other remedies.

Such rights and remedies ware given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

15.6    Books and Records.    The Company's books and records shall be maintained by the Manager at the Manager's office, or such other place as the Manager may designate by written notice to the partners and by complying with the requirements of law at the time of such change. Except as otherwise stated in this Agreement, each Member shall have access to the Company" books and records during regular business hours and may copy such records at his or her own expense. The books and records shall be kept in accordance with generally accepted accounting practices for federal income tax purposes applied on a consistent basis by the Company and shall reflect all Company transactions. The Company shall maintain its accounts on an accrual basis and shall adopt such Company tax year as the Manager may determine.

15.7    Financial Reports.    Financial statements shall be prepared by the Company on an accrual basis in accordance with generally accepted accounting principals and shall be transmitted to each of the Members within 30 days after the close of each month. Each Member has the right to have the books of the Company audited at his or her own expense.

15.8    Majority.    Unless otherwise stated in this Agreement a "majority" of the members shall refer to greater than fifty percent (50%) of the members based upon the number of members, and not upon their respective interests in the Company.

Amended & Restated
Animation Holdings, LLC Agreement                                                9

**IN WITNESS WHEREOF, the undersigned have executed this Agreement.**

**WITHDRAWING MEMBERS:**

**900 Capital Service, Inc.**

By: _Dana L. Pierson_

Its: _Secretary_

**Mark Cohn**

**MEMBERS:**

**FOUR STAR FINANCIAL SERVICES, LLC**

By: _Dana L. Pierson_

Its: _Secretary_

**WARD LEBER**

Amended & Restated
Animation Holdings. LLC Agreement

10

# ANIMATION HOLDINGS, LLC
## OWNERSHIP STRUCTURE

Four Star Financial Services - 50%

Ward Leber - 50%

28447

# AMENDMENT TO
## THE AMENDED AND RESTATED OPERATING AGREEMENT FOR
## ANIMATION HOLDINGS, LLC

THIS AGREEMENT (the "Amendment") is entered into for the purposes of amending and modifying the terms of the Amended and Restated Operating Agreement for Animation Holdings, LLC, of January 1, 1998, which Agreement is herein referred to as the "Operating Agreement". The effective date of the Amendment shall be March 1, 1998.

1.      Section 6.1 of the Operating Agreement referenced certain Promissory Notes, one being for an original face amount of nineteen million dollars ($19,000,000.) payable to Four Star Financial Services, LLC ("Four Star"), and the other being for an original face amount of four point five million dollars ($4,500,000.) payable to Ward Leber ("Leber") or his order.  Collectively these Promissory Notes are referenced herein as the "Notes"

2.      Leber and Four Star each agree to reduce the amount of their Note indebtedness by two million dollars ($2,000,000.) apiece.  In consideration therefore, each Leber and Four Star are hereby issued two million dollars ($2,000,000) in face amount of Class B membership units in Animation Holdings, LLC (the "Company").

3       Class B units shall be described as follows.  they shall represent equity membership interests in the Company   They shall carry no voting rights whatsoever. After payment of any required debt service of the Company, Class B unit holders shall be entitled to receive a thirteen percent (13%) annualized, cumulative yield against the stated face amount of said units payable out of available cash flow out of the Company, which payment shall be made prior to any distributions to other membership interests.  The subject cumulative yield shall commence as of the effective date hereof.

4       Currently there is one other class membership of the Company   This class membership will hereinafter be known as the "Class A" units.

5       To the extent that it is determined that the Company be liquidated or, to the extent that the Company sells twenty-five percent (25%) or more of its assets, the Class B units shall be redeemed by the Company out of cash so made available for their face amount plus any applicable cumulative yields. This redemption out of sales proceeds shall be made prior to any distributions to Class A members.  However, these distributions shall be junior to any required payment on pre-existing indebtedness.

6. Further, to the extent the Company borrows any money and distributes said funds to the members, first of such money shall be applied to redeeming the Class B units for the face amount plus cumulative yield. To the extent that there is inadequate funds, then it is understood that the redemption shall be to the extent that funds are available

7 Except as set forth herein. all terms of the Operating Agreement shall remain unchanged and in full force and effect

8. This Agreement shall be valid if executed in counterparts. Further, facsimile signatures shall be deemed effective.

9. This Agreement shall be governed pursuant to the laws of the State of California.

**AGREED TO BY THE MEMBERS OF:**

**ANIMATION HOLDINGS, LLC**

By:  _____

Ward Leber

**FOUR STAR FINANCIAL SERVICES, LLC**

By  _____

Dana L Pierson

# ANIMATION HOLDINGS, LLC
# OPERATING AGREEMENT

THIS AGREEMENT, dated the ⟨10⟩ day of ⟨October⟩, 1997, is entered into by and between 900 Capital Services, Inc. (hereinafter "900 Capital" or "Member"), and Mark F. Cohn (hereinafter "Cohn") (collectively, "the Members").

## W I T N E S S E T H:

1.      1.1 <u>Formation</u>.   The Members hereby form a Limited Liability Company ("The Company") pursuant to the laws of the State of California and pursuant to the California Limited Liability Company Act.  The business of the Company shall be conducted under the name "Animation Holdings, LLC"  The Company shall conduct its business as a member managed limited liability company.

1.2  <u>Statement of Intent</u>.   It is the intent of the Members that this Company be created pursuant to the provisions of I.R.C. Revenue Procedure 95-10, in order that the Company may be considered a partnership for federal income tax purposes.  If any provision of this Agreement results in a contrary result, such provision shall be considered null and void, with the remaining provisions remaining in full force and effect.

2.      <u>Place of Business</u>.   The principal place of business of the Company shall be at 601 Gateway Boulevard, Suite 260, South San Francisco, California  94080, or such other place as may be from time to time designated in writing.  The Company may also maintain such other offices as it may deem advisable.

3.      <u>Registered Office and Registered Agent</u>.    CT Corporation Systems, San Francisco, CA.

4.      <u>Term of Existence</u>.   The term of the Company shall be until December 31, 2096, unless sooner terminated.

5.      <u>Purpose and Business of the Company</u>. The purposes of the company are to engage in the business of marketing telecommunications products and related services through the use of animation cel art as customer premiums and sales incentives and to do all things reasonably incidental to or in furtherance of that business.

6.      <u>Members</u>.

6.1      <u>Interests</u>.  An interest of a Member in the Company is personal property; no Member has any specific interest in the property of the Company.  The initial Members of the Company are 900 Capital and Cohn, with interests as follows:

6.1.1. Cohn has one percent (1%) interest in the Company
6.1.2. 900 has a ninety nine percent (99%) interest in the Company.

Animation Holdings, LLC Agreement                                                                1

6.2    Profits and Losses.    Items of income, gain, loss, deduction, and credit shall be allocated in accordance with the percentage interests held by each member provided however that, prior to payments of any profits to any partner, the Loan from 900 Capital shall be repaid in full with all accrued and unpaid interests.

6.3    Distributions.    Subject to the other provisions of this Agreement, distributions shall be made to Members based upon a Member's interest in the Company. Distributions shall not be allowed if such distributions result in liabilities of the Company, with the exception of those liabilities to members (including return of capital contributions), and recourse liabilities, in excess of the fair market value of the Company's assets. If any Member shall knowingly receive a distribution under such circumstances, the Company has the right to receive the return of such distribution for a period of three years from the date said distribution is made.

6.4    Profit.    For purposes of this paragraph 6.4, "profit" is defined as gross income less expenses deductible for federal income tax purposes.

6.5    Access to Information.    Any Member shall have free access to the books and records of the Company such that such Member may review such books and records at any time without notice to any other Member or to the Manager of the Company.

7.    Management.

7.1    Structure of Management.    The management of the company shall be effected by officers who shall be elected by a majority (as defined in Paragraph 14.8) of the Members. Officers shall serve until they resign or by termination by a majority of the Members. Officers may also be Members.

7.1.1    Offices.    Offices created shall be President, Executive Vice President, Chief Operating Officer, Chief Executive Officer, and Secretary.

7.1.2    President.    The President shall be the principal executive officer and shall in general supervise and control all of the business and affairs of the Company. He or she shall preside at all meetings of the Members. The President shall have authority, subject to such rules as may be prescribed by the Members, to appoint such agents and employees of the Company as he or she shall deem necessary, to prescribe their powers, duties and compensation, and to delegate authority to them. Such agents and employees shall hold office at the discretion of the President. The President shall have authority to sign, execute, and acknowledge on behalf of the Company all deeds, mortgages, bonds, stock certificates, contracts, leases, reports, and all other documents or instruments necessary or proper to be executed in the course of the Company's regular business, or which shall be authorized by resoltuion of the Members; and, except as otherwise provided by law of the Members, the President may authorize any Vice President or other officer or agent of the Company to sign, execute, and acknowledge such documents or instruments in his or her place and stead. In general, he shall perform all duties incident to the office of President and such other duties as may be prescribed by the Members from time to time. The President hereby delegates all duties in his absence to the Executive Vice President.

7.1.3    Executive Vice President.    The Executive Vice President shall perform all of the President's  duties in the absence of the President. The President may

Animation Holdings, LLC Agreement                                              2

designate either orally or in writing that the Executive Vice President is acting on the President's behalf. In addition, the Executive Vice President shall peform all duties incident to the office of Executive Vice President and such other duties as may be prescribed by the Members from time to time, including the daily management of all internal business operations of the Company and to take other such action and perform such other acts as may be necessary and desirable for the conduct of Company busines or effect any powers accorded to a Limited Liability Company pursuant to California law. All employees of the Company shall report directly or indirectly, to the Executive Vice President.

7.1.4   Chief Operating Officer.   The Chief Operating Officer shall manage, maintain, develop, operate, and defend all business operations of those companies in the control, ownership, or otherwise related to the Company. All officers, managers, directors, and other executives of said businesses shall report to the Chief Operating Officer. The Chief Operating Officer shall review no less than monthly the status of each company in the control, ownership, or otherwise related to the Company with the Executive Vice President and the President, and if requested by either the Executive Vice President or the President, shall prepare a written report on each status.

7.1.5   Secretary.   The Secretary shall: (a) keep the minutes of any meetings of the Members or the Officers in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Agreement as required by law; (c) be custodian of the records; (d) keep or arrange for the keeping of a register of the post office address of each member which shall be furnished to the Secretary by such member; (e) have general charge of the interest transfer books of the Company; and (f) in general, perform all duties incident to the office of Secretary and have such other duties and exercise such authority as from time to time may be delegated or assigned to him or her by the President or by the Members.

7.2   Member Consent.   Notwithstanding the foregoing delegations of powers to officers, the following actions shall require majority consent in writing of all Members of the Company:

a)   Authorization of initial funding of any investments;

b)   Approval of disbursement of funds exceeding one thousand dollars ($1,000), except compensation of officers or other employees as agreed to in any separate employment agreement;

c)   Authorization of any Officer to perform outside consulting work.

7.3   Compensation.

7.3.1   Officers.   No officer shall receive a salary.

8.   Limited Liability.   No Member or Manager or Officer of the company shall be personally liable for the Company's obligations solely by reason of being a Member, Manager, or Officer.

8.1    No Member shall take part in the control of Company business or transact any business on behalf of the Company, in such Members capacity as a Member, except as set forth herein.

8.2    If a Member receives the return of any part of the Member's contribution without violation of the Agreement, a Member is liable to the Company for the period of one (1) year thereafter for the amount of the returned contribution, but only to the extent necessary to discharge the Company's liabilities to creditors who extended credit to the Company during the period the contribution was held by the Company.

8.3    Each Member shall not be liable for the general obligations of the Company. However, if a Member acts in such a way that persons who transact business with the Company reasonably believe, based upon the Member's conduct, that the Member is acting as the Manager or an Officer, then such Member shall be held liable in obligations only to those persons who reasonably believe the Member to be the Manager or an Officer of the Company.

8.4    Limited Distributions.    No salaries shall be paid to any Member in such Member's capacity as a Member, nor shall any Member have a drawing account. No Member shall be entitled to the return of such Member's Capital Contribution, except to the extent that distributions made pursuant to this Agreement may be considered as such by law and except upon termination of the Company as provided in this Agreement. No Member shall be entitled to receive interest on his Capital Contribution except that 900 Capital shall be entitled to the interest in its Loan to the Company.

9.    Assignment by Members.

9.1    Generally.    Provided that such action is in compliance with applicable state or federal securities laws and any other applicable laws and other agreements to which the Company is a party or by which the Company or any Company property may be bound or subject, but only upon approval by the Manager and all remaining Members, a Member may assign, hypothecate, or transfer all or part of the Interest thereof, to become effective as of such assignment, hypothecation, or transfer is executed. Such assignment, hypothecation, or transfer shall not release the Member transferring an Interest from the obligations under this Agreement, nor shall it constitute the transferee a substitute Member; such transaction shall be an economic assignment as defined herein. The assignee may become a Member when the assignee delivers to the Manager: (i) a counterpart of this Agreement executed by the assignee whereby the assignee evidences the intention to become a Member, and to be bound by the provisions of this Agreement; and (ii) an opinion of legal counsel acceptable to the Manager that the proposed transfer does not violate applicable state or federal securities laws and any other applicable laws and (iii) upon written approval of the Manager and all remaining Members. In any event, any release of any Member transferring an Interest under this Agreement shall be subject to the provisions of California Limited Liability Company Act.

9.2    Limitations.    Except as provided in this Agreement, no assignment, hypothecation, or transfer of all or any part of any Interest (including, without limitation, any rights to income or other attributes of any Interest) shall be made by any of the Members and the Company will not recognize any such attempt. No additional interests in Company capital and profits will be issued by the Company, if, in the opinion of counsel to the Company, when added to the total of all interests in Company capital and profits sold, exchanged, or issued within a period of twelve consecutive months prior thereto, such sale, exchange, or issuance

Animation Holdings, LLC Agreement                                                    4

could result in the Company's not being taxed as a Partnership, or the Company's being terminated for tax purposes under the Internal Revenue Code.

9.3    Economic Assignment.    An assignee who does not become a substitute Member as provided herein has no right to require any information or accounting for Company transactions, to inspect the Company books, to seek judicial dissolution, to receive allocations and distributions the assignor may otherwise have received, or to exercise any voting or consensual rights, all of which shall be recognized by the Company as rights solely of the assignor.

9.4    Payment After Assignment.    The Company shall, after the effective date of any assignment, hypothecation, or transfer in accordance with Section 9.1, make all further allocations and distributions in respect of the Interest so assigned, to the assignee from the date such Interest is transferred on the books of the Company after compliance with the foregoing provisions.

9.5    Accountability to Assignees.    No assignment, hypothecation, or transfer to more than one party, including assignment, hypothecation, or transfer of less than all of a Member's rights hereunder, shall require the Company to account to more than one party. The assignees or transferees shall designate in writing one party to act as their representative in all Company matters.

9.6    Allocation.    In the event of an assignment of a Membership Interest in accordance with Section 9.1, allocation of items of Company income, gain, loss, deduction, and credit between the assignor and the assignee shall be based on the number of days in the particular year during which each such Membership Interest is held according to Company records, or on any other basis deemed reasonable by the Manager consistent with Delaware Law and Federal Income Taxation of Partnerships. Each Member shall be entitled to such allocation of income, gain, loss, deduction, and credit in computing taxable income or tax liability to the exclusion of any other party.

10.    Dissolution and Winding Up.

10.1    General.

10.1.1 Mandatory Dissolution.    The Company shall be dissolved upon any of the following occurrences:

(a)    The filing of any bankruptcy proceeding by any Member;

(b)    The expiration date of this Agreement which is December 31, 2096;

(c)    By the written consent of all Members;

(d)    Entry of a decree of judicial dissolution upon application by or for any Member or Manager.

10.2    Withdrawal of Members.    A Member may withdraw or shall be deemed withdrawn from the Company upon the following circumstances: Retirement, death,

adjudication of incapacity, bankruptcy (as determined by the commencement of the filing of bankruptcy proceedings), dissolution, or liquidation. Any voluntary withdrawal by a Member shall be effective upon such Member providing to the Manager in writing notice of such member's withdrawal 90 days before the date of such Member's planned withdrawal date. The withdrawal of any Member, whether voluntary or involuntary, or the transfer of a Member's interest in the Company, shall not dissolve the Company, so long as such withdrawal or transfer does not violate the provisions set forth in Article 9 of this Agreement.

10.3    Effectiveness of Termination.    Termination shall be effective on the date on which the event occurs giving rise to the termination, but the Company shall not wind up until the assets have been distributed pursuant to this Agreement.

10.4    Distribution Upon Terms.    Upon winding up, assets shall be distributed in the following order:

a)    To creditors of the Company, including Members or Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or reasonable provision for payment thereof) other than liabilities for distributions to Members or former Members, including but not limited interim distributions and distributions upon resignations;

b)    To Members and former Members in satisfaction of liabilities of interim distributions and distributions upon resignation, including the preferred return set forth in Article 6;

c)    Return of Members contributions and subsequently respecting their interest, in proportions in which Members share in distributions.

10.5    Allocations upon Termination.    Upon the termination of the Company:

(a)    Company properties, or any portion of them, may be sold at the election of the Manager if a price deemed reasonable by the Manager may be obtained.

(b)    The fair market value of any Company properties that are not sold shall be determined, and the gain or loss that would have resulted had each such Company property been sold for its fair market value shall be computed.

(c)    Gain or loss realized on actual sales of Company property and the gain or loss that would have been realized on sales of unsold Company property computer as provided in (b) above, shall be allocated for federal income tax purposes among the Members as provided in Section 6.3 hereof.

(d)    The Company properties, or the proceeds from them in the event of a sale of all or a portion of them, shall be distributed as provided above in Section 10.4.

Company Properties distributed upon termination of the Company shall remain subject to such agreements, if any, then in effect with respect to such Company properties.

Animation Holdings, LLC Agreement                                                                6

10.6 Upon dissolution and completion of winding up a certificate of cancellation shall be filed with the Secretary of State containing;

a) The name of the Company;

b) The date the certificate was filed;

c) The reason for canceling;

d) The future effect of time of cancellation;

e) Any other information deemed advisable at time of cancellation.

10.7 <u>Winding Up</u>. The winding up of Company affairs and liquidation and distribution of its assets shall be conducted exclusively by the Manager or, if the Manager is unable or unwilling to act, by a trustee named by unanimous consent of all remaining members (the "Trustee"). The Manager or the Trustee is hereby authorized to do any and all acts and things authorized by law to effect such dissolution, liquidation, and distribution of the assets of the Company.

11. <u>Income Tax Elections</u>.

11.1 <u>Income Tax Election</u>. The Manager shall make such federal income tax elections as it deems in the interest of the Company. Pursuant to Rev. Proc. 95-10, the Company shall be subject to income tax as a partnership.

11.2 <u>Election upon Transfer, Death, or Distribution</u>. In the event of the transfer of a Company Interest, or upon the death of an individual Member, or in the event of the distribution of Company properties to any party, the Company may, upon the request of any Member and in the complete discretion of the Manager, file an election in accordance with applicable United States Treasury Regulations to cause the basis of the Company properties to be adjusted for federal income tax purposes as provided in §734 and §743 of the Internal Revenue Code.

12. <u>Amendment of Agreement</u>

12.1 <u>Amendments Requiring Consent</u>. This Agreement may be amended by majority vote of the Members in any way deemed necessary or desirable by such Members to satisfy any requirements, conditions, guidelines, or election pursuant to or in connection with any opinion, directive, order, ruling, or regulation of the Securities and Exchange Commission, the Internal Revenue Service, or any other federal, state, or local agency, or in connection with any federal, state, or local statute or ordinance, compliance with which the Manager deems to be in the best interests of the Company. This Agreement, however, shall not be amended without the unanimous consent of the Members if the effect of such amendment would be to (i) change the purpose provisions set forth in Article 5; (ii) increase the liability of the Members; (iii)change the contributions required of Members; (iv) change the rights and interests in profits and losses of the Company; (v) change the rights of Members upon liquidation; (vi) amend allocations under Article 9; or (vii) amend this Article.

12.2 Prohibited Amendments. No amendment to this Agreement shall be effective if, in the opinion of counsel to the Company, such amendment could result in the Company's not being taxed as a partnership, or the Company's being terminated for tax purposes.

13. Further Assurances. Each Member hereby agrees to execute and deliver to the Manager within 10 days after receipt of the Manager's written request such other and further statements of interest and holdings, designations, powers of attorney, and other instruments as the Manager deems necessary or desirable to comply with the requirements of law or administrative rule for the formation and operation of this Company.

13.1 Irrevocability of Power. The foregoing grant of authority are hereby declared to be irrevocable, and a power coupled with an interest, and shall survive the death of the Member.

13.2 Conflicts Between Exercise of Power and this Agreement. In the event of any conflict between the provisions of this Agreement and any document executed or filed by the Manager pursuant to exercise of the Power of Attorney granted herein, this Agreement shall govern.

14. Miscellaneous.

14.1 Counterparts. This Agreement may be executed in as many counterparts as shall be deemed necessary by the Manager, and when so executed, each such counterpart shall be as fully valid and binding on all parties as every other such counterpart.

14.2 Headings. The headings in this Agreement are inserted for convenience and identification only and are in no way intended to limit the scope, extent, or intent of this Agreement or any provision of it.

14.3 Severability. If any provision of this Agreement or the application of such provision to any person or circumstance is illegal or invalid for any reason whatsoever, such illegality of invalidity shall not affect the validity of the remaining terms and provisions of it.

14.4 Governing Law and Venue. This Agreement and the application or interpretation of it shall be governed exclusively by its terms and by the laws of California without regard to its conflicts of laws provisions. Each of the parties agrees to submit to the jurisdiction of the state and federal courts in California, in any action, claim, or other proceeding arising out of any dispute in connection with this Agreement.

14.5 Cumulative Remedies. The rights and remedies provided by this Agreement are cumulative, and the exercise of one right or remedy by any party shall not preclude or waive its rights to use any or all other remedies.

Such rights and remedies ware given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

14.6 Books and Records. The Company's books and records shall be maintained by the Manager at the Manager's office, or such other place as the Manager may designate by written notice to the partners and by complying with the requirements of law at the

time of such change. Except as otherwise stated in this Agreement, each Member shall have access to the Company" books and records during regular business hours and may copy such records at his or her own expense. The books and records shall be kept in accordance with generally accepted accounting practices for federal income tax purposes applied on a consistent basis by the Company and shall reflect all Company transactions. The Company shall maintain its accounts on an accrual basis and shall adopt such Company tax year as the Manager may determine.

14.7    <u>Financial Reports</u>.    Financial statements shall be prepared by the Company on an accrual basis in accordance with generally accepted accounting principals and shall be transmitted to each of the Members within 30 days after the close of each month. Each Member has the right to have the books of the Company audited at his or her own expense.

14.8    <u>Majority</u>.    Unless otherwise stated in this Agreement a "majority" of the members shall refer to greater than fifty percent (50%) of the members based upon the number of members, and not upon their respective interests in the Company.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of this 10 day of October , 1997.

MEMBERS:

**900 CAPITAL SERVICES, INC.**

By: Dana L. Pierson

Its: Corp. Secretary

**MARK F. COHN**

26489

Animation Holdings, LLC Agreement                                                    9



**COMMUNITY
BENEFIT
ALLIANCE, LLC.**

June 14, 1999

<u>CORPORATE RESOLUTION</u>

This day, September 21, 1998, the members have met to address the business at hand. By majority vote, it has been decided that Mr. Lewis P. Blackburn, US Passport number 130780395, be engaged to work for Community Benefit Alliance, LLC, as Associate Director of International Operations. Mr. Blackburn shall have the single capacity and sole purpose of acting as Mr. Mark Cohn's financial advisor with regard to any activities under taken in bank secured investment contracts. Mr. Blackburn is empowered to be co-signatory for all contracts, undertakings and agreements, as well as, for any bank accounts established for the bank secured investment process. The only contracts that this company will consider valid are those first signed by Mr. Mark Cohn, then secondly signed by Mr. Lewis P. Blackburn on behalf of the business dealing exclusively with bank secured investment contracts.

This corporate resolution is in full force and effect as of this date, September 21, 1998, and shall continue without interruption until further notice.

Issued this day, June 14, 1999, with full corporate authority.

By: _____
    Mark Cohn, President
    Community Benefit Alliance, LLC

*(Notary Attached)*

#28975

601 Gateway Blvd., Suite 260, South San Francisco, CA 94080



**COMMUNITY BENEFIT ALLIANCE, LLC.**

June 14, 1999

## RESOLUTION

This 14th day of June 1999, the Board of Directors/Members met to address business at hand. By majority vote, it has been decided that Mr. Mark Cohn, President of Community Benefit Alliance, LLC, be empowered to sign for or on behalf of the company. This authorization allows Mr. Cohn to sign contracts, establish bank accounts, commit and bind the company, as he deems right and necessary.

This resolution is in full force and effect as of this 14th day of June 1999, and shall continue without interruption until further notice.

By: _____
    Dana Pierson, Secretary
    Community Benefit Alliance, LLC

*(Notary Attached)*

#28977v2

**601 Gateway Blvd., Suite 260, South San Francisco, CA 94080**

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of _CALIFORNIA_

County of _SAN MATEO_

On _JUNE 14, 1999_ before me, _SALLY A. STOLLMAN, NOTARY PUBLIC_
Date                              Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _DANA PIERSON_
Name(s) of Signer(s)

☒ personally known to me – OR – ☐ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

SALLY A. STOLLMAN
Commission #1147175
Notary Public - California
San Mateo County
My Comm. Expires Jul 18, 2001

_Sally A. Stollman_
Signature of Notary Public

--- OPTIONAL ---

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____

☐ Individual
☐ Corporate Officer
  Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing:

_____

Signer's Name: _____

☐ Individual
☐ Corporate Officer
  Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing:

_____



**COMMUNITY
BENEFIT
ALLIANCE, LLC.**

September 18, 1998

RESOLUTION

This 18th day of September 1998, the Board of Directors/Members met to address business at hand. By majority vote, it has been decided that Mr. Mark Cohn, President of Community Benefit Alliance, LLC, be empowered to sign for or on behalf of the company. This authorization allows Mr. Cohn to sign contracts, establish bank accounts, commit and bind the company, as he deems right and necessary.

This resolution is in full force and effect as of this 18th day of September 1998, and shall continue without interruption until further notice.

By _____
Dana Pierson, Secretary
Community Benefit Alliance, LLC

*(Notary Attached)*

#28977

601 Gateway Blvd., Suite 260, South San Francisco, CA 94080
TEL (650) 869-3600 • FAX (650) 869-3700

## COMMUNITY BENEFIT ALLIANCE, LLC

## RESOLUTION

This day, 29 November 1998, the members have met to address business at hand. By majority vote, it has been decided that Mr. Lewis P. Blackburn, U.S. Passport number 130780395, be engaged to work for Community Benefit Alliance, as Vice President, Finance. Mr. Blackburn shall have the capacity and purpose of acting as Mr. Mark Cohn's financial advisor with regard to any activities undertaken in bank secured investment contracts, undertakings and agreements, as well as, for any bank (or other institution) revenue accounts established for the bank secured investment process. The only contracts that this corporation will consider valid are those first signed by Mr. Mark Cohn, then secondly signed by Mr. Lewis Blackburn as Vice President, Finance, on behalf of the corporation business dealing exclusively with bank secured investment contracts.

The primary corporate capital account will remain only under the sole signatory control of Mark Cohn. All subsequent contracts, undertakings, agreements and accounts shall be administered per the above defined procedure.

This corporate resolution is in full force and effect as of this date, 29 November 1998, and shall continue without interruption until further notice.

Issued this day, 29 November 1998, with full authority.


By: _____
    Dana Pierson, Secretary



Notary Attached

**EXHIBIT CC**



# State of California
# Bill Jones
## Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**A $70.00 filing fee must accompany this form.**
**IMPORTANT – Read Instructions before completing this form.**

File# 200104510012

**FILED**
In the Office of the Secretary of State
of the State of California

FEB 1 3 2001

*Bill Jones*
**BILL JONES, Secretary of State**

This Space For Filing Use Only

---

1. Name of the limited liability company (end the name with the words "Limited Liability Company," " Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.")

   FSF, LLC

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea limited liability company act.

3. Name the agent for service of process and check the appropriate provision below:

   C T Corporation System _____ which is

   [ ] an individual residing in California. Proceed to item 4.

   [X] a corporation which has filed a certificate pursuant to section 1505. Proceed to item 5.

4. If an individual, California address of the agent for service of process:
   Address:

   City:                    State: **CA**                    Zip Code:

5. The limited liability company will be managed by: **(check one)**

   [ ] one manager  [ ] more than one manager  [ ] single member limited liability company  [x] all limited liability company members

6. Other matters to be included in this certificate may be set forth on separate attached pages and are made a part of this certificate. Other matters may include the latest date on which the limited liability company is to dissolve.

7. Number of pages attached, if any:  None

8. Type of business of the limited liability company. (For informational purposes only)
   Finance

9. **DECLARATION:** It is hereby declared that I am the person who executed this instrument, which execution is my act and deed.

   _Dana L. Pierson_
   Signature of Organizer

   Dana L. Pierson
   Type or Print Name of Organizer

   February 9, 2001
   Date

10. **RETURN TO:**

    **NAME**      Dana L. Pierson
    **FIRM**      FSF, LLC
    **ADDRESS**   1000 Marina Boulevard, Suite 600
    **CITY/STATE** Brisbane, CA 94005
    **ZIP CODE**

SEC/STATE (REV. 12/99)

FORM LLC-1 – FILING FEE $70.00
Approved by Secretary of State

CA076 - 1/17/2000 C T System Online



# AMENDED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# FSF, LLC

# A CALIFORNIA LIMITED LIABILITY COMPANY




# TABLE OF CONTENTS

**Page**

**ARTICLE I**

**DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.1     "Act"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.2     "Affiliate"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.3     "Agreement"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.4     "Bankruptcy"  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.5     "Capital Account"  . . . . . . . . . . . . . . . . . . . . . . . 2
1.6     "Capital Contribution"  . . . . . . . . . . . . . . . . . . . 2
1.7     "Certificate of Formation"  . . . . . . . . . . . . . . . . 2
1.8     "Code" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.9     "Company"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
1.10    "Company Minimum Gain"  . . . . . . . . . . . . . . . . 2
1.11    "Distributable Cash"  . . . . . . . . . . . . . . . . . . . . . 2
1.12    "Distribution"  . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.13    "Economic Risk of Loss"  . . . . . . . . . . . . . . . . . 3
1.14    "Fiscal Year"  . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.15    "Majority in Interest"  . . . . . . . . . . . . . . . . . . . . 3
1.16    "Member"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
1.17    "Member Nonrecourse Debt"  . . . . . . . . . . . . . . 3
1.18    "Member Nonrecourse Deductions"  . . . . . . . . . 3
1.19    "Membership Interest"  . . . . . . . . . . . . . . . . . . . 3
1.20    "Membership Termination Event"  . . . . . . . . . . 3
1.21    "Net Profits" and "Net Losses"  . . . . . . . . . . . . 4
1.22    "Nonrecourse Deductions"  . . . . . . . . . . . . . . . . 4
1.23    "Nonrecourse Liability"  . . . . . . . . . . . . . . . . . . 4
1.24    "Percentage Interest"  . . . . . . . . . . . . . . . . . . . . 4
1.25    "Person"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
1.26    "Tax Credits"  . . . . . . . . . . . . . . . . . . . . . . . . . . 4
1.27    "Tax Matters Partner"  . . . . . . . . . . . . . . . . . . . . 4
1.28    "Transfer"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
1.29    "Treasury Regulations'  . . . . . . . . . . . . . . . . . . . 5

**ARTICLE II**

**ORGANIZATION MATTERS**  . . . . . . . . . . . . . . . 5
2.1     Name  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
2.2     Term  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

| 2.3 | Office and Agent | 5 |
| 2.4 | Purpose of Company | 5 |
| 2.5 | Intent | 6 |
| 2.6 | Reimbursement of Expenses of Organization | 6 |

## ARTICLE III

| | **CAPITAL CONTRIBUTIONS** | 6 |
| 3.1 | Initial Capital Contributions | 6 |
| 3.2 | Additional Capital Contributions | 6 |
| 3.3 | Capital Accounts | 6 |
| 3.4 | No Priorities of Members; No Withdrawals of Capital | 6 |
| 3.5 | No Interest | 6 |

## ARTICLE IV

| | **MEMBERS** | 7 |
| 4.1 | Limited Liability | 7 |
| 4.2 | Admission of Additional Members | 7 |

## ARTICLE V

| | **MANAGEMENT AND CONTROL OF THE COMPANY** | 7 |
| 5.1 | Management of the Company by Members | 7 |
| | (a) Management by Members | 7 |
| | (b) Agency Authority of Members | 7 |
| | (c) Decisions of the Members | 7 |
| | (d) Meetings of Members; Written Consent | 8 |
| 5.2 | Officers of the Company | 8 |
| | (a) Appointment of Officers | 8 |
| | (b) Signing Authority of Officers | 8 |
| 5.3 | Limitations on Power of Members | 8 |
| 5.4 | Transactions between the Company and the Members | 9 |
| 5.5 | Performance of Duties; Liability of Members and Officers | 9 |
| 5.6 | Company Opportunities | 9 |
| 5.7 | Expenses | 10 |

## ARTICLE VI

| | **ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS** | |
| 6.1 | Minimum Gain Chargeback | 10 |
| 6.2 | Member Minimum Gain Chargeback | 10 |
| 6.3 | Qualified Income Offset | 10 |

6.4    Allocation of Net Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
6.5    Allocation of Net Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
6.6    Distribution of Assets by the Company . . . . . . . . . . . . . . . . . . 11
6.7    Allocation of Net Profits and Losses and Distributions in
       Respect of a Transferred Interest . . . . . . . . . . . . . . . . . . . . . . . 11
6.8    Tax Allocation Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
       6.8.1    Contributed or Revalued Property . . . . . . . . . . . . . . . 12
       6.8.2    Recapture Items . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
6.9    Order of Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
6.10   Allocation of Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
6.11   Form of Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**ARTICLE VII**

                       **TRANSFER OF INTERESTS** . . . . . . . . . . . . . . 13
7.1    Transfer of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
7.2    Transfer to Certain Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . 13

**ARTICLE VIII**

      **CONSEQUENCES OF MEMBERSHIP TERMINATION EVENTS** . . . 13
8.1    Dissolution of Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
8.2    Admission or Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**ARTICLE IX**

      **ACCOUNTING, RECORDS, REPORTING BY MEMBERS** . . . 14
9.1    Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
9.2    Bank Accounts; Invested Funds . . . . . . . . . . . . . . . . . . . . . . . 14
9.3    Tax Matters for the Company Handled by Members and
       Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
9.4    Accounting Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**ARTICLE X**

         **DISSOLUTION AND WINDING UP** . . . . . . . . . . . . . . 15
10.1   Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
10.2   Date of Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
10.3   Winding Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
10.4   Distributions in Kind . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
10.5   Order of Payment of Proceeds Upon Dissolution . . . . . . . . . . . . . 16
       10.5.1 Liquidating Distributions . . . . . . . . . . . . . . . . . . . . . 16
       10.5.2 No Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10.6   Limitations on Payments Made in Dissolution   . . . . . . . . . . . . . 16
10.7   Certificate of Cancellation   . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10.8   Compensation for Services   . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**ARTICLE XI**

**INDEMNIFICATION**   . . . . . . . . . . . . . 16
11.1   Indemnification   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
11.2   Contract Right;  Expenses   . . . . . . . . . . . . . . . . . . . . . . . . . . 17
11.3   Indemnification of Officers and Employees   . . . . . . . . . . . . . . . . . 17
11.4   Insurance   . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . 17

**ARTICLE XII**

**MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . 17
12.1   Amendments   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
12.2   Offset Privilege   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
12.3   Arbitration   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.4   Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.5   Notices   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.6   Attorney's Fees   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.7   Jurisdiction   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.8   Complete Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.9   Binding Effect   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.10  Section Headings   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.11  Interpretation   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.12  Severability   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.13  Multiple Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Exhibits:

Exhibit A     Capital  Contributions,  Addresses  and  Percentage  Interest  of
              Members

## AMENDED LIMITED LIABILITY COMPANY AGREEMENT OF
## FSF, LLC
## A CALIFORNIA LIMITED LIABILITY COMPANY

This Amended Limited Liability Company Agreement is made as of June 26, 2001, by Ronald Anson, Jack Garrett, Dana L. Pierson, hereinafter referred to as the "Members," as defined below, with reference to the following facts:

A.     The parties desire to form FSF, LLC (the "Company") as a limited liability company under the laws of the State of California and, to that end, has filed the Articles of Organization for the Company with the California Secretary of State.

B.     The parties now desire to adopt a limited liability company agreement to govern its respective rights and obligations as Members of the company.

NOW, THEREFORE, in consideration of mutual covenants contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the parties agree that the following shall be the Limited Liability Company Agreement of the Company.

## ARTICLE I

## DEFINITIONS

When used in this Agreement, the following terms have the following meanings:

1.1     "Act" means the Limited Liability Company Act of the State of California.

1.2     "Affiliate" of a Member means (a) a Person directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with that Member; (b) an officer, director, partner, member or immediate family member of that Member; or (c) a member of the immediate family of an officer, director, partner or member of that Member. For these purposes "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

1.3     "Agreement" means this Limited Liability Company Agreement of FSF, LLC, as originally executed and as amended from time to time.

1

1.4   "Bankruptcy" if a Member means the institution of any proceedings under any federal or state law for the relief of debtors, including the filing by or against that Member of a voluntary of involuntary case under the federal bankruptcy law, which proceedings, if involuntary, are not dismissed within sixty (60) days after their filing; an assignment of the property of that Member for the benefit of creditors; the appointment of a receiver, trustee or conservator of any substantial portion of the assets of that Member, which appointment, if obtained ex parte, is not dismissed within sixty (60) days thereafter; the seizure by a sheriff, receiver, trustee or conservator of any substantial portion of the assets of that Member; the failure by that Member generally to pay its debts as they become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court; or that Member's admission in writing of its inability to pay its debts as they become due.

1.5   "Capital Account" of a Member means the Capital Account of that Member determined from the inception of the Company strictly in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations. In the event that assets of the Company other than cash are distributed to a Member in kind, Capital Accounts shall be adjusted for the Hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold for their fair market values in a cash sale (in order to reflect unrealized gain or loss). In the event of the liquidation of the Company, Capital Accounts shall be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if all Company assets had been sold for their fair market values in a cash sale (in order to reflect unrealized gain or loss).

1.6   "Capital Contribution" of a Member, at any particular time, means the amount of money or property or a promissory note or other binding obligation to contribute money or property, which that Member has theretofore contributed to the capital of the Company.

1.7   "Articles of Organization" mans the Articles of Organization of the Company as filed under the Act with the California Secretary of State.

1.8   "Code" means the Internal Revenue Code of 1986.

1.9   "Company means FSF, LLC, a California limited liability company.

1.10   "Company Minimum Gain" with respect to any taxable year of the Company means the "partnership minimum gain" of the Company computed strictly in accordance with the principles of Section 1.704-2(d) of the Treasury Regulations.

1.11   "Distributable Cash" at any time means that portion of the cash then on hand or in bank accounts of the Company which the Members, in their absolute discretion, deem available for distribution to the Members, taking into account (a) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise) and (b) the amount of cash necessary to establish prudent reserves for the payment of future capital expenditures, improvements, retirements of indebtedness, operations and contingencies, known

2

or unknown, liquidated or unliquidated, including, but not limited to, liabilities which may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

      1.12   "Distribution" means the transfer of money or property by the Company to one or more Members without separate consideration.

      1.13   "Economic Risk of Loss" means the economic risk of loss within the meaning of Section 1.752-2 of the Treasury Regulations.

      1.14   "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

      1.15   "Majority in Interest" means Percentage Interests which, taken together, exceed fifty percent (50%) of the aggregate of all Percentage Interests held by all Members.

      1.16   "Member" means each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Articles of Organization or this Agreement or is a transferee of a Member who has become a Member in accordance with Article VII, and (b) has not suffered a Membership Termination Event.

      1.17   "Member Nonrecourse Debt" means any "partner nonrecourse liability" or "partner nonrecourse debt" under Section 1.704-2(b)(4) of the Treasury Regulations. Subject to the foregoing, it means any Company liability to the extent the liability is nonrecourse for purposes of Section 1.1001-2 of the Treasury Regulations, and a Member (or related Person within the meaning of Section 1.752-4(b) of the Treasury Regulations) bears the Economic Risk of Loss under Section 1.752-2 of the Treasury Regulations because, for example, the Member or related Person is the creditor or a guarantor.

      1.18   "Member Nonrecourse Deductions" means the Company deductions, losses and Code Section 705(a)(2)(B) expenditures, as the case may be (as computed for "book" purposes), that are treated as deductions, losses and expenditures attributable to Member Nonrecourse Debt under Section 1.704-2(i)(2) of the Treasury Regulations.

      1.19   "Membership Interest" means a Member's total interest as a Member of the Company, including that Member's share of the Company's Net Profits, Net Losses, Distributable Cash or other Distributions, its right to inspect the books and records of the Company and its right, to the extent specifically provided in this Agreement, to participate in the business, affairs and management of the Company and to vote to grant consent with respect to matters coming before the Company.

      1.20   "Membership Termination Event" with respect to any Member means one or more of the following: the death, insanity, permanent disability, withdrawal, resignation, expulsion, Bankruptcy, dissolution or occurrence of any other event which terminates the continued membership of that Member in the Company, other than a Transfer of a Member's Membership Interest which is made in accordance with the provisions of Article VII.

1.21    "Net Profits" and "Net Losses" means, for each fiscal period, the net income and net loss, respectively, of the Company determined strictly in accordance with federal income tax principles (including rules governing depreciation and amortization), except that in computing net income or net loss, the "book" value of an asset will be substituted for its adjusted tax basis if the two differ, and the following items shall be excluded from the computation:

(a)    any gain, income, deductions or losses specially allocated under Section 6.1, 6.2, or 6.3;

(b)    any Nonrecourse Deductions; and

(c)    any Member Nonrecourse Deductions.

1.22    "Nonrecourse Deductions" in any fiscal period means the amount of Company deductions that are characterized as "nonrecourse deductions" under Treasury Regulations Section 1.704-2(b) of the Treasury Regulations.

1.23    "Nonrecourse Liability" means a liability treated as a "nonrecourse liability" under Sections 1.704-2(b)(3) and 1.752-1(a)(2) of the Treasury Regulations.

1.24    "Percentage Interest" means the percentage interest of a Member set forth opposite the name of that Member in Exhibit A, as such percentage may be adjusted from time to time pursuant to the provisions of this Agreement.

1.25    "Person" means any entity, corporation, company, association, joint venture, joint stock company, partnership, trust, limited liability company, limited liability partnership, real estate investment trust, organization, individual (including personal representatives, executors and heirs of a deceased individual), nation, state, government (including agencies, departments, bureaus, boards, divisions and instrumentalities thereof), trustee, receiver or liquidator.

1.26    "Tax Credits" means all credits against income or franchise taxes and credits allowable to Members under state, federal or other tax statutes.

1.27    "Tax Matters Partner" means the Member appointed pursuant to the provisions of Section 9.4 to serve as the "tax matters partner" of the Company for purposes of Section 6221-6233 of the Code. Initially, the Tax Matters Partner shall be Four Star Financial Services, LLC.

1.28    "Transfer" means, with respect to a Membership Interest or any interest therein, the sale, assignment, transfer, disposition, pledge, hypothecation or encumbrance, whether direct or indirect, voluntary, involuntary or by operation of law, and whether or not for value, of (a) all or any part of that Membership Interest or interest therein or (b) a controlling interest in any Person which directly or indirectly through one or more intermediaries holds that Membership Interest or interest therein.

1.29 "<u>Treasury Regulations</u>" means the regulations of the United States Treasury Department pertaining to the income tax.

References in this Agreement to "Articles," "Sections," "Exhibits" and "Schedules," shall be to the Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specifically provided; all Exhibits and Schedules to this Agreement are incorporated herein by reference; any of the terms defined in this Agreement may, unless the context otherwise requires, be used in the singular or the plural and in any gender depending on the reference; the works "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and except as otherwise specified in this Agreement, all references in this Agreement (a) to any Person shall be deemed to include such Person's permitted heirs, personal representatives, successors and assigns; and (b) to any agreement, any document or any other written instrument shall be a reference to such agreement, document or instrument together with all exhibits, schedules, attachments and appendices thereto, and in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; and (c) to any law, statute or regulation shall be deemed references to such law, statute or regulation as the same may be supplemented, amended, consolidated, superseded or modified from time to time.

# ARTICLE II

## ORGANIZATION MATTERS

2.1    <u>Name.</u> The name of the Company shall be "FSF, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable law, under any other name that the Members deem appropriate or advisable.

2.2    <u>Term.</u> The term of the Company's existence commenced upon the filing of its Articles of Organization with the California Secretary of State on February 13, 2001 and shall continue until such time as it is terminated pursuant to Article X.

2.3    <u>Office and Agent.</u>    The principal office of the Company shall be at 1000 Marina Boulevard, Suite 600, Brisbane, CA 94005 or at such other place as the Members may determine from time to time. The name and business address of the Company's agent for service of process in the State of California is set forth in its Articles of Organization, or as may otherwise be determined by the Members from time to time.

2.4    <u>Purpose of Company.</u> The Company may engage in any lawful activity for which a limited liability company may be organized under the Act; however, its primary purpose shall be to engage in the business of finance.

2.5     Intent. It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. It is also the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of The United States Bankruptcy Code. No Member shall take any action inconsistent with that express intent.

2.6     Reimbursement of Expenses of Organization.     The Members hereby authorize the Company to pay its expenses of organization and to reimburse any Person advancing funds for the purpose.

# ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1     Initial Capital Contributions. Concurrently herewith, each Member shall contribute to the Company the monies and/or properties which are specified in Exhibit A as that Member's initial Capital Contribution.

3.2     Additional Capital Contributions.     No Member shall be required to make any additional Capital Contributions not specifically referred to in Section 3.1.

3.3     Capital Accounts.     The Company shall establish and maintain an individual Capital Account for each Member.

3.4     No Priorities of Members; No Withdrawals of Capital.     Except as otherwise specified in Article VI and in the Act, no Member shall have a priority over any other member as to any Distribution, whether by way of return of capital or by way of profits, or as to any allocation of Net profits or Net Losses. No Member shall have the right to withdraw or reduce its Capital Contributions in the Company except as a result of the dissolution of the Company or as otherwise provided in the Act, and no Member shall have the right to demand or receive property other than cash in return for its Capital Contributions.

3.5     No Interest.     No Member shall be entitled to receive any interest on its Capital Contributions.

## ARTICLE IV

## MEMBERS

4.1     Limited Liability.     Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation or liability of the Company, whether that Liability or obligation arises in contract, tort or otherwise.

4.2     Admission of Additional Members.     Subject to compliance with applicable law and the approval of the requisite Members specified in Section 5.3 (c), additional Members may be admitted to the Company from time to time upon such terms and conditions as the Members may determine, and any such additional Members shall be granted Membership Interests and may participate in the management, Distributable Cash, Net Profits, Net Losses, Tax Credits and other Distributions of the Company on such terms as the Members may fix.

## ARTICLE V

## MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management of the Company by Members

(a)     Management by Members.     The business and affairs of the Company shall be managed and controlled exclusively by the Members. The Members shall have full authority, power and discretion to manage and control the business property and affairs of the Company, to make all decisions regarding those matters, to supervise, direct and control the actions of the officers, if any, of the Company and to perform any and all other actions customary or incident to the management of the Company's business, property and affairs.

(b)     Agency Authority of Members.     Subject to Section 5.3, any Member, acting alone, is authorized to endorse all checks, drafts and other evidences of indebtedness made payable to the order of the Company and to execute all agreements, contracts, commitments, checks, instruments and other documents on behalf of the Company. The Members shall have the right to delegate in writing any or all of their authority, rights and/or obligations, whether arising hereunder, under the Act or otherwise, to any one or more officers, agents or other duly authorized representatives.

(c)     Decisions of the Members.     Except to the extent that this Agreement expressly requires the unanimous approval of all of the Members, any decision or action taken by a Majority in Interest of all the Members (whether verbally or in writing, whether in person or by proxy and whether or not at a formal meeting called pursuant to Section 5.1(d) shall constitute the act or decision of the Members. The Members may, however, delegate to any one or more Members, acting alone, the authority to make specific decisions.

(d)     <u>Meetings of Members; Written Consent.</u>          Annual Meetings of the Members shall be held at such time and place within or without the State of California as the Members constituting a Majority in interest of all the Members shall determine. No annual or regular meetings of Members are required, but if such meetings are held, they shall be noticed, held and conducted pursuant to the Act.  Members may participate in any meeting through the use of conference telephones or similar communications equipment as long as all Members participating can hear one another.  A Member so participating is deemed to be present in person at the meeting.  Any action which may be taken by the Members at a meeting may also be taken without a meeting, if a consent in writing setting forth the action so taken is signed by Members having not less than the minimum votes that would be necessary to authorize that action at a meeting of the Members duly called and noticed.

5.2     <u>Officers of the Company.</u>

(a)     The Members may, at their discretion, appoint officers of the Company at any time to conduct, or to assist the Members in the conduct of the day-to-day business and affairs of the Company.  The officers of the Company may include a Chairperson, a President or Chief Executive Officer, one or more Senior Vice Presidents, one or more Vice Presidents, a Secretary, one or more Assistant Secretaries, a Chief Financial Officer, a Treasurer, one or more Assistant Treasurers and a Comptroller.  The officers shall serve at the pleasure of the Members subject to all rights, if any, of an officer under any contract of employment.  Any individual may hold any number of offices.  The officers shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Members, but subject in all instances to the supervision and control of the Members.  Initially, there shall be a President, a Secretary and an Assistant Secretary of the Company.  Mark Cohn shall serve as the initial President and Secretary of the Company, and Dana Pierson shall serve as the initial Assistant Secretary of the Company, subject to all of the foregoing prerogatives of the Members.

(b)     <u>Signing Authority of Officers.</u>          The officers, if any, shall have such authority to sign checks, instruments and other documents on behalf of the Company as may be delegated to them by the Members.

5.3     <u>Limitations on Power of Members.</u>  Notwithstanding any other provisions of this Agreement, however, the Members shall have no power or authority to approve or cause the Company to engage in any of the following, without first obtaining the unanimous vote or written consent of all Members;

(a)     the sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in a series of transactions, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution;

(b)     the merger of the Company with another limited liability company or a corporation, general partnership, limited partnership or other entity;

(c)    the admission of another Person as a Member of the Company;

(d)    any transaction between the Company and a Member or any Affiliate of a Member, or any transaction between the Company and any Person in which a Member or any Affiliate of a Member has a material financial interest;

(e)    any alteration of the primary purpose of the Company as set forth in Section 2.4;

(f)    any act which would make it impossible to carry on the ordinary business of the Company;

(g)    any decision to place the Company into Bankruptcy; or

(h)    any amendment to the Certificate of Formation or this Agreement.

5.4    Transactions between the Company and the Members. Notwithstanding that it may constitute a conflict of interest, the Members may, and may cause their Affiliates to, engage in any transaction with the Company so long as that transaction is either (a) fair to the Company or (b) approved by the Members.

5.5    Performance of Duties; Liabilities of Members and Officers. No Member or officer shall be liable to the Company or to any other Member for any losses or damages suffered by them, except as the result of fraud, deceit, gross negligence, reckless or intentional misconduct or a knowing violation of law or this Agreement by that Member or officer or as a result of acts from which that Member or officer derives an improper personal benefit. The Members and officers, if any, shall perform their duties in good faith, in a manner they reasonably believe to be in the best interests of the Company and the Members. In performing their duties, the Members and officers shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Members and officers act in good faith and after reasonable inquiry when the need therefore is indicated by the circumstances.

5.6    Company Opportunities.    Each Member shall be required to offer to the Company each and every opportunity it acquires after the date of this Agreement to pursue a prospective business venture if, by its nature, that prospective business venture is within the primary purpose of the Company specified in Section 2.4 and if the Company would reasonably be in a position to take up that prospective business venture in the course of its business.

5.7    Expenses.    The Company shall reimburse the Members and their respective Affiliates for all reasonable out-of-pocket costs and expenses incurred by them in connection with the business and affairs of the Company, as well as organizational expenses (including, without limitation, legal and accounting fees and costs) incurred by them to form the Company and to prepare the Certificate of Formation and this Agreement.

## ARTICLE VI

## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

6.1    Minimum Gain Chargeback. In the event that there is a net decrease in the Company Minimum Gain during any taxable year, the minimum gain chargeback described in Sections 1.704-2(f) and (g) of the Treasury Regulations shall apply.

6.2    Member Minimum Gain Chargeback.    If during any taxable year there is a net decrease in Member Nonrecourse Debt minimum gain, any Member with a share of that Member Nonrecourse Debt minimum gain (determined under Section 1.704-2(i)(5) of the Treasury Regulations) as of the beginning of the year must be allocated items of income and gain for the year (and, if necessary, for succeeding years) equal to that Member's share of the net decrease in the Member Nonrecourse Debt minimum gain in accordance with Section 1.704-2(i) of the Treasury Regulations.

6.3    Qualified Income Offset.    Any Member who unexpectedly receives an adjustment, allocation or Distribution described subparagraphs (4), (5) or (6) of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, which adjustment, allocation or distribution creates or increases a deficit balance in that Member's Capital Account, shall be allocated items of "book" income and gain in an amount and manner sufficient to eliminate the deficit balance in that Member's Capital Account so created or increased as quickly as possible. Allocations under this Section 6.3 shall be comprised of a pro rata portion of each item of Member income (including gross income) and gain for the year, and "book" income and gain shall be determined by reference to values set forth on the books of the Company in accordance with the principles of Section 1.6. For purposes of this Section 6.3, Capital Accounts shall be adjusted hypothetically as provided for in Sections 1.704-1(b)(2)(ii)(d) and 1.704-1(b)(4)(iv)(f) of the Treasury Regulations. The Members intend that the provisions of this Section 6.3 will constitute a "qualified income offset" as described in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations. The Treasury Regulations shall control in the case of any conflict between the Treasury Regulations and this Section 6.3.

6.4    Allocation of Net Profits.    The Net Profits for each fiscal period of the Company shall be allocated to the Members in accordance with the following order of priority:

(a)    first, to those Members with negative Capital Accounts, among them in proportion to the ratio of the negative balances in their Capital Accounts, until no Member has a negative Capital Account;

(b)    second, to those Members whose Capital Contributions are in excess of their Capital Accounts, among them in accordance with the ratio of these excesses, until all of these excesses have been eliminated; and

(c)    finally, to the Members in proportion to their Percentage Interests.

6.5    Allocation of Net Losses.

(a)    net Losses and Nonrecourse Deductions for each fiscal period of the Company shall be allocated to the Members in proportion to their Percentage Interests; and

(b)    after the allocations of Net Losses and Nonrecourse Deductions, Member Nonrecourse Deductions shall be allocated among the Members as required in Section 1.704-2(i)(1) of the Treasury Regulations in accordance with the manner in which the Member or Members bear the burden of an Economic Risk of Loss corresponding to the Member Nonrecourse Deductions.

6.6    Distribution of Assets by the Company.    Subject to applicable law and any limitations contained elsewhere in this Agreement, the Members may elect from time to time to distribute Distributable Cash to themselves, which Distributions shall be in the following order of priority:

(a)    first, to the Members in proportion to their unreturned Capital Contributions until each Member has recovered its Capital Contributions; and

(b)    finally, to the Members in proportion to their Percentage Interests.

6.7    Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest.   If any Membership Interest is Transferred or is increased or decreased by reason of the admission of a new Member or otherwise during any Fiscal Year, each item of income, gain, loss, deduction or credit of the Company for that Fiscal Year shall be assigned pro rata to each day in the particular period of that Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each item so assigned to any such day shall be allocated to the Member based upon that Member's respective Membership Interest at the close of that day.   Notwithstanding any provision above to the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company shall be allocated solely to the parties owning Membership Interests as of the date that sale or other disposition occurs.

6.8    Tax Allocation Matters.

6.8.1  Contributed or Revalued Property.    Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property where the Company's property is revalued pursuant to Paragraph (b)(2)(iv)(*f*) of Section 1.704-1 of the Treasury Regulations, shall be determined in the manner (and as to revaluations, in the same manner as) provided in Section 704(c) of the Code.  The allocation shall take into account, to the full extent required or permitted by the Code, the difference between the adjusted basis of the property to the Member contributing it and the fair market value of the property determined by the Members at the time of its contribution or revaluation, as the case may be.  The Company shall apply Section 704(c)(1)(A) by using the "traditional method" as set forth in Section 1.704-3(b) of the Treasury Regulations.

6.8.2  Recapture Items.    In the event that the Company has taxable income that is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain or loss from the sale of Company assets (to the extent possible) shall include a proportionate share of this recapture income equal to that Member's share of prior cumulative depreciation deductions with respect to the assets which gave rise to the recapture income.

6.9    Order of Application.    To the extent that any allocation, Distribution or adjustment specified in any of the preceding Sections of this Article VI affects the results of any other allocation, Distribution or adjustment required herein, the allocations, Distributions and adjustments specified in the following Sections shall be made in the priority listed:

(a)    Section 6.6.

(b)    Section 6.1.

(c)    Section 6.2.

(d)    Section 6.3.

(e)    Section 6.5(a).

(f)    Section 6.5(b).

(g)    Section 6.4.

(h)    Section 10.5.

These provisions shall be applied as if all Distributions and allocations were made at the end of the Company's Fiscal Year.  Where any provision depends on the Capital Account of any Member, that Capital Account shall be determined after the operation of all preceding provisions for the Fiscal Year.

6.10    Allocation of Liabilities.    Each Member's interest in Company profits for purposes of determining that Member's share of the Nonrecourse Liabilities of the Company, as used in Section 1.752-3(a) of the Treasury Regulations, shall be equal to that Member's Percentage Interest.

6.11    Form of Distribution. No Member, regardless of the nature of its Capital Contribution, has the right to demand and receive any Distribution from the Company in any form other than money.  No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Member(s), and except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind.

## ARTICLE VII

## TRANSFER OF INTERESTS

7.1    Transfer of Interests. Except as provided in this Article VII, no Member shall be entitled to Transfer all or any part of its Membership Interest except with the prior written consent of all other Members, which consent may be given or withheld, conditioned or delayed as the other Members may determine in their sole and absolute discretions.  Any attempted Transfer without such prior written consent shall be null and void ab initio, and the transferee shall not become a Member.

7.2    Transfer to Certain Affiliates.    Any Member may Transfer to a wholly-owned Affiliate of such Member all or any part of such Member's Membership interest any time and for any reason upon thirty (30) days prior written notice to the other Members, and such transferee shall become a Member.

## ARTICLE VIII

## CONSEQUENCES OF MEMBERSHIP TERMINATION EVENTS

8.1    Dissolution of Company.    The occurrence of a Membership Termination Event as to any Member other than the last and only remaining Member shall not dissolve the Company.  Upon the occurrence of a Membership Termination Event as to the last and only remaining Member, the Company shall dissolve unless the personal representative or other successor-in-interest of the last and only remaining Member consents in writing within ninety (90) days of that Membership Termination Event to the continuation of the Company and to the admission of such personal representative or other successor-in-interest, or its designee or nominee, as a Member.

8.2    Admission or Conversion.    Upon    the    occurrence    of    a Membership Termination Event with respect to a Member under circumstances where the

Company does not dissolve, the remaining Members shall determine which one of the following shall occur and give written notice thereof to the Member who suffered the Membership Termination Event (the "Former Member"):

(a)    the Former Member's personal representative or other successor-in-interest shall be admitted as a Member of the Company in the place and stead of the Former Member to the extent of the Former Member's Membership Interest (the "Former Member's Interest"); or

(b)    the Former Member's Interest shall be converted to a bare economic interest, and the Former Member's representative or other successor-in-interest shall become the owner of that economic interest.

## ARTICLE IX

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

9.1    <u>Books and Records.</u>    The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with generally accepted accounting principles. The books and records of the Company shall reflect all the Company transactions and shall be appropriate and adequate for the Company's business. Each Member and its duly authorized representative shall have complete access to all such books and records at any time.

9.2    <u>Bank Accounts; Invested Funds.</u>    All funds of the Company shall be deposited in such account or accounts of the Company as may be determined by the Members and shall not be commingled with the funds of any other Person. All withdrawals therefrom shall be made upon checks signed by such persons and in such manner as the members may determine. Temporary surplus funds of the Company may be invested in commercial paper, time deposits, short-term government obligations or other investments determined by the Members.

9.3    <u>Tax Matters for the Company Handled by Members and Tax Matters Partner.</u>  The Members shall from time to time cause the Company to make such tax elections as they deem to be in the best interests of the Company and the Members. The Tax Matters partner shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend Company funds for professional services and costs associated therewith. The Tax matters partner shall oversee the Company's tax affairs in the overall best interests of the Company. If for any reason the Tax Matters Partner can no longer serve in that capacity, the Members may designate another Member to be Tax Matters Partner.

9.4     Accounting Matters.  All decisions as to accounting matters shall be made by the Members.

**ARTICLE X**

**DISSOLUTION AND WINDING UP**

10.1     Dissolution.   The Company shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

>          (a)     the unanimous vote of the Members;

>          (b)     the occurrence of a Membership Termination Event as to the last and only remaining Member if that Member's personal representative or other successor-in-interest fails to consent to the continuation of the Company in accordance with Section 8.1 within ninety (90) days after the occurrence of that event;

>          (c)     the sale of all or substantially all of the assets of the Company; or

>          (c)     the Company's Bankruptcy.

10.2     Date of Dissolution.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company have been liquidated and distributed as provided herein.  Notwithstanding the dissolution of the Company, prior to the termination of the Company the business of the Company and the rights and obligations of the Members, as such, shall continue to be governed by this Agreement.

10.3     Winding Up.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors.  The Members shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities and assets of the Company, shall cause its assets either to be sold or distributed, as they may determine, and shall cause the proceeds therefrom, to the extent sufficient, to be applied and distributed as provided in Section 10.5.  The Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the company.

10.4     Distributions in Kind. Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if that asset had been sold for that value, the Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect those allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in the distributed asset shall be the fair market value of the

interest (net of any liability secured by the asset that the member assumes or takes subject to). The fair market value of that asset shall be determined by the Members.

### 10.5    Order of Payment of Proceeds Upon Dissolution.

10.5.1 Liquidating Distributions.    After determining that all known debts and liabilities of the Company, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall promptly be distributed to the Members in accordance with their positive Capital Account Balances, after taking into account income and loss allocations for the Company's taxable year during which the liquidation occurs.

10.5.2 No Liability.    No Member shall have any liability to the Company, any Member or any creditor of the Company on account of any deficit balance in its Capital Account.

10.6    Limitations on Payments Made in Dissolution.    Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of the Member's positive Capital Account balance and shall have no recourse for its Capital Contributions and/or share of Net Profits (upon dissolution or otherwise) against any other Member.

10.7    Certificate of Cancellation.    Upon completion of the winding up of the Company's affairs, the Members shall cause a Certificate of Cancellation to be filed with the California Secretary of State.

10.8    Compensation for Services.    The Persons winding up the affairs of the Company shall be entitled to reasonable compensation from the Company for their services.

## ARTICLE XI

### INDEMNIFICATION

11.1    Indemnification.    The Company shall indemnify and hold harmless each of the Members, and each of their respective officers, directors, shareholders, partners, members, trustees, beneficiaries, employees, agents, heirs, assigns, successors-in-interest and Affiliates, (collectively, "Indemnified Persons") from and against any and all losses, damages, liabilities and expenses, (including costs and reasonable attorneys' fees), judgments, fines, settlements and other amounts (collectively "Liabilities") reasonably incurred by any such Indemnified Person in connection with the defense or disposition of any action, suit or other proceeding, whether civil, criminal, administrative or investigative and whether threatened, pending or completed (collectively a "Proceeding"), in which any such Indemnified Person may be involved or with which any such Indemnified Person may be threatened, with respect to or arising out of any act performed by the Indemnified Person or any omission or failure to act if (a)

16

the performance of the act or the omission or failure was done in good faith and with the scope of the authority conferred upon the Indemnified Person by this Agreement or by the Act, except for acts of willful misconduct, gross negligence or reckless disregard of duty, or acts which constitute a material breach of this Agreement or from which such Indemnified Person derived an improper personal benefit or (b) a court of competent jurisdiction determines upon application that, in view of all of the circumstances, the Indemnified Person is fairly and reasonably entitled to indemnification from the Company for such Liabilities as such court may deem proper. The Company's indemnification obligations hereunder shall apply not only with respect to any Proceeding brought by the Company or a Member but also with respect to any Proceeding brought by a third party.

    11.2 <u>Contract Right; Expenses.</u> The right to indemnification conferred in this Article XI shall be a contract right and shall include the right to require the Company to advance the expenses incurred by the Indemnified Person in defending any such Proceeding in advance of its final disposition; <u>provided, however,</u> that, if the Act so requires, the payment of such expenses in advance of the final disposition of a Proceeding shall be made only upon receipt by the Company of an undertaking, by or on behalf of the indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article XI or otherwise.

    11.3 <u>Indemnification of Officers and Employees.</u> The Company may, to the extent authorized from time to time by the Members, grant rights to indemnification and to advancement of expenses to any officer, employee or agent of the Company to the fullest extent of the provisions of this Article XI with respect to the indemnification and advancement of expenses of Members of the Company.

    11.4 <u>Insurance.</u> The Company may purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against that Person and incurred by that Person in any such capacity or arising out of that Person's status as an agent, whether or not the Company would have the power to indemnify that Person against liability under the provisions of Section 11.1 or under applicable law.

**ARTICLE XII**

**<u>MISCELLANEOUS</u>**

    12.1 <u>Amendments.</u> No amendment to this Agreement may be made without compliance with Section 5.3(h). All amendments to this Agreement must be in writing.

    12.2 <u>Offset Privilege.</u> Any monetary obligation owing from the Company to any Member may be offset by the Company against any monetary obligation then owing from that Member to the Company.

12.3    <u>Arbitration.</u>

(a)    <u>General.</u>    In the event of any dispute, claim or controversy among the parties arising out of or relating to this Agreement or the Certificate of Formation, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of this Agreement or the Certificate of Formation, such dispute, claim or controversy shall be resolved by and through an arbitration proceeding to be conducted under the auspices and the commercial arbitration rules of the American Arbitration Association (or any like organization successor thereto) at Brisbane, California. The arbitrability of the dispute, claim or controversy shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association. Both the foregoing agreement of the parties to arbitrate any and all such disputes, claims and controversies, and the results, determinations, findings, judgments and/or awards rendered through any such arbitration shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

(b)    <u>General Law.</u> The arbitrator(s) shall follow any applicable federal law and California State law (with respect to all matters of substantive law) in rendering an award.

(c)    <u>Costs of Arbitration.</u>    The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, each party's attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator(s), may be prorated between the parties in such proportion as the arbitrator(s) determines to be equitable and shall be awarded as part of the arbitrator's award.

12.4    <u>Remedies Cumulative.</u>    Except as otherwise provided herein, the remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled.

12.5    <u>Notices.</u>    Any notice to be given to the Company or any Member in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice by courier or other means of personal service, when received if sent by facsimile, or three (3) days after deposit of the notice by first class mail, postage prepaid, or certified mail, return receipt requested. Any such notice must be given to the Company at its principal place of business, and to any Member at the address specified in Exhibit A. Any party may, at any time by giving five (5) day's prior written notice to the other parties, designate any other address as the new address to which notice must be given.

12.6    <u>Attorney's Fees.</u>    In the event that any dispute between the Company and/or the Members should result in litigation or arbitration, the prevailing party in that dispute shall be entitled to recover from the other party all reasonable fees, costs and

expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, subject, however to the provisions of Section 12.3(c).

12.7    Jurisdiction.    Each Member consents to the exclusive jurisdiction of the state and federal courts sitting in Brisbane, California in any action on a claim arising out of, under or in connection with this Agreement or the transaction contemplated by this Agreement, provided such claim is not required to be arbitrated pursuant to Section 12.2. Each Member further agrees that personal jurisdiction over it may be effected by service of process by registered or certified mail addressed as provided in Section 12.5 and that when so made shall be as if served upon it personally.

12.8    Complete Agreement.    This Agreement and the Certificate of Formation constitute the complete and exclusive statement of agreement among the Members with respect to their respective subject matters and supersede all prior written and oral agreements or statements by and among the Members. No representation, statement, condition or warranty not contained in this Agreement or the Certificate of Formation shall be binding on the Members or have any force or effect whatsoever. To the extent that any provision of the Certificate of Formation conflicts with any provision of this Agreement, the Certificate of Formation shall control.

12.9    Binding Effect.    Subject to the provisions of this Agreement relating to Transferability, this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

12.10    Section Headings.    All Section headings are inserted only for convenience of reference and are not to be considered in the interpretation or construction of any provision of this Agreement.

12.11    Interpretation.    In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or that Member's counsel.

12.12    Severability.    In any provision of this Agreement or the application of that provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of that provision to persons or circumstances other than those to which it is held invalid shall not be affected.

12.13    Multiple Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, all of the Members of FSF, LLC, a California limited liability company, have executed this Agreement, effective as of the date first above written.

**MEMBERS:**


_____
Ronald I. Anson


_____
Jack E. Garrett


_____
Dana L. Pierson

## EXHIBIT A

CAPITAL CONTRIBUTIONS, ADDRESSES AND PERCENTAGE INTERESTS OF MEMBERS AS OF THE DATE OF THIS AGREEMENT.

| Member's Name | Member's Address | Member's Capital Contribution | Member's Percentage Interest |
|---|---|---|---|
| Ronald Anson | 11755 Wilshire Blvd. Suite 1350 Los Angeles, CA 90025 | $400 | 40% |
| Jack Garrett | 11755 Wilshire Blvd. Suite 1350 Los Angeles, CA 90025 | $400 | 40% |
| Dana L Pierson | 1000 Marina Blvd. Suite 600 Los Angeles, CA 94005 | $200 | 20% |



1

2                    UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                              --o0o--

5

RESERVOIR CAPITAL CORPORATION,          )

6                                               )

                                              )

7                    Plaintiff,                 )

                                              )

8          vs.                                  ) No. FJ02-0002MJJ

                                              )      (JCS)

9    FOUR STAR FINANCIAL SERVICES,             )

                                             )

10                   Defendants.                )

     _____)

11

12

13

14

15                       DEPOSITION OF

16                       RICK SAPERSTEIN

17                (Volume II, Pages 160-258)

                    _____

18

                    Friday, March 14, 2003

19                    CERTIFIED COPY

20

REPORTED BY:   GAIL C. HECK, CSR 5289          JOB 01-330712

21

22

23

24

25

                                                            160





global court reporting • large case specialists
legal videography • litigation support • trial presentation

Combs & Greenley
601 Van Ness Avenue, Suite 2052  San Francisco, CA 94102